1  Gary Snodgrass
   CDCR#: C-50459
2  CTF-Central
   P O Box 689
3  Soledad, CA 93960-0689

4
   Petitioner In Pro Se
5



6

7                    UNITED STATES DISTRICT COURT

8                    NORTHERN DISTRICT OF CALIFORNIA

9

10  GARY SNODGRASS,                    | Case No.: _____

11        Petitioner,                  | California Supreme Court Case No. S162262
                                       | 1st App. Dist., Div.3, Case No. A120907
12        v.                           | Contra Costa Superior Court No. 071708-2
                                       | Former Criminal Case No. 26252
13
                                       | PETITION FOR WRIT OF HABEAS
14  BEN CURRY, Warden,                 | CORPUS; VERIFICATION;
    California Training Facility, Soledad, CA.,  | MEMORANDUM OF POINTS AND
15                                     | AUTHORITIES
16        Respondent.
    _____|

17

18        COMES NOW Gary Snodgrass, Petitioner, to submit a Petition for Writ of Habeas

19  Corpus. Petitioner is presently in custody of the Respondent and is unlawfully restrained of his

20  liberty by the California Board of Parole Hearings. Petitioner alleges that the State courts'

21  decisions denying his petition were an unreasonable application of and contrary to federal

22  constitutional law as defined by United States Supreme Court precedent, as set forth in his

23  separate Memorandum of Points & Authorities.

24        Petitioner separately submits a motion to proceed with this modified format rather than

25  the Court's standard form petition. Petitioner asserts that the form petition anticipates that the

26  prisoner is challenging the original conviction and is confusing for challenges against the

27  parole board. Further, Petitioner asserts that the form unfairly limits his ability to set forth his

28

ORIGINAL

claims. This Petition format accurately follows the standard informational form as previously submitted.

**A.** **Information about your conviction and sentence ( See Exhibit A.)**

1.  What sentence are you challenging in this petition?

    (a)  Name and location of court that imposed sentence.

         Contra Costa Superior Court       Martinez, California
                    *Court*                         *Location*

    (b)  Case number, if known _____ CC-26252 _____

    (c)  Date and terms of sentence  July 13, 1982, 15 years to Life
         W/Possibility of Parole

    (d)  Are you now in custody serving this term?   Yes _____

         Where?        California Training Facility,
                       *(Name of Institution)*

                       P.O. Box 689, Soledad, CA   93960-0689
                       *(Address)*

2.  For what crime were you given this sentence?
    Penal Code § 187 (Murder 2nd);

3.  Did you have any of the following?
    Arraignment:  Yes __X__       Preliminary Hearing:  Yes _X_
    Motion to Suppress:    Don't Know _X____

4.  How did you plead?      Not Guilty __X____

5.  If you went to trial, what kind of trial did you have? Jury __Yes___

6.  Did you testify at your trial?  Yes_____ No_____

7.  Did you have an attorney at the following proceedings:

    (a)  Arraignment                          Yes__X_ No_____

    (b)  Preliminary hearing                  Yes_X__ No_____

    (c)  Time of Plea                         Yes_X__ No_____

| | (d) | Trial | Yes __X__ No _____ |
| | (e) | Sentencing | Yes __X__ No _____ |
| | (f) | Appeal | Yes __X__ No _____ |
| | (g) | Other post-conviction proceeding | Yes _____ No __X__ |

8.    Did you appeal your conviction? Yes

      (a)    If you did, to what court(s) did you appeal?

             Court of Appeal, First Appellate District

             Any other court:    <u>No</u>

      (b)    If you appealed, were the grounds the same as those that you are raising in this petition?  No

      (c)    Was there an opinion?

      (d)    Did you seek permission to file a late appeal under Rule 31(a)?

             *Not applicable to this petition.*

9.    Other than appeals, have you previously filed any petitions, applications or motions with respect to this conviction in any court, state or federal?

             Yes _____ No __X__

[ ***Petitioner's Note***: This petition concerns a challenge to a decision by the Board of Prison Terms, not to his original conviction. The following answers to the remainder of question 9 are relative to the State exhaustion of the claims raised in this petition.   ]

      **(a)**    **Lower Court Proceedings:**

**I.**    Name of Court: <u>Court of Appeal, State of California, First Appellate District</u>

             Type of Proceeding: <u>Petition for Writ of Habeas Corpus</u>

             Filed: March 13, 2008, No. A120907

             Grounds Raised (Be brief but specific):

             ***Ground 1***:

                  Petitioner alleges that the Board had no evidence to support its findings and conclusions that Petitioner Snodgrass presented a c current risk of danger to society if released to parole.  The

Board's actions in this case were arbitrary and capricious, unsupported by the record, and violated Petitioner's state and federal due process rights.

### *Ground 2*:

Petitioner's due process rights were violated by the Board when it denied him parole first and primarily on the commitment offense for the thirteenth time. The Board did not link the offense to any reliable evidence that such reliance demonstrated a need for a lengthier period of confinement, thus violating due process of law.

### *Ground 3*:

Petitioner contends that the Board applies a *sub rosa* policy indicative of an anti-parole policy by applying 15 Cal.Code Regs., §2402(c), ("especially heinous, atrocious, and cruel") to every murder offense, regardless of whether the inmate meets the "beyond the minimum elements necessary to sustain the conviction" standard set forth in *In re Dannenberg*, and *In re Lee*, *infra*, violating due process of law by depriving him of his right to individualized treatment of his parole application.

Result: _____ Denied  (see **Appendix 1**)

Date of Result: _March 21, 2008_____

**II.**    Name of Court _____California Supreme Court_____

Type of Proceeding __Petition for Review_____

Grounds Raised (Be brief but specific):

a)    The Board had no evidence to support its finding that Petitioner Snodgrass presented a current risk of danger if released to parole. The Board's actions in this case were arbitrary and capricious, unsupported by the record, and violated Petitioner's state and federal due process rights.

b)    Petitioner's due process rights were violated by the Board when it denied him parole first and primarily on the commitment offense for the thirteenth time. The Board did not link the offense to any reliable evidence that such reliance demonstrated a need for a lengthier period of confinement, thus violating due process of law.

c)    Petitioner contends that the Board applies a *sub rosa* policy indicative of an anti-parole policy by applying 15 Cal.Code Regs., Div. 2, sec. 2402(c) ("especially heinous, atrocious, and cruel") to every murder offense, regardless of whether the inmate

1   meets the "beyond the minimum elements necessary to sustain the conviction" standard set forth in *In re Dannenberg*, *infra*, and

2   *In re Lee*, *infra*, violating due process of law by depriving him of his right to individualized treatment of his parole application.

3

4   Result: Denied (see **Appendix 2**)

5   Date of Result:   June 11, 2008

6   (b)   Is there any petition, appeal or other post-conviction proceeding now

7   pending in any court?        Yes _____ No.  X

8

9   ## B.   GROUNDS FOR RELIEF

10   Claim One:   Petitioner has made the following factual allegations regarding

11   his primary claim of unlawful restraint of his liberty:

12   1.   Petitioner is unlawfully restrained of his rightful liberty under the Fifth and

13   Fourteenth Amendments to the United States Constitution (due process) where he was denied

14   parole for the thirteenth time by the Board of Parole Hearings, **a)** where the parole hearing was

15   a pro forma sham following a predetermined policy;  **b)** the decision denying him parole was

16   without any evidence having any relevant or reliable evidence to support the Board's

17   conclusion that he posed an unreasonable risk of danger to public safety if released to parole.

18   ### Supporting Facts:

19   ### a)   Introduction

20   Petitioner was received into the California Department of Corrections (now the

21   California Department of Corrections and Rehabilitation) on July 19, 1982.  Petitioner was

22   sentenced on July 13, 1982 to an indeterminate sentence of 15 years-to-life for second degree

23   murder.  The additional enhancement of PC §12022.5 for use of a firearm was stayed under

24   Rules of Court rule 423 subsections 1 & 2.  (**Exhibit A,** Abstract of Judgment; *also* **Exhibit B,**

25   Sentencing Transcript.)  Upon his entrance into the Department of Corrections on July 19,

26   1982, he had a Minimum Eligible Parole Date of September 11, 1990.  (**Exhibit C,** CDCR's

27   Legal Status documents.)

28

1        Petitioner has been before the Board of Prison Hearings 13 times. Each time he

2  was denied parole, the denial was based primarily on the commitment offense. There is

3  substantial forensic evidence that points to the fact that Petitioner has not been considered a

4  risk to the public safety for many years. Petitioner has served far beyond his minimum term.

5  Without any evidence that he poses an unreasonable risk to society if he is paroled, the Board

6  of Prison Hearings is abusing their discretion when they repeatedly deny parole based

7  primarily on the commitment offense and related factors.

8        **b)**    **The Parole Hearings**

9  **1)**    **The 12/27/2006 Parole Hearing (13th denial):**

10       In its conclusion finding Snodgrass "would pose an unreasonable risk of danger to

11  society or a threat to public safety if released from prison," the Panel stated the following:

12          **Reason #1: The Commitment Offense:**   "We find that the
commitment offense was carried out in a very cruel and callous
13          manner. It was carried out in a dispassionate and very calculated
manner, very much like an execution style murder in which the
14          inmate, basically, laid in wait in the garage for his stepfather to
come in and then ended up shooting him twice. It was carried out
15          in a manner that demonstrates an exceptionally callous disregard
for human suffering. He --- the victim was shot first in the chest,
16          fell backwards, was yelling something to the inmate to the effect
that he'd done it now, and the inmate walked up and shot him once
17          again, this time hitting him in the neck. The motive for the crime
was somewhat trivial in relation to the offense.

18

19       (**Exhibit BB**, pp. 70-71.) The Panel then selectively chose facts about Snodgrass's

20  relationship with his father, leaving out crucial facts about a substantial and explicable motive,

21  and stated the facts they relied on as follows:

22          "As stated and discussed with Mr. Snodgrass, he felt that his
security was being threatened by his stepfather and that he was
23          being asked to move out of the home and to start a life. And at that
point in Mr. Snodgrass's life, he didn't feel like he was ready to
24          move on. These conclusions are drawn from the Statement of Facts
wherein the prisoner again, had developed a consuming hatred of
25          his stepfather, John Mailen. He had fantasized about killing the
victim months before the crime took place, and then on November
26          17, 1981, he secreted his stepfather's rifle behind some plaster
board in the garage. When his stepfather returned home from
27          dropping off his wife and daughter at work, he retrieved the
weapon. As he was preparing the weapon, it accidentally
28          discharged. When Mr. Mailen came outside to investigate the

1    disturbance, he was shot twice by the defendant. He subsequently
     died that morning at the hospital."

2    (*Id.*, pp. 71.)

3        No mention was made by the Panel of crucial facts, such as the years of child and sexual

4    abuse Snodgrass suffered which engendered the hatred in the first instance, or of how his father

5    was going to move the family, except for Snodgrass, somewhere else and sell the house, leaving

6    Snodgrass nowhere to go, and no money to go on. Snodgrass, despite being 20 years old at the

7    time, suffered abuse by his stepfather and sexual abuse by his stepbrother, who was seven years

8    his senior, abuse which began at age 7 for Snodgrass. So his developmental record shows

9    delayed maturity and anger provocation that eventually exploded. This crime was not

10   inexplicable because it has been explained in psychological evaluations over the years, and to the

11   extent that "motive" plays a role, "trivial" motive is hardly apparent in this case.

12       **Reason #2:**

13       "Regarding the institutional behavior, again, we find that the
         inmate has programmed in a limited manner in the last about two
14       and a half years while incarcerated. In the last two and a half years,
         we find that he's taken one class in Anger Management, and he's
15       not sufficiently participated in beneficial self-help and/or therapy
         programs, at least not in the last two and a half years. And again,
16       we stated that we take a look at your progress since your last
         hearing. And as my colleague has said, he felt that you almost shut
17       down at a certain point in time. In terms of his conduct while
         incarcerated, it includes around seven 128(a) counseling chronos,
18       the last one being in June of 2005 for showering without
         permission. And then there was one 115 disciplinary, which was
19       really administrative in August of 1989, for being out of bounds.
         Okay."

20

21       (**Exhibit BB**, p. 71-72.)

22       Despite there not being *any definitive criteria* as to when programming is "sufficient" or

23   "adequate," nor any regulation specifying *any* requirement for any inmate to participate in self-

24   help or therapy as a pre-requirement for parole suitability, or requiring *uninterrupted*

25   programming for 15-25-35 years, the Panel found Snodgrass's one program completion (Anger

26   Management) in the previous 2 ½ years "insufficient." The Panel then noted:

27       "Basically, sir, it comes back to where we see that all of a sudden it
         seemed like you just stopped, and you gave up. And we don't think
28       that that's in your best interest to do that. We also state though,

that you should be commended for --- you have an exemplary work record, you know, over a long period of time, and you should be commended for that. You have multiple certified trades that include Aircraft Maintenance, the Vocational Welding, and the Mill and Cabinet. And the fact that you have no real record of any serious 115s, you should be commended for that. So you've been doing a lot of good things.

After giving him a one-year denial, the Panel recommended:

"The panel does recommend that you remain disciplinary-free. Again, you have done very, very well, and continue with that. And if available, try to participate in any and all self-help that you can. Okay? It'll just help make you stronger and be able to deal with some of the stresses that you'll be face with if and when you get a date. That doesn't mean that you have to go to AA and NA. It means that there's other types. Get some books. Read them, write reports, brief reports about how that's helping you to cope and to live and for you to make decisions so you **don't end up in the same situation again.** [emphasis added.] Okay? And also if available, which is difficult often, any additional therapy that can help make you stronger to be able to cope. Okay? That really concludes the reading of the decision. I'm going to ask my fellow commissioner if he has any other comments.

(**Exhibit BB**, p.75-76.)

**Parole Plans**: The Panel was confusing about Snodgrass's parole plans. At page 72, Commissioner **Eng** said, "… you do have parole plans; however, we highly advise that you firm them up and focus it and think back about what we were discussing about what's in your best interests for success. [*See* pages 61-64, transcript, where **Eng** questioned Snodgrass about living with his mother initially upon his release, and how he felt about that, and whether if another similar circumstance developed like that when he murdered his stepfather would he take the same "drastic steps" as then. Surely the Court here can see how ridiculous and unintelligent was this conversation.] And at page 72, **Eng** returned to that same implied suggestion of parole plans that doesn't include living with his own mother, and telling him he needs letters that detail whether he will have his own room and bathroom, or support for X-number of years, or whether his medical needs will be taken care of by X-supporter(s), or his transportation needs provided for, or providing "more documentation you can show the panel as to your taking total control, and it's well thought out, and this is what you're going to do….." (p.74:13.) This merely indicates **Eng** was grasping at straws.

*Page 8*

**Institutional Behavior**:    Snodgrass's institutional behavior has been exemplary. His only CDC-115 rule infraction was in 1989 and <u>minor</u>, for being "Out of Bounds" for which he was warned and reprimanded.  He's had seven custodial counseling chronos, three in 1983 (failure to participate, failure to report to assignment, use of food), two in 1991 (failed to make his lock-up, smuggling wood into CMF-Main), one in 1995 (not following rules), and one in 2005 for "showering w/o permission."  None of these were cited as cause for parole denial although the Panel noted them in the context of noting he had been discipline-free since the last CDC-115 in 1989. (**Exhibit BB,** pp. 72, 75:10.)

**Opposition by Law Enforcement**:  The Pinole Police Department sent a letter opposing parole, but the Panel did not cite to the letter as "cause" for parole denial. At page 67 of the transcript, when referencing the letter, Presiding Commissioner Eng stated:

> **PRESIDING COMMISSIONER ENG:** " . . . And basically this states that it is --- it is the Department's position and opinion that Gary Snodgrass should remain in prison. So the net of it is that they are opposed to your parole. Okay? And that's all I'm going to state about that letter. Okay?"

In the decision portion of the hearing, **Eng** merely noted this opposition:

> "Regarding the 3042 responses, we do note that we did receive a letter from the City of Pinole Policy Department, the law enforcement agency that investigated the case, and they did state that they are opposed to parole at this time."

Nothing in this record expresses or implies that this opposition had any influence on the Board's decision to deny Snodgrass parole.  Rather, the Panel merely complied with Penal Code §3046(c)'s requirement that any opposition to parole be <u>noted</u> in the record.  (p.74.)

Previous parole hearings were similarly based, as shown *infra*.

### 2)    **Hearings Since 1994 :**

At his 1994 hearing, Snodgrass, having observed the gubernatorial and Board policies against granting paroles, as published in the newspapers, and expressing a belief that he was being "victimized" by current politics, got an incredible response from Presiding Commissioner Gillis, a principal figure in the inauguration of a more stringent parole policy,

1  who said, **"Although this may or may not be true of the factual situation, it would seem to**
2  **this examiner that Mr. Snodgrass ought to try to find ways to nevertheless find a <u>deeper</u>**
3  **<u>inner-calmness</u>." (Exhibit FF**, page 56.)  (Incredible!!  No such regulation exists.)

4  At his 1995 hearing, commissioner Van Court read from the 1995 psych report that
5  Snodgrass's violence potential was only average (**Exhibit GG,** p. 38), then read the conclusion
6  that "parole decisions should be made on correctional rather than psychiatric factors,"  but then
7  concluded that "The prisoner needs therapy in order to face, discuss and understand and cope
8  with stress in a non-destructive manner" and "[u]ntil progress is made, the prisoner continues
9  to be unpredictable and a threat to others."  (*Ibid.*)

10  In 1997, the 'carrot talk' began.  After denying parole for the same reasons on which it
11  previously based parole denial, the Panel began to dangle the proverbial 'carrot' by telling
12  Petitioner how close he was to being paroled.  At the conclusion of the **1997** hearing, Presiding
13  Commissioner Van Court denied parole for one year and said, "In this one year, we want you
14  to complete that aviation and get your license." (**Exhibit HH,** at page 52.)  He explained,
15  "Yeah, and continue in the programs that you are doing now because you're doing so well.
16  And every one of us agree and are impressed with the progress that you've made, but we all
17  agree that we'd like to see you stay one more year to get that - - get those licenses under your
18  belt so that you can go out and get instant - - you know, a good job...."  Petitioner left the
19  hearing with the distinct impression that at his next hearing he would be granted a parole date.

20  At the 1998 hearing, Petitioner brought that FAA license.  After denying him parole for
21  another year, the Panel (composed of 2 members from the 1997 panel), now tell him "It was
22  the Panel's discussion that you're almost there, but it's such a horrible, *well-planned crime*,
23  cold, that you need more time." (**Exhibit II**, at page 43, emphasis added.)  Petitioner left that
24  hearing confused at why the Board did not follow through with its implied promise of a parole
25  grant at the previous hearing.

26  At the next 2000 hearing, the Panel (new members), denied him parole for another year
27  and tell him, "... solidify your parole plans. Get good parole plans. Get a job lined up if you
28  can, and get letters of support from family that say that they're willing to support you or you

1  can live in a particular place. Good, solid plans on housing, transportation, and job

2  opportunities, okay?" (**Exhibit JJ**, at page 30.)  Petitioner left the hearing hoping that the next

3  hearing would bring a parole grant but now pessimistic that the Board would honor its implied

4  promise of parole.

5      At the next 2001 hearing, the Panel denies him parole another year, and again dangles

6  the carrot with the explanation of "firm up those parole plans..." (**Exhibit KK**, at page 34.)

7  Apparently after noting Petitioner's depression and/or frustration by being repeatedly subjected

8  to this 'dangle the carrot' game, Deputy Commissioner Coldren says:

> Just a couple [of comments], for what they're worth. It's not all
> that common that a District Attorney gives relatively positive
> comments to the progress that you've made. I think you should pay
> attention to that. I also think you should pay attention to what the
> Chairman said about getting good parole plans available and I
> would make every effort I could to get myself in an up attitude and
> try to get rid of any depression and did the very best you can to
> present the best case you can when you come up for a parole
> hearing because I think that things - - you know, you got 20 years
> in and you got a lot of things going for you.  ..."

15     At the 2002 hearing, the Panel just went through the rote exercise of citing the

16 boilerplate reasons the Board in his case has been citing since 1990, recognizing progress but

17 giving it little value, even after 22 years of imprisonment on a second degree murder. At the

18 2002 hearing, the Panel did not even bother to 'dangle the carrot.' (**Exhibit SS**.)

19     At the 2004 hearing, Petitioner was understandably quite frustrated with the

20 disingenuousness of the commissioners, and the Panel accused him of having a chip on his

21 shoulder for representing himself, and suggesting he needed a lawyer, stating that "I don't feel

22 that you represented yourself very well today, even though it's your right to represent

23 yourself." (**Exhibit TT**, decision pp. 3-4.)  The Deputy Commissioner (Garner-Easter)

24 dangled the carrot: "I want to tell you that my impression is of voting for a date for you. . . . ."

25 (*Id.*, at p. 3-4.)  No evidence supported their conclusions.

26     At the 2005 hearing, Petitioner was faced with having crime victim advocate

27 commissioner Susan Fisher on his panel, and he stipulated to a one-year denial (**Exhibit UU**,

28

1    2005 documents), to avoid the sham hearing that she was noted for, and for which she was
2    eventually asked to resign by the Senate Rules Committee. (**Exhibit NN**, documents.)

3    At the 2006 hearing, Petitioner was, once again, told he needed to do more time. Not
4    an iota of evidence existed to justify the decision of the commissioners to reject the numerous
5    risk assessments by the psychologists and the correctional counselors that favored his release
6    to parole.

7    **C.    The Need to End the Charade:**

8    Petitioner asks the Court to relieve him of this charade of meaningless, torturous sham
9    hearings that do nothing more than dangle a 'carrot' they apparently never intend for Mr.
10   Snodgrass to have. Petitioner's substantial liberty interest should not hinge upon so ambiguous
11   and standardless a process as the 'Carrot Plan' of deceit and capriciousness. It has been some
12   15 years since the Board dangled the first "carrot" of an implied promise that a parole grant
13   was very likely at the next hearing. He has had numerous hearings subsequent to that first
14   'carrot.' Such sham hearings per se violate constitutional due process. These denials go
15   against the many evaluations attesting to Snodgrass's lack of risk if paroled. To say that the
16   Board gave "individualized consideration" of his parole application is laughable; a pro forma
17   hearing at which the result is predetermined is carried out precisely by the use of a sham
18   hearing masquerading as "individualized consideration." It's time the courts step up to the
19   reality of the California parole administration, and put a stop to this sham.

20   **D.    Jurisdiction of the United States District Court**

21   This Court has jurisdiction pursuant to 28 United States Code § 2254 to
22   entertain a federal petition for writ of habeas corpus by a state prisoner alleging that he is
23   currently imprisoned and that his continued restraint is unlawful.

24   This court has federal-subject matter jurisdiction over any claim "arising under
25   the Constitution, laws, or treaties of the United States." 28 U.S.C. 1331. A proper petition for
26   habeas corpus gives rise to federal subject-matter jurisdiction. 28 U.S.C. 2254(a) (petition must
27   claim that the prisoner is held "in custody in violation of the Constitution or laws or treaties of
28   the United States"). The Fifth and Fourteenth amendments prohibit the government from

*Page 12*

depriving a prisoner of life, liberty, or property without due process of law. A prisoner claiming a due-process violation must allege deprivation of a constitutionally protected liberty or property interest, which can be created by a state statute, and a denial of adequate procedural protections. *Biggs v. Terhune*, 334 F.3d 910, 913 (9th Cir.2003). A federal, constitutional claim confers subject-matter jurisdiction on district courts unless the claim's "unsoundness so clearly results from the previous decisions of [the Supreme C]ourt as to foreclose the subject and leave no room for ... controversy." *Hagans v. Lavine,* 415 U.S. 528, 536-38, 94 S.Ct. 1372, 39 L.Ed.2d 577 (1974).

Petitioner possesses a federally protected "expectancy of release" which is a liberty interest established by mandatory and presumptive language in the California Penal Code section 3041 and Board regulations 15 Cal.Code of Regulations, Div.2, BPH Rules, sections 2400 et seq.

Petitioner has been deprived of those liberty interests by an arbitrary, capricious, and standardless process applied to his parole decision at issue here.

**E.    The Commitment Offense**

The following statement of the offense is taken from the CDCR's Life Prisoner Evaluation dated January 23, 1990. (**Exhibit D**):

> According to statements from the POR, on November 17, 1981, Snodgrass asked his mother to awake him the following morning prior to her leaving for work. After she awoke him, he waited until his stepfather left the house to take his wife to work. At that time, Snodgrass took his stepfather's 7 millimeter hunting rifle from his closet, hid it in the garage, and then went back to bed. When his stepfather returned home, he ordered Snodgrass to get out of bed and put the cat outside. Snodgrass complied with the order, and then went to the garage area and retrieved the rifle. He then went out of the garage area to a woodpile and attempted to determine the weapons operation. While doing so, the rifle discharged. When his stepfather came out of garage door to investigate the gunshot, Snodgrass pointed the rifle at him and pulled the trigger, however, the safety prevented the rifle from firing.  During this time, a neighbor heard the shot, observed Snodgrass holding the rifle and called the police. Mr. Nailen had gone back into the garage and shut the door. Snodgrass and his stepfather conversed from their separate locations. When Snodgrass observed the police arrive, he told his stepfather that the police had arrived, and his stepfather

emerged from the garage. At that time, Snodgrass shot his stepfather in the chest area. His stepfather fell to the ground and began yelling at Snodgrass. He then walked to the victim and shot him in the neck area. ¶ Snodgrass then placed another shell in the chamber with the intention of killing himself. At that point, the officers gave orders for him to come out with his hands up. Snodgrass then unloaded the weapon, placed it on the woodpile, exited the yard through the gate, and was taken into custody without resistance. When the police asked who he had been talking to, he stated "my dad, my stepfather, I just killed him." Mr. Nailen

was found by the police in an unconscious state and transported to the hospital, but pronounced dead at the hospital.

(The Life Prisoner Evaluation evaluator noted that Snodgrass concurred with the above version.) *Ibid.*

Petitioner asks the Court to note that he was permitted to bail out while awaiting trial, and during that period of time, he did not present a threat of danger to society even though he had been charged with first degree murder. (*See* Probation Report, p.1, Custodial Status, arrested 11/18/1981 to 12/09/81 [bailed], 5/13/82 (convicted) to 7/13/82 (sentence pronounced).) (**Exhibit LL,** Probation Report p. 1; **Exhibit B,** Judgment & Sentence; Sentencing transcript, marked pages 13-14, computing in-custody credits ["MR. KOCHLY: It appears in discussing it with counsel and an exam of our file, he was originally in custody from the date of his arrest, November 18, 1981 until November 26[th], which was the day following the reduction in bail after a bail study, so he would be entitled to that period, plus the date of the verdict."].)  It seems illogical that 26 years later, having matured in age and character, with many years of therapy, self-help, and other positive programming, and with parole-favorable evaluations, he would currently present a danger to society more so than he did while out on bail shortly after the crime.

**F.** **Postconviction History**: **Postconviction Factors Show No Danger to Society**

**1)** ***Mental Health Evaluations:***

Since his confinement, Petitioner Snodgrass has had no less than thirteen psychological evaluations, nearly all recognizing the psychodynamics of a murder by an abused child. In the initial evaluation dated June 20, 1985, the evaluator examined those dynamics and concluded "[t]he commitment offense is indirectly related to the psychological diagnosis. Violence

1 potential has diminished. Three years have passed since Mr. Snodgrass was last evaluated.

2 Most of the signs of mental disorder listed by the pretrial psychologist were not evident. A

3 developing maturity was noticed. Nevertheless, a Category T for psychological treatment is

4 recommended. Emotional conflicts related to his past family situation have been merely buried,

5 not resolved. Before Mr. Snodgrass can progress in rebuilding his life, he must have

6 psychological treatment." (**Exhibit E,** 1985 Mental Health Evaluation (MHS).)

7      In an August 17, 1988, evaluation, the evaluator noted the efforts Snodgrass had been

8 making while confined, including "an appropriate degree of remorse", and concluded that

9 "[v]iolence potential, related in the past to unusual circumstances unlikely to recur, is

10 considered very low." (**Exhibit F**, 1988 MHS.)

11      In a January 25, 1990, evaluation, the evaluator opined that "[r]esearch findings

12 indicate that inmates with profiles similar to that of Mr. Snodgrass have a good prognosis for

13 parole success, and are relatively unlikely to be reoffend." [sic] (**Exhibit G**, 1990 MHS.)

14      In 1991, having been transferred to the San Quentin State Prison, a comprehensive

15 Category X Psychological Evaluation was performed on Snodgrass. The Cat-X program is an

16 intensive program that spans several months of group and individual therapy, and the reports

17 are written by psychologists, psychiatrists, and correctional counselors. The 18-page

18 evaluation is dated May 30, 1991, and is attached as **Exhibit H**, 1991 MHS.) The

19 psychodynamics of the offense were exhaustively considered and analyzed. Some of the

20 comments/conclusions are quoted here:

21          CATEGORY X COUNCIL EVALUATION: " … Both evaluators
were in agreement that Mr. Snodgrass has a very good prognosis

22          for parole. Both evaluators also expressed some very minor
concerns regarding facets of Mr. Snodgrass's response to social

23          situations. Dr. Bruce, for example, touched on Mr. Snodgrass's
mild tendency to isolate himself, while Dr. Ishida reiterated some

24          concerns regarding the dimensions of Mr. Snodgrass's relationship
with his mother following his release. On the whole, however, Mr.

25          Snodgrass seemed to have matured significantly during the course
of his incarceration, having productively utilized the time in prison

26          as an opportunity to address and begin to resolve some of the
fundamental issues that led to the instant offense. Mr. Snodgrass

27          also spoke briefly of his vocational and educational aspirations,
and he was commended for his efforts in trying to improve

28          himself. Again, it was agreed that the social and psychological

factors considered during the course of this assessment appeared improved, and a positive social adjustment is expected once parole is approved and the inmate released from CDC.

(*Id.,* at page 1.)

CATEGORY X PSYCHOLOGICAL EVALUATION: "In many offenses the underlying dynamics that contributed to an offense remain difficult to discern. Mr. Snodgrass's case is one in which the causative factors are clearly in evidence. It is not difficult to understand how a childhood of pointed, continuing and uncalled for emotional and psychological abuse at the hands of a stepfather who tacitly allowed the overwhelming victimization of his stepson, failed to discharge his paternal responsibility to protect a child in his care, could lead to the rage expressed in Mr. Snodgrass's offense. If an "eye for an eye" mentality still underlies and motivates our penal system, we must admit that at least Mr. Snodgrass was direct enough to take revenge on the source of his problems rather than some random victim of displaced anger, which is more commonly the case. Although Mr. Snodgrass's actions were intemperate and wrong from a coolly logical standpoint, the degree of loss, abuse and uncalled for belittlement he was forced to suffer over an extended period of time would have taxed the psychological resources of the strongest. He was being driven slowly mad by an opponent he could not avoid, appease or enjoin. The same one who tormented him about his lack of ability to emancipate simultaneously and for a long time had destroyed his ability to feel the self-confidence and strength to emancipate. This is a double-blind with no apparent solution other than one with the gravest of consequences. Mr. Snodgrass acted irrationally and then with a clear rationality and determination sought to put his life back together. . . . ¶ His parole prognosis appears excellent. . . .

*Id.,* at page 2.

Mr. Snodgrass shows an admirable and thorough grasp of the dynamics of his offense. This is due in great part to his determination and vigor in seeking treatment and understanding of himself purely out of self-concern and without the need of external motivation. . . . ¶ Mr. Snodgrass needs no further treatment to be ready for parole.

*Id.*, at page 3.

At pages 4-15, the Cat-X report went into great deal about Mr. Snodgrass's history. No subsequent report has been so detailed in its insight. At page 16, under "Psychodynamic Formulation", the report explains:

Mr. Snodgrass, at the time of the offense, is best understood by a consideration of his emotional isolation, unmet dependency needs, and inability to communicate emotions. ¶ A markedly impoverished emotional environment can result from such circumstances as that faced by Mr. Snodgrass, i.e., born the second unplanned child to a mother preoccupied with a terminally ill husband, forced to raise three young children of her own, and who herself grew up in an emotionally impoverished environment. Given these circumstances, she was unable to adequately meet her

son's emotional needs to feel wanted and lovingly nurtured. ¶ Mr. Snodgrass grew up shy, timid, and withdrawn, feeling rejected and inadequate, unable to articulate what he was feeling. The early loss of his father, followed by a series of losses of paternal substitutes within a period of a year and a half had a major impact on Mr. Snodgrass's life. ¶ With these significant losses, his mother became all important, the only consistent figure taking care of him – physically, if not emotionally. Since Mr. Snodgrass's inner needs were inadequately met his unconscious attachment to her became even more clinging. Separation anxiety heightened and his survival threatened at the thought of sharing her with anyone else. ¶ He was acutely depressed by his mother's marriage to John Nailen. His relationship with the Nailen family was disastrous. He felt rejected, belittled, and humiliated by his stepfather's verbal abuse. He was terrorized by his stepbrother's sadistic acts and intimidation and traumatized by his sexual abuse. For the quiet, sensitive boy, perceived by the Nailen's as a mama's boy, this ordeal was worsened by the failure of his mother to intercede on his behalf. He felt powerless and defenseless and withdrew further into his shell, not telling anyone about how he was feeling. ¶ There was a short period of respite for Mr. Snodgrass when his mother separated from his stepfather and moved back to Pinole. However, his stepfather was soon back in the picture, attending marital counseling sessions with his mother. Mr. Snodgrass felt considerable hatred and resentment when he found out that his mother remarried John Nailen without telling him or discussing the possibility with him. Mr. Snodgrass inferred that he did not matter to his mother and expressed his anger and hurt towards her, his jealousy towards his stepfather, and his feelings of helplessness by "blowing it and screwing up," drinking alcohol and smoking pot. ¶ He remained emotionally isolated and withdrawn and became increasingly consumed by his rage towards his stepfather who continued to be verbally and emotionally abusive. His mother and stepfather's demands to get out of the familial home and find a place to live and work were not congruent with Mr. Snodgrass's inner needs of wanting to be taken care of. He felt inadequate to make it on his own. He was in a state of tension, confusion, frustration, and depression. ¶ It was the last straw for Mr. Snodgrass to be informed by his stepfather of his and his mother's plans to move to their retirement home in Rio Vista and to have Mr. Snodgrass move out so that they could rent their present house. Mr. Snodgrass was enraged that he was being kicked out of his home, his only source of security. ¶ In his needy regressed state, he could not think of alternative courses of action. Inner tension mounted. Infantile rage against the abandonment prevailed with consuming hatred focused on his stepfather, inexorably

> leading to the acting out of his aggressive impulses. ¶ Mr. Snodgrass has made significant gains psychologically in the nine years of his incarceration through his own self-help efforts. The degree of passivity, dependency, and felt inadequacy evident at the time of the offense is substantially diminished.

*Ibid.*

Upon his return to the Deuel Vocational Institute prison at Tracy, California, a psychological evaluation dated 02-18-1992 was performed for the Board of Prison Terms. (**Exhibit I**, 1992 MHS.) The evaluator reviewed and considered the Category X evaluation report, and recommended to readers they do so as well. *Id.*, page 1. The evaluator noted that Snodgrass showed "insight that was well above average for this [inmate] population." *Ibid.* The report concluded:

> "Psychopathology at the time of the instant offense appears to have been indirectly related to the offense. Mr. Snodgrass appears to have psychologically improved greatly since incarceration. There do not appear to be any psychological/psychiatric contraindications to parole."

In a psychological evaluation dated 02-23-1993, the evaluation took note of Mr. Snodgrass's reunification of family resources, noting many visitors including his mother, sister, nephew, aunt and uncle, a girlfriend, and an old friend of the family. (**Exhibit J**, 1993 MHS, page 1.) The evaluator concluded:

> Subject presents an exemplary record of adjustment during incarceration. He has participated in an 18 month Category T Program and has received very positive reports regarding his psychological progress. The subject has also participated in the Category X Program where he received a very positive prognosis regarding his adjustment in the community. He has an unusually rich family/friend resource to tap when he returns to the community.

In a psychological evaluation dated 03-08-1994, the evaluator also reviewed and considered past psychological evaluations and concurred. (**Exhibit K**, 1994 MHS.) The evaluator concluded that Snodgrass's "[v]iolence potential when released to the free community is estimated to have decreased and to be below average compared to other inmates. There is no history of violence except the committing offense. Subject has shown positive

initiative in participating in help and self-help types of programs." *Id.,* at page 2. Except for a

recommendation to explore spirituality, the evaluation had no other recommendations. *Ibid.*

In the sixth psychological evaluation performed on 01-23-1995, the evaluator also took

notice of previous evaluations. (**Exhibit L,** 1995 MHS.) Noting current progress since the

previous comments of the 1993 evaluator, the evaluator concluded that:

> "Mr. Snodgrass is an intelligent young man who has made good
> use of therapy opportunities and subsequently has made excellent
> personal growth progress. It is notable that, following his break-
> through regarding responsibility and remorse, his signs now are
> expanding to include the broad field of the humanities, especially
> philosophy, by which he hopes to still further understand himself
> and his relationship to others."

In a psychological evaluation dated 06-30-1997, the evaluator concluded:

> "Mr. Snodgrass has changed significantly during his incarceration
> since 1982. He has greatly improved psychiatrically. He says he
> has benefited more from the Road to Freedom program than from
> AA meetings. He sincerely expresses how he has learned not to be
> angry. He now accepts personal responsibility with appropriate
> remorse. He says he did not make enough attempts to break the
> wall between him and his stepfather, "I could have tried." He has
> good occupational skills. In a less controlled setting such as return
> to the community, he is considered likely to maintain the gains."

(**Exhibit M,** 1997 MHS.)

In the 05-29-1998 psychological evaluation, the evaluator reviewed and considered

previous evaluations.    Other than a recommendation for outpatient clinic and abstinence from

alcohol and/or drugs, the evaluator simply concluded that "[p]arole decisions should be made

on correctional rather than psychiatric factors" – whatever that means. (**Exhibit N**, 1998

MHS.)

In the 07-13-1999 psychological evaluation, the evaluator concluded that Snodgrass

"has made considerable gains in prison and is likely to maintain these gains in a less controlled

setting such as return to the community." (**Exhibit O**, 1999 MHS) In an addendum to this

report, dated 08-03-2001, the evaluator observed:

> "Subject has maintained his exemplary disciplinary record. He
> currently is employed in Vocational Welding where his
> performance can be described as exceptional. He also has
> completed, in previous years, Mill and Cabinetry, and earned his
> FAA license in Powerplant (reciprocal and turbine engines) and

structure. He completed a vocational course in drafting. Subject has been active in Alcoholics Anonymous since 1990. He is serving in the Office of Treasurer for the past two years. He also keeps track of inmate's sobriety dates and makes the sobriety-chip awards. He was honored with a certificate during the last AA banquet, July 4, 2001, for his fifteen years of sobriety."

The 2003 Mental Health Evaluation by Dr. Joe Reed, Ph.D., assessed Petitioner as follows:

"His risk for violent behavior within a controlled setting is considered to be low relative to this level II inmate population. This conclusion is based on several factors. ¶ The bulk of the evidence weighs heavily in favor of a low risk for future violence. He does not have a juvenile criminal history, and he has no history of gang involvement. He has no adult criminal history, other than that of the instant offense. Moreover, he is a first termer." [ Dr. Reed continues listing Snodgrass's lack of a significant disciplinary history, no violent behavior in 21 years in prison, his maturation, his attendance in a large number of self-help groups, regular attendance in AA/NA, an excellent history of good programming, vocational trades, and exceptional ratings in his work performance. ]   ¶   "Additionally, two psychological test instruments were completed during the clinical interview. Results from the HCR-20 suggest a low prediction of future violence for this individual in a controlled setting relative to level II inmates. Results from the Hare Psychopathy Checklist, Short Version, do not suggest the presence of sociopathy. ¶ Finally, the facts unique to this case indicate that the death of the victim was a direct result of a heightened domestic dispute, and such behavior does not appear likely to happen again. . . . If released to the community, clinically assessed, his violence potential is considered to be no more than that of the average citizen in the community. ¶ There are no significant risk factors which may be precursors to violence for this individual."

(**Exhibit P,** 2003 Mental Health Evaluation.) In making his recommendations, Dr. Reed stated:

A. This inmate is competent and responsible for his behavior. He has the capacity to abide by institutional standards, and he has done so during his incarceration.

B. The inmate does not have a mental disorder which would necessitate treatment, either during his incarceration period or following upon parole.

C. This inmate does not appear to have a significant drug abuse history, and there are no recommendations in this area.

The essence of this and other evaluations is that Gary Snodgrass does not present an unreasonable risk of danger to the community if he is paroled, and there is not an iota of

evidence in the record upon which the Board could reasonably dispute these professional risk

assessments. Without any evidence of unreasonable risk, the Board cannot deny Mr.

Snodgrass parole because he has not only exceeded his Minimum Eligible Parole Date period,

but he has exceeded the term period that would be appropriate punishment for his offense were

the Board to calculate his release date. Prevailing judicial decisions affirm this conclusion.

(*See* Memorandum of Points & Authorities, *infra,* under separate cover.)

## 2.    *Life Prisoner Evaluations by CDCR:*

Petitioner Snodgrass's Life Prisoner Evaluations have likewise been supportive of

parole release. In the 01-23-1990 LPE, the correctional evaluator found the circumstances of

the commitment offense included mitigating factors, to wit:

- The prisoner participated in the crime under partially excusable circumstances which do not amount to a legal defense.
- The crime was committed due to an unusual situation unlikely to reoccur.
- The crime was committed during a period [of] extreme mental and emotional trauma.
- The prisoner has no history of criminal behavior.

The correctional evaluator concluded:

> "Considering the commitment offense, lack of prior record, and prison adjustment, the writer feels the prisoner would pose an extremely low degree of threat to the public if released from prison at this time."

(**Exhibit D,** 1990 LPE.)

In the 08-14-1991 LPE for the Board, the evaluator likewise concluded that Snodgrass

"would pose a minimal threat to the public at this time, if released from prison." (**Exhibit Q.**)

This risk assessment conclusion was echoed by the correctional evaluator in the March 1992

LPE ["minimal risk"]. (**Exhibit R.**) Interestingly, in the March 1993 LPE, a new correctional

counselor, not adequately familiar with him, departed from the lineage before him to conclude

that Snodgrass "would probably pose a <u>moderate</u> degree of threat to the public, if released from

prison" despite a glowing record of continued improvement by Snodgrass. (**Exhibit S.**) The

March 1994 LPE, written by another correctional counselor, dutifully followed the previous

LPE by again concluding "moderate risk" despite a continuing exemplary record of progress

*Page 21*

1  by Snodgrass. (**Exhibit T**.)  In the January 1995 LPE, the correctional counselor returned to
2  the more accurate assessment of "low degree of threat to the public, if released from prison at
3  this time."  (**Exhibit U**.)  In the July 1997 LPE, the recognition of mitigating circumstances
4  continued, but the correctional counselor concluded "the prisoner would probably pose a
5  moderate degree of threat to the public at this time, if released from prison" although
6  Snodgrass continued to improve. (**Exhibit V**.)  The September 1998 LPE again concluded
7  "moderate" risk although Snodgrass continued his positive programming and achievements.
8  (**Exhibit W**.)  The September 1999 LPE continued the "moderate" risk assessment while
9  recognizing his continuing positive programming. (**Exhibit X**.)  The April 2001 LPE continued
10  the "moderate" assessment while recognizing his continuing positive programming.[1]  (**Exhibit
11  Y**.)  The November 2002 LPE evaluator concluded "low degree of threat to the public."
12  (**Exhibit Z**.)  The November 2003 LPE evaluator concluded "low degree of threat."  (**Exhibit
13  AA**.)  Following an injunctive decision by the superior court for the county of Los Angeles,
14  namely, *In re Cortez,* Los Angeles Superior Court No. BH001953, and *In re Aremu,* Los
15  Angeles Superior Court No. BH002661, in 2004/2005, (**Exhibit QQ,** the Board of Prison
16  Terms was prohibited from permitting correctional counselors from making risk assessments,
17  thus, in the 2005 Life Prisoner Evaluation for Mr. Snodgrass, the counselor only laid out the
18  facts, including noting that that he "has employable skills, as a machine operator (wood
19  furniture products), welding fabrication and installation, vocational Mill and Cabinet,
20  landscaper, drafting and air frame, all of which fall under Cal. Code Regs., tit.15, BPH
21  Regulations, section 2402(d)(8), for "marketable skills" as a factor tending to indicate
22  suitability for parole.  (**Exhibit PP**, 2005 LPE.)  It can be reasonably assumed that if the
23  correctional counselors were allowed to make a risk assessment, it would be consistent with
24  the previous assessments where they were permitted.
25  //

---

[1]  The vacillations between LPE assessments can only be attributed to the subjective viewpoints of the evaluators, but the "low risk" evaluations are more consistent with the psychological evaluations.

1

### 3.    *Community Support and Parole Plans*:

2      Petitioner has the support from his mother, Marietta Snodgrass, who gave her

3  wholehearted support for parole and offered a place to stay, (**Exhibit BB**, 2006 BPH Parole

4  Hearing transcript, page 53); from his cousin Sandi Bowman, of San Rafael, (*id.,* p.54); from a

5  Glenn Webber, a friend since childhood, who has offered employment and residence in their

6  home (*id.*, p.55); and the Panel discussed Snodgrass's parole plans. (*Id.,* pp. 59-60).  (See

7  **Exhibit RR**, letters from Sandi Bowman and Glenn Webber.)

8

9                                **RELIEF REQUESTED**

10      When all is said and done, the record does not show that Gary Snodgrass poses an

11  unreasonable risk to public safety if paroled.  The problem of why he is not being paroled is a

12  legal and procedural one.  There will always be some negative fact or inference a Board can

13  cite to using its regulations, and an unfair court can easily defer to this game the Board plays.

14  The Board has simply created a litany of *reasons* in its regulations that cover just about every

15  aspect of an offense, preconviction record, and postconviction record one can imagine.  Via

16  these regulations, the Board can cite to just about every innocuous fact, idea, or speculation

17  imaginable, as cause for denial of parole, and a reviewing court, giving unfair deference to a

18  Board cited many times over the years for abusing its discretion under the due process clause,

19  may sweep the petition away as "without merit" unless it does a proper analysis of the facts

20  and law.  This is what Gary Snodgrass asks of the Court, i.e., to give him a fair review.  The

21  specific form of relief he seeks is as follows:

22           1.  That the Court grant the writ of habeas corpus.

23           2.  That the Court find that the State courts' decisions were an unreasonable

24               application of the law to the facts in this case.

25           3.  That the Court find that the State courts' decision were contrary to and an

26               unreasonable application of clearly established United States Supreme Court

27               precedent defining due process in administrative proceedings, such as prisons and

28               parole boards.

4. That the Court find no evidence to support the Board's conclusion that Snodgrass currently poses an unreasonable risk to public safety if paroled, and that this violates due process of law.

5. That the Court order the Board to set Snodgrass's parole release date.

6. That the Court order that any surplus time Snodgrass has spent incarcerated be credited toward his parole period.

7. That the Court find that the Board is acting unfairly pursuant to a sub rosa policy masquerading as "individualized consideration" that deprives life prisoners like Snodgrass of his federally-protected liberty interests in parole, and that the Board's decision in his case, based upon said policy, must per se invalidate the Board's decision and require it to set his release date.

8. That the Court issue such other relief as due process of law requires and release him from a parole administration that ignores judicial precedent and, more importantly, the State and Federal Constitutions.

9. That the Court order the Respondent to provide the same discovery that it provided the superior court in the *Criscione* case, evidence that will demonstrate indisputably that the Board is malfunctioning.

## CONCLUSION

The Court should grant the Petition for Writ of Habeas Corpus.

Respectfully submitted,

Petitioner Gary Snodgrass, in pro se

## VERIFICATION

I, Gary Snodgrass, the petitioner proceeding in pro se, do verify that I have read the contents of this petition and know them to be true and correct to the best of my knowledge, information, and belief, and by my signature below I attest to their accuracy.

Sworn to under penalty of perjury, this 1st day of July, 2008, at Soledad, CA.

Gary Snodgrass, petitioner in pro se

## **RELATED CASES**

The Petitioner has no other related cases pending in the Court.

Dated: July 1st, 2007.

Gary Snodgrass, declarant/petitioner

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# APPENDIX 1

Superior Court denial of petition for writ of habeas corpus.

*Page i*

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA
IN AND FOR THE COUNTY OF CONTRA COSTA

No. 071708-2
Deputy Clerk

In re Gary Snodgrass
On Habeas Corpus

Decision on Pro Per.
Petition for Writ of
Habeas Corpus.

Underlying Case
No. 26252

## The Nature of the Case

On May 13, 1982, following a jury trial, petitioner was convicted of one count of second degree murder in violation of Penal Code section 187. The jury also found true an allegation that petitioner used a firearm in the commission of the offense, in violation of Penal Code section 12022.5. On July 15, 1982, petitioner was sentenced to fifteen years to life in state prison for the second degree murder. The prison term on the use of a firearm was stayed.

At petitioner's twelfth parole hearing on December 27, 2006, the Board of Parole Hearings [hereinafter the Board] denied parole to the petitioner for one year. The present habeas corpus petition challenges that denial.

## The Commitment Offense

On November 18, 1981, petitioner was twenty years old, living in the same house with his mother and his stepfather. His mother and his stepfather had been divorced and remarried, (Exhibit BB, Reporter's transcript of parole hearing, pp. 25-27.)

Petitioner took his stepfather's rifle and hid it in the garage. When petitioner's stepfather told him to put out the cat, petitioner went to the garage and retrieved the rifle. While petitioner was preparing the weapon for use against his stepfather it went off accidentally. Petitioner's stepfather came out to the garage and petitioner shot him. Petitioner then approached his stepfather and shot him a second time. (Exhibit BB, Transcript of parole hearing pp.14-17.)

At the hearing, petitioner explained his actions by saying that he felt his security was threatened by his stepfather. Petitioner's stepfather wanted him to move out of the house, even though he had no real career plans. Moreover, his stepfather constantly humiliated and embarrassed him. (Exhibit BB, pp. 31-33.)

As further background explaining his animosity towards his stepfather's family, petitioner added that, at an earlier age, he had been sexually molested by his stepfather's son. (Exhibit BB, p.22.) A psychological evaluation prepared by the Department of Corrections in 1991, revealed that when petitioner was eight years old he was subjected to continuous sexual abuse over a period of about a year and a half by his stepbrother who was ten years older. (Exhibit G, p.6.)

Although the crime was not related directly to drug or alcohol use, petitioner acknowledged that around the time of the offense he was abusing alcohol and marijuana. (Exhibit BB, pp. 43-44.)

### Contentions of the Habeas Corpus Petition

Petitioner contends that the decision of the Board to deny him parole was not supported by the totality of facts. Moreover, petitioner contends that because the Board routinely denies parole without considering the individual facts of each case, the court should employ a more stringent standard of review than the "some evidence" standard mandated by our Supreme Court. Finally, the petition is accompanied by a motion for discovery of materials to show that the Board, in fact, denies parole without fair consideration of individual cases.

### Discussion

### The Legal Standard

The Board will set a release date for life prisoners unless it determines that the gravity of the commitment offense is such that consideration of public safety requires a lengthier period of incarceration. (Penal Code section 3041 subdivision

2

(b).) The regulations implementing Penal Code section 3041 are set out in California Administrative Code, Title 15, Section 2402. [All further references to administrative regulations are to Title 15 unless otherwise indicated.] A prisoner who would pose an unreasonable risk of danger to society shall be found unsuitable for parole regardless of the length of time served. (Section 2402 subdivision (a).) Title 15 delineates specific criteria for determining dangerousness and hence parole suitability. The criteria, however, are general guidelines and the importance to be attached to any circumstance or combination of circumstances is left to the judgment of each parole hearing panel. (Section 2402 subdivision (c).)

In determining whether a prisoner would pose an unreasonable risk of danger the Board may rely solely on the nature of the commitment offense to find a prisoner unsuitable for reasons of public safety. To support such a determination there should be some evidence that the violence or viciousness of the commitment offense exceeded the minimal elements necessary for conviction of the underlying crime. (*In re Dannenberg* (2005) 34 Cal. 4th 1061, 1094-1095.) However, the nature of the commitment offense is an immutable factor. Reliance on the commitment offense alone to deny parole can be sustained only where all other relevant factors are considered and only if the circumstances of the crime reliably established by evidence in the record rationally indicate that the offender will present an unreasonable public safety risk if released from prison. (*In re Scott* (2005) 133 Cal. App. 4th 573, 595.)

In reviewing a finding of unsuitability for parole by the Board, the court exercises very limited powers of review. A court may only determine whether there is "some evidence" to support the Board's decision based upon the factors set out in the regulations. A writ of habeas corpus seeking to overturn the Board's finding of unsuitability should be granted only where the Board's finding is devoid of a factual basis. (*In re Rosenkranz* (2004) 29 Cal. 4th 616, 658.)

For the reasons stated below, the court concludes that there is some evidence to support the Board's determination that the commitment offense was especially cruel. Furthermore, the court finds there is some evidence to support the Board's assessment that the nature of the commitment offense indicated petitioner would present an unreasonable public safety risk if released from prison.

**The Boards Finding of Unsuitability**

The Board explicitly based its finding of unsuitability for parole on the nature of the commitment offense. Employing the factors set out in the

3

regulations, the Board found that the offense was especially cruel. (Section 2402 subdivision (c) (1).) The Board found the crime was committed in a dispassionate calculated manner. Adopting the language of the regulation the Board described the crime as very much like an execution murder. (Section 2402 subdivision (c) (1) (A).) Furthermore, the crime was carried out in a way that demonstrated an exceptionally callous disregard for human suffering. (Section 2402 subdivision (c) (1) (D).) Finally, the motive for the crime was trivial. (Section 2402 subdivision (c) (1) (E).) (Exhibit BB, p.70.)

The court finds that there is some evidence to support the Board's evaluation of the commitment offense as especially cruel. (*People v. Rosenkranz*, supra , 29 Cal. 4th p.658.) The evidence that petitioner hid the gun, and then in the commission of the crime, delivered a second shot to the wounded victim provides evidence of dispassionate calculated conduct and disregard for human suffering. The motivation for the crime in petitioner's animosity toward his stepfather appears trivial in comparison with the magnitude of the offense.

The Board considered the nature of the commitment offense in the context of other factors bearing upon parole suitability. With regard to petitioner's institutional behavior, the Board found that petitioner had not participated in enough self help and improvements programs in the last two years. During that time, he had completed only one anger management class. (Exhibit BB, p.71.)

It is a factor weighing in favor of parole suitability, that a prisoner has made realistic plans for release. (Section 2402 subdivision (d) (8).) Petitioner had realistic plans in that he intended to stay with his mother and look for employment. (Exhibit BB, p.53.) The Board acknowledged petitioner's parole plans, but determined that he needed to firm them up in order to be suitable for parole. (Exhibit BB, p.72.)

## Conclusion

The court has reviewed the record in detail and notes that some criteria to be considered under the regulations would point toward a finding of parole suitability. Petitioner had no juvenile or adult criminal history apart from the commitment offense. (Exhibit BB, p.43; Exhibit C, Petitioner's California Criminal record.) . (Section 2404 subdivisions (d) (1) and (d) (2).) Petitioner did not have a history of serious misconduct in prison. (Exhibit BB, p.72.) (Section 2402 subdivision (c) (5).)

Nonetheless, the court finds that there is some evidence to support the Board's finding of unsuitability for parole and that the decision petitioner would pose a risk of danger if released is not devoid of a factual basis.

4

The court must follow the some evidence standard mandated by our state precedents. Having determined that the finding of parole unsuitability was supported by some evidence in petitioner's case, the court need not address petitioner's contention regarding the general practices of the Board with regard to other cases. Consequently, the court also need not address petitioner's request for discovery. Moreover, petitioner's request for discovery needs to be denied in light of his failure to make a prima facie case giving rise to an order to show cause. The court's power to order discovery relevant to a habeas corpus petition arises only after issuance of an order to show cause. (*Board of Prison Terms v. Superior Court (Ngo)* (2005) 130 Cal. App.4th 130, 1242.)

**Disposition**

Accordingly the petition is denied

Dated _Dec. 18_, 2007

Theresa Canepa
Judge of the Superior Court

Cc: Petitioner
No. 071637-3

TM/Snodgrass/12/07



This document is a correct copy of the original on file in this office.

ATTEST: DEC 1 2007

K. TORRE, Clerk of the Court
Superior Court of the State of California County of Contra Costa

By _____ Deputy Clerk.

5

# SUPERIOR COURT OF THE STATE OF CALIFORNIA
# IN AND FOR THE COUNTY OF CONTRA COSTA

**PEOPLE OF THE STATE OF CALIFORNIA**          **CASE NO.** 05-071708-2

**Vs.**

**Gary Snodgrass,**
         **Defendant.**

---

## CERTIFICATE OF MAILING

I, the undersigned, certify under penalty of perjury that I am a citizen of the United States, over 18 years of age, employed in Contra Costa County, Martinez, California; that I served the attached Notice, Order or Paper by causing to be placed a true copy thereof in an envelope addressed to the parties or attorneys for the parties, as shown below; which envelope was then sealed and postage fully prepaid thereon, and thereafter was deposited in the United States Mail at Martinez, California, on the date shown below; that there is delivery service by the United States Mail between the place of mailing and the place so addressed.

District Attorney's Office (via Interoffice Mail)

Gary Snodgrass-C-50449
CTF SOLEDAD
PO Box 689
Soledad, CA 3960-0689

I declare under penalty of perjury that the foregoing is true and correct.
     Executed at Martinez, California on December 18, 2007.

CLERK OF THE SUPERIOR COURT

By: _____ Deputy
     J. Arnold

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# **APPENDIX 2**

Court of Appeals denial of petition for writ of habeas corpus

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

MAR 2 1 2008

| | |
|---|---|
| In re GARY SNODGRASS, <br> on Habeas Corpus. | A120907 <br><br> (Contra Costa County <br> Super. Ct. No. 071708-2 (26252)) |

THE COURT:[*]

The petition for a writ of habeas corpus is denied.

**McGuiness, P.J.**

Dated:  MAR 2 1 2008                                                                P.J.

---

[*] McGuiness, P.J., Siggins, J. & Horner, J. (Judge of the Alameda Super. Ct., assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18

# **APPENDIX 3**

19
20
Supreme Court denial of Petition for Review
21
S162262
22
Date:  June 11, 2008
23
24
25
26
27
28

Court of Appeal, First Appellate District, Div. 3 - No. A120907
**S162262**

# IN THE SUPREME COURT OF CALIFORNIA

**En Banc**

In re GARY SNODGRASS on Habeas Corpus

The petition for review is denied.

SUPREME COURT
**FILED**

JUN 1 1 2008

Frederick K. Ohlrich Clerk

_____
Deputy

**GEORGE**
_____
Chief Justice

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# **APPENDIX 4**

## **Death Statistics of Life Prisoners**

*Page iv*

**APPENDIX 3**

Lifer Deaths since 2000

# 6 8 6

Data Analysis Unit                                      Department of Corrections and Rehabilitation
Estimates and Statistical Analysis Section                              State of California
Offender Information Services Branch                                         June 2007

NUMBER OF OFFENDERS DISCHARGED FROM INSTITUTIONS BY REASON OF DEATH
BETWEEN JANUARY 1, 2000 AND MAY 31, 2007
AS OF MAY 31, 2007

| | | TERM GROUP END DATE | | | | | |
| | | 2000 | | | 2001 | | |
| | | SENTENCE TYPE | | | SENTENCE TYPE | | |
| | | LIFER | NON-LIFER | TOTAL | LIFER | NON-LIFER | TOTAL |
| AGE | Gender | | | | | | |
| UNDER 20 | MALE | . | . | . | . | 1 | 1 |
| 20 - 24 | FEMALE | . | . | . | . | . | . |
| | MALE | 3 | 6 | 9 | . | 5 | 5 |
| 25 - 29 | FEMALE | . | . | . | . | 1 | 1 |
| | MALE | 1 | 7 | 8 | 3 | 14 | 17 |
| 30 - 34 | FEMALE | 1 | 3 | 4 | . | 2 | 2 |
| | MALE | 7 | 13 | 20 | 3 | 23 | 26 |
| 35 - 39 | FEMALE | . | 5 | 5 | . | 2 | 2 |
| | MALE | 7 | 20 | 27 | 4 | 21 | 25 |
| 40 - 44 | FEMALE | . | . | . | . | 1 | 1 |
| | MALE | 12 | 30 | 42 | 17 | 24 | 41 |
| 45 - 49 | FEMALE | 1 | 2 | 3 | 3 | . | 3 |
| | MALE | 14 | 22 | 36 | 17 | 27 | 44 |
| 50 AND OVER | FEMALE | 2 | 9 | 11 | . | 2 | 2 |
| | MALE | 38 | 94 | 132 | 54 | 74 | 128 |
| TOTAL | | 86 | 211 | 297 | 101 | 197 | 298 |

(Continued)

THESE DATA VALUES MAY DIFFER DUE TO DATABASE UPDATES.
LIFER SENTENCE TYPE INCLUDES THOSE ON DEATH ROW WHO HAVE BEEN EXECUTED.
REFERENCE W:\DAU\SAS\MARCIA\DEATH2000_2007.SAS

Data Analysis Unit                                    Department of Corrections and Rehabilitation
Estimates and Statistical Analysis Section                                    State of California
Offender Information Services Branch                                                June 2007

NUMBER OF OFFENDERS DISCHARGED FROM INSTITUTIONS BY REASON OF DEATH

BETWEEN JANUARY 1, 2000 AND MAY 31, 2007

AS OF MAY 31, 2007

| | | TERM GROUP END DATE | | | | | |
| | | 2002 | | | 2003 | | |
| | | SENTENCE TYPE | | | SENTENCE TYPE | | |
| | | LIFER | NON-LIFER | TOTAL | LIFER | NON-LIFER | TOTAL |
| AGE | Gender | | | | | | |
| UNDER 20 | MALE | . | . | . | . | 1 | 1 |
| 20 - 24 | FEMALE | . | . | . | . | . | . |
| | MALE | . | 5 | 5 | 1 | 7 | 8 |
| 25 - 29 | FEMALE | . | . | . | . | . | . |
| | MALE | 4 | 5 | 9 | . | 10 | 10 |
| 30 - 34 | FEMALE | . | 1 | 1 | . | . | . |
| | MALE | 3 | 17 | 20 | 3 | 13 | 16 |
| 35 - 39 | FEMALE | 1 | 1 | 2 | 1 | . | 1 |
| | MALE | 9 | 23 | 32 | 10 | 18 | 28 |
| 40 - 44 | FEMALE | 1 | . | 1 | . | 1 | 1 |
| | MALE | 15 | 42 | 57 | 15 | 32 | 47 |
| 45 - 49 | FEMALE | 1 | 4 | 5 | 2 | 1 | 3 |
| | MALE | 17 | 28 | 45 | 7 | 46 | 53 |
| 50 AND OVER | FEMALE | 4 | 3 | 7 | 2 | 1 | 3 |
| | MALE | 64 | 98 | 162 | 67 | 95 | 162 |
| TOTAL | | 119 | 227 | 346 | 108 | 225 | 333 |

(Continued)

THESE DATA VALUES MAY DIFFER DUE TO DATABASE UPDATES.
LIFER SENTENCE TYPE INCLUDES THOSE ON DEATH ROW WHO HAVE BEEN EXECUTED.
REFERENCE W:\DAU\SAS\MARCIA\DEATH2000_2007.SAS

Data Analysis Unit
Estimates and Statistical Analysis Section
Offender Information Services Branch

Department of C rections and Rehabilitation
State of California
June 2007

NUMBER OF OFFENDERS DISCHARGED FROM INSTITUTIONS BY REASON OF DEATH
BETWEEN JANUARY 1, 2000 AND MAY 31, 2007
AS OF MAY 31, 2007

| | | TERM GROUP END DATE | | | | | |
| | | 2004 | | | 2005 | | |
| | | SENTENCE TYPE | | | SENTENCE TYPE | | |
| | | LIFER | NON-LIFER | TOTAL | LIFER | NON-LIFER | TOTAL |
| AGE | Gender | | | | | | |
| UNDER 20 | MALE | . | . | . | . | . | . |
| 20 - 24 | FEMALE | . | 1 | 1 | . | 1 | 1 |
| | MALE | 1 | 7 | 8 | 1 | 6 | 7 |
| 25 - 29 | FEMALE | . | 1 | 1 | . | . | . |
| | MALE | 6 | 10 | 16 | 3 | 9 | 12 |
| 30 - 34 | FEMALE | . | 1 | 1 | 1 | 1 | 2 |
| | MALE | 6 | 17 | 23 | 6 | 16 | 22 |
| 35 - 39 | FEMALE | 1 | 2 | 3 | . | 2 | 2 |
| | MALE | 5 | 19 | 24 | 12 | 14 | 26 |
| 40 - 44 | FEMALE | 1 | 1 | 2 | . | 3 | 3 |
| | MALE | 9 | 26 | 35 | 13 | 35 | 48 |
| 45 - 49 | FEMALE | . | 1 | 1 | . | 1 | 1 |
| | MALE | 16 | 36 | 52 | 22 | 38 | 60 |
| 50 AND OVER | FEMALE | 3 | 1 | 4 | 4 | 4 | 8 |
| | MALE | 82 | 96 | 178 | 78 | 115 | 193 |
| TOTAL | | 130 | 219 | 349 | 140 | 245 | 385 |

(Continued)

THESE DATA VALUES MAY DIFFER DUE TO DATABASE UPDATES.
LIFER SENTENCE TYPE INCLUDES THOSE ON DEATH ROW WHO HAVE BEEN EXECUTED.
REFERENCE W:\DAU\SAS\MARCIA\DEATH2000_2007.SAS

Data Analysis Unit
Estimates and Statistical Analysis Section
Offender Information Services Branch

Department of Corrections and Rehabilitation
State of California
June 2007

NUMBER OF OFFENDERS DISCHARGED FROM INSTITUTIONS BY REASON OF DEATH
BETWEEN JANUARY 1, 2000 AND MAY 31, 2007
AS OF MAY 31, 2007

| | | TERM GROUP END DATE | | | | | |
| | | 2006 | | | 2007 | | |
| | | SENTENCE TYPE | | | SENTENCE TYPE | | |
| AGE | Gender | LIFER | NON-LIFER | TOTAL | LIFER | NON-LIFER | TOTAL |
|---|---|---|---|---|---|---|---|
| UNDER 20 | MALE | . | 1 | 1 | . | 1 | 1 |
| 20 - 24 | FEMALE | . | . | . | . | . | . |
| | MALE | 2 | 1 | 3 | . | 2 | 2 |
| 25 - 29 | FEMALE | 2 | 1 | 3 | . | . | . |
| | MALE | 4 | 12 | 16 | 1 | 2 | 3 |
| 30 - 34 | FEMALE | . | . | . | . | 1 | 1 |
| | MALE | 4 | 16 | 20 | 2 | 5 | 7 |
| 35 - 39 | FEMALE | . | . | . | . | . | . |
| | MALE | 10 | 19 | 29 | 5 | 1 | 6 |
| 40 - 44 | FEMALE | . | 7 | 7 | . | . | . |
| | MALE | 17 | 37 | 54 | 5 | 13 | 18 |
| 45 - 49 | FEMALE | . | 3 | 3 | . | 1 | 1 |
| | MALE | 31 | 30 | 61 | 10 | 13 | 23 |
| 50 AND OVER | FEMALE | 5 | 2 | 7 | 3 | 3 | 6 |
| | MALE | 94 | 114 | 208 | 45 | 37 | 82 |
| TOTAL | | 169 | 243 | 412 | 71 | 79 | 150 |

THESE DATA VALUES MAY DIFFER DUE TO DATABASE UPDATES.
LIFER SENTENCE TYPE INCLUDES THOSE ON DEATH ROW WHO HAVE BEEN EXECUTED.
REFERENCE W:\DAU\SAS\MARCIA\DEATH2000_2007.SAS

1
2
3
4
5
6
7
8
9
10
11
12

# **APPENDIX 5**

13
14

## **Release Statistics**

15
16
17
18
19
20
21
22
23
24
25
26
27
28

# APPENDIX 4

Lifer Grants of Parole Since 2000

# 1 2 9

## TABLE OF TIME SERVED
## SECOND AND FIRST DEGREE MURDER OFFENDERS
## YEARS 1977-2006
## MEDIAN & MEDIANS

| YEAR | 2ND DEGREE | | | 1ST DEGREE | | |
| --- | --- | --- | --- | --- | --- | --- |
| | MEAN | MEDIAN | NUMBER PAROLED | MEAN | MEDIAN | NUMBER PAROLED |
| 1977 | 40-100 | 60 | 232 | 99-200 | 125 | 77 |
| 1978 | n/a | n/a | n/a | n/a | n/a | n/a |
| 1979 | 48-81 | 58 | 201 | 55-163 | 124 | 53 |
| 1980 | 43-77 | 55 | 210 | 89-158 | 131 | 30 |
| 1981 | 42-79 | 58 | 221 | 102-205 | 134 | 39 |
| 1982 | n/a | n/a | n/a | n/a | n/a | n/a |
| 1983 | 40-64 | 54 | 175 | 58-162 | 118 | 74 |
| 1984 | 38-82 | 60 | 94 | 42-154 | 129 | 71 |
| 1985 | n/a | n/a | n/a | n/a | n/a | n/a |
| 1986 | 76.3 | 68 | 20 | 168.9 | 169.4 | 33 |
| 1987 | 103.2 | 85.9 | 9 | 167.7 | 157.7 | 75 |
| 1988 | 41.0 | 41 | 1 | 158.6 | 159 | 42 |
| 1989 | 61.9 | 52 | 3 | 166.3 | 166 | 51 |
| 1990 | 120.6 | 136.5 | 9 | 174.6 | 171.6 | 33 |
| 1991 | 92.8 | 88.9 | 18 | 168.9 | 169.4 | 33 |
| 1992 | 125.3 | 144.1 | 9 | 205.5 | 200.3 | 8 |
| 1993 | 155.1 | 165.7 | 10 | 193.7 | 193.7 | 2 |
| 1994 | 149.1 | 164.5 | 5 | 0 | 0 | 0 |
| 1995 | 113.0 | 141.4 | 8 | 0 | 0 | 0 |
| 1996 | 145.9 | 164.1 | 10 | 0 | 0 | 0 |
| 1997 | 165.8 | 190.1 | 18 | 0 | 0 | 0 |
| 1998 | 186.8 | 183.7 | 12 | ISL 361.3 DSL 241.7 | ISL 361.3 DSL 241.7 | 1 |
| 1999 | 126.3 | 126.3 | 2 | ISL 286.2 | ISL 286.2 | 2 |
| 2000 | 151.1 | 165.8 | 4 | 0 | 0 | 0 |



| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 2001 | 187.0 | 198.8 | 1 | | DSL 251.4 | 1 | DSL 251.4 | 1 |
| 2002 | 221.1 | 221.1 | 1 | | DSL 240.0 | 3 | DSL 239.1 | 3 |
| 2003 | 212.6 | 214.2 | 12 | | DSL 253.2 | | 243.2 | 2 |
| 2004 | 248.3 | 257.5 | 49 | | 342.5 (pre-78) 284.7 (post-78) | 7 8 | 336.6 (pre-78) 286.4 (post-78) | 7 8 |
| 2005 | 272.3 | | 32 | | 372.0 (pre-78) 290.4 (post-78) | 2 3 | | 2 3 |
| 2006 | 41.3 (pre-78) 268.4 (post-78) | 41.3 (pre-78) 277.2 (post-78) | 2 27 | | 521.9 (ISL) 315.8 (post-78) | 1 3 | 521.9 (ISL) 310.8 (post-78) | 1 3 |

**Source:**
California Department of Corrections
Offender Information Services Branch
Statistics and Analysis

I, Carl McQuillion, a paralegal, certify under oath that the above statistics in this chart are true and correct, and taken from source documents provided to me by the Department of Corrections over the years. Under penalty of perjury, I so swear.

*Carl McQuillion  1-17-07*
Signature and Date

## DECLARATION OF SERVICE BY MAIL

**Case Name:**    GARY SNODGRASS v. BEN CURRY, WARDEN

**Court:**    United States District Court,
Northern District of California

**Title of Doc.:**    **PETITION FOR WRIT OF HABEAS CORPUS**

I, the undersigned, declare:

I am the party in the foregoing action. I am over 18 years of age and a citizen of the United States. On the date below I have served a copy of the attached subject document upon the opposing party by placing a true copy of same in the U.S. mail depository, proper postage affixed thereto, and correctly addressed as follows:

Attorney General of California
Attn:  Scott C. Mather, Deputy Attorney General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004

SWORN TO UNDER PENALTY OF PERJURY, under the laws of California, this 1st day of July, 2008, at Soledad, CA.

GARY SNODGRASS, declarant