GARY SNODGRASS, C-50459
CTF-SOLEDAD
P O BOX 689
SOLEDAD, CA 93960-0689

PETITIONER IN PRO SE

# VOLUME 1 of 2
## EXHIBITS A thru BB

RECEIVED

JUL - 9 2008

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

E-filing

JSW

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

CV 08    3322 (PR)

Gary Snodgrass,                 )    No. _____
                                )
              Petitioner,       )    **PETITIONER'S EXHIBITS TO**
                                )    **PETITION FOR WRIT OF**
        v.                      )    **HABEAS CORPUS**
                                )
Ben Curry, Warden,              )
California Training Facility,   )    Former Crim. # 26252
Soledad, CA.,                   )
                                )    Honorable Judge of the
              Respondent .      )    Northern District of California
_____)

| EXHIBIT # | DESCRIPTION | |
|-----------|-------------|---|
| A | Abstract of Judgment | 2 |
| B | Sentencing transcript | 2,22,23 |
| C | CDCR's Legal Status documents | 2 |
| D | 1990 Life Prisoner Evaluation report | 5,16 |
| E | 1985 Mental Health Evaluation report | 7 |
| F | 1988 Mental Health Evaluation report | 7 |
| G | 1990 Mental Health Evaluation report | 8 |

**1**

| H  | 1991 Mental Health Evaluation report (Cat-X) | 8 |
| I  | 1992 Mental Health Evaluation report | 12 |
| J  | 1993 Mental Health Evaluation report | 12 |
| K  | 1994 Mental Health Evaluation report | 12 |
| L  | 1995 Mental Health Evaluation report | 13 |
| M  | 1997 Mental Health Evaluation report | 13 |
| N  | 1998 Mental Health Evaluation report | 14 |
| O  | 1999 Mental Health Evaluation report | 14 |
| P  | 2003 Mental Health Evaluation report | 15 |
| Q  | 1991 Life Prisoner Evaluation report | 17 |
| R  | 1992 Life Prisoner Evaluation report | 17 |
| S  | 1993 Life Prisoner Evaluation report | 17 |
| T  | 1994 Life Prisoner Evaluation report | 17 |
| U  | 1995 Life Prisoner Evaluation report | 17 |
| V  | 1997 Life Prisoner Evaluation report | 17 |
| W  | 1998 Life Prisoner Evaluation report | 17 |
| X  | 1999 Life Prisoner Evaluation report | 17 |
| Y  | 2001 Life Prisoner Evaluation report | 17 |
| Z  | 2002 Life Prisoner Evaluation report | 18 |
| AA | 2003 Life Prisoner Evaluation report | 18 |
| BB | 2006 Board of Parole Hearings transcript | 18, passim |
| CC | 1990 BPT parole denial decision only | 39 |
| DD | 1992 BPT parole denial decision only | 39 |
| EE | 1993 BPT parole denial decision only | 39 |

**2**

## EXHIBIT INDEX – CONT'D

**Pages**

| | | |
|---|---|---|
| **FF** | 1994 BPT parole denial decision only ........................... | 31, 39 |
| **GG** | 1995 BPT parole denial decision only ........................... | 31-32, 39 |
| **HH** | 1997 BPT parole denial decision only ........................... | 32, 39 |
| **II** | 1998 BPT parole denial decision only ........................... | 32, 39 |
| **JJ** | 2000 BPT parole denial decision only ........................... | 33, 40 |
| **KK** | 2001 BPT parole denial decision only ........................... | 34, 40 |
| **LL** | Probation Officers Report ................................................ | 6, 22 |
| **MM** | [ *This Exhibit Removed* ] | |
| **NN** | Gubernatorial Misconduct: Pressuring Commissioners to Deny Parole .................................................................. | 3 |
| **OO** | *In re Criscione,* Santa Clara Superior Court case .......... | 4, MPA 25 |
| **PP** | 2005 Life Prisoner Evaluation report ........................... | 18 |
| **QQ** | *In re Cortez / In re Aremu* case documents ................. | 18 |
| **RR** | Letters from Sandi Bowman & Glenn Webber ............ | 19 |
| **SS** | 2002 BPT parole denial decision only ......................... | 33, 40 |
| **TT** | 2004 BPT parole denial decision only ........................... | 34, 40 |
| **UU** | 2005 BPT denial stipulation by Gary Snodgrass .......... | 40 |
| **VV** | *Coleman v. CA. Bd. of Prison Terms* case ........................ | MPA 5 |
| **WW** | *Dennis Kimble* case: Declaration by Knox, Attorney .... | MPA 7 |

///

SUPERIOR COURT OF CALIFORNIA, COUNTY OF    CONTRA COSTA

P. O. BOX 911, MARTINEZ, CALIFORNIA   94553

**FOR COURT USE ONLY**

F I L E D

JUL 13, 1982

J. R. OLSSON, County Clerk
CONTRA COSTA COUNTY
by M. Johannes
DEPUTY

PEOPLE OF THE STATE OF CALIFORNIA

DEFENDANT   GARY RANDALL SNODGRASS   ☒ Present   ☐ Not Present

☒ JUDGMENT OF COMMITMENT TO:   ☒ STATE PRISON   ☐ COUNTY JAIL

CASE NUMBER
26252

| Date of hearing | Dept. No | Judge | Clerk | Reporter |
|---|---|---|---|---|
| 7-x-82 | 1 | Robert G. McGrath | M. Johannes | Bob Gatlin |
| Counsel for People | | Counsel for defendant | | Probation Officer |
| Robert Kochly | | Thomas Shelby | | Madeline F. Jensen |

Defendant was convicted of the commission of the following crime on (Date)   May 13, 1982

| Count | Code Section | Crime | Degree | By Jury Court or Plea (Specify) |
|---|---|---|---|---|
| 1 | 187 PC | Murder | 2nd | Jury |

C. Vaughn

2  Defendant  ☐ was arraigned  ☒ waived arraignment for judgment

3  The court, having read and considered the probation report/and no good cause having been shown **and report of Dwight R. Murray, Ph.D.** be pronounced

a  ☒  Sentences defendant to State Prison for the term prescribed by law -- 15 years to life.

b  ☐  Specifies pursuant to Per C 1202c the minimum term of imprisonment shall be ___ months as to Count

c  ☐  Sentences defendant to County Jail for the period of (Specify number of days)

d  ☐  Suspends imposition of sentence and defendant is placed on probation for the period of ___
☐ upon conditions set forth in attachment 3d

4  ☐  Defendant convicted of more than one count, shall
☐  serve the sentence as to each count as follows:

| Count | Consecutive With | Concurrent with |
|---|---|---|

b  ☐  serve the counts made consecutive in the following order

5  Defendant shall serve this sentence with respect to any prior uncompleted sentence   a ☐ concurrently   b ☐ consecutively
c  ☐  as set forth below or in attachment ☒

6  Execution of sentence is
a  ☐  stayed on the following count ___ pending appeal, with the stay to become permanent
when the sentence is completed as to count
b  ☐  suspended and defendant is placed on probation for the period of
☐ upon conditions set forth in attachment 6b

7  ☐  No allegation to enhance punishment was made in count

8  ☒  It was alleged
a  ☐  Defendant was armed with a deadly weapon at the time of the commission or attempted commission of the crime charged in count ___   ☐ and allegation stricken as to count

This form satisfies the requirements of Penal Code 1213.5 (Abstract of Judgment and Commitment). Except where the jury. This form is not to be used in proceedings other than death. A copy of probation report shall accompany this form pursuant to Penal Code 1203c and a copy of any supplementary probation report shall be furnished to the Department of Corrections. Attachments may be used but must be incorporated by reference.

**BEST AVAILABLE COPY**

b ☒ Defendant used a firearm in count .....One .....  ☐ and allegation stricken as to count:

c ☐ Defendant was armed at the time of arrest with a concealed deadly weapon within the meaning of Pen. C. 3024
   ☐ and allegation stricken

d ☐ Other (Specify and indicate if stricken):

☒ The Court finds the defendant

a ☐ was armed at the time of commission or attempted commission of the crime with a deadly weapon within the meaning of Pen. C.

   (1) ☐ Pen C 3024 as to count          ☐ but strikes the finding as to count

   (2) ☐ Pen C 12022 as to count         ☐ but strikes the finding as to count

   (3) ☐ Pen C 1203 (Specify weapon)
       as to count                       ☐ but strikes the finding as to count

b ☐ was not armed at the time of commission or attempted commission of the crime within the meaning of

   (1) ☐ Pen C 3024 as to count

   (2) ☐ Pen C 12022 as to count

   (3) ☐ Pen C 1203 as to count

c ☒ did use a firearm as to count .....one .....          ☐ but strikes the finding as to count

   (1) ☒ The use was one use for the following counts. One ..... The additional penalty shall
       run consecutively to the sentence on the last count to be served ; said additional term is stayed.

d ☐ did not use a firearm as to count

e ☐ was armed at the time of arrest with a concealed deadly weapon within the meaning of Pen. C. 3024  ☐ but strikes
   the finding

f ☐ was not armed at the time of arrest with a concealed deadly weapon within the meaning of Pen. C. 3024.

g ☐ Other (Specify and indicate if stricken):

10 ☐ Prior convictions which affect defendant's sentence were alleged and disposed of ☐ as follows ☐ as set forth in
   attachment 10

| Conviction date | Jurisdiction | Crime and code Section | Applies to Count | Disposition |
|---|---|---|---|---|
| | | | | |

11 The court finds defendant  a ☐ is  ☐ is not an habitual criminal under Pen C 644a

   b ☐ is  ☐ is not an habitual criminal under Pen C 644b

12 The court pronounced sentence on (Date) 7-13-82 and defendant was held in custody through and including
   the date of pronouncement of sentence for (Total No. of days) 93 days as follows

| Count | Time other than Dept. of Corrections | Dept. of Corrections Time |
|---|---|---|
| | | |
| 4019 Credit: | 62 days | 0 |
| | 31 days | |

13 Defendant is remanded to the custody of the Sheriff

a ☐ For the period of (Specify no. of days) ☐ upon conditions and recommendations set forth in attachment 13a

b ☒ To be delivered ☒ at the earliest convenient time ☐ after 48 hours, excluding Saturdays, Sundays and holidays
   [Pen C 1203c] into the custody of the Director of Corrections at

   (1) ☐ California Institution for Women—Frontera          (3) ☐ California Institution for Men—Chino

   (2) ☒ California Men's Facility—Vacaville                 (4) ☐ Other

14 ☒ The court requests a copy of the diagnostic study and recommendations as provided in Pen C 1168

15 The court advised defendant of all appeal rights as required in CRC Rule 250 and defendant acknowledged understanding them

16 ☒ Other (Specify) : (a) Defendant is advised of parole rights

Dated July 13, 1982      Hon. Robert G. McGrath

TOTAL NO. of boxes checked      11

CLERK'S CERTIFICATE
I hereby certify that the foregoing is a correct copy of the original on file in my office
Clerk of the Superior Court

By _____ Deputy

BEST AVAILABLE COPY

*Clarence / _____  8/11/2*

## SUPERIOR COURT OF THE STATE OF CALIFORNIA
### IN AND FOR THE COUNTY OF CONTRA COSTA

THE PEOPLE OF THE STATE OF CALIFORNIA

against

Gary Randall SNODGRASS

Defendant

No. 26252

F I L E D

MAR 4 - 1982

J. R. OLSSON, County Clerk
CONTRA COSTA COUNTY
By _____

**INFORMATION**

1.   PC 187

In the Superior Court of the State of California, in and for the County of Contra Costa

The District Attorney of the County of Contra Costa hereby accuses

GARY RANDALL SNODGRASS          defendant          of the crime of Felony, to wit, violation of

SECTION 187, CALIFORNIA PENAL CODE (Murder)          committed as follows, to wit          4.

That said defendant     on or about  November 18, 1981          at          Pinole

in Contra Costa County, State of California, did then and there unlawfully, willfully and feloniously

murder John Daniel Nailen, a human being.

USE OF FIREARM

It is further alleged that defendant, GARY RANDALL SNODGRASS, personally
used a firearm in the commission of the above offense, within the meaning
of Penal Code Section 12022.5.

WILLIAM A. O'MALLEY
District Attorney

Garrett J. Grant
Deputy District Attorney

GJG:jmd

**BEST AVAILABLE COPY**

# EXHIBIT B

# EXHIBIT B

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF CONTRA COSTA

COPY

PEOPLE OF THE STATE OF CALIFORNIA,    )
                                       )
            Plaintiff,                 )
                                       )
    vs.                                )    No. 26252
                                       )
GARY RANDALL SNODGRASS,                )    F I L E D
                                       )
            Defendant,                 )        ( - 1982
                                       )
                                       )    J. R. OLSSON County Clerk
                                            CONTRA COSTA COUNTY
                                            By O. VAN _____

HONORABLE ROBERT G. McGRATH, JUDGE

JULY 13, 1982

SENTENCING HEARING

APPEARANCES:

FOR THE PEOPLE

ROBERT KOCHLY, Deputy District Attorney.
Courthouse
Martinez, CA  94553

FOR THE DEFENDANT

THOMAS G. SHELBY
2090-23rd St.
San Pablo, CA  94806

BOB J. GATLIN
C.S.R. #2256

BEST AVAILABLE COPY

- 1 -

JULY 13, 1982                                    9:10 A.M.

THE COURT:  This is the time set for sentencing.
I understand it's also the time set for a hearing on a motion.

Mr. Shelby, do you wish to be heard in support of
your motion at this time?  I've read the points and authorities
that have been submitted to the Court.

MR. SHELBY:  Your Honor, the points and authorities
basically set forth my position on the motion for new trial
and an order to modify the verdict.  I don't see any real
reason to reiterate the evidence.  Your Honor heard it as well
as I and you are as well aware of it as I am.  I simply feel
that in the interest of justice and all of the matters set
forth in the Probation Report, psychological reports that are
attached thereto, it cries out for a resolution different
than what the law affords, according to the finding of the
jury, which I believe was probably a compromise between the
position set forth for them.  That the interest of justice
would be best served by giving Your Honor some latitude that
a reduction to voluntary manslaughter would allow.  And Your
Honor does have the power to do the same.

THE COURT:  Mr. Kochly?

MR. KOCHLY:  Yes, Your Honor, I certainly have no
quarrel with the proposition that this Court has the power to
grant the motion for a new trial or to modify or reduce the
verdict under certain limited circumstances, and none of those
exist in this case.  Younsel has pointed out, this Court has
heard the evidence and I'm sure still has it clear in your
mind in this case, and the evidence clearly supports this

**BEST AVAILABLE COPY**

-2-

verdict and clearly could have supported an even higher
verdict. In this case, I think the jury's verdict, as I think
they do in many cases, took into account some of the circum-
stances and factors which counsel has pointed out this morning,
regarding the facts, the underlying equities, if you will, of
the situation which resulted in this murder. And I think that
the Court should be loathe to interfere with the verdict of
the jury in this case, as it should be in any particular case.

I think the verdict should stand and the defense
motion should be denied.

THE COURT: Is the matter submitted?

MR. SHELBY: On that particular area, yes.

THE COURT: On the motion, yes.

MR. KOCELY: Yes.

MR. SHELBY: Yes.

THE COURT: As I've said, I've read the points
and authorities that have been submitted and I have reviewed
this file and I find in this case, the verdict is supported
by the evidence that was presented before this jury and the
motion will be denied.

Mr. Shelby, is there any legal cause -- I will allow
you to be heard on sentence, but at this point, is there any
legal cause why sentence or judgment should not now be
imposed?

MR. SHELBY: No, Your Honor, there is not.

THE COURT: Mr. Snodgrass, do you know of any reason
why sentence should not be imposed finally?

MR. SNODGRASS: No.

BEST AVAILABLE COPY

-3-

THE COURT:  You have to answer out loud.

MR. SNODGRASS:  No.

THE COURT:  Thank you.  Mr. Shelby, is arraignment for judgment and sentencing waived?

MR. SHELBY:  It is.

THE COURT:  The record should reflect that I have received, read and considered the probation officer's report dated June 23rd, 1982, which consists of 20 pages.  And, I've also read the report from Dr. Murrey which was attached to Mr. Shelby's motion, and the file does not have in it a statement in mitigation or aggravation.

Does either counsel know of any statement having been prepared and not filed or having been filed and not reaching the files?

MR. KOCHLY:  No, Your Honor.

MR. SHELBY:  Yes, Your Honor, I sent in a statement pursuant to Rules of Court and 414 and 416.--

THE COURT:  I can't hear you, counsel.

MR. SHELBY:  I sent in a statement to the Probation Officer pursuant to the Rules of Court.

THE COURT:  And that's incorporated in --

MR. SHELBY:  That's incorporated in the probation report.

THE COURT:  All right.

MR. SHELBY:  But there is no separate statement filed that I'm aware of.

THE COURT:  Other than the one --

MR. SHELBY:  No, that was sent and then incorporated.

BEST AVAILABLE COPY

-4-

5.

THE COURT: Okay, Mr. Kochly, you are not aware of any such statement?

MR. KOCHLY: No, Your Honor, no.

THE COURT: In respect to the allegations in the Information that the defendant personally used a firearm during the commission of the offense of murder, the Court finds that that has been found to be true by the jury and therefore, Mr. Snodgrass is ineligible for probation under Subdivision A of Section 1203.06. To the extent that there may have been an application for probation, that is formally denied.

Does either counsel wish to be heard concerning the sentence or present any evidence in mitigation or aggravation at this point? And I point out circumstances in mitigation and aggravation although that only effects the enhancement and not the term prescribed by law, but does either counsel want to be heard concerning the sentence?

Mr. Shelby?

MR. SHELBY: I believe it's all pointed out in the probation report pursuant to the Rules of Court which I cited wrongfully a few moments ago, 421 et seq. I would, however, at this point, ask Your Honor to exercise your discretion under 1170.1(g) of the Penal Code to strike the term with the use of a firearm which is allowable under People vs. Tanner. Also, Your Honor, you could do it on your own motion of 1385.

I would like to point out what may also be a defect in the pleadings. Although my research has not lead me to a conclusion one way or the other, it has been the policy of this county to charge under these types of Informations, that

BEST AVAILABLE COPY

-5-

6

the conduct engaged in does, in fact, come within the auspices
of 1203.06, which generally is placed on the pleading itself
and has been in the prior cases, which I could cite case
numbers if Your Honor would like, and in this particular case,
it was not. I found out, apparently, the District Attorney
takes the position that they no longer have to do that because
by citing the 12022 section, that gives adequate notice.

THE COURT: Okay, are you -- you're referring to
the absence of the section being cited, 1203.06?

MR. SHELBY: That's correct, although I suspect
that there has been no cases involving that and conceivably,
one could not be put on notice that 1203.06 would, in fact,
apply, therefore eliminating probation as a consideration.

I should also state for the record that it did not
appear, in my opinion, because of lack of authority, that
that would have been demurrable. So therefore, the demurrer
was not filed because I thought it would be a waste of time.
But I think when it comes to sentencing, that the point should
be brought up and it has.

20      THE COURT: Mr. Kochly?

21      MR. KOCHLY: Well Your Honor, counsel has not
22  indicated that he, in fact, was not, in fact, on notice that
23  the provisions of 120306 were brought into play by this, by
24  our allegations in this Information. Just the Section 120306
25  is just not mentioned. I do, in fact, believe, Your Honor,
26  that there is case law which supports the proposition that
27  alleges using a firearm in the manner as we have in this
28  particular Information is sufficient to put Defendant on notice

BEST AVAILABLE COPY

- 6 -

and to bring into play the provisions of 120306. I do not
have a citation for the Court present at my fingertips because
I did not know that this particular point was going to be
raised at this proceeding. But, I believe that that is -- that
that is the law and that the Defendant was adequately noticed
of the provisions that would be brought into play by the
allegations of that use clause.

THE COURT: Well I believe that the defense was
properly placed on notice, but even more importantly than
that, we do have a situation where the jury found that a
murder was committed, and the jury specifically found Mr.
Snodgrass did personally use a firearm, so he clearly has been
brought within the provisions of 120306.

Does either counsel wish to be further heard on the
matter of sentence?

MR. KOCHLY: The only other comment I would like to
make to the Court is that I believe that this jury's verdict
in this case adequately reflects their feeling as to the --
obviously as to the proper disposition in this case. By that
I mean because of the factors that were presented in this
case, both from the People's perspective regarding the manner
in which the crime was committed and the evidence that was
certainly present for the jury to find, if they wished to, of
first degree murder, balanced against the factors that were
presented by the defense, fully and completely to the jury
regarding the defendant's alleged diminished capacity, and
his prior relationship with his stepfather, the victim in this
case, I think that bearing all those things in mind, that those,

BEST AVAILABLE COPY

-7-

in a sense, adequately reflect the factors, so called, in
aggravation and mitigation.  And, that those are factors
which were under the unique circumstances of this case,
balanced by the jury in arriving at their verdict of second
degree.

Therefore, I don't believe that this is a case
where the Court should exercise its discretion in further
altering the verdict of the jury by striking the use clause
for the purposes of sentencing in this matter.  I think the
factors, when properly balanced out, place it where it stands
right now.  Second degree murder with use of a firearm and
that's what the Defendant should receive punishment for.

THE COURT:  Is the matter submitted?

MR. SHELBY:  One further thing.

MR. KOCHLY:  Submitted for the People.

THE COURT:  Yes.

MR. SHELBY:  As pointed out in the motion, the
Defendant is statutorily eligible for California Youth
Authority.  The chances of them taking him because of his
chronological age are somewhat slim, but I think, nonetheless,
that it can be done if Your Honor would order the 120 day
commitment under 1737 and 1737.1 of the Welfare and Institution
Code for further diagnosis.  And, if Your Honor were to submit
along with that order a statement under 1203.01, that at least
it's worth a chance.  He can be saved.  He needs treatment.
It seems to me that the interests of justice could be served
under those circumstances, or at least is worth a trial.  I
don't believe, and Your Honor has evidence in the report in

**BEST AVAILABLE**

- 8 -

... ... ... ... somewhat unsatisfactory ... ... ... the
survive a commitment to the adult system.

THE COURT: ... Frankly, I ... ... ...

... ... ... ... ... ... ... the ... are not
would not be, as ... the learny heart pointed ... ... the ... the

... ... accepted by the California ... ... Authority,

... an its correct or .... given the chronolog:cal age and
the fact that the Youth Authority has decided that they are
going back to, because of their space problems in treating
juveniles which is what they were originally sent up to do,
This defendant can't be treated as such.

I think he should be committed to the Department of
Corrections. That a diagnostic evaluation from the Youth
Authority at this point in time would be futile and useless . —
and I don't think it's the appropriate disposition.

THE COURT. Is the matter submitted?

MR. SHELBY: With one more comment. It appears to
me that the Defendant meets five of the seven criteria under
the Rule 416, which would be sentencing in an unusual case,
which obviously cannot apply in this case because of the type
of verdict. But since that appears to be the case, then the
attempted committment would seem to be in order. They will
take people in unusual cases that are statutorily eligible.
Section 736 of the Welfare and Institution Code states that
the California Youth Authority shall accept borderline psychia-
tric or borderline mentally deficient cases, or those who
suffer from a primary behavior disorder.

THE COURT: Mr. Shelby, the reason that I don't plan

BEST AVAILABLE

- 9 -

10.

to commit Mr. Snodgrass to the Youth Authority, or to refer
him there for a diagnostic, is that Mr. Snodgrass next month
will be 21 years old and the Youth Authority will only be
able to keep Mr. Snodgrass until he was age 25 and four years
in custody certainly is not an appropriate disposition in this
case. I am aware of the fact that the Youth Authority can
petition to the Court if they believe that Mr. Snodgrass
should be detained beyond age 25, but as a practical matter,
that procedure is rarely used. But even more important than
that, I don't believe that whether or not Mr. Snodgrass be
incarcerated beyond age 25 should be an administrative decision
made down the road. I think it's important that a decision
be made today and the four-year period of time in which he
would be incarcerated at the Youth Authority is certainly not
appropriate.

MR. SHELBY:  They can also recommend a transfer to
the Adult Authority.

THE COURT:  They could do that but as a practical
matter, that is rarely done, and again, that is an administra-
tive decision that would be made four years from now and in
all likelihood, that probably would not be done.

But at any rate, I don't think that the decision
that is made today should be left to an administrative decision
down the road.

Is the matter submitted?

MR. SHELBY:  Yes.

MR. KOCHLY:  Yes.

THE COURT:  The term in this case shall be the term

**BEST AVAILABLE**

- 10 -

prescribed by law, which is 15 years to life.

I find that the allegations that the Defendant personally used a firearm, within the meaning of Section 12022.5 has been plead and proved, and that shall be added to the term of 15 years.

That additional term shall be stayed. It's going to be stayed because that additional term does not effect the maximum period of time for which Mr. Snodgrass could be incarcerated, and it is also going to be stayed because Mr. Snodgrass does fall within Rule 423 Subsection 1 and 3. Mr. Snodgrass has no prior record, and the Defendant did acknowledge wrongdoing at the time of arrest. Also to a certain extent, Subsection 2 does apply since the evidence does establish that Mr. Snodgrass' mental condition did at least contribute to this offense. Accordingly, his term of imprisonment shall be 15 years to life.

Mr. Snodgrass, it is the judgment and sentence of this Court that you shall be imprisoned in the State Prison for 15 years to life.

I further order that you shall be remanded to the custody of the Sheriff of this County and the Sheriff is ordered to transfer you to the Reception Guidance Center at Vacaville, California.

Mr. Snodgrass, the law requires at this time that I address you concerning certain matters and I'm going to read these matters to you. At the end, I will ask you if you understand what I have read to you.

At the expiration of your period of incarceration,

**BEST AVAILABLE**

-11-

... ... placed on parole for a period not to exceed seven
years. And that is unless that is waived for good cause by
the Board of Prison Terms. If you violate the provisions of
... ... ..granted, your parole may be revoked and you could be
... returned for a period not to exceed 12 months in each
... ... ... ... revocation. The total time spent in custody due
... revocation of parole and the limit of the parole itself may
not exceed the period of seven years.

Do you understand what I have read to you, Mr.
Snodgrass?

MR. SNODGRASS. Yes, sir.

THE COURT. Do you have any questions concerning
your parole rights?

MR. SNODGRASS: No.

THE COURT. Mr. Snodgrass, it's also my duty at this
time to advise you of your appeal rights. You have the
absolute right to appeal from the judgment of this Court in
imposing sentence upon you today. That means if you wish to
appeal, you must file a written notice of your intention to
appeal within 60 days from today. That notice must be in
writing and must be signed by you or your attorney or both
may sign it. It must specify what it is that you're appealing
from, whether it's the whole judgment or just part of the
judgment.

If you do appeal, you will have the right of a
complete transcript of the trial court proceedings. That is
provided by law and without any cost to you.

If you do appeal and you do not have the financial

BEST AVAILABLE

ability to retain the services of an attorney to represent
you or appeal, the Appellate authorities will appoint counsel
to represent you. In that regard, it's your obligation to
keep the Appellate authorities advised at all times of your
current residing address so that they can be in touch with
you to advise you of appointed counsel.

Do you understand what I have just read to you,
Mr. Snodgrass?

MR. SNODGRASS: Yes.

THE COURT: And do you understand also that unless
you file your written notice of your intention to appeal in
this Court within 60 days from today's date, that you will
lose that right forever?

MR. SNODGRASS: Yes.

THE COURT: Do you have any questions that you
wish to ask me or your attorney at this time about your
appeal rights?

MR. SNODGRASS: No.

THE COURT: Do you understand them?

MR. SNODGRASS: Yes.

THE COURT: Counsel, I do not have information
available to show the actual days in custody.

Madame Clerk, what was the date --

MR. SHELBY: I do know it but it will take me a
minute to find it.

MR. KOCHLY: It appears in discussing it with counsel
and an exam of our file, he was originally in custody from the
date of his arrest, November 18th until November 26th, which

BEST AVAILABLE

-13

14.

was the day following the reduction in bail after a bail study. So he would be entitled to that period, plus the date of the verdict.

MR. SHELBY: The verdict --

MR. KOCHLY: To today's date.

THE COURT: What was the date of the verdict?

MR. KOCHLY: May 13th.

THE COURT: Yes, it was May 13th.

All right, in addition to those eight days, Mr. Snodgrass is entitled to actual days in custody since May 13th. He is entitled to credits pursuant to Section 4019 of the Penal Code.

Is there anything further before the Court at this point?

MR. KOCHLY: No, Your Honor.

MR. SHELBY: No, Your Honor.

THE COURT: Thank you, counsel.

> (Whereupon, at 9:32 a.m. the
> record in this matter was
> closed.)

BEST AVAILABLE

15

CERTIFICATE OF OFFICIAL CERTIFIED SHORTHAND REPORTER

STATE OF CALIFORNIA
               ) ss:
COUNTY OF CONTRA COSTA )

       I, BOB J. GATLIN, Official Reporter of the Superior Court of the State of California, in and for the County of Contra Costa, do hereby certify that as such, I took down in Stenotype all of the proceedings had in the within-entitled cause, People of the State of California vs. Gary Randall Snodgrass, Superior Court Action No. 26252, heard before the Honorable Robert G. McGrath, Judge, on July 13th, 1982, and that I thereafter transcribed my notes into longhand type-writing, and the foregoing transcript consisting of page one (1) to page fourteen (14), inclusive, constitutes a full, true and correct transcript of my notes taken at said time.

       DATED this ___ day of August, 1982.


                        BOB J. GATLIN, C.S.R. #1256
                        Official Reporter
                        Superior Court
                        Contra Costa County

BEST AVAILABLE

-15-

# EXHIBIT C

# EXHIBIT C

Dianne McAdor

STATE OF CALIFORNIA                                    DEPARTMENT OF CORRECTIONS

**LEGAL STATUS**

| CDC NUMBER | ALPHA ID | NAME | TERM STARTS | ETHNIC |
|---|---|---|---|---|
| C-50459 | | SNODGRASS, Gary Randall | 07-19-82 | White |

| MAX. REL./EPR DATE | MIN. RELEASE DATE | EPR DATE | ELI DATE / FLASBER BAR | PAROLE PERIOD |
|---|---|---|---|---|
| TO I.E. DETERMINED | Eligible P.D. 05-12-92 | 9-1-90 | | 05 years |

BASE TERM  15=00  • ENHANCEMENTS  00-00  • TOTAL TERM  15-00

GOOD TIME CREDITS AVAILABLE (2931 PC) (PC  449  BC 1347  ) =   1796

PRE PRISON CREDITS:                CASE NO. CC 26252

2900.5 PC        62
12C3.03 PC
2900.1 PC                 Ⓒ
CRC
Mental Health
4019 PC        31
2931 PC
Post Sentence    05

Hearings
Rx: 4-83
Doc: 7-85
Initial: 4-91  9/9/94 sub

TOTAL PRE PRISON CREDITS (DAYS)    98

REGISTRATION REQUIRED PER: 3058.6. 290.2

| DATE REC'D | CO. CASE NO. | CT. | CODE & OFF. | TYPE WPN. | DATE OF OFFENSE | SENTENCE DATE |
|---|---|---|---|---|---|---|
| | | | | | | |

CONTROLLING PRINCIPAL AND CONSECUTIVE (INCLUDING ENHANCEMENT) OFFENSE(S):

| | | | | | | |
|---|---|---|---|---|---|---|
| 07-19-82 | CC 26252 | 01 | P187 MURD 2nd | Rifle | 11-18-81 | 07-13-82 |

Investigating Agency: Pinole P.D.
Defense Atty: Shelby, Thomas

BEST COPY AVAILABLE

## INSTITUTION STAFF RECOMMENDATION SUMMARY

SOURCES OF REPORT:

Probation Officer's Report and Inmate Interviews.

CONFIDENTIAL INFORMATION:    None

HOLDS/DETAINERS:    None

MEDICAL/DENTAL:

Camp Qualified, Dental Class 1.

PSYCHIATRIC/PSYCHOLOGICAL:

Referral indicated prior to release on parole based on commitment offense, Murder 2nd.

WORK SKILLS:    None.

NARCOTICS/DRUGS/ALCOHOL:

Alcohol (13) occasionally, Marijuana (13) occasionally.  Experimented with LSD, no longer uses.

ESCAPE HISTORY:    None

ARSON HISTORY:    None

SEX RELATED OFFENSES:    None

ACADEMIC/VOCATIONAL:

I.Q.: _____  TOTAL READ: _____  TOTAL ARITH: _____  TOTAL GPL: _____

Defer to receiving institution.

CASEWORK FOLLOW-UP:    None

PRIOR INCARCERATION HISTORY & ADJUSTMENT:    None.

CRIMINAL HISTORY:    None.

EVALUATION:

Snodgrass is a 20-year-old first termer, who has never been involved in criminality.  He is a high school graduate and appears to be of average intelligence.  His overall demeanor is passive and highly depressed.

SNODGRASS    C-50459    NRC-CMF    8-2-82    cs    Page 1

EVALUATION: (CONT'D)

At this time he has extreme difficulty in discussing his case. There
appears to be some remorse, but at this time it is difficult to
determine whether it is due to the committing offense or the fact
that he is incarcerated. There appears, also, to be some inward
hostility-not sure at this time to whom it is directed.

CLASSIFICATION SCORE:

NUMBER: 064    LEVEL: IV

INSTITUTION RECOMMENDATION:

San Quentin.

CORRECTIONAL COUNSELOR:        F. Weber, CC-I, NRC

DATE:                          7-28-82

SUPERVISOR'S RECOMMENDATION:

The victim was the Subject's stepfather, John Nailen, who married
the Subject's mother in 1969, when Subject was only eight years
old. He shot the victim when the latter retired from his career
with PG&E. See psychological diagnosis in POR, page 15. Schizotypal
and borderline personality disorder.

Transfer to CMC-East as Category P for sheltered environment and
possible on-going psychiatric monitoring.

SUPERVISOR:

Albert Ng, CC-III
8-3-82

SOCIAL FACTORS

| Parents: | Name | AGE DOB | Occupation | Address |
|---|---|---|---|---|
| Mother: | Marietta Snodgrass | 48 | Secretary/School | 2664 Emma Dr., Pinole, CA |
| Father: | Harold Snodgrass | | Deceased | |

Siblings:

| | | | | |
|---|---|---|---|---|
| 1. | Kathy Snodgrass | 25 | PG&E | W/Mother |
| 2. | DiAnna Snodgrass | 23 | Inst./Deaf | W/Mother |
| 3. | | | | |
| 4. | | | | |
| 5. | | | | |

| Marriages | Location | Date | Current Address | Outcome |
|---|---|---|---|---|
| 1. N/A | | | | |
| 2. | | | | |

Not Legalized:

| | | | | |
|---|---|---|---|---|
| 1. N/A | | | | |
| 2. | | | | |

| Children | DOB | Supported by | Living with |
|---|---|---|---|
| 1. N/A | | | |
| 2. | | | |
| 3. | | | |
| 4. | | | |

Family Arrest History:

1. None
2.

Social Security Number: 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

Drivers License: N-8899119

Religion: Protestant

| NAME | SNODGRASS | NUMBER | C-50459 | NRC-CMF CS | DATE | 8-2-82 |
|---|---|---|---|---|---|---|

BEST AVAILABLE

H
HY.CA039015C.07137757.CARM (C50459)


171293  1115
CY 1238
H TCY

E: QHY.CA039015C.07137757.CARM C5      DATE:07-12-93 TIME:11:12:20
ESTRICTED-DO NOT USE FOR EMPLOYMENT,LICENSING OR CERTIFICATION PURPOSES
TTN:CARM C50459
                                  /
* III CALIFORNIA ONLY RECORD
II/A07137757
OB/08-04-1961   SEX/M   RAC/WHITE
GT/509  WGT/135  EYE/GRN  HAI/BRO   POB/CA
AM/01 SNODGRASS,GARY RANDALL

PC HENRY
2 M 25 - OOI   -
 S  2 U OIO 11

BI/73526AA6
DL/N8899119
OC/557231806
NN/CDC-C050459
  * * *

RR/DET/CITE:         NAM:01
1-18-81   CAPD PINOLE

NT:01    #X3827
 187 PC-MURDER
  - - -
OURT:           NAM:01
17-13-82   CASC CONTRA COSTA CO

NT:01    #26252
 187 PC-MURDER:SECOND DEGREE
DISPO:CONVICTED
  CONV STATUS:FELONY
  COM:15 YR TO LIFE
 * * *

ARR/DET/CITE:       NAM:01
1-18-81   CASO MARTINEZ

NT:01    #8111585J
 187 PC-MURDER
  COM:FOR DISPO SEE ENTRY OF 11-18-81 CAPDPINOLE NBR
      X3827
 * * *

RR/DET/CITE:       NAM:01
5-13-82   CASO MARTINEZ

NT:01    #82006907J
 187 PC-MURDER:SECOND DEGREE
  COM:DKT NBR 26252
 * * *

USTODY:CDC        NAM:01
7-19-82   CASD CORRECTIONS

NT:01    #C-50459
 187 PC-MURDER:SECOND DEGREE
 SEN:. 15-LIFE;
  COM:SEN FROM CONTRA COSTA CO/SC#26252
    *      *      *     END OF MESSAGE    *      *      *

STATE OF CALIFORNIA                REQUESTED FOR:CADJ SACRAMENTO
DEPARTMENT OF JUSTICE              ATTN:COMMAND CENTER RNC 02
BUREAU OF CRIMINAL                 REQUESTED BY:CA0349400   MNEMONIC:JCC
IDENTIFICATION                     DATE:08-15-83  TIME:12:44:59  PAGE:001

```
    CRIMINAL HISTORY TRANSCRIPT          FOR OFFICIAL USE ONLY
              *UNAUTHORIZED USE IS A CRIMINAL OFFENSE*
```

```
  CII NUMBER    DOB     SEX  RACE  HGT  WGT  EYE  HAIR  POB
  A07137757   08-04-61   M    W    509  135  GRN  BRO   CA
```

NAMES
01 SNODGRASS,GARY RANDALL

```
MISCELLANEOUS NUMBERS
FBI-073528AA6
CDL-N8899119
SOC-557231806
INN-CDC-C050459
```

```
FPC HENRY
12 M 25 - 00I -
   S  2 U OIO 11
```

MICROFILMED AT CDC

```
  DATE       AGENCY/FILE NUMBER      NAME  COUNT        ACTION
```

```
APPLICANT:
03-19-81  CASDAPPLICANT AGENCY      01    01  APPLICANT LICENSE OR
             2-26-81                              PERMIT
                                     COM:ORI-INSURANCE,SACRAMENTO
```

```
ARR/DET/CITE:
11-18-81  CAPDPINOLE               01    01  187 PC-MURDER
             X3827
```

```
COURT:
07-13-82  CASCCONTRA COSTA         01    01  187 PC-MURDER,SECOND
             26252                              DEGREE
                                             -COMMITTED TO STATE
                                              PRISON
                                              FELONY
                                     COM:15 YR TO LIFE
```

```
ARR/DET/CITE:
11-18-81  CASOMARTINEZ             01    01  187 PC-MURDER
             8111585J
                                     COM:FOR DISPO SEE ENTRY OF
                                     11-18-81 CAPDPINOLE NBR X3827
```

(CONTINUED PAGE 002)                                00482

```
DATE:08-15-83   TIM    :44:59  PAGE:002
CII NUMBER:A07137757   NAME:SNODGRASS,GARY RANDALL
```

```
           CRIMINAL HISTORY TRANSCRIPT        FOR OFFICIAL USE ONLY
                 *UNAUTHORIZED USE IS A CRIMINAL OFFENSE*
```

```
    DATE        AGENCY/FILE NUMBER    NAME  COUNT        ACTION
```

```
ARR/DET/CITE:
 05-13-82   CASOMARTINEZ             01    01  187 PC-MURDER,SECOND
            82006907J                          DEGREE
                                            COM:DKT NBR 26252
```

```
CUSTODY:CDC
 07-19-82   CASDCORRECTIONS          01    01  187 PC-MURDER,SECOND
            C-50459                             DEGREE
                                            SEN:,15-LIFE,

                                            COM:SEN FROM CONTRA COSTA
                                            CO/SC#26252
```

```
END OF TRANSCRIPT                                              00483
```

RECALCULATION OF MEPD FOR 15-LIFE AND 25-LIFE PRISONERS
RECEIVED PRIOR TO 5-27-87
PURSUANT TO IN RE MONIGOLD (1988) 205 CAL. APP. 3d
NO DSL TERM OR DSL TERM COMPLETED

A. CREDITS VESTED PER PC2934 (If offense date prior to 1-1-83)
1. Total days served prior to waiver date (Waiver date - received date + postsentence credit)     =  444
2. A1 ÷ 2 (round down)                                                                              =  222
3. Less credits lost per PC2932                                                                     -  6
4. Credits to be vested                                                                             =  222

B. MAXIMUM ELIGIBLE PAROLE DATE
1.  7-14-82    +    15                                                                              =  7.19.97
   RECEIVED DATE   TOTAL TERM                                                                          BASE DATE
2. Less total preconfinement credit                                                                -  78
3. Less A4 OR vest 1/2 postsentence credit                                                         -  222
4. MAXIMUM ELIGIBLE PAROLE DATE                                                                     =  4.2.96

C. WORKTIME CREDIT PER PC2933/PC2934
1. Less NET worktime credit earned from waiver/ received date through 2-15-89 or end of DSL term if later   -  1896
2. Current MEPD (cannot exceed B4)                                                                  =  6.25.91

D. GOOD TIME CREDIT PER PC2931
1. Date credit applied through (2-15-89 or date DSL term ends if later)                             -  2-15-89
2. Days left to serve                                                                               =  81.0
3. Divide by 3 (round up)                                                                           =  __
4. PC Balance (D3 ÷ 4)                                                                              =  __
5. BC Balance (D4 x 3)                                                                              =  __

E. RECALCULATED MEPD (C2 - D3)                                                                      =  9-11-90
1. Add credits lost for CDC 115's after D1                          + PC____ BC____
2. Subtract restrictions for credit losses in E1    - PC____ BC____
3. New PC/BC Balance                                PC=____ BC=____
4. Add any 7 or 9 year MEPD CS Life term(s)                                                         +  __

F. ADJUSTED MEPD (E + E1 - E2 + E4)                                                                 =  __

G. INITIAL PAROLE CONSIDERATION HEARING                                                             =  _____
   (13 months prior to F)                                                                              month/year

H. NEXT DOCUMENTATION HEARING    #____                                                              =  _____
                                                                                                      month/year

Your Minimum Eligible Parole Date has been recalculated pursuant to
In Re Monigold and you have been granted  1896  days worktime credit
from  10-1-83  through 2-15-89/the end of your DSL term (circle one).
Your recalculated/adjusted (circle one) MEPD is  9-11-90 . Your initial
life parole consideration hearing will be scheduled during the month
of_____/first available calendar (circle one).

_Ruuu Cochiane.2_                        2/16/200
CASE RECORDS STAFF                       DATE

C50459        Snedamss                   D-1
NUMBER        ! NAME                      INSTITUTION
5/89                FORM A - SIDE 1

SOURCE

California Board of Prison Terms Rules and Regulations in CCR 15, Div. 2, § 2290 (b) states: "The suggested amount of postconviction credits is 4 months for each year served since the date the life term started."

| ACTUAL TIME SERVED | | | POSTCONVICTION CREDITS | | | EQUIVALENT PRIMARY TERM | | |
|---|---|---|---|---|---|---|---|---|
| YEARS | | MONTHS | | MONTHS | | MONTHS | | YEARS/MONTHS |
| 07 | or | 084 | + | 028 | = | 112 | or | 09/4 |
| 08 | or | 096 | + | 032 | = | 128 | or | 10/8 |
| 09 | or | 108 | + | 036 | = | 144 | or | 12/0 |
| 10 | or | 120 | + | 040 | = | 160 | or | 13/4 |
| 11 | or | 132 | + | 044 | = | 176 | or | 14/8 |
| 12 | or | 144 | + | 048 | = | 192 | or | 16/0 |
| 13 | or | 156 | + | 052 | = | 208 | or | 17/4 |
| 14 | or | 168 | + | 056 | = | 224 | or | 18/8 |
| 15 | or | 180 | + | 060 | = | 240 | or | 20/0 |
| 16 | or | 192 | + | 064 | = | 256 | or | 21/4 |
| 17 | or | 204 | + | 068 | = | 272 | or | 22/8 |
| 18 | or | 216 | + | 072 | = | 288 | or | 24/0 |
| 19 | or | 228 | + | 076 | = | 304 | or | 25/4 |
| 20 | or | 240 | + | 080 | = | 320 | or | 26/8 |
| 21 | or | 252 | + | 084 | = | 336 | or | 28/0 |
| 22 | or | 264 | + | 088 | = | 352 | or | 29/4 |
| 23 | or | 276 | + | 092 | = | 368 | or | 30/8 |
| 24 | or | 288 | + | 096 | = | 384 | or | 32/0 |
| 25 | or | 300 | + | 100 | = | 400 | or | 33/4 |
| 26 | or | 312 | + | 104 | = | 416 | or | 34/8 |
| 27 | or | 324 | + | 108 | = | 432 | or | 36/0 |
| 28 | or | 336 | + | 112 | = | 448 | or | 37/4 |
| 29 | or | 348 | + | 116 | = | 464 | or | 38/8 |
| 30 | or | 360 | + | 120 | = | 480 | or | 40/0 |
| 31 | or | 372 | + | 124 | = | 496 | or | 41/4 |
| 32 | or | 384 | + | 128 | = | 512 | or | 42/8 |
| 33 | or | 396 | + | 132 | = | 528 | or | 44/0 |
| 34 | or | 408 | + | 136 | = | 544 | or | 45/4 |
| 35 | or | 420 | + | 140 | = | 560 | or | 46/8 |

# EXHIBIT D

## 01-23-1990 LIFE PRISONER EVALUATION

# EXHIBIT D

 

CALIFORNIA MEDICAL FACILITY

PSYCHOLOGICAL EVALUATION FOR THE BOARD OF PRISON TERMS

FEBRUARY 1990 CALENDAR

This is the third report to the Board of Prison Terms concerning this 28-year-old first-termer received in CDC on 7-19-82 for Murder Second Degree. The victim was his stepfather.

The present report is based on a review of the inmate's file and medical record, a 90-minute clinical interview, the Minnesota Multiphasic Personality Inventory, and consultation with staff involved with the prisoner.

BACKGROUND

This man is a high school graduate with no record of prior offenses. The murder represented the culmination of years of feeling disregarded, put down, and emotionally abused by his stepfather. According to Mr. Snodgrass, his mother and stepfather had a conflictual off-again, on-again relationship that began a year or so after the death from Hodgkinson's disease of the biological father when the subject was five years old. Additionally, Mr. Snodgrass was sexually abused by the victim's son, who was 10 years older than the subject. Previous CDC evaluators have found no major mental disorder; a Passive Aggressive Personality Disorder was diagnosed in 1985, but the 1988 evaluator found no manifest psychopathology. He had eight months of group psychotherapy at CMF with Dr. Durbin in 1988. His institutional adjustment was good, with good job performance and no disciplinary infractions.

PRESENT STATUS

Since the last BPT report, Mr. Snodgrass has continued to do well, remaining free from disciplinary citations and performing at a superior level in the Vocational Mill and Cabinet Program, developing a trade which he hopes to practice when paroled. He has been in individual and then in group psychotherapy with Dr. Fleming, appears committed to psychological growth, and feels that he has made much progress, especially in his sense of self-esteem and personal identity. He has read several books relevant to personal growth, and has sought out additional activities, such as participating in a series of group discussions based on videotapes of John Bradshaw's television series on dysfunctional families.

The Minnesota Multiphasic Personality Inventory (MMPI) results at this time are well within the normal range, consistent with freedom from diagnosable psychopathology. It was possible to compare these results with his response to the same test in October 1987, which was also consistent with minimal psychopathology, and the overall interpretation is that he has made significant growth. The current profile configuration indicates that Mr. Snodgrass is more open and self-accepting than he appeared in 1987. He is independent, resourceful, and energetic. He appears to have become more

SNODGRASS, Gary      C-50459      CMF-Main      1/25/90      SXH      1

sensitive to his own feelings, more emotionally expressive, more assertive, and increasingly secure in his masculine identity, all of which would decrease the likelihood of another violent offense. While his 1987 profile would not be interpreted as showing mistrustfulness and social alienation, his current profile suggests continuing progress in the domain of human relatedness. He probably has some continuing difficulty in the appropriate expression of anger, as people usually do when they shift from passivity to a mode of more open expression. He is very possibly showing some mild rebelliousness and resentfulness of authority, but it is stressed that, in an individual with his background this would appear to be a positive rather than a negative indicator. His profile suggests that he is likely to show continued growth in psychotherapy, is below average in susceptability to substance abuse problems, and has personal qualities that should enable him to move into leadership roles as he matures. Research findings indicate that inmates with profiles similar to that of Mr. Snodgrass have a good prognosis for parole success, and are relatively unlikely to be reoffend.

DIAGNOSIS

No manifest psychopathology.

CONCLUSIONS AND RECOMMENDATIONS

Over his years in prison, Mr. Snodgrass has matured considerably. His parole plans are realistic and consistent with his skills and interests, and he is seen as having benefitted maximally from incarceration. His violence potential is considered to be well below the average for this population, as is his risk for recidivism. It is anticipated that he will be able to maintain present gains when paroled. No particular needs for other-than-routine parole management are apparent. Continued psychotherapy is highly recommended, not because of diagnosable psychopathology, but because of the more subtle problems posed for emotional development and intimate relationships by his life experiences. Parole prognosis is favorable.

Sharon K. Halpern

SHARON K. HALPERN, Ph.D.
Staff Psychologist

NOTED AND APPROVED:

PAUL MORENTZ, M.D., Chief Psychiatrist
Inpatient/Outpatient Services


SNODGRASS, Gary      C-50459      CMF-Main      1/25/90      SKH      2

# EXHIBIT E

## 06-20-1985 INITIAL PSYCH EVALUATION

# EXHIBIT E

COPY SENT TO INMATE 6-21-85

PSYCHOLOGICAL EVALUATION FOR THE BOARD OF PRISON TERMS
June, 1985, Calendar
DEUEL VOCATIONAL INSTITUTION

This is the first psychological evaluation to the Board on this twenty-three-year-old first termer. Mr. Snodgrass was committed from Contra Costa County on July 19, 1982 for Murder Second Degree with a sentence of fifteen years to life. This report is based on review of medical and central files and one clinical interview.

The commitment offense was discussed with Mr. Snodgrass. He reiterated the offense as described in the Probation Officer's Report, saying that his step-father had alternately "ignored" or "berated" him. His anger and frustration built up and he fatally shot his step-father.

When he was five years of age, Mr. Snodgrass' father died of Hodgkinson's disease. In 1969 his mother remarried, but the new marriage was a stormy one. After numerous separations, the couple was divorced in 1976. However, three years later they were again married. Apparently the relationship between Mr. Snodgrass and his step-father was always problematic. In addition, Mr. Snodgrass was sexually abused by a step-brother who was ten years his senior.

There is no prior criminal history. Drug use was limited to the occasional use of marijuana and beer. Prior to his transfer to DVI, Mr. Snodgrass was at Folsom and San Quentin. While at Folsom he was unassigned, but spent a brief time in school and seven months in Vocational Office Business Machines at San Quentin. Currently he is assigned to Industries, working in the wood shop. Institutional adjustment has been good with no disciplinary documentations.

There is no history of psychological intervention prior to one week before the commitment offense. At that time Mr. Snodgrass saw a psychologist at the urging of his mother. The psychologist recognized that the young man "was in trouble in a lot of areas of his life." However, the offense occurred on the day of his second appointment. For six months before his trial, Mr. Snodgrass was seen by a second psychologist. Family dynamics were explored in a treatment setting and this psychologist offered psychological explanations for the offenses. His diagnoses were schizotypal personality disorder and borderline personality disorder.

Upon interview, he presented a courteous and cooperative manner. He was well-groomed and behaved appropriately. There is no indication of gross psychopathology as might be associated with psychosis or organic brain dysfunction or mental deficiency. Conversation was relevent and coherent. Native intelligent appears to be within the normal range.

Diagnosis:  Passive-aggressive personality disorder.

Conclusions: The commitment offense is indirectly related to the psychological diagnosis. Violence potential has diminished. Three years have passed since Mr. Snodgrass was last evaluated. Most of the signs of mental disorder listed by the pretrial psychologist were not evident. A developing maturity was noticed. Nevertheless, a Category T for psychological treatment is recommended. Emotional conflicts related to his past family situation have been merely buried, not resolved.

SNODGRASS                C50459                DVI          .mfw              6-20-85

Before Mr. Snodgrass can progress in rebuilding his life, he must have psychological treatment.

B.J. Krepps Ph.D.

B. J. Krepps, Ph.D.
Staff Psychologist

# EXHIBIT F

## 08-17-1988 PSYCHOLOGICAL EVALUATION

# EXHIBIT F

CALIFORNIA MEDICAL FACILITY
Vacaville, California

PSYCHOLOGICAL EVALUATION FOR THE BOARD OF PRISON TERMS
October 1988 Calendar

This is the second psychological report to the paroling authority on
this 27 year old white inmate with the controlling crime of second
degree murder of his stepfather. He was seen on 8/15/88, in a single
interview, for purposes of this report only.

On interview, Mr. Snodgrass presented as a small-framed man with a
moustache wearing a white convention-delegate-style hat. He projected
a somewhat defensive, rather jaunty and jocular manner that was
intended to conceal his underlying vulnerability. However, these
masking efforts did not appear to be evidence of a deep-seated
personality disorder so much as a superficial defensive style.
Generally, Mr. Snodgrass was open, cooperative and respectful. He was
clearly reaching for emotional insight and groping toward some
reconciliation with his past. He has obviously worked hard on his
ability to express his emotion verbally as well as to change his
historical pattern of interpersonal withdrawal and estrangement.

Affect was slightly depressed but appropriate to the situation,
intelligence and reasoning ability appeared average, and no signs of
gross psychopathology such as psychosis, thought disturbance, or
organic brain illness were noted. Mr. Snodgrass seemed realistic about
himself and the possibilities in life that are open to him. While he
reported transient bouts of depressive emotion which he experiences as
a sense of sadness and loss, these symptoms appear related more to
situational limitations than to serious neurosis at this time. Noted
is that he has regularly attended group therapy with staff psychologist
Dr. Nora Durbin over the last eight months. He has solid plans to
continue treatment and perhaps also attend family counseling with his
mother, who has remained supportive, upon parole.

His offense was discussed with him and he showed an appropriate degree
of remorse as well as an awareness of his gross immaturity and low
self-worth at the time of committing this crime at age 20.

In a less controlled setting, Mr. Snodgrass would be expected to
maintain his gains. He has shown that he is able to deal with
disappointments and frustrations in a controlled and realistic fashion.
He has actively worked on uncovering the roots of the
psychological/emotional problems that were indirectly related to his
commitment offense.

Specifically, he has worked on verbal assertiveness and verbal
expression of hurt, helplessness and anger as well as on understanding
the present day effects of his background of emotional abuse and
deprivation. Growth toward maturity and the productive use of his time
were apparent.

SNODGRASS, Gary    C-50459    I-239U    Unit II    CMF    8/17/88    RG/mg    1.

In summary, Mr. Snodgrass appears better organized and less conflicted or guarded than described in previous reports. Violence potential, related in the past to unusual circumstances unlikely to recur, is considered very low.

DIAGNOSTIC IMPRESSION: No manifest psychopathology at this time.

RECOMMENDATION:    Parole prognosis is favorable.  There are no specific psychiatric recommendations regarding the conditions of parole at this time.

NOTED AND APPROVED:

RUTH E. GATTOZZI, Ph.D.
Staff Psychologist

V. MEENAKSHI, M.D.
Chief Psychiatrist

SNODGRASS, Gary    C-50459    I-239U   Unit II    CMF    8/17/83    RG/mg  2.

# EXHIBIT G

## 01-25-1990 PSYCHOLOGICAL EVALUATION

# EXHIBIT G



CALIFORNIA MEDICAL FACILITY

PSYCHOLOGICAL EVALUATION FOR THE BOARD OF PRISON TERMS

FEBRUARY 1990 CALENDAR

This is the third report to the Board of Prison Terms concerning this 28-year-old first-termer received in CDC on 7-19-82 for Murder Second Degree. The victim was his stepfather.

The present report is based on a review of the inmate's file and medical record, a 90-minute clinical interview, the Minnesota Multiphasic Personality Inventory, and consultation with staff involved with the prisoner.

BACKGROUND

This man is a high school graduate with no record of prior offenses. The murder represented the culmination of years of feeling disregarded, put down, and emotionally abused by his stepfather. According to Mr. Snodgrass, his mother and stepfather had a conflictual off-again, on-again relationship that began a year or so after the death from Hodgkinson's disease of the biological father when the subject was five years old. Additionally, Mr. Snodgrass was sexually abused by the victim's son, who was 10 years older than the subject. Previous CDC evaluators have found no major mental disorder; a Passive Aggressive Personality Disorder was diagnosed in 1985, but the 1988 evaluator found no manifest psychopathology. He had eight months of group psychotherapy at CMF with Dr. Durbin in 1988. His institutional adjustment was good, with good job performance and no disciplinary infractions.

PRESENT STATUS

Since the last BPT report, Mr. Snodgrass has continued to do well, remaining free from disciplinary citations and performing at a superior level in the Vocational Mill and Cabinet Program, developing a trade which he hopes to practice when paroled. He has been in individual and then in group psychotherapy with Dr. Fleming, appears committed to psychological growth, and feels that he has made much progress, especially in his sense of self-esteem and personal identity. He has read several books relevant to personal growth, and has sought out additional activities, such as participating in a series of group discussions based on videotapes of John Bradshaw's television series on dysfunctional families.

The Minnesota Multiphasic Personality Inventory (MMPI) results at this time are well within the normal range, consistent with freedom from diagnosable psychopathology. It was possible to compare these results with his response to the same test in October 1987, which was also consistent with minimal psychopathology, and the overall interpretation is that he has made significant growth. The current profile configuration indicates that Mr. Snodgrass is more open and self-accepting than he appeared in 1987. He is independent, resourceful, and energetic. He appears to have become more

SNODGRASS, Gary    C-50459    CMF-Main    1/25/90    SKH    1

sensitive to his own feelings, more emotionally expressive, more assertive, and increasingly secure in his masculine identity, all of which would decrease the likelihood of another violent offense. While his 1987 profile would not be interpreted as showing mistrustfulness and social alienation, his current profile suggests continuing progress in the domain of human relatedness. He probably has some continuing difficulty in the appropriate expression of anger, as people usually do when they shift from passivity to a mode of more open expression. He is very possibly showing some mild rebelliousness and resentfulness of authority, but it is stressed that, in an individual with his background this would appear to be a positive rather than a negative indicator. His profile suggests that he is likely to show continued growth in psychotherapy, is below average in susceptibility to substance abuse problems, and has personal qualities that should enable him to move into leadership roles as he matures. Research findings indicate that inmates with profiles similar to that of Mr. Snodgrass have a good prognosis for parole success, and are relatively unlikely to be reoffend.

DIAGNOSIS

No manifest psychopathology.

CONCLUSIONS AND RECOMMENDATIONS

Over his years in prison, Mr. Snodgrass has matured considerably. His parole plans are realistic and consistent with his skills and interests, and he is seen as having benefitted maximally from incarceration. His violence potential is considered to be well below the average for this population, as is his risk for recidivism. It is anticipated that he will be able to maintain present gains when paroled. No particular needs for other-than-routine parole management are apparent. Continued psychotherapy is highly recommended, not because of diagnosable psychopathology, but because of the more subtle problems posed for emotional development and intimate relationships by his life experiences. Parole prognosis is favorable.

Sharon K. Halpern
SHARON K. HALPERN, Ph.D.
Staff Psychologist

NOTED AND APPROVED:

PAUL MORENTZ, M.D., Chief Psychiatrist
Inpatient/Outpatient Services


SNODGRASS, Gary      C-50459      CMF-Main      1/25/90      SKH      2

# EXHIBIT H

## 05-30-1991 CATEGORY – X EVALUATION

# EXHIBIT H

SNODGRASS, Gary  C-50459                                    May 30, 1991

## CATEGORY X COUNCIL EVALUATION

Mr. Snodgrass was provided with his Category X reports prior to the
final council meeting and had an opportunity to read them. He proved
to be pleased with the assessment process, the reports, and the
favorable opinions contained therein.

Both evaluators were in agreement that Mr. Snodgrass has a very good
prognosis for parole.  Both evaluators also expressed some very minor
concerns regarding facets of Mr. Snodgrass's response to social
situations.  Dr. Bruce, for example, touched on Mr. Snodgrass's mild
tendency to isolate himself, while Dr. Ishida reiterated some concerns
regarding the dimensions of Mr. Snodgrass's relationship with his
mother following his release.  On the whole, however, Mr. Snodgrass
seemed to have matured significantly during the course of his incar-
ceration, having productively utilized the time in prison as an
opportunity to address and begin to resolve some of the fundamental
issues that led to the instant offense.  Mr. Snodgrass also spoke
briefly of his vocational and educational aspirations, and he was
commended for his efforts in trying to improve himself.  Again, it was
agreed that the social and psychological factors considered during the
course of this assessment appeared improved, and a positive social
adjustment is expected once parole is approved and the inmate released
from CDC.


LARRY WORNIAN, Ph.D.                         RANALD BRUCE, Ph.D.
Staff Psychologist                           Staff Psychologist
Chairman                                     Coordinator


HELEN ISHIDA, Ph.D.                          ROBERT E. BENJAMIN
Staff Psychologist                           Corr. Counselor

                        Reviewed by:

                        WILLIAM C. SULLIVAN, M.D.
                        Chief Psychiatrist (A)


SNODGRASS, Gary  C-50459 SAN QUENTIN CATEGORY X        5/30/91

SNODGRASS, Gary C-50459                                    May 29, 1991

## CATEGORY X PSYCHOLOGICAL EVALUATION

Tests Administered:
Objective - MMPI, MCMI, CPI, CAQ
Intellectual - WAIS-R
Projectives - Rorschach, TAT

## PERSONALITY DYNAMICS RELATED TO THE OFFENSE:

In many offenses the underlying dynamics that contributed to an offense remain difficult to discern. Mr. Snodgrass's case is one in which the causative factors are clearly in evidence. It is not difficult to understand how a childhood of pointed, continuing and uncalled for emotional and psychological abuse at the hands of a step-father who tacitly allowed the overwhelming victimization of his step-son, failed to discharge his paternal responsibility to protect a child in his care, and used his position to degrade and brutalize this child, could lead to the rage expressed in Mr. Snodgrass's offense. If an "eye for an eye" mentality still underlies and motivates our penal system, we must admit that at least Mr. Snodgrass was direct enough to take revenge on the source of his problems rather than some random victim of displaced anger, which is more commonly the case. Although Mr. Snodgrass's actions were intemperate and wrong from a cooly logical standpoint, the degree of loss, abuse and uncalled for belittlement he was forced to suffer over an extended period of time would have taxed the psychological resources of the strongest. He was being driven slowly mad by an opponent he could not avoid, appease or enjoin. The same one who tormented him about his lack of ability to emancipate simultaneously and for a long time had destroyed his ability to feel the self-confidence and strength to emancipate. This is a double-bind with no apparent solution other than one with the gravest of consequences. Mr. Snodgrass acted irrationally and then with a clear rationality and determination sought to put his life back together.

## 1.    Violence Potential:

Mr. Snodgrass's test results were uniformly encouraging. He has superior intelligence, little or no antisocial leanings, an excellent degree of psychological integration and development, good insight, adequate controls and realistic plans for the future. His parole prognosis appears excellent.

SNODGRASS, Gary  C-50459  SAN QUENTIN CATEGORY X    5/29/91    RB:jl

                                                                      2

2.    Ability to Abstain from Alcohol/Drugs:

Testing and history suggests little or no reasons for concern in this
area.    His abuse of marijuana and alcohol at the time of his offense
were clearly situationally related and given his degree of stress,
were still much less than they might have been.  He does not appear to
be inclined to drug or alcohol abuse.

3.    Exploration of Offense:

Mr. Snodgrass shows an admirable and thorough grasp of the dynamics of
his offense.  This is due in great part to his determination and vigor
in seeking treatment and understanding of himself purely out of self-
concern and without the need of external motivation.

4.    Need for Treatment:

Mr. Snodgrass needs no further treatment to be ready for parole.

RANALD BRUCE, Ph.D.
Staff Psychologist

SNODGRASS, Gary  C-50459  SAN QUENTIN CATEGORY X    5/29/91    RB:jl

3

SNODGRASS, Gary Randall  C-50459                         May 20, 1991

## CATEGORY X PSYCHOLOGICAL EVALUATION

### BOARD OF PRISON TERMS REFERRAL QUESTIONS

1.   Violence Potential:   Mr. Snodgrass's violence potential is judged to be well below average for an inmate with a 15 year to life term. The likelihood that he will violently act out is minimal.  He has no record of offenses nor a history of violence prior to the commitment offense.   There is also no history of violent behavior during his nine years of incarceration.   There are no organic factors which would increase his violence potential.

2.   Significance of Alcohol and Drugs:   The use of alcohol and drugs was not directly related to the commitment offense although it may have been a contributing factor.  He does have a history of alcohol and cannabis abuse, particularly in the months prior to the instant offense.  He drank heavily and smoked pot to avoid problems and escape reality.   With impaired judgment and numbing effect resulting from substance abuse, he became even less capable of constructive problem-solving.     Since his past history indicates a tendency towards substance abuse in the face of psychosocial stresses, continued participation in such self-help programs as A.A. is recommended.

3.   Exploration of Commitment Offense:   Mr. Snodgrass has a high degree of insight and understanding of the factors which contributed to the commission of the crime.  He has made substantial gains through his efforts in therapy as well as reading and self-introspection.  At the time of the offense, Mr. Snodgrass felt no remorse for the victim, only a great sense of relief that the victim was out of his life.  He did feel regret towards his mother when he saw how badly he had hurt her.   He gradually began to feel remorse.   "Even though he was a bully, and I hated him, I didn't have a right to do what I did.  He didn't deserve that."

4.   Need for Therapy:   As attested to by past psychological evaluations, Mr. Snodgrass has made considerable progress towards self-understanding and personal growth.  There are a few areas which will, in all likelihood, pose some difficulties for him.  As he attempts to individuate and psychologically separate from his mother, unresolved issues with her may surface.  Problems may arise in future relationships in such areas as expressing anger and intimacy.  Since he tends to be passive in his orientation but feels a need to show more initiative and to do things, this may be a source of conflict. More insight-oriented therapy will be beneficial to Mr. Snodgrass but is not mandatory for parole.

SNODGRASS, Gary  C-50459      - 1 -   SQ CATEGORY X      5/20/91  HI:jl

SNODGRASS, Gary Randall  C-50459

## CATEGORY X PSYCHOLOGICAL EVALUATION

### I.  IDENTIFICATION:

Gary Randall Snodgrass is a 29-year old single Caucasian male, an American of Scottish/Irish/German heritage and a high school graduate. He is serving a 15-year to life sentence for Murder 2nd degree. He has had three psychological evaluations while in the CDC. This report is based on a review of the inmate's central file, medical and psychiatric records as well as ten hours of individual interviews in the past thirty days.

### II.  PERSONAL HISTORY PRIOR TO COMMITMENT:

A.  Childhood:  Mr. Snodgrass was born on August 4, 1961 in Oakland, California and reared in Pinole Valley by his natural parents until age five.  He is the youngest of three children; his sister Kathy is four years his senior and sister Diana two years his senior. He was a healthy child with no serious illnesses.  His earliest memory at age three is of Blackie, the family dog, romping around with his two sisters.

Mr. Snodgrass described his father as a kind, caring man.  He does not remember playing with him or being disciplined by him.  His father was diagnosed with Hodgkin's disease in 1958, three years prior to Mr. Snodgrass's birth and died in 1966 when Mr. Snodgrass was age five. His father worked as a printer for the Richmond Independent newspaper, but became progressively weaker, especially during the last year of his life.  Mr. Snodgrass recalled one incident when paramedics came to his house and two visits to the hospital before his father died.

At this tender young age, Mr. Snodgrass was not aware of how seriously ill his father was.  He remembers asking his mother when his father was going to get well.  Shortly after his death, he recalled having a nightmare of a monster chasing after him and of waking up screaming. His mother came to comfort him.

Mr. Snodgrass described his mother as "very nice with a good disposition and nice personality."  He perceives her as  strong in her ability to cope with difficult situations without showing much emotion.  She provided him with material goods but "lacked emotional leadership" in that she was not sufficiently sensitive to pick up on Mr. Snodgrass's emotional needs.  She started working as a secretary at Kohler Chemical Company after his father's death.

Since feelings were never discussed in his family, Mr. Snodgrass never learned to communicate emotions and was not able to articulate what he

SNODGRASS, Gary  C-50459      - 2 -   SQ CATEGORY X      5/20/91  HI:jl

5

was feeling. Since early childhood, he felt isolated with emotional needs unmet.

Within a period of a year and a half, he sustained a series of significant losses: his father, paternal grandfather, uncle Ben (family friend), and Calvin, his mother's first male relationship after his father's death. They were all men he liked and respected. Calvin had spent time with Mr. Snodgrass. He took him to auto races and to meet his son who was about the same age, bought boxing gloves for him and taught him to spar. Mr. Snodgrass never saw Calvin after his mother broke up with him.

Mr. Snodgrass's memories of school are vague, preoccupied as he was with traumatic emotional upheavals during those years. He did remember the names of his teachers from grades one thru three, and that he generally did satisfactory work. He recollected having problems with arithmetic in the second grade and of receiving some extra help after school.

Some time between the second and third grades when Mr. Snodgrass was age eight his mother remarried. She had joined Parents Without Partners and met a man 17 years her senior, John Nailen, who had a daughter Colleen age 17 and son John Jr. age 16 from a previous marriage. Prior to the wedding, Mr. Snodgrass met the Nailen family at a couple of group activities such as picnics, but never "felt right" about John Nailen and felt depressed when his mother married him.

After the marriage, the Snodgrass family moved to his stepfather's home in Concord. Mr. Snodgrass shared a room with his sister Diana in the garage which had been converted into a bedroom. His sister Kathy shared a room with stepsister Colleen, and stepbrother John Jr. had his own room. His mother worked as a secretary at the grammar school where Mr. Snodgrass attended.

John Jr. was put in charge of taking care of Mr. Snodgrass after school until the parents returned from work. As described by Mr. Snodgrass, "John Jr. was a sadistic punk who deliberately tried scaring me to death. Maybe he saw me as too sensitive and a mama's boy and tried to toughen me up. He tortured and roasted tadpoles. He persuaded me to smoke and tried to corrupt me. He put me through shit."

To Mr. Snodgrass at age eight, John Jr. was a physically imposing, intimidating figure. John Jr. was 6'3" tall and ten years his senior, "a carouser who didn't do well in school, and like his father, a mean bully." Mr. Snodgrass liked having the company of a big brother but predominantly felt terrorized and helpless. He was sexually abused by John Jr. The enormity of the traumatization was evident in his statement, "I don't want to talk about it." He did reveal one incident of

SNODGRASS, Gary  C-50459      - 3 -   SQ CATEGORY X      5/20/91  HI:jl

John Jr.'s soiled underpants being put over his head and of being forced to perform oral sex. Forced oral and anal intercourse continued once a week over a period of a year and a half. The sadistic coercion left Mr. Snodgrass feeling powerless and humiliated.

When he was alone with his mother, he attempted to bring the abuse to his mother's attention by stating, "When you and John are gone, John Jr. makes me do bad things." His mother failed to discern his distress and didn't "take heed." Mr. Snodgrass felt abandoned and defenseless. The sexual abuse continued until his mother's separation from John Nailen and their move back to Pinole.

Mr. Snodgrass described his mother's marriage to John Nailen as "tempestuous." He didn't know that they were separating until the day of the move, when he was taken out of class at school. His mother, sisters, and he moved back to their home in Pinole. After a year and a half, he felt he was truly home again. It was a good feeling to be back. He was also welcomed back by his schoolmates.

His mother and stepfather began attending marital counseling sessions, so that his stepfather spent Wednesday evenings and weekends with them in Pinole. He eventually moved in. His daughter had graduated from high school and married, and his son had joined the Air Force.

Mr. Snodgrass and his stepfather never hit it off. His stepfather was an insensitive, domineering man who was not interested in kids. He never talked to Mr. Snodgrass nor did anything with him except for two occasions. He once took him to a church sponsored father-son retreat. Mr. Snodgrass perceived this action on his stepfather's part was more to look good to others than to improve their relationship. He also remembered going with him to a RV show at the Oakland Coliseum. Mr. Snodgrass felt that he was treated by his stepfather as an object. The only time his stepfather addressed him was to order him to help with household chores. He felt emotionally neglected and hurt.

He completed the third grade in Concord and grades four to six in Pinole, making average grades. When he was between ages eleven and twelve, his mother told him one day after a Boy Scout meeting that she was getting a divorce. He began junior high school shortly thereafter. These were good times for Mr. Snodgrass. He made better grades - B's and A's, made new friends, and began enjoying social activities. In the eighth grade, he began experimenting with smoking cigarettes and marijuana.

B.  Adolescence:  At age fourteen, Mr. Snodgrass began ninth grade at a local high school which was within walking distance from his home. Although he went to a few football games, he didn't participate in any extracurricular activities. Of the classes he took, he liked his drama class in the ninth grade and shop class in the tenth. He gravitated towards the "stoners," troubled youths like himself

SNODGRASS, Gary  C-50459     - 4 -   SQ CATEGORY X    5/20/91  HI:jl

7

using alcohol and drugs to escape. He started drinking alcohol and smoking pot in the tenth grade, which later escalated to abuse. He was suspended once for cutting classes. He graduated high school as a member of the class of '79.

He continued to be lonely and emotionally isolated. He felt the absence of a loving father figure and a twinge of envy and longing when he saw his classmates' camaraderie and rapport with their dads. He was unable to be emotionally open with anybody. His closest friend was his cousin Mitch. His friendships were casual and superficial, based on common activities, e.g., riding bicycles and going to football games. He did go to a few Mason-sponsored dances.

In the latter part of his senior year, his mother went with a man named Jim for two to three months, another man in his mother's life who proved to be disappointing. Jim claimed to be a photo journalist but was a con man. Mr. Snodgrass later found out that Jim had previously married a woman for her community assets and set fire to the house to collect the money. Meanwhile his former stepfather had developed cancer of the spleen, and his mother helped nurse him back to health after his surgery. In 1980, his mother remarried him.

Mr. Snodgrass found out about the marriage fait accompli. "I didn't like it. I wasn't consulted. I inferred it didn't matter how I felt about it. Maybe she told me. Maybe I ignored it." But there was John Nailen back again, an unwelcome intruder in his life. Mr. Snodgrass felt considerable animosity and resentment.

After completing high school, Mr. Snodgrass enrolled at a junior college for auto shop, but dropped out shortly thereafter. He then worked doing odd jobs, e.g., at a gas station, landscaping, etc. He worked for one year at Grand Auto as a sales clerk. He was, in his words, "blowing it and screwing up." He was borrowing his mother's car, partying, drinking, and smoking pot.

In May 1980, Mr. Snodgrass was "shipped off" to Chico, where his sister Kathy was manager of a Jack-in-the-Box and stayed with her and her boyfriend for two to three months. His mother and stepfather saw it as a way to get Mr. Snodgrass to grow up. The day after his arrival, Mr. Snodgrass obtained a job at a carwash.

After staying a while with his sister and her boyfriend, Mr. Snodgrass felt that he was cramping his sister's style, so he began camping out in the park. He spent the summer there, and after his 18th birthday, he sold his bike and ventured out on his own. He headed north to Oregon, walking and hitchhiking. When he reached Salem, he stayed for several weeks with some old family friends. He wore out their welcome and was asked to leave. He, apparently, did not make any attempt to find a job or to earn his keep by helping them. They called his

SNODGRASS, Gary  C-50459      - 5 -    SQ CATEGORY X      5/20/91  HI:jl

mother and he was told to return home by bus. By this time, he had enough of his adventure and was ready to go home.

Mr. Snodgrass, tanned and trim, was welcomed back by his carousing friends, but not by his stepfather, who appeared to resent him even more. His mother, he thought, was probably disappointed, but seemed relieved to have him back. "Things became awkward around the house." There was mutual animosity between the two men. Mr. Snodgrass felt that his stepfather did not like him, did not want him there and wished he were gone. His stepfather never spoke to him except to order him and looked past him rather than at him. Mr. Snodgrass bitterly resented him. His stepfather had invaded his house. He was there before his stepfather, and he belonged there, and his stepfather did not. His mother was in denial in her apparent inability to acknowledge the hostility between the two or to perceive the extent of her son's hatred for his stepfather.

In the summer of 1981, Mr. Snodgrass went to Colorado Springs for a family reunion with his mother, stepfather, aunt, uncle and cousin. They traveled in a stationwagon jeep, attaching a trailer to it. It was a stressful two weeks for Mr. Snodgrass. He was forced to be in close proximity to his stepfather, who belittled and humiliated him in front of his relatives. Mr. Snodgrass also resented that his stepfather talked to his uncle about him and in turn, had his uncle talk to him, as if Mr. Snodgrass was "the problem."

After the vacation, Mr. Snodgrass was still at home, "acting irresponsibly and not growing up." His stepfather was now retired from PG&E, and since they were both at home, Mr. Snodgrass saw him as "more actively trying to push my buttons." Mr. Snodgrass tried to avoid him as much as possible. In preparation for his retirement, his stepfather had built a home in Rio Vista,and he informed Mr. Snodgrass one day that he and his mother were planning to move there and to rent their present house. He indicated that he expected Mr. Snodgrass to move out of the house.

For Mr. Snodgrass, this was the last straw. He was being kicked out of his home. The only source of his security was being threatened. He did not feel he had the resources to make it outside his home. "I wasn't able to make it on my own. I felt I couldn't carry myself out there. I was losing my mother to my stepfather and there was jealousy. Anger was stewing in me. Over the years of the negative relationship, I wanted love and acceptance and was not getting it. It was always on my mind."

Mr. Snodgrass interviewed for a job at PG&E which his stepfather arranged for him. His stepfather's brother conducted the interview, but Mr. Snodgrass did not get the job. He was disappointed, but not terribly. Mr. Snodgrass did not want to work. "Deep down, I didn't want it. I wanted to be taken care of." In his needy regressed state,

SNODGRASS, Gary  C-50459     - 6 -   SQ CATEGORY X     5/20/91  HI:jl

infantile rage against the imminent abandonment was beginning to mount and the inner tension barely containable. Mr. Snodgrass spent several months in this emotional state prior to the instant offense.

## III. FAMILY HISTORY:

Mr. Snodgrass was age five when his father died of Hodgkin's disease. His mother was also age five when her mother died. Mrs. Snodgrass was born in Wichita, Kansas, the youngest of fourteen children in a farm-ing family. She was also quite young when her father remarried a "mean and sadistic" woman. Mr. Snodgrass's mother currently works as a secretary for the Richmond School District. Through the years of his incarceration, she has been supportive and visits him regularly. Although his mother does not divulge much about herself or her emotions, Mr. Snodgrass feels that he has been able to become more open about his emotions and can talk to her about anything.

When Mr. Snodgrass was age eight, his mother married John Nailen. Mr. Nailen, born one of six children to a coal-miner's family also lost his mother at a young age. He was ten when his mother died and he was sent to an orphanage for two years. It can be inferred that he grew up in an impoverished atmosphere. He pulled himself up by his own bootstraps to make it on his own, but also became a hard-driving insensitive man. In a 2/22/83 letter from Mr. Snodgrass's mother to CDC, she described Mr. Nailen as an "unloving, overbearing, hateful stepfather." He worked for PG&E until his retirement and was killed soon after he retired. He was 60 years old at the time of his death.

Mr. Snodgrass's sister Kathy is married with a son age three. She works for PG&E and her husband works for the Post Office. Mr. Snodgrass describes his oldest sister as an outgoing, friendly, and active person.

His sister Diana is currently living at home with his mother after studying at the Moody Bible Institute in Chicago. Her work pattern tends to be a cyclic one of work and study. Mr. Snodgrass described her as academically and people-oriented, overweight, nice, rather dramatic and theatrical. Of the three siblings, Mr. Snodgrass perceives her to be the most insecure. She had a bedwetting problem in childhood and was relentlessly made fun of by her stepfather.

Mr. Snodgrass is not aware of any serious medical or psychiatric problems in his family except for his father's Hodgkin's disease. He has had no contact with his step-siblings and no knowledge of their present whereabouts.

## IV. HISTORY OF PRESENT COMMITMENT:

Several months before the crime, Mr. Snodgrass was becoming increas-ingly more desperate and distraught at the prospect of being

SNODGRASS, Gary  C-50459      - 7 -   SQ CATEGORY X      5/20/91  HI:jl

abandoned, with no place to stay, no job, and no mother to take care
of him.   He was seething inside and felt emotionally isolated.    He
lapsed into an irrational state of rage towards his stepfather.    One
week prior to the shooting, Mr. Snodgrass went to see a psychologist
in response to his mother's request.  He had told her that his step-
father "pushed his button" and so enraged him that he felt like
hitting him with a wine bottle.    For the first time, his mother
confronted his stepfather about the adverse effect of his behavior on
her son.  His stepfather reacted incredulously and did not acknowledge
the situation.

Mr. Snodgrass decided one night, after partying, to actually  go
through with the killing.  In the morning, while his stepfather was
driving his mother to work, Mr. Snodgrass got out of bed and took his
stepfather's rifle and shells out of the closet, wrapped them in a
blanket and stashed them in the garage.  He then went back to bed.
When his stepfather returned, he roused Mr. Snodgrass out of bed and
ordered him to put the cat out and to go get a job.

Mr. Snodgrass went outside to the side door of the garage and re-
trieved the rifle.  He sat down with the rifle and "fiddled around to
see how it worked."  He loaded the shells and in the process shot off
a round.  He did not know if it discharged accidentally or if he had
shot it off. There was a loud noise, and he knew that his stepfather
would be coming out to check out the noise.

Mr. Snodgrass heard the door open.  He had mixed "surreal" feelings of
acting out of his own volition and, at the same time, feeling out of
control, thrust in a position in which he was driven to act.  When his
stepfather appeared, Mr. Snodgrass aimed the rifle at him and pulled
the trigger, but somehow he had engaged the safety latch.  His step-
father looked surprised and taken aback; he slammed the door shut and
retreated out of the line of fire.

The next door neighbor had also heard the shot and saw Mr. Snodgrass
with the rifle, talking to someone.    Mr. Snodgrass was, in fact,
telling his stepfather how angry he was at the way his stepfather was
acting toward him now and in the past.    Despite previous family
counseling sessions, during which his stepfather had apologized twice
for being "a bad parental role model," there was no change in his
behavior.  (Mr. Snodgrass believes that his stepfather only apologized
so that he could get back together with his mother.)    Mr. Snodgrass
told his stepfather how he felt about being treated the way he was
over the years, "He was a mean, neglecting person. All these years, he
couldn't be a decent person towards me."

Within minutes, Mr. Snodgrass saw a police car approaching.  His step-
father tried to rationalize why Mr. Snodgrass shouldn't do this, but
Mr. Snodgrass was beyond rationality.   He had disengaged the safety
latch.  He now had power over his stepfather.  He wanted to see him

SNODGRASS, Gary  C-50459      - 8 -   SQ CATEGORY X      5/20/91  HI:jl

()

squirm the way he was made to squirm.   His stepfather did not
acknowledge his actions or accept responsibility for his behavior.
Perhaps he thought that Mr. Snodgrass would not shoot.  His stepfather
lunged for the rifle, and Mr. Snodgrass shot him.  As his stepfather
was going down after the first shot, he told Mr. Snodgrass in a
threatening tone of voice, "Gary, you've done it now."  Mr. Snodgrass
stated, "It was kind of surreal as I looked down at his body." He shot
him again.   He then heard a police officer on the megaphone, "Put down
the gun and lay it down."

Mr. Snodgrass explained that at this point, he was in a "totally
destructive mode," acting out in anger towards his stepfather and
feeling angry at his mother and blaming her for enabling this to
happen. He placed the muzzle of the rifle in his mouth and his finger
on the trigger.  He tried to muster up enough courage to pull the
trigger but could not do it.  He obeyed police orders.  He was hand-
cuffed and put in back of the car.

He felt a "big feeling of relief - a load was taken off me. Intellectu-
ally, I didn't understand what I'd just done.  I wasn't thinking of
the consequences."  He was placed in an isolation cell and given a
blanket. He closed his eyes and relaxed; his stepfather was out of his
life, and he no longer had to contend with him.

Mr. Snodgrass gradually realized what he had actually done.   "When I
started seeing how badly I had hurt my mother, I felt regret towards
her, but I was not sorry for killing John Nailen."   Through self
introspection and later through therapy, he began to see that there
were other alternative ways that he could have taken.  Mr. Snodgrass
gradually started to feel sorry for his stepfather as he began to
understand his conduct.  "Even though he was a bully and I hated him,
I didn't have a right to do what I did. He didn't deserve that."  Mr.
Snodgrass wanted therapy to understand himself better and wanted
answers as to why he did what he did.

Mr. Snodgrass arrived in Vacaville on 7/19/82 and was there for three
weeks for classification. He was transferred to San Quentin on 8/6/82.
He attended school 12/28/82 to 1/28/83 and received straight A's in
algebra, writing, psychology, and math.  He started vocational machine
repair, but after three days in the program he was transferred to
Folsom on 3/2/83, where he remained unassigned.  He then moved to DVI
on 9/12/83 where he worked in culinary (9/83 - 9/84) and industries
(10/84 - 10/87).

He was next placed in CMF-Main in 10/87 for the Category 'T' program
in which he participated for 18 months.  He also joined A.A. in 1989
and attended on a weekly basis.  He worked in vocational janitorial,
and canteen, and then was assigned to  vocational cabinet shop where
he earned a certificate of completion after 15 months.  He arrived at
San Quentin on 6/15/90 for the Category 'X' program and has been

SNODGRASS, Gary  C-50459      - 9 -    SQ CATEGORY X      5/20/91  HI:jl

working as a porter and culinery. He has received laudatory chronos from supervising cooks Cassey and Salazar.

His hobby is woodworking.  He makes jewelry boxes, desk clocks, picture frames, kids' toys, etc., which his mother sells for him. During the course of his nine years in the CDC, Mr. Snodgrass has not been a discipline nor a security problem.  He has two CDC 115's on record:  (1) in 1983 at San Quentin for taking part in a work strike which was later dropped to a CDC 128, and (2) in 1988 at Vacaville for being out of bounds.  He has consistently received above average to excellent evaluations for school and work performances.

Mr. Snodgrass's current parole plans are to obtain employment using his woodworking skills, such as cabinet-making, light construction or finish carpentry.  Although his mother has offered him a place to live, he is presently choosing to live apart from her, so that he would not revert back to a position of dependency on her.  He has received letters of support for a place to live and work from family friends, relatives, and church members, who appear to be responsible, sincere, and in positions where they can provide Mr. Snodgrass with assistance (central file records).

Mr. Snodgrass's future goals are to learn more about woodworking, perhaps to the level of master artisan, to become financially secure, and eventually marry.  Plans appear realistic in light of his vocational training, work skills, and genuine pleasure in working with wood.

V.   PAST PSYCHIATRIC AND MEDICAL HISTORY:

Mr. Snodgrass has a medical history of back problems since adolescence subsequent to a skateboard accident in 1976.  He sustained another back injury in an industrial accident at DVI while lifting a sheet of masonite.  MRI (Magnetic Resonance Imaging) report of 11/7/90 by Dr. D. Sacco, M.D. reveal (1) a disc extrusion at L5/S1 level with resultant compression of right S1 nerve root and (2) disc degeneration at L4/5 level.  Mr. Snodgrass is currently awaiting back surgery.

He reported one other industrial accident in which he was cut by a bard saw and required four stitches.  He also has a history of chronic constipation, particularly when under stress.

Mr. Snodgrass has a history of alcohol and drug use beginning as a teenager.  He drank beer and occasionally hard liquor, initially on a social basis.  He also smoked marijuana with his peers.  He averaged one joint per day.  "If it was there, I wouldn't turn it down."  He experimented with LSD and cocaine after high school.  His use of alcohol and pot escalated to abuse.  Prior to the instant offense, he drank "a lot" to avoid problems and escape reality.  After the crime, when he was out on bail, he was unable to cope and smoked extensive

SNODGRASS, Gary  C-50459      -10-   SQ CATEGORY X      5/20/91  HI:jl

13

amounts of marijuana and was "stoned" on a daily basis. He reported that his last substance use was in 1983 at DVI, drinking prison pruno and smoking pot a couple of times. He has participated in A.A. starting in 1989.

He has never taken psychotropic medications nor been hospitalized for psychiatric reasons. His first contact with a psychologist was one week prior to the offense. Dr. Aaron Cooper, who he saw only once, noted that Mr. Snodgrass appeared depressed, anxious, troubled, and enmeshed in his family system. Mr. Snodgrass committed the crime on the day that he was scheduled for a second appointment.

After the instant offense, Mr. Snodgrass was seen in pretrial (while on bail) by psychologist Dr. Dwight Murray from 12/17/81 to 5/82. Dr. Murray described Mr. Snodgrass as a "frail, pretty, Caucasian male, sensitive, inarticulate with flat affect, who related as a child, not fully grasping circumstances and gravity of the situation."    He diagnosed Mr. Snodgrass as having a Schizotypal Personality Disorder and Borderline Personality Disorder.

Based on Dr. Murray's report, concern was expressed in the probation officer's report that Mr. Snodgrass would become an easy target for predatory males.    With his youthful appearance, physical size, and look of vulnerability, Mr. Snodgrass was indeed a target.    He was sexually harrassed, intimated, and raped at San Quentin.

Official records indicate that Mr. Snodgrass and his mother sought to get psychotherapy for him either through an outside therapist or CDC since early 12/9/83.  He was finally moved to CMF-Main in October, 1987 for the Category 'T' program. He participated in group as well as individual therapy for 18 months.  He also participated in the five-week long John Bradshaw Seminar and Workshop, which consisted of viewing tapes and group work.  He supplemented therapy by reading psychology-oriented books.

Mr. Snodgrass has had three psychological evaluations while in the CDC.  Psychological improvement is noted on each successive report. His first evaluation by Dr. B.J. Krepps, Ph.D. on 6/20/85 at DVI gave him the diagnosis of Passive-Aggressive Personality Disorder.    Dr. Krepps noted that most of the signs of mental disorder previously manifested (as per Dr. Murray's report) were no longer evident and that Mr. Snodgrass was developing in maturity.  Dr. Krepps recommended Category 'T' program for psychotherapy to work through buried and un-resolved family conflicts.

The second report by Dr. R. Gattozi, Ph.D. on 8/17/88 at CMF was written after Mr. Snodgrass had been in group and individual therapy for about 10 months.  Dr. Gattozi noted the substantial progress that Mr. Snodgrass has made dealing with the psychological problems indirectly related to the offense.    His violence potential was

SNODGRASS, Gary  C-50459      -11-    SQ CATEGORY X      5/20/91  HI:jl

estimated to be very low with a favorable parole prognosis. No diagnosis was given with the notation "No manifest psychopathology at this time."

The third report by Dr. S. Halpern, Ph.D. on 1/25/90 at CMF-Main came to similar conclusions of significant growth based on a comparison of MMPI profiles of 10/87 to that of 1/90. Dr. Halpern noted some mild rebelliousness and resentfulness of authority and probable difficulty in expression of anger. No manifest psychopathology was noted with a below-average substance abuse susceptibility and good prognosis for parole.

Mr. Snodgrass has no history of prior suicide attempts except for the suicidal gesture made after he killed his stepfather. "I hated my life then."

## VI.  MENTAL STATUS:

A.  General Appearance and Behavior: Mr. Snodgrass is 5'8", somewhat slight in build, neatly groomed, soft-spoken, and serious in demeanor. He initially appeared quite tense and uncomfortable, and although he seemed more at ease with each successive interview, his tenseness was apparent throughout. He was alert and cooperative. His speech was clear, affect appropriate to thought content, and mood calm. He appeared to have good control of his impulses.

B.  Sensorium: Mr. Snodgrass is oriented to person, place, and time and in good contact with reality. His attention and concentration were well within normal limits. His memory was intact, his reasoning and judgment good. His fund of knowledge is estimated to be in the high average range.

C.  Content of Thought: Mr. Snodgrass is coherent and logical. There was little evidence of conflict on the surface, but some underlying anxiety and emotional vulnerability could be inferred from his general demeanor. There was no apparent evidence of psychotic symptoms such as hallucinations or delusions nor persecutory trends. There were no evidence of obsessions, compulsions, or phobias. There is currently no sense of hopelessness or suicidal ideation. Past history suggests depressive tendencies, stemming from losses which then trigger early separation anxieties.

Mr. Snodgrass tries to live by the Golden Rule. He defined 'right' as "what's best for me without stepping on someone else and not harming yourself or others." He defined 'wrong' as "transgressing society's rules meant for the common good."

D.  Object Relations: Mr. Snodgrass has a fairly realistic view of the offense, he was very insecure with no real sense of self-worth or self-confidence. In the totally alien

SNODGRASS, Gary  C-50459        -12-   SQ CATEGORY X       5/20/91  HI:jl

15

environment of prison, he was a "distraught, scared kid" with "no street smarts" to deal with violence. He gradually became aware that he may somehow be acting in a way to provoke others' mistreatment of him. He asked himself, "What am I doing wrong? What could I do to defend myself?" He realized that it was partly a personality problem, and he was "half of the equation." It wasn't until he began his personal work that he learned about self-respect and respect for others. Beneath the surface, one can infer some lingering insecurities about himself.

The forced physical separation from his mother, due to his incarceration has allowed him the opportunity to become more his own person and to feel less dependent upon her. However, his dependency needs may continue to be somewhat problematic. He appears to be able to tolerate ambivalence towards others.

E. Defenses: Denial, repression, and suppression predominated in childhood. These were followed by devaluation, displacement, turning against self, and passive-aggression. At the time of the instant offense, regression and acting-out prevailed. In recent years, intellectualization and rationalization are seen with some somatization. With developing maturity, sublimation is increasingly seen.

F. Insight: Through his reading, self-introspection, psychotherapy, and self-help program, e.g., Bradshaw seminar, Mr. Snodgrass has gained a high degree of insight about himself and his past behaviors. He has a very good ability to understand his own feelings, wishes, thoughts and behavior as they developed.

G. Judgment: This has been very poor in the past, but has improved substantially over the course of his incarceration.

H. Reliability: Mr. Snodgrass's version of events corresponded closely to the official records with a few exceptions. He omitted mentioning that a few weeks prior to the offense, he began to fantasize about ways to kill his stepfather and constructed a weapon from a baseball bat with spikes inserted within (which he did not use). He elaborated on his suicidal gesture at the time of the offense, i.e., that he placed the muzzle of the rifle into his mouth before putting it down.

## VII. PSYCHODYNAMIC FORMULATION:

Mr. Snodgrass, at the time of the offense, is best understood by a consideration of his emotional isolation, unmet dependency needs, and inability to communicate emotions.

A markedly impoverished emotional environment can result from such circumstances as that faced by Mr. Snodgrass, i.e., born the second

SNODGRASS, Gary  C-50459      -13-    SQ CATEGORY X      5/20/91  HI:jl

16

unplanned child to a mother preoccupied with a terminally ill husband, forced to raise three young children on her own, and who herself grew up in an emotionally impoverished environment. Given these circumstances, she was unable to adequately meet her son's emotional needs to feel wanted and lovingly nurtured.

Mr. Snodgrass grew up shy, timid, and withdrawn, feeling rejected and inadequate, unable to articulate what he was feeling. The early loss of his father, followed by a series of losses of paternal substitutes within a period of a year and a half had a major impact on Mr. Snodgrass's life.

With these significant losses, his mother became all important, the only consistent figure taking care of him - physically, if not emotionally. Since Mr. Snodgrass's inner needs were inadequately met his unconscious attachment to her became even more clinging. Separation anxiety heightened and his survival threatened at the thought of sharing her with anyone else.

He was acutely depressed by his mother's marriage to John Nailen. His relationship with the Nailen family was disastrous. He felt rejected, belittled, and humiliated by his stepfather's verbal abuse. He was terrorized by his stepbrother's sadistic acts and intimidation and traumatized by his sexual abuse. For the quiet, sensitive boy, perceived by the Nailen's as a mama's boy, this ordeal was worsened by the failure of his mother to intercede on his behalf. He felt powerless and defenseless and withdrew further into his shell, not telling anyone about how he was feeling.

There was a short period of respite for Mr. Snodgrass when his mother separated from his stepfather and moved back to Pinole. However, his stepfather was soon back in the picture, attending marital counseling sessions with his mother. Mr. Snodgrass felt considerable hatred and resentment when he found out that his mother remarried John Nailen without telling him or discussing the possibility with him. Mr. Snodgrass inferred that he did not matter to his mother and expressed his anger and hurt towards her, his jealousy towards his stepfather, and his feelings of helplessness by "blowing it and screwing up," drinking alcohol and smoking pot.

He remained emotionally isolated and withdrawn and became increasingly consumed by his rage towards his stepfather who continued to be verbally and emotionally abusive. His mother and stepfather's demands to get out of the familial home and find a place to live and work were not congruent with Mr. Snodgrass's inner needs of wanting to be taken care of. He felt inadequate to make it on his own. He was in a state of tension, confusion, frustration, and depression.

It was the last straw for Mr. Snodgrass to be informed by his stepfather of his and his mother's plans to move to their retirement home

SNODGRASS, Gary  C-50459        -14-    SQ CATEGORY X        5/20/91  HI:jl

/7

in Rio Vista and to have Mr. Snodgrass move out so that they could
rent their present house. Mr. Snodgrass was enraged that he was being
kicked out of his home, his only source of security.

In his needy regressed state, he could not think of alternative
courses of action. Inner tension mounted. Infantile rage against the
abandonment prevailed with consuming hatred focused on his stepfather,
inexorably leading to the acting out of his aggressive impulses.

Mr. Snodgrass has made significant gains psychologically in the nine
years of his incarceration through his own self-help efforts.   The
degree of passivity, dependency, and felt inadequacy evident at the
time of the offense is substantially diminished.

VIII.     DIAGNOSIS:

Axis I    Alcohol Abuse, in remission  305.00
          Cannabis Abuse, in remission 305.20
Axis II   No diagnosis                 V71.09
Axis III  Disc Extrusion, nerve root compression (L5/S1) and disc
             degeneration (L4/5) - currently awaiting surgery
Axis IV   Psychosocial Stressors:
             At time of offense 4-5 severe to extreme (substance abuse,
                emotional abuse, unemployment, imminent homelessness)
             Currently 2 mild (incarceration)
Axis V    Global Assessment of Functioning:
             At time of offense 20;  Currently 71.

Helen Ishida, Ph.D.
HELEN ISHIDA, Ph.D.
Staff Psychologist

SNODGRASS, Gary  C-50459     -15-    SQ CATEGORY X     5/20/91  HI:jl

/8

# EXHIBIT I

## 02-18-1992 PSYCHOLOGICAL EVALUATION

# EXHIBIT I

PSYCHOLOGICAL REPORT TO THE BOARD OF PRISON TERMS
MARCH, 1992, CALENDAR
DEUEL VOCATIONAL INSTITUTION

The following is a psychological report to the Board of Prison Terms on this thirty year old inmate committed to the CDC for second degree murder. This evaluation is based on review of the health record and a single interview. Readers are referred to previous evaluations and a Category X report.

Mr. Snodgrass reported that his institutional adjustment since the last report has been satisfactory. He said that he is currently working in industries, and completed a cabinet making vocational trade at CMF. Mr. Snodgrass further said that he is on the waiting list for Alcoholics Anonymous, and that he has been at DVI only since December 31, 1991. Mr. Snodgrass also said that he is on the waiting list for hobby. He said that he receives frequent visits from family members, including his mother, sisters, and cousins. Mr. Snodgrass said that in his spare time he does some walking on the yard and reads mystery novels and books about wood working.

With respect to the instant offense, Mr. Snodgrass described it in much detail. He described the instant offense, which he killed his step father, as the culmination of many years of anger and frustration. He said that he suffered from a great deal of neglect and mental abuse for the ten years that the step father was in the family. Through his descriptions, Mr. Snodgrass showed a great deal of insight into both the instant offense and his own psychological dynamics. He appears to be a person who has worked quite hard to gain an understanding of himself and his offense. He showed a great deal of ability to empathize, and much remorse as he described the events that took place on the day of the instant offense.

Mental Status Evaluation was unremarkable for symptoms of mental illness. Mr. Snodgrass showed insight that was well above average for this population. Judgement also appears to be well above average. Intelligence would appear to be some where above the average range. He was oriented toward person, place and time. Affective range was quite good, and affect was appropriate to content. Memory functioning appeared to be within normal limits.

DIAGNOSTIC IMPRESSION:   V71.09  No psychiatric disorder

Snodgrass, Gary   C-50459   DVI   jns   February 18, 1992

COPY SENT TO INMATE 2-27-93

Page 2

CONCLUSION/RECOMMENDATION:    Psychopathology at the time of
the instant offense appears to have been indirectly related
to   the   offense.      Mr.   Snodgrass   appears   to   have
psychologically improved greatly since incarceration.   There
do   not   appear   to   be   any   psychological/psychiatric
contraindications to parole.

Jonathan Gonick, Ph.D.
Staff Psychologist

# EXHIBIT J

## 02-23-1993 PSYCHOLOGICAL EVALUATION

# EXHIBIT J

## PSYCHOLOGICAL REPORT TO THE BOARD OF PRISON TERMS
### MARCH 1993, CALENDAR
### DEUEL VOCATIONAL INSTITUTION

This is the fourth Board of Prison Terms report on this 31 year old Caucasian male inmate who entered CDC 7/19/82 for murder in the second degree, sentenced 15 years to life. Victim was the subject's 60 year old stepfather. Weapon was a rifle. This report is based upon a review of the subject's central file, medical records, plus a 2 hour clinical assessment interview.

MENTAL STATUS EXAMINATION: The subject is oriented in terms of time, person, place and exhibits no psychotic symptomotology. Subject is introversive; seems predelicted towards focussing on minutiae at the expense of securing an overview of the situation at hand. The subject is very serious, somewhat inappropriately assertive and has a penchant to focus on differences rather than commonalties. He seems somewhat unconcerned about establishing rapport for this interview. He ascribed his presentation of self to a strong feeling of nervousness and defensiveness. The subject's adjustment could be enhanced by exercising more resiliency and the importance of the interpersonal factor in human relations. He tends to intellectualize and psychologize which could obstruct authentic insight. He also seems quite self-centered and could benefit from becoming more other-centered. His adjustment could be enhanced by developing more than just a totally serious attitude toward everyday life.

There is mention in previous psychological reports on the subject that he directed his anger toward the appropriate Object, namely, the stepfather. This seems only part of the psychological discovery if the subject is to secure honesty in insight from the instant offense experience. Although it is true that much of the subject's cathexis was to the stepfather as the punishing-one, the mother failed the subject in a traumatic manner to provide protection for the subject. Additionally, the subject must repossess the psychological projections which he placed on the stepfather, sort these out, and acknowledge his own responsibility for this dysfunctional relationship. It certainly was not a one way street.

INMATE'S DEVELOPMENT AND ADJUSTMENT: The subject has completed at least 18 months of the Category X Program, California Medical Facility, Vacaville, CA. He also completed the Category X Program at San Quentin, June 1990. The reports from these programs are all extremely positive toward the subject. These programs represent the foundation from which the subject can further awareness about himself and his relations with other people particularly in the area of conflict resolution.

The subject has been in the Alcoholics Anonymous since 1990. He perceives himself as a recovering alcoholic. He is active in wood working and completed the Vocational Cabinet-Making course, 1990, CMF. He has been a Vocational Draftsperson at DVI since 12/31/92. He sees this drafting experience as complementing cabinet-making.

The subject is active in Hobbies, making picture frames and fulfilling custom orders which involve working in artistry. The subject has many visitors which include his: Mother, girlfriend, sisters, nephew, aunt and uncle, and an old friend of the family. He has lots of support of this kind.

SNODGRASS, GARY R.    C-50459    DVI    cle/ 2/23/93

COPY SENT TO INMATE

Page 2

DIAGNOSTIC IMPRESSIONS: As per DSM-III-R the following diagnosis seems appropriate for the subject: AXIS I V61.80 Family Circumstances at the time of the instant offense; 303.90 Alcohol Dependence, by history. AXIS II 301.84 Passive Aggressive Personality with dependent features. AXIS III Surgery, 6/10/91. AXIS IV Moderate Psychosocial Stress. AXIS V Moderate Symptoms in adjustment (GAF Scale = 60).

CONCLUSIONS: Subject presents an exemplary record of adjustment during incarceration. He has participated in an 18 month Category T Program and has received very positive reports regarding his psychological progress. The subject has also participated in the Category X Program where he received a very positive prognosis regarding his adjustment in the community. He has an unusually rich family/friend resource to tap when he returns to the community.

Violence potential in the community is observed as average for the general population. Psychopathology is indirectly related to the instant offense.

RECOMMENDATIONS: Continue with positive programming. Any parole to the community should include abstinence from alcohol and/or drugs.

*Richard J. Obrochta PhD*

RICHARD J. OBROCHTA, Ph.D.
Staff Psychologist

SNODGRASS, GARY R.   C-50459   DVI   cle,   2/23/93

# EXHIBIT K

## 03-08-1994 PSYCHOLOGICAL EVALUATION

# EXHIBIT K

PSYCHOLOGICAL REPORT TO THE BOARD OF PRISON TERMS
MARCH, 1994, CALENDAR
DEUEL VOCATIONAL INSTITUTION

This is the fifth report to the Board on this 32 year old lifer in CDC since 1982 for murder second. It is based upon a review of the central file, previous psychological reports including the Cat X evaluation done in 1991, and interviews on 2-18-94 and 3-2-94.

Past evaluations have been generally favorable. The 1991 Cat X Program saw him as having made "Considerable progress towards self-understanding and personal growth." His psychological test results back then were "uniformly encouraging" showing superior intelligence, few antisocial leanings, and an excellent degree of psychological integration. The Cat X noted that prior to the crime there had been a history of alcohol and drug abuse, and also an over-dependency on his mother. There have been differences of opinion as to whether or not this man has a personality disorder or "No mental disorder". Dr. Gonick, in the 1992 report indicated "No psychiatric disorder". On the other hand, Dr. Obrochta, in the 1993 report diagnosed him as being a passive aggressive personality with dependent features.

The present examiner agrees with past evaluations finding no underlying symptoms of mental illness. This man interviews in a clear and coherent manner, and generally within normal range. Emotionally there is considerable underlying despair and moderate depression, in general related to his frustration over the period of time he is doing in prison, and with an unclear date as to when he will be able to return to the community. Similar to many lifers he tends to fume over the poor prospects of lifers getting a date. On the positive side of this equation the inmate was able to openly verbalize his frustration with this situation, thereby allowing himself some ventilation of his emotions.

This man verbalizes remorse for the committing offense and states quite frankly that he didn't have the right to take a life.

PRISON PROGRESS: His behavior in prison has been above average with virtually no disciplinary 115's whatsoever. He has participated in the Cat T Program. He continues in Alcoholics Anonymous. Recently in 1993 he attended Dr. Ferrant's Lifer's Group. He reports that in December, 1993 he participated as a volunteer in the Arts in Corrections Program, doing a benefit for a children's shelter. He has worked in Vocational Drafting since 1991 and believes that is it helpful because it augments his cabinet making, an activity that he states he enjoys a great deal. He likes woodworking.

SNODGRASS, GARY          C-50459          DVI          cle          March 8, 1994

COPY SENT TO INMATE 3-23-94

Overall then this inmate has been using his time in prison in a constructive and positive manner. The primary source of negative feelings for this man appears to be the question of when lifers will get a date. Regarding this type of ambiguous stress he seems to react with feelings of being victimized for example stating that he felt he was being victimized by "Current politics". Although this may or may not be true of the factual situation, it would seem to this examiner that Mr. Snodgrass ought to try to find ways to nevertheless find a deeper inner-calmness. This would help build confidence that he can react to stress in constructive ways rather than anger or bitterness.

DIAGNOSTIC IMPRESSIONS: 1) Mixed Personality Disorder with Passive Aggressive, borderline, and dependency features, by history, showing improvement. 2) Chronic Low-Grade Depression associated with situational resentment. 3) Alcohol and Polysubstance Abuse, by history, in institutional remission.

Violence potential when released to the free community is estimated to have decreased and to be below average compared to other inmates. There is no history of violence except the committing offense. Subject has shown positive initiative in participating in help and self-help types of programs.

RECOMMENDATIONS: Continue present programming. In the course of the interview this inmate and I had a discussion regarding his religious or spiritual ideas. The inmate admits a skepticism about religion in general. Snodgrass nevertheless was encouraged to explore further the spiritual aspects of himself. This recommendation, however, should not be considered mandatory as this is a highly personal, individualized and voluntary type of search. There are no other recommendations.

R Kotila, Ph. D.

ROGER KOTILA, Ph.D.
Staff Psychologist

SNODGRASS, GARY        C-50459        DVI        cle        March 8, 1994

# EXHIBIT L

## 01-11-1995 PSYCHOLOGICAL EVALUATION

# EXHIBIT L

## PSYCHOLOGICAL REPORT TO THE BOARD OF PRISON TERMS
### MARCH 1995, LIFER CALENDAR
### DEUEL VOCATIONAL INSTITUTION

This is the sixth report to the Board of Prison Terms on Gary Snodgrass, age 33, a first termer who is serving a 15 years to Life Sentence for Second Degree Murder. The report is based upon a review of the Central File, medical/psychiatric record, observation from eighteen individual psychotherapy sessions and a clinical assessment interview.

There have been no significant changes in Subject's institutional programming since the last evaluation, by Dr. Obrochta, in February 1993. He continues his excellent adjustment to incarceration, with no disciplinaries since August 31, 1989. Vocationally, Mr. Snodgrass has been giving much thought to parole employment and how he might intensify his efforts to obtain job offers. He has excellent and marketable cabinetry skills. Beyond this, he hopes eventually to advance to the artisan level and have a wood craft shop of his own.

As noted in previous reports, Mr. Snodgrass has made considerable psychological progress during the years of his incarceration. He seems to have taken advantage of every therapeutic opportunity available to him and has been described as highly motivated. Most recently, Mr. Snodgrass said he has been greatly concerned about the issue of remorse. At his 1993 Board Hearing he said he had difficulty exhibiting genuine remorse. He began to carefully consider Dr. Obrochta's 1993 observation: "The Subject must repossess the psychological projections which he placed on the step-father, sort these out, and acknowledge his own responsibility for this dysfunctional relationship." As a result, Subject sought additional psychotherapy.

In this therapy, the process of "sorting out" was an understandably painful one. The progress of the therapy bogged down in apparent unconscious resistance from time to time. Mr. Snodgrass persevered. He began to realize and admit that for many years both prior to and following the murder he had been blaming his father for the dysfunctional relationship between them. He had not accepted any responsibility for his part in the situation. Eventually in therapy he was able to be completely honest with himself about the responsibility and, further, to acknowledge that he "had no right to play God."

At about the same time, Subject was deeply impressed by a comment his sister made during a visit that he had never apologized to the family. He now realizes such an apology is highly appropriate and overdue. He reports also that he is beginning to generate an overall and more positive attitude as a result.

COPY SENT TO INMATE 1-23-95

DIAGNOSTIC IMPRESSION:

| | | |
|---|---|---|
| AXIS I | 303.90 | Alcohol Dependence, by history. |
| | V61.80 | Family circumstances at time of instant offense. |
| AXIS II | | Narcissistic, Passive-Aggressive, and Depressive Traits, greatly improved. |

During observation in the institution, Subject has improved psychiatrically greatly. In a less controlled setting, such as return to the community, he is considered likely to maintain this improvement.

Violence potential at the time of the crime is estimated to have been above average due to alcohol use and is now considered average.

**CONCLUSION:** Mr. Snodgrass is an intelligent young man who has made good use of therapy opportunities and subsequently has made excellent personal growth progress. It is notable that, following his break-through regarding responsibility and remorse, his sights now are expanding to include the broad field of the humanities, especially philosophy, by which he hopes to still further understand himself and his relationship to others.

**RECOMMENDATION:** Parole decision should be made on correctional rather than psychiatric factors.

*Brunla Vancleve*

**BRUNLA VANCLEVE, Ph.D.**
**Staff Psychologist**

# EXHIBIT M

## 06-30-1997 PSYCHOLOGICAL EVALUATION

# EXHIBIT M

## PSYCHOLOGICAL REPORT TO THE BOARD OF PRISON TERMS
### AUGUST 1997, LIFER CALENDAR
### DEUEL VOCATIONAL INSTITUTION

The following information is the seventh report to the Board of Prison Terms for Mr. Gary Snodgrass. He is a 34-year-old, Caucasian male who is currently serving a 15-year to Life sentence for second degree murder. The victim was Subject's 60-year-old stepfather. The weapon was a rifle. Subject entered the CDC system on 07/19/82.

This report is based upon a review of Subject's central file, medical records and a clinical assessment interview.

**BACKGROUND INFORMATION:** Subject's background information has been described in detail in previous psychological and counselor's reports. Subject describes significant losses as a child including his father's death when he was age 5, his grandfather's death, and other significant losses such as Uncle Ben (a family friend), and Calvin, his mother's first male relationship after his father's death. When Subject was 8, his mother married his stepfather, John Nailen, who was 50 years old while his mother was 34 years old. He says that his stepfather was an insensitive, domineering man who was not interested in him, and who never talked to Mr. Snodgrass nor did anything with him except for two occasions. He feels that he was treated by his stepfather as an object. He felt emotionally neglected and hurt. Additionally, he was sexually abused by his stepbrother. Before the killing Subject was full of rage towards his stepfather, very angry because he thought that his stepfather was intruding and invading on his thoughts. He went to see a psychologist in response to his mother's request about one week prior to the shooting.

**MENTAL STATUS EXAMINATION:** Subject presented as alert and oriented. His grooming and hygiene were good. Eye contact was direct. Rate of speech and articulation were normal. Attention span and concentration were normal. Thought processes ·were clear and coherent. There was no evidence of psychotic processes such as hallucinations or delusions. His mood was within the normal range. Judgment and insight were fair. He had no suicidal or homicidal ideations.

**INMATE PROGRESS AND DEVELOPMENT:** Since the last psychological report, Subject says that he is still enrolled in Aircraft mechanics. He works five days a week. He also attends AA meetings. He participated in the Road to Freedom program and Hobby program. He has not incurred any disciplinary CDC 115s.

**DIAGNOSTIC IMPRESSIONS:** As per DSM IV, the following diagnostic impressions seem appropriate for this Inmate:

AXIS I.    303.90     Alcohol dependence by history, in full institutional remission.
           V61.80     Family circumstances at the time of instant offense.



COPY SENT TO INMATE 1-3-97

AXIS II.                      Narcissistic, passive-aggressive and depressive traits greatly
                              improved.

AXIS III.                     No medical problems reported.

AXIS IV.                      Incarceration is a major stressor.

AXIS V.                       Global assessment of functioning on a scale of 0-100 = 85, he is
                              high functioning.

CONCLUSION: Mr. Snodgrass has changed significantly during his incarceration since 1982.
He has greatly improved psychiatrically. He says he has benefited more from the Road to
Freedom program than from AA meetings. He sincerely expresses how he has learned not to be
angry. He now accepts personal responsibility with appropriate remorse. He says he did not
make enough attempts to break the wall between him and his stepfather, "I could have tried." He
has good occupational skills. In a less controlled setting such as return to the community, he is
considered likely to maintain the gains.

RECOMMENDATION:    Parole decisions should be made on correctional rather than
psychiatric factors.

GURMEL S. DHALIWAL, Ph.D.          Noted:
Staff Psychologist                 ROGER KOTILA, Ph.D.
                                   Staff Psychologist

# EXHIBIT N

## 05-19-1998 PSYCHOLOGICAL EVALUATION

# EXHIBIT N

# PSYCHOLOGICAL REPORT TO THE BOARD OF PRISON TERMS
## AUGUST, 1998, LIFER CALENDAR
## DEUEL VOCATIONAL INSTITUTION

This is the eighth report on this 36-year-old, Caucasian male who entered CDC on 07/19/82 for Murder Second Degree, sentenced 15 years to Life. Victim was Subject's 60-year-old stepfather. Weapon was a rifle. This report is based upon a review of the Subject's central file, medical record, plus a three hour clinical assessment interview on 05/14/98.

REVIEW OF BPT EVALUATIONS: This examiner conducted the Board of Prison Terms evaluation report on the Subject on 02/23/93. At that time, this Examiner observed the Subject as somewhat inappropriately assertive and with a penchant to focus on differences rather than commonalties. The Subject also seemed unconcerned about establishing rapport for this important interview. At that time, also, Subject tended to intellectualize and psychologize rather than strive to secure authentic insight. In 1993, he was observed by this Examiner as being self-centered and an individual who could benefit from becoming more other-centered.

In the 1995 Board of Prison Terms evaluation report conducted by Brunla VanCleve, Ph.D., DVI Staff Psychologist, she made a positive statement about the Subject, namely, she observed him as carefully considering one of this Examiner's 1993 significant observations: "The Subject must repossess the psychological projections which he placed on the stepfather, sort these out, and acknowledge his own responsibility for this dysfunctional relationship." As a result, according to Dr. VanCleve, the Subject began psychotherapy.

In a 1997 BPT evaluation conducted by Gurmel S. Dhaliwal, Ph.D., DVI Staff Psychologist, the report was favorable, "Mr. Snodgrass has changed significantly during his incarceration since 1982...he says he has benefited more from the Road to Freedom program than from AA meetings...he now accepts personal responsibility with appropriate remorse...in a less controlled setting such as a return to the community, he is considered likely to maintain the gains." Dr. Dhaliwal concludes that parole decisions should be made on correctional rather than psychiatric factors.

BACKGROUND INFORMATION: The Subject's background information and the instant offense have been described in detail in previous BPT evaluation reports. This information will not be included in this current BPT evaluation report, except as might be appropriate.

MENTAL STATUS EXAMINATION: Subject is oriented in terms of person, place, time and situation. He exhibits no psychotic symptomatology.

Initial rapport in this current assessment interview was labored but improved as the process unfolded. The Subject camouflages his fears and apprehensions through a stoic presentation of self, which could be misperceived as unfriendly. The Subject is more oriented toward things, so to speak, than toward people. He is not socially facile.

COPY: SENT TO INMATE 6/4/98 @vm

One could imagine how the Subject, in growing up, would have had difficulty in communicating with his mother and stepfather. As the Subject says, the stepfather "...was large and domineering...I was afraid of him...he had the mentality of a bully...although he never hit me..."

Subject's early experiences also included a fear of the stepfather's son who was 18 at the time when the Subject was 8-years old. This stepbrother molested the Subject and is described by the Subject as, "...a big bully...made threats of violence..."

Subject took these fears to his mother and she did little if anything about it, "...my mother stood by when all this happened...she didn't do a good job of looking after me as a kid..." Subject experienced his mother as one who could not articulate anything of a sensitive nature, e.g., her reason for divorce, marriage, etc., when these were of appropriate concern and could have been clarified, were there more honest dialogue between the mother and the Subject.

Overall, we observe the Subject, in these developmental years, as having legitimate fears of the stepfather and the stepbrother, with no one to go to for safety. Subject did not experience the mother providing the environment for meeting his security needs. Subject had the onerous label of "mama's boy" but did not feel he received any of its "benefits." Subject resorted to nonverbal solutions for his problems, namely, alcohol, drugs, and things rather than people. The shooting of the stepfather represents the last link in this series of dysfunctional familial interactions.

DIAGNOSTIC IMPRESSIONS: As per DSM-IV, the following diagnostic impressions seem appropriate for the Subject:

| AXIS I. | V62.81 | Relational Problem, NOS, dysfunctional family circumstances at the time of the instant offense. |
|---|---|---|
|  | 303.90 | Alcohol and Drug Dependence, by history, in institutional remission. |
| AXIS II. | 301.84 | Passive-Aggressive Personality with Dependent Features. |
| AXIS III. |  | No significant current or chronic medical problems by self-report or medical record. |
| AXIS IV. |  | Incarceration is a major stressor. |
| AXIS V. | GAF=85 | Global Assessment of Functioning (GAF) on a scale of 0-100: absent or minimal symptoms; good functioning in all areas; interested and involved in a wide range of activities. |

PRISON ADJUSTMENT: Subject has not had any major disciplinary actions since the last Board of Prison Terms report.

Subject remains active in Alcoholics Anonymous but is reluctant to open up to others. This could be considered judicious, or defensive when one is incarcerated, "...I don't have much to share...more than willing to read and speak...I endorse the program."

Subject remains active, for over two years, in the Road to Freedom program. This is a self-help program based upon the practices espoused by Abraham Low, M.D., psychiatrist, who rehabilitated mentally ill patients back into the community. Dr. Low's ideas have been modified and applied to a myriad of situations, such as, the Road to Freedom.

Subject has been in the Aircraft and Engines program at DVI. He is preparing for his Federal Aviation Administration (FAA) license in Power Plant and Air Frame. These examinations are scheduled for July and September of this year.

Subject has participated in psychotherapy throughout the years of his incarceration; has completed the Category-X program; Anger Management; and other self-help programs within the State prison system.

CONCLUSION: Violence potential in the community is observed as average for the general population. Psychopathology is indirectly related to the instant offense.

Subject has made excellent use of the self-help opportunities available within the State prison system. He presents an exemplary record of adjustment during incarceration. Friends and family represent resources for him to utilize when he returns to the community.

RECOMMENDATIONS:    Continue with positive program as long as the Subject is incarcerated. A parole to the community must include abstinence from alcohol and/or drugs, and arrangements to monitor this behavior. It also would be beneficial to Subject to utilize the Mental Health Services of the Parole Outpatient Clinic, County Mental Health and similar resources. His Federal Aviation Administration license in Power Plant and Air Frame elevates the probability of him securing meaningful, satisfying, and well-paid employment in the community.

Parole decisions should be made on correctional rather than psychiatric factors.

Richard J. Obrochta, Ph.D.
Senior Psychologist (CF) Supervisor

Noted:
J. Eric Nelson, Ph.D.
Staff Psychologist

# EXHIBIT O

## 07-13-1999 PSYCHOLOGICAL EVALUATION

# EXHIBIT O

Mental Health Evaluation
(Revised 1998)
Lifer Calendar
Deuel Vocational Institution

I. **IDENTIFYING INFORMATION:** This is the ninth report on this 37 year-old single Caucasian male. He is 5'9" tall and weights about 165 pounds. Subject is serving 15 years to life for second degree murder. Victim was his 60 year-old step-father. The weapon was a rifle and the report is based upon a review of Subject's central file, unit health record and clinical assessment interview.

II. **DEVELOPMENTAL HISTORY:** Subject was born on 8/4/61 in Oakland, California. There were no prenatal or perinatal concerns and no birth defects. His developmental milestones were within normal limits. He does not remember any unusual habits. Subject was fond of riding bikes. His father was diagnosed with Hodgkin's Disease three years before Subject was born. Subject was 5 years-old when his father died, "My mother says that I was kind of sad but I still had a life". Subject was sexually abused at age 7 for about 1 1/2 years by his step-brother who was 17 years-old.

III. **EDUCATION:** Subject graduated from high school in 1979. His Grade Point Level, as measured in prison, is 12.0 years.

IV. **FAMILY HISTORY:** Subject's mother remarried in 1969 when he was 7 years-old. Mother did secretarial work. Subject's step-father worked part time for PG&E until his retirement and was murdered soon after by the Subject. The step-father was 60 years-old at the time of his death. Subject has two older sisters, 40 and 42 years-old. Both are married and working. They have no history of any problems with the law. His middle sister writes to him two times a year. Mother is 64 years-old and retired. She lives in the East Bay area and visits the Subject about once a year.

V. **PSYCHOSEXUAL DEVELOPMENT AND SEXUAL ORIENTATION:** Subject reports average psychosexual development with heterosexual orientation. He has no history of high risk behavior or sexual aggression.

VI. **MARITAL HISTORY:** Subject was never married and has no children.

VII. **MILITARY HISTORY:** None.

VIII. **EMPLOYMENT HISTORY:** Subject worked a few different jobs at gas stations and fast food restaurants. He says that he had completed a two year auto mechanic shop program in high school.

IX. **SUBSTANCE ABUSE HISTORY:**

A. **Alcohol and Illegal drug usage:** Subject began smoking pot and drinking alcohol at age 14. "It continued until my arrest, most of the days varied according to what I could afford, but no more than 6-pack on occasion".

SNODGRASS, GARY R.          C-50459          7/13/99          (DVI)          el          Page 1

C. Current Problems/Needs: None.

X. **PSYCHIATRIC AND MEDICAL HISTORY:** Subject never has taken any psychiatric medications nor has he been hospitalized for any psychiatric problems. He has no history of suicidal ideation or attempts. There is no history of serious head injury, seizure or other neurological conditions. There are no disabilities or significant impairments or illnesses.

XI. **PLANS IF GRANTED RELEASE:** The Subject plans to live with his mother in Pinole, California and seek employment as an aircraft mechanic or "I can also be employed as a cabinet maker, possibly a welder". There appear to be no problems in complying with conditions of parole. He has no enemies. His plans appear viable. Prognosis for community living is considered fair.

## CLINICAL ASSESSMENT

XII. **CURRENT MENTAL STATUS / TREATMENT NEEDS:** Subject presented as a fairly well groomed individual. He was alert and oriented. He was cooperative with good eye contact. His speech was normal. There was no evidence of any significant symptoms of psychotic thought disorder, hallucinations, or paranoid ideation. There were no significant symptoms of any major mood disturbance. Judgment and insight were fair. He is of average intelligence. His memory is intact. Concentration is fair. There is no suicidal/homicidal ideation.

As per DSM-IV the following diagnostic impressions seem appropriate for this Subject.

| AXIS I | V61.80<br>303.90 | Family circumstances at the time of offense.<br>Alcohol abuse by history in full remission. |
| --- | --- | --- |
| AXIS II | V71.09 | No diagnosis. |
| AXIS III | | No medical problems. |
| AXIS IV | | Incarceration is a major stressor. |
| AXIS V | | Global Assessment Functioning on a scale 0-100=80.<br>He is high functioning. |

**CURRENT LEVEL OF CARE:** General population.

**TREATMENT ACTIVITIES:** None at this time.

**MEDICATIONS:** None at this time.

**PROGNOSIS:** Fair.

SNODGRASS, GARY R.                    C-50459        7/13/99    (DVT)      cl        Page 2

XIII. REVIEW OF LIFE CRIME: The Subject had continued ... elt rejected, belittled and
emasculated by his ... p-father's verbal abuse. He also was ... malized by sexual abuse
Case 3:08-cv-03322-JSW    Document 4-2    Filed 07/09/2008    Page 27 of 79

by his step-brother. He felt powerless and defenseless when his mother failed to intercede on his behalf. He became increasingly consumed by rage towards his step-father who continued to be verbally and emotionally abusive. It became a precipitating factor for the crime when Subject was informed by his step-father of his and his mother's plan to move to their retirement home in Rio Vista and have the Subject move out so they could rent their present house. The Subject said, "The morning of the crime, my step-father, older sister and mother went out. I went into the house to get my step-father's hunting rifle. I took the rifle and stashed it in the garage. When my step-father got back, (after dropping off my mother and sister at their work) I went around to the side of the house, retrieved the gun and loaded it. As I was loading it somehow it fired, knowing that my step-father would hear it, I was scared. My step-father came down to investigate the gun shot, was scared, he tried to talk to me. I pointed the rifle at him and pulled the trigger, however, the safety prevented the rifle from firing. During this time a neighbor heard the shot, observed me holding the rifle and called the police." Subject's step-father had gone back into the garage and shut the door. Subject and his step-father conversed from their separate locations when Subject observed the police arrived he told his step-father that the police had arrived and his step-father emerged from the garage. At this time Subject shot his step-father in the chest area. His step-father fell to the ground and began yelling at the Subject. The Subject then walked to the victim and shot him in the neck area.

The Subject then placed another shell in the chamber with the intention of killing himself, at this point the police gave orders for him to come out with his hands up. Subject then unloaded the gun and surrendered.

XIV. **ASSESSMENT OF DANGEROUSNESS:** Subject received a CDC-115 Disciplinary for being out of bounds in 1989 and none since then. He has programmed well. If released to the community his level of dangerousness is considered average for the general population.

XV. **CLINICAL OBSERVATIONS/COMMENTS/RECOMMENDATIONS:** This 37 year-old Subject was emotionally and psychologically abused by his step-father, victim of the crime. This eternally humiliating situation turned into rage when Subject was asked to move out. At this point Subject decided to kill his step-father. It was an act of righteousness in his mind and perhaps he was trying to get his "perceived honor" back by implementing this decision and in this process became blind to the future implications of that moment. The Subject now realizes that he "had no right to play God". He now accepts personal responsibility with appropriate remorse.

He has made considerable gains in prison and is likely to maintain these gains in a less controlled setting such as return to the community.

G. S. DHALIWAL, Ph.D.
Senior Psychologist, Supervisor (CF)
Reception Center
SNODGRASS, GARY R.                    C-50459

Noted:
RICHARD J. OBROCHTA, Ph.D.
Senior Psychologist, Supervisor (CF)
Mainline
7/13/99     (DVI)        ci          Page 3

## DEUEL VOCATIONAL INSTITUTION
Life-Term Inmate Evaluation for the Board of Prison Terms
(Revised 1998)
Mental Health Evaluation

### ADDENDUM TO REPORT OF July 13, 1999

Subject requested corrections regarding his BPT psychological assessment dated 07/13/99. Subject was oriented in terms of person, place, time and situation. He exhibited no suicidal symptoms.

IV.    **FAMILY HISTORY (Corrections for 07/13/99 BPT Report):**    The Subject's stepfather was a full time employee of PG&E, and not a part time employee as the report indicates.

There is a sister, Diana, 40, who writes and visits the Subject. This sister is employed.

There is a sister, Kathy, 42, who writes to the Subject but has not been visiting him in prison. She is married and employed.

The Subject's mother visits him in prison throughout the year.

The Subject indicates there have been no significant changes in his record or activities at DVI since the last psychological evaluation report to the Board of Prison Terms.

Noted by:

RICHARD J. OBROCHTA, Ph.D.
**Senior Psychologist Supervisor (CF)**

J.E. NELSON, Ph.D.
**Staff Psychologist**

RJO/km

Original: C-File
cc:    Medical File

COPY SENT TO INMATE (FEB 2 5 2000

| SNODGRASS, Gary R. | | CDC# C58459 |
|---|---|---|
| DVI | February 7, 2000 | Page 1 |

UEL VOCATIONAL INSTITUTIO

Life-Term Inmate Evaluation for the Board of Prison Terms

Mental Health Evaluation

(Revised 1998)

November 2001, Lifer Calendar

## Addendum to Board of Prison Terms Report
## Dated July 13, 1999

I.   **IDENTIFYING INFORMATION:**

| | |
|---|---|
| Name: | Snodgrass, Gary |
| CDC: | C-50459 |
| Age: | 40 years |
| DOB: | 08/04/61 |
| Marital status: | Single- never been married. |
| Ethnicity: | Caucasian |
| Gender: | Male |
| Religious preference: | Christian |
| Nicknames or alias: | None |
| Tattoos: | None noted. |

Subject is aware that none of the information transpired during this psychological evaluation is considered confidential and will be presented before the Board of Prison Terms.

Subject is serving 15-years-to-Life for 2nd Degree Murder, which occurred in November 1981. He entered into CDC July 19, 1982.

Subject is oriented in terms of person, place, situation and time. He exhibits no suicidal or homicidal ideation. (Please refer to the complete psychological assessment dated 07/13/99 for further details.)

Subject has maintained his exemplary disciplinary record. He currently is employed in Vocational Welding where his performance can be described as exceptional. He also has completed, in previous years, Mill and Cabinetry, and earned his FAA license in Powerplant (reciprocal and turbine engines) and structure. He completed a vocational course in drafting. Subject has been active in Alcoholics Anonymous since 1990. He is serving in the Office of Treasurer for the past two years. He also keeps track of inmate's sobriety dates and makes the sobriety-chip awards. He was honored with a certificate during the last AA banquet, July 4, 2001, for his fifteen years of sobriety.

Noted by:

RICHARD J. OBROCHTA, Ph.D.
Senior Psychologist Supervisor (CF)

PATRICIA MILLER, Ph.D.
Staff Psychologist

RJO/tav
Original: C-File
cc:   Medical File

COPY SENT TO INMATE  8/24/01

# EXHIBIT P

# EXHIBIT P

PSYCHOLOGICAL EVALUATION FOR THE BOARD OF PRISON TERMS
(REVISED AUGUST 1998)
PAROLE CONSIDERATION HEARING
NOVEMBER 2003 LIFER CALENDAR

CORRECTIONAL TRAINING FACILITY, SOLEDAD
OCTOBER 20, 2003

This is an updated psychological evaluation for the Board of Prison Terms on inmate
Gary Snodgrass, CDC# C-50459. This report is based upon a personal clinical interview
of the inmate, conducted on 10/20/03, as well as a review of his Central file and unit
health record. This clinical interview and a review of all pertinent documents were for
the express purpose of preparing this report.

## PSYCHOSOCIAL ASSESSMENT

### I.    IDENTIFYING INFORMATION:

Inmate Snodgrass is a 42-year-old, single, Caucasian male whose date of birth is
08/04/61. His stated religious preference is Protestant. No obvious unusual
physical characteristics were observed, and he denied ever using any nicknames
or aliases.

### II.    DEVELOPMENTAL HISTORY:

Inmate Snodgrass does not have a significant history of birth defects,
abnormalities of developmental milestones, or a history of cruelty to animals,
arson, or significant childhood medical illnesses. However, he did acknowledge
that he was abused at around the age of seven by his older stepbrother, who was
16 years old at the time. He said that he had been sexually abused for about one
and a half years, and that it ceased when the inmate moved away.

### III.    EDUCATIONAL HISTORY:

Inmate Snodgrass reported that he attended public school, and is a high school
graduate. He said that he has completed some junior college level work. His
August 2000 TABE reading grade point level was 12.9. He has no significant
history of special education or behavioral problems in school. He currently has no
current involvement or interest in educational activities.

### IV.    FAMILY HISTORY:

Inmate Snodgrass indicated that there was no significant history of crime or drug
abuse in his family. He indicated that he has maintained a warm and supportive
relationship with his mother, who visits about four times a year. He also said he
has one sister, who writes about two times a year.

SNODGRASS        C-50459        CTF-CENTRAL        10/20/03        gmj

SNODGRASS, GA
CDC NUMBER: C-50459
BPT PSYCHOLOGICAL EVALUATION
PAGE TWO

## V.     PSYCHOSEXUAL DEVELOPMENT AND SEXUAL ORIENTATION:

Inmate Snodgrass is a heterosexual male. He denied any history of sexual
aggression or high-risk sexual behavior.

## VI.    MARITAL HISTORY:

Inmate Snodgrass indicated that he has never been married, and that he has no
children from any relationship.

## VII.   MILITARY HISTORY:

Records indicate this inmate has no military history.

## VIII.  EMPLOYMENT/INCOME HISTORY:

Inmate Snodgrass reported that his preincarceration work history includes
working approximately one year as a clerk in an auto store, and having worked in
various gas station cashier positions. He also worked as a landscaper.

He noted that his incarceration work history includes becoming certified in 1990
in mill and cabinet work, and in 1994 becoming certified in vocational drafting.
In 1999, he became certified in aircraft maintenance and gained FAA certification
in air frame and power plant. In 2000, he was certified for vocational welding.
He has obtained average to above average work assessments from his work
supervisors. For example, in 1987, he received above average work ratings in
cabinet making. In 1988, he received average to exceptional ratings in wood
shop.

## IX.    SUBSTANCE ABUSE HISTORY:

Inmate Snodgrass acknowledged that he has a history of recreational use of
alcohol, noting further that he has used alcohol from 1974 until 1982, that is, upon
his incarceration. He also acknowledged having used marijuana until his
incarceration. He reported further that he regularly attended Alcoholics
Anonymous and Narcotics Anonymous from 1990 until 2002. This inmate
currently does not appear to have a significant drug problem.

## X.     PSYCHIATRIC AND MEDICAL HISTORY:

In 1991, inmate Snodgrass was briefly hospitalized for back surgery with no
apparent significant residual symptoms.

Inmate Snodgrass was placed in the CCCMS program in September of 2001 for
approximately six months for a brief period of depression. He does not have a
history of serious accidents, including head injuries. He has no history of suicidal

SNODGRASS        C-50459        CTF-CENTRAL        10/20/03        gmj

SNODGRASS, GARY
CDC NUMBER: C-50459
BPT PSYCHOLOGICAL EVALUATION
PAGE THREE

behavior. He has no history of seizure or other neurological conditions. He has
no significant disabilities or impairments. He currently is not taking any
significant medications.

XI.    **PLANS IF GRANTED RELEASE:**

If granted parole, this inmate plans to live in Contra Costa County with his
mother, who has agreed to this arrangement. His financial and vocational plans
include working in welding, in aircraft maintenance, or alternatively in cabinet
making. The viability of his financial and vocational plans appears to be sound,
and he appears to have adequate supportive relationships. His prognosis for
community living appears to be good.

## CLINICAL ASSESSMENT

XII.    **CURRENT MENTAL STATUS/TREATMENT NEEDS:**

During the clinical interview, inmate Snodgrass was alert and oriented to person,
place and time. He was well dressed and groomed. His speech was articulate
and contextually meaningful. His mood and affect were within normal limits, and
his behavior was appropriate to the setting. No evidence of a mood or thought
disorder was demonstrated. His estimated level of intellectual functioning was
within the average range.

**CURRENT DIAGNOSTIC IMPRESSIONS (DSM-IV):**

**AXIS I:**     Cannabis Abuse, in sustained full remission in a controlled
environment.
**AXIS II:**    No Contributory Personality Disorder.

In addition to attending Alcoholics Anonymous and Narcotics Anonymous,
inmate Snodgrass has attended a large number of other self-help groups. In 1989,
he completed Category T group and individual therapy. In 1993, he completed
group therapy with Dr. Ferrat. In 1994, he completed psychotherapy with Dr.
Van Clive. In 1995, he completed a Stress and Anger Management group. In
1997, he completed home study in mental health. In 1998, he completed a
Personal Devotion Discipline class and further home study in mental health work.
In 2001, he completed a Self-Confrontation class.

His insight and judgment in general, and specifically regarding the commitment
offense is good, and supports a positive prediction of successful adaptation to
community living.

SNODGRASS        C-50459        CTF-CENTRAL        10/20/03        gmj

SNODGRASS, GA~
CDC NUMBER: C-50459
BPT PSYCHOLOGICAL EVALUATION
PAGE FOUR

## XIII.  REVIEW OF LIFE CRIME:

Inmate Snodgrass described the circumstances surrounding his commitment offense, involving Second Degree Murder With A Firearm.  He admits full responsibility for the death of the victim, his 60-year-old stepfather.

Inmate Snodgrass described how he killed his stepfather, apparently during a domestic dispute.  His recall of historical events suggests a dysfunctional family.  He noted that his mother divorced and subsequently remarried the victim.  Inmate Snodgrass apparently was subject to significant emotional abuse by his stepfather.

Inmate Snodgrass does appear to understand adequately the causative factors underlying the instant offense.  A principle factor appears to lie in the fact that he did not seek outside help, such as counseling or friends, enabling him to deal more effectively emotionally with his domestic problems.  Inmate Snodgrass does appear to be genuinely penitent for his crime.

## XIV.  ASSESSMENT OF DANGEROUSNESS:

A.  His risk for violent behavior within a controlled setting is considered to be low relative to this level II inmate population.  This conclusion is based upon several factors.

The bulk of the evidence weighs heavily in favor of a low risk for future violence.  He does not have a juvenile criminal history, and he has no history of gang involvement.  He has no adult criminal history, other than that of the instant offense.  Moreover, he is a first-termer.  His one significant disciplinary (i.e., CDC-115) was obtained in 1989, and only involved a violation of going out of bounds.  Importantly, he has never obtained a significant disciplinary for violent behavior during his 21 years completed within CDC.  Notably, he was only 21 years of age at the time of the instant offense.  He does appear to have matured greatly during his incarceration within CDC.  He has attended a large number of self-help groups, including his regular attendance at AA/NA groups for 12 years.  He has attended a large number of other self-help groups.  He also has an excellent history of good programming within CDC, having been certified in mill and cabinet, vocational drafting, aircraft maintenance, and certification in airframe and power plant, and certification in vocational welding.  Inmate Snodgrass has consistently gotten average to exceptional ratings in his work performance by his work supervisor.

Additionally, two psychological test instruments were completed during the clinical interview.  Results from the HCR-20 suggest a low prediction of future violence for this individual in a controlled setting relative to level II inmates.  Results from the Hare Psychopathy Checklist, Short Version, do not suggest the presence of sociopathy.

| SNODGRASS | C-50459 | CTF-CENTRAL | 10/20/03 | gmj |

SNODGRASS, GA
CDC NUMBER: C-50459
BPT PSYCHOLOGICAL EVALUATION
PAGE FIVE

Finally, the facts unique to this case indicate that the death of the victim was a direct result of a heightened domestic dispute, and such behavior does not appear likely to happen again.

Therefore, in light of these factors, his violence potential within a controlled setting is considered to be low relative to this level II inmate population.

B.    If released to the community, clinically assessed, his violence potential is considered to be no more than that of the average citizen in the community.

C.    There are no significant risk factors which may be precursors to violence for this individual.

## XV.    CLINICIAN OBSERVATIONS/COMMENTS/RECOMMENDATIONS:

A.    This inmate is competent and responsible for his behavior. He has the capacity to abide by institutional standards, and he has done so during his incarceration.

B.    This inmate does not have a mental disorder which would necessitate treatment, either during his incarceration period or following upon parole.

C.    This inmate does not appear to have a significant drug abuse history, and there are no recommendations in this area.

**JOE REED, Ph.D.**
**Staff Psychologist**
**CORRECTIONAL TRAINING FACILITY, SOLEDAD**

**B. ZIKA, Ph.D.**
**Senior Supervising Psychologist**
**CORRECTIONAL TRAINING FACILITY, SOLEDAD**

JR/gmj

D: 10/30/03
T: 10/31/03

SNODGRASS        C-50459        CTF-CENTRAL        10/20/03        gmj

# EXHIBIT Q

## 08-14-1991 LIFE PRISONER EVALUATION

# EXHIBIT Q

LIFE PRISONER EVALUATION REPORT
SUBSEQUENT PAROLE CONSIDERATION HEARING
1991 CALENDAR

SNODGRASS, GARY                              C-50459

I.    COMMITMENT FACTORS:

  A.    Life Crime:

        All relevant documents from previous Hearings have been
        reviewed and all information remains valid. This writer has
        no further information to add.

  B.    Prisoner's Version:

        Remains the same as stated in the 1/23/90 Life Prisoner
        Evaluation.

  C.    Aggravating and Mitigating Circumstances:

        Circumstances remain the same as stated in previous Life
        Prisoner Evaluations.

II.   PRECONVICTION FACTORS:

      Information documented for previous hearings has been reviewed
      and remains valid. This writer has no further information to
      add.

III.  POSTCONVICTION FACTORS:

      Documents from previous hearings have been considered and that
      information remains valid. See attached Postconviction Progress
      Report for transfer and custody details. Mr. Snodgrass has
      remained disciplinary free, continued his vocational upgrading,
      and completed the Category X program in compliance with BPT re-
      commendations of 3/9/90. Although no documnentation has been
      placed in his Central File, Mr. Snodgrass indicates that he
      participated in A.A. at both CMF and SQ.

SNODGRASS, Gary C-50459        -1-    SQ SUBSEQUENT 1991 CAL.    RB:jl

Life Prisoner Evaluation Subsequent
Parole Consideration Hearing
1991 Calendar
Page 2

IV.   FUTURE PLANS:

      Upon release, Mr. Snodgrass plans to reside in the Pinole,
      California area. Specific plans will be developed prior to
      release.

      Members of the Pinole Valley Baptist Church continue to express
      support in the area of housing and employment. He has employable
      skills as a mill and cabinet worker, landscape laborer, and
      salesman.

V.    SUMMARY:

      A.    Considering Mr. Snodgrass's commitment offense,lack of a
            prior record and institutional adjustment, this writer
            believes that he would pose  a minimal threat to the public
            at this time, if released from prison.

      B.    Prior to release, Mr. Snodgrass could benefit from remaining
            disciplinary free and maintaining his excellent work
            records.

      C.    This Board Report is based upon two (2) hours of review of
            the central file and a personal interview for the purpose of
            preparing this report.

Prepared by:



ROBERT E. BENJAMIN
Correctional Counselor II
Psychiatric Staff Specialist


Reviewed by:

JOHN CHIAPPUZZO   4
Correctional Counselor III
Classification & Parole Representative

SNODGRASS, Gary C-50459      -2-   SQ SUBSEQUENT 1991 CAL.    RB:jl

Case 3:08-cv-03322-JSW   Document 4-2   Filed 07/09/2008   Page 39 of 79

☐ DOCUMENTATION HEARING

☐ PAROLE CONSIDERATION HEARING

☐ PROGRESS HEARING

INSTRUCTIONS

TO CDC STAFF:  DOCUMENT EACH 12-MONTH PERIOD FROM THE DATE THE LIFE TERM STARTS TO PRESENT.

TO BPT STAFF:  FOR EACH 12-MONTH INCREMENT APPLY THE GUIDELINES UNDER WHICH THE PAROLE DATE WAS ORIGINALLY
ESTABLISHED, i.e., 0-2 MONTHS FOR PBR AND 0-4 MONTHS FOR BPT. SEE BPT §§2290 - 2292, 2410 AND 2439.

| POSTCONVICTION CREDIT | | | REASONS |
|---|---|---|---|
| YEAR | BPT | PBR | |
| 1-23-90<br>to<br>7-19-90 | | | Mr. Snodgrass was housed at CMF-Main with Medium-A custody and an assignment to Vocational Mill and Cabinet Shop where he was viewed as an excellent worker. On 3-9-90, he attended his BPT hearing and received a one-year denial, with a recommendation for participation in a Category X program. On 6-14-90 Mr. Snodgrass was transferred to San Quentin as a Category X and Return (CMF)case. He was assigned Medium-A custody with initial placement as a Donner Section block worker. He was subsequently assigned to Food Service. He received average to above-average work reports and remained disciplinary free during this period. |
| 7-20-90<br>to<br>7-19-91 | | | Mr. Snodgrass continued Medium-A custody and his Food Service assignment as an above-average worker. He completed the Category X program and remained disciplinary free during this period. |
| 7-20-91<br>to<br>Present<br>(8-14-91) | | | Mr. Snodgrass maintained Medium-A custody and his Food Service assignment. He remained disciplinary free during this period. |

8/14/9|

fir...  — 2/7/62.

| CORRECTIONAL COUNSELOR SIGNATURE | | | | DATE |
|---|---|---|---|---|
| ROBERT BENJAMIN, CCII | | | | 8-14-91 |

| NAME | CDC NUMBER | INSTITUTION | CALENDAR | HEARING DATE |
|---|---|---|---|---|

SNODGRASS, Gary C-50459      -4-    SQ SUBSEQUENT 1991 CAL.   RB:jl

BPT 1004 (REV. 7/16)                    PAGE 1 of _____

# EXHIBIT R

## 03-00-1992 LIFE PRISONER EVALUATION

# EXHIBIT R

LIFE PRISONER EVALUATION REPORT
SUBSEQUENT PAROLE CONSIDERATION HEARING
MARCH 1992 CALENDAR

I.    COMMITMENT FACTORS:

   A.    Life Crime:    All relevant documents from the
         previous hearing, including the transcript, have
         been considered and that information appears valid
         and this writer has no further information to add.

         1.    Offense Summary:

         2.    Prisoner's Version:    Remains the same as
               stated in the Initial Parole Consideration
               Hearing of March 1990.

         3.    Aggravating and Mitigating Circumstances:
               Remains the same as stated in the previous
               hearings.

II.   PRECONVICTION FACTORS:    Documents from the previous
      hearings have been considered and that information
      remains valid

III.  POSTCONVICTION FACTORS:    Documents from the previous
      hearings have been considered and the information
      remains valid.    Snodgrass last appeared before the BPT
      on  3-9-90,  for  his  Initial  Parole  Consideration
      Hearing.    Parole was denied one year and the panel
      recommended that Snodgrass remain disciplinary free; 2)
      Upgrade  vocationally  and  or  educationally;  3)
      participate in self-help and/or therapy programming
      such as A.A. or N.A.; 4) cooperate with clinicians and
      staff and/or the psychiatric council in a Category X
      Program.    During the period of time since then the
      prisoner's behavior has improved, in that he has
      remained disciplinary free, continued his vocational
      upgrading, and completed the Category X program in
      compliance with BPT recommendations of 3-9-90.    See
      attached Postconviction Progress Report for details.

IV.   FUTURE PLANS:    Remain the same as indicated in the
      previous Board report.

SNODGRASS      C-50459        PAGE 1 OF 2      DVI        03/92

COPY SENT TO INMATE 3/6/92

V.    SUMMARY:

    A.    Considering the commitment offense, prior record and prison adjustment, this writer believes the prisoner would probably pose a minimal' threat to the public at this time, if released from prison.

    B.    Prior to release, the prisoner could benefit from remaining disciplinary free and maintaining his excellent work record.

    C.    This board report is based on a thorough review of his central file and an interview with Gary R. Snodgrass.

J. ZUNIGA, CC I

K. ROST, CC II

J. DAWSON, C&PR (A)

☐ DOCUMENTATION HEARING

☐ PAROLE CONSIDERATION HEARING

☐ PROGRESS HEARING

**NSTRUCTIONS**
TO CDC STAFF: DOCUMENT EACH 12-MONTH PERIOD FROM THE DATE THE LIFE TERM STARTS TO PRESENT.
TO BPT STAFF: FOR EACH 12-MONTH INCREMENT APPLY THE GUIDELINES UNDER WHICH THE PAROLE DATE WAS ORIGINALLY
ESTABLISHED, i.e., 0-2 MONTHS FOR PBR AND 0-4 MONTHS FOR BPT. SEE BPT §§2290 - 2292, 2410 AND 2439.

| POSTCONVICTION CREDIT | | | REASONS |
|---|---|---|---|
| YEAR | BPT | PBR | |
| 08-14-91 TO 02-07-92 | | | Inmate Snodgrass remains at San Quentin under Medium A Custody, housed in the GP, CS 0, and continues his assignment to Food Services (3rd Watch Culinary Sgt's Clerk). On 10-16-91, he receives laudatory chrono for his commitment, honesty and insight towards Alcoholics Anonymous. Noted is a CDC 128-B, dated 10-16-91, regarding his excellent job performance while assigned to Food Services. On 10-17-91, Snodgrass is transferred to CMF as a Category X return. Noted is CDC 128-B dated 11-6-91, requesting that Snodgrass be assigned to Vocational Mill and Cabinet Program. Mr. A. Altamirano, Vocational Instructor reflects that Snodgrass was programming adequately, and was an asset to the program. Snodgrass is seen by CMF-M Unit II Committee for Initial Classification. His custody is maintained at Medium A, CS 0 and is assigned to Vocational Mill and Cabinet. At this time, he is also requesting a transfer to DVI-III/CMF-S III for general population placement. Snodgrass is endorsed for DVI III on 12-13-91 and was transferred on 12-30-91. He is seen by DVI Initial Classification on 1-8-92 and assigned to the Industries waiting list. His custody remains at Medium A with a CS of 0. On 1-13-92, Snodgrass is assigned to Industries Crew #5. He is then reassigned to Industries-Upholstery on 2-6-92. Snodgrass remains disciplinary free for this period. Work Supervisor Reports are unavailable. |

| CORRECTIONAL COUNSELOR SIGNATURE | | | DATE 2/10/92 |
|---|---|---|---|
| NAME | CDC NUMBER | INSTITUTION | CALENDAR        HEARING DATE |
| SNODGRASS | C-50459 | DVI | MARCH 92 |

2

| POSTCONVICTION CREDIT | | | REASONS |
|---|---|---|---|
| YEAR | BPT | PBR | |
| | | | |
| | | | |
| | | | |
| | | | $\Delta$ |
| | | | J. ZUNIGA, CC I |
| | | | |
| | | | |
| | | | |
| | | | K. ROST, CC II |
| | | | |
| | | | |
| | | | |
| | | | J. DAWSON, C&PR (A) |
| | | | |
| | | | |

ORDER:

☐ BPT date advanced by _____ months.      ☐ BPT date affirmed without change.

☐ PBR date advanced by _____ months.      ☐ PBR date affirmed without change.

SPECIAL CONDITIONS OF PAROLE:

☐ Previously imposed conditions affirmed.

☐ Add or modify _____

☐ Schedule for Progress Hearing on appropriate institutional calendar.

| NAME | CDC NUMBER | INSTITUTION | CALENDAR | HEARING DATE |
|---|---|---|---|---|
| SNODGRASS | C-50459 | DVI | MARCH 92 | |

2    2

# EXHIBIT S

## 03-00-1993 LIFE PRISONER EVALUATION

# EXHIBIT S

1976. During the marriage, from age seven to nine, Snodgrass is sexually molested by his step-brother who is ten years his senior. The above occurred approximately once per week over a two year period and included forced anal intercourse and oral copulation.

His mother remarried John Nailen.

Snodgrass stated he felt ignored, belittled and verbally harassed by his step-father.

Snodgrass graduated from Pinole Valley High School in 1979. Attended Contra Costa Junior College for "a couple of months" before dropping out due to domestic problems and anxieties.

Snodgrass has no documented history of military service.

Snodgrass was 20 years old at the time of the instant offense and reportedly in good health.

His employment prior to the instant offense consisted of 6 months with Grand Auto Stores and of "small jobs" in gas stations, a pharmacy and landscaping services for friends. He states he drank a lot of alcohol to escape reality. After the instant offense, his use of marijuana reached alarming proportions.

III. POSTCONVICTION FACTORS: During his incarceration with CDC, Snodgrass has received one administrative CDC 115 and six documented episodes of custodial counseling (CDC 128A's). He completed the Vocational Mill and Cabinet Program in January of 1990, and a one semester course of business math through the San Joaquin Delta Community College District in the Fall of 1986. His work reports and vocational grades are consistently above average and/or excellent. He has received many references about his positive attitude and his eagerness and willingness to learn. His courtesy towards his peers and staff are also often mentioned. Snodgrass participated in and completed a Category "T" program while at CMF-Main from October 1987 through June 1990. His psychiatric reports indicate he has matured significantly. Snodgrass received lumbar disc surgery in San Francisco in 1991 and has subsequently returned to DVI and records appear to reflect a satisfactory recovery. He also completed a CAT X program in the fall 1991. The Board of Prison Terms had recommended he complete Category "X" and "T" programs and participate in self help groups such as Alcoholics and/or Narcotics Anonymous. He has completed those BPT recommendations. See attached Postconviction Progress Report for details.

IV. FUTURE PLANS: Snodgrass plans to live in the Pinole, California area. More specific plans will be developed prior to his release.

Members of the Pinole Valley Baptist Church have expressed support in the area of housing and employment. He possess employable skills, as a mill and cabinet worker and landscaper labor.

V. SUMMARY:

A. Considering Snodgrass' commitment offense, lack of a prior record and institutional adjustment, this caseworker believes the prisoner would probably pose a moderate degree of threat to the public at this time, if released from prison.

B. Prior to release, Snodgrass could benefit from remaining disciplinary free and maintaining his excellent work record and continuing to upgrade his vocational skills.

C.    This Board report is based upon an eight (8) hour review of his central file and approximately a one (1) hour interview with Snodgrass.

J. BAILEY, CC I

H. WHITLEY, CC II

J. DAWSON, C & PR(A)

DOCUMENTATION HEARING

PAROLE CONSIDERATION HEARING

PROGRESS HEARING

**TRUCTIONS**

O CDC STAFF: DOCUMENT EACH 12-MONTH PERIOD FROM THE DATE THE LIFE TERM STARTS TO PRESENT.
O BPT STAFF: FOR EACH 12-MONTH INCREMENT APPLY THE GUIDELINES UNDER WHICH THE PAROLE DATE WAS ORIGINALLY
ESTABLISHED, i.e., 0-2 MONTHS FOR PBR AND 0-4 MONTHS FOR BPT. SEE BPT §§2290 - 2292, 2410 AND 2439.

| POST CONVICTION CREDIT | | | REASONS |
|---|---|---|---|
| YEAR | BPT | PBR | |
| 02-08-92<br>TO<br>01-06-93<br>(PRESENT) | | | Remains at Deuel Vocational Institution (DVI) as a Medium A custody, general population inmate assigned to the Prison Industries Authority Program (PIA) receiving above average work ratings with grades of 2. On 7-2-92, received a Unit Classification Committee (UCC) annual review and Post Board review. His custody was reviewed and deemed appropriate. He was informed of the Board of Prison Terms recommendations and continued in his program. On 8-22-92, he received an informative chrono from the Alcoholics Anonymous (AA) staff sponsor indicating his participation in DVI's AA program. On 11-16-92, UCC reviews subject's program per his request. UCC acts to place subject on the Educational Services-Vocational Drafting waiting list until reassigned. Snodgrass has remained disciplinary free for this period. |

J. BAILEY, CC I

H. WHITLEY, CC II

J. DAWSON, C & PR(A)

| IECTIONAL COUNSELOR SIGNATURE | | | | DATE |
|---|---|---|---|---|
| | | | | 1-20-1993 |

| AE | CDC NUMBER | INSTITUTION | CALENDAR | HEARING DATE |
|---|---|---|---|---|
| SNODGRASS | C-50459 | DVI | 03/93 | |

# EXHIBIT T

## 03-00-1994 LIFE PRISONER EVALUATION

# EXHIBIT T

PRISONER EVALUATION REPORT
SUBSEQUENT PAROLE CONSIDERATION HEARING
MARCH 1994 CALENDAR

I.    COMMITMENT FACTORS:

A.    Life Crime: All relevant documents from the previous hearings have been considered. The information appears valid, and the writer has no further information to add.

Source of information is the Probation Officer's Report dated 06-18-82, pages 4 - 7 and 18.

B.    Prisoner's Version: Remains the same as stated in the previous hearings.

C.    Aggravating and Mitigating Circumstances: Remains the same as stated in the previous hearings.

II.   PRECONVICTION FACTORS: Documents from the previous hearings have been considered and the information remains valid.

The Source of this information is the Probation Officer's Report dated 06-18-82, pages 10 - 13.

III.  POSTCONVICTION FACTORS: Documents from the previous hearings have been considered and the information remains valid. During the period of time since, then the prisoner's behavior has remained the same. His assignment continues to be Education Services, Vocational Drafting where he has received satisfactory grade reports. Alcoholics Anonymous attendance has been continuous since February 26, 1992. Voluntary therapy participation in Dr. Ferrant's lifer group included seven sessions in 1993. See attached Postconviction Progress Reports for details.

IV.   FUTURE PLANS:

Snodgrass suggests he has two families he could reside with if paroled. These are Glen Weber of Milpitas, California and Bob Turner of San Pablo, California. Each will provide letters to the Board of Prison Terms outlining their support. Regarding employment Snodgrass will seek work in Wood Working or in Drafting. Additional support is available from members of the Pinole Valley Baptist Church and the inmate's mother, Marietta Snodgrass who resides at 2664 Emma Drive, Pinole, California, telephone number (510) 724-7090.

V.    SUMMARY:

A.    Considering the commitment offenses, prior record, and institutional adjustment, this caseworker believes the prisoner would probably pose a moderate degree of threat to the public, if released from prison.

B.    Prior to release, Snodgrass could benefit from remaining disciplinary free, continuing to upgrade vocationally and participating in self-help programming.

C.     This Board report is based on 6 hours of central file, inmate interview and incidental contact in the housing unit.

D. BEST, CC I

S, JACKSON, CC II

K. ROST, C & PR(A)

INSTRUCTIONS

TO CDC STAFF: DOCUMENT EACH 12-MONTH PERIOD FROM THE DATE THE LIFE TERM STARTS TO PRESENT

TO BPT STAFF: FOR EACH 12-MONTH INCREMENT APPLY THE GUIDELINES UNDER WHICH THE PAROLE DATE WAS ORIGINAL
ESTABLISHED. i.e., 0-2 MONTHS FOR PBR AND 0-4 MONTHS FOR BPT  SEE BPT §§2290 - 2292, 2410 AND 243

| POSTCONVICTION CREDIT | | | REASONS |
|---|---|---|---|
| YEAR | BPT | PBR | |
| 01-07-93 TO 07-18-93 | | | Remained at Deuel Vocational Institution (DVI) in the general population under Medium A custody. Assigned to Education Services, Vocational Drafting on 12-31-93, receiving satisfactory grade reports from the instructor. On 03-04-93 appeared before the Board of Prison Terms (BPT). Parole was denied one year. A Post Board Review was held on 06-14-93. Unit Classification Committee noted the BPT's recommendations to remain disciplinary free, continue to upgrade educationally, maintain vocational gain, participate in self-help programming and participate in therapy programming with a focus on issues outlined in the BPT decision in the psychiatric evaluation: No program change occurred. Received CDC 128-B dated 06-28-93, reflecting completion of the Alcoholics Anonymous 12 Step and 12 Tradition Program. Received no rule violations, adverse or laudatory chronos. |
| 07-19-93 TO 01-20-94 (PRESENT) | | | Remained at DVI in the general population under Medium A custody. Continued assignment in Vocational Drafting, no grade report on file. Received no rule violation, adverse or laudatory chrono. Received a CDC 128-C dated 11-04-93, reflecting attendance at 7 sessions of a lifer therapy group. Received a CDC 128-B reflecting attendance at Alcoholic Anonymous since 02-26-92. |
| | | | *A BL #* D. BEST, CC I |
| | | | S. JACKSON, CC II |
| | | | K. ROST, C&PR(A) |

| CORRECTIONAL COUNSELOR SIGNATURE | | | | | DATE |
|---|---|---|---|---|---|
| *Marlene Best* | | | | | 2-8-94 |
| NAME | CDC NUMBER | INSTITUTION | | CALENDAR | HEARING D/ |
| SNODGRASS | C-50459 | DVI | | 03/94 | |

# EXHIBIT U

## 01-00-1995 LIFE PRISONER EVALUATION

# EXHIBIT U

LIFE PRISONER EVALUATION REPORT
SUBSEQUENT PAROLE CONSIDERATION HEARING
MAR 1995 CALENDAR

I.  COMMITMENT FACTORS:

A.  Life Crime: Murder 2nd, (187PC) case # CC26252, 15 years to Life, MEPD: 9/28/90: Victim: John Naulen

1.  Offense Summary:  All relevant documents from the previous hearings including transcripts, have been considered and that information appears valid and the written has no further information to add.

2.  Prisoner's Version: Remains the same as stated in the previous hearings.

3.  Aggravating Circumstances: Remains the same as stated in the previous hearing.

4.  Mitigating Circumstances: Remains the same as stated in the previous hearings.

II.  PRECONVICTION FACTORS: Documents from the previous hearings have been considered and that information remains valid.

III.  POSTCONVICTION FACTORS:  Documents from the previous Documentation Hearing has been considered and that information remains valid.  During the period of time since then Snodgrass's behavior has remained the same in that he continued to remain disciplinary free.  On 5/23/94 Snodgrass transferred to the Vocational Air Engine Program.  On 10-18-94, he entered the Vocational Air Frame Program and he continues to perform satisfactory.

IV.  FUTURE PLANS: Remains the same as indicated in the previous Board Reports.

V.  SUMMARY:

A.  Considering the commitment offense, prior record and prison adjustment, the writer believes that Snodgrass would probably pose a low degree of threat to the public, if released from prison at this time.

B.  Prior to release the inmate could benefit from maintaining his disciplinary free record continuing his positive programing and being an active participant in the Vocational Air Frame Program.

C.  This Report is based upon 1 1/2 hours of incidental contact in the housing unit a through review of the central file, and feed back from work supervisors and unit staff.

COPY SENT TO INMATE 1-23-95

V DOBSON, CC I

S. K. JACKSON, CC II

K. ROST, C&PR

# EXHIBIT V

## 07-00-1997 LIFE PRISONER EVALUATION

# EXHIBIT V

LIFE PRISONER EVALUATION REPORT
SUBSEQUENT PAROLE CONSIDERATION HEARING
JULY 1997 CALENDAR

## I.    COMMITMENT FACTORS:

A.    Life Crime:  Murder 2nd, (187 PC) 1 Count, Case #CC26252, 15 years to Life;
MEPD: 09-28-90; Victim: John Nailen, age 60.

1.    Offense Summary:  On the 18th of November 1981, in Pinole, California,
Snodgrass shot his stepfather, Mr. John Nailen (age 60), in the chest area with
Mr. Nailen's 7 millimeter hunting rifle.  Mr. Nailen fell to the ground.
Snodgrass then walked up to Mr. Nailen's position and shot him a second time
in the neck.    Mr. Nailen was transported to a hospital where he was
pronounced dead.  Source documents considered Probation Officer's Report
(POR) dated 06-18-82, pages 4, 5, 6, 7 & 18.

2.    Prisoner's Version: **As established in the Initial Probation Officer's Report
of 06-18-82.** "Constant harassment, belittlement, antagonism by stepfather
and his family, has had a negative effect on my mental state of mind.  I
reached my breaking point after more than ten years of it.  I broke and shot
and killed my stepfather with a hunting rifle.  I got involved by my mother
marrying into the deceaced victim's family.  The way in which I was involved
is as follows:  I am the youngest in my mother's family.  I was molested by 17
year old son of deceaced when I was 7 years old.  This went on for about two
years and it has had a negitive effect on my mind.  That, in addition to
terrorization by stepbrother and stepfather, over protectiveness by my mother
has give me some mental problems I need to have taken care of.  I'm not
crazy, but I know I need help with these problems including depression and
anxiety as well as others.  I feel that the sooner I get help, the sooner I'll be
able to feel normal and lead a normal life.  Being that this whole perdicament
was domestic in origin, I feel that it couldn't happen again.  I'm a bit older
and wiser now, and I'm trying to see things in their true light.  I can be helped,
and I want to be rid of these problems (I can be rid of these problems).  I feel
sentenceing without probation could only complicate my problems."

"My long-range plans are to feel better about myself, learn a skill and find a
decent job.  To marry, have kids, and to love them and give the things in life I
never had, which I so desperately needed."

COPY SENT TO INMATE 6.4.97

3.    Aggravating Circumstances:

   a)    The crime involved great violence in that a person is now deceased.

   b)    The victim was particularly vulnerable, having few avenues of retreat when Snodgrass pointed the rifle at him.

   c)    The available information pertaining to the offense establishes premeditation.

   d)    During the commission of the crime the inmate had a clear opportunity cease but instead continued.

4.    Mitigating Circumstances:

   a)    The inmate has a minimal or no history of criminal behavior.

   b)    The crime was committed during or due to an unusual situation unlikely to occur.

   c)    The crime was committed during a brief period of extreme mental and/or emotional trauma.

## II.    PRECONVICTION FACTORS:

A.    Juvenile Record: None. Per POR dated 06-18-82, page 2.

B.    Adult Convictions: No adult arrest record prior to the commitment offense. Per POR dated 06-18-82, page 2.

C.    Personal Factors: Snodgrass was born 08-04-61, in Oakland, California, to the union of Harold Nathan Snodgrass and Marietta Montgomery Snodgrass. He is the youngest of three children, with two older sisters. His father died when he was five years old. When was eight years old, his mother married John Nailen, the victim in the instant offense. Their marriage is described as menacing, and included several separation with a divorce in 1976. In January of 1979, John Nailen under went surgery for cancer of the spleen and spent the majority of that year receiving radiation treatment. In December of 1979, John Nailen remarried Marietta. In October of 1981, Mr. Nailen was give a clean bill of health.

Snodgrass stated he felt ignored, belittled and verbally harassed by his step-father. He graduated from Pinole Valley High School in 1979. Attended Contra Costa Junior College for "a couple of months" before dropping out due to domestic problems and anxieties. He has no documented history of military service. He was 20 years old at the time of the offense and reportedly in good health. His employment prior to the instant consisted of 6 months with Grand Auto Stores and of "small jobs" in gas stations, a pharmacy and landscaping services for friends. He states he drank a lot of alcohol to escape reality. After the instant offense, his use of marijuana reached alarming proportions.

III.  POSTCONVICTION FACTORS:  During his incarceration with CDC, Snodgrass has received one (1) administrative CDC-115 and six (6) documented episodes of custodial counseling (CDC-128-A's). He completed the Vocational Mill and Cabinet Program in January of 1990, and a one semester course of business math through the San Joaquin Delta Community College District in the Fall of 1986.  His work reports and vocational grades are constantly above average and/or excellent.  He has received many references about his positive attitude and his eagerness and willingness to learn.  His courtesy towards his peers and staff are also often mentioned. Snodgrass participated in and completed a Category "T" program while at CMF-Main from October 1987 through June 1990.  His psychiatric reports indicate he has matured significantly.  He completed a CAT X program in the fall of 1991. The Board of Prison Terms (BPT) had previously recommended he complete CAT "X" and "T" programs and participate in self help groups such as Alcoholics and/or Narcotics Anonymous. He has completed those BPT recommendations. (See attached Postconviction Progress Report for details.)

IV.  FUTURE PLANS:  Snodgrass upon release plans to reside temporary with his mother Marietta Snodgrass, 2664 Emma Drive, Pinole, CA 94564. Telephone (510) 724-7090. Once he establishes himself, he plans to live on his own. His employment plans appear to be straight forward. Once he receives his Federal Aviation Administration (FAA) License in Air Engine and Air Frame he will be very employable. As a back-up, he does posses employable skills in Mill & Cabinet.

V.  SUMMARY:

A.  Considering Snodgrass commitment offense, lack of a prior record and institutional adjustment, this caseworker believes the prisoner would probably pose a moderate degree of threat to the public at this time, if released from prison.

B.  Prior to release, Snodgrass could benefit from remaining disciplinary free and maintaining his excellent work record and continuing to upgrade his education and vocational skills.

_____
G. KINNARD, CC I

_____
D. JETT, CC-II

_____
D. ITEN, C&PR

FE PRISONER: POSTCONVICT. PROGRESS REPORT

DOCUMENTATION HEARING

PAROLE CONSIDERATION HEARING

PROGRESS HEARING

INSTRUCTIONS

TO CDC STAFF:   DOCUMENT EACH 12-MONTH PERIOD FROM THE DATE THE LIFE TERM STARTS TO PRESENT.
TO BPT STAFF:   FOR EACH 12-MONTH INCREMENT APPLY THE GUIDELINES UNDER WHICH THE PAROLE DATE WAS ORIGINALLY
ESTABLISHED, i.e., 0-2 MONTHS FOR PBR AND 0-4 MONTHS FOR BPT.  SEE BPT §§2290 - 2292, 2410 AND 2439.

| POSTCONVICTION CREDIT | | | REASONS |
|---|---|---|---|
| YEAR | BPT | PBR | |
| 1-21-94 to 7-18-94 | O | | Remained at Deuel Vocational Institution (DVI) in the general population under Medium A Custody.  Continued assignment in Vocational Drafting, receiving satisfactory work reports.  On 03-18-94, UCC approved family visits.  On 03-21-94 received laudatory chrono for "Participation in Alcoholics Anonymous." On 03-17-94, completed "Intro to Algebra"- Patton College, grade of D completed 3 units.   On 06-15-94 completed course in Psychotherapy (six session noted).  On 06-16-94 appeared before the Board of Prison Terms (BPT), parole was denied one (1) year.  BPT recommended (1) Remain disciplinary free, (2) Continue to participate in Self-help and Therapy Programs.  Received no rule violations, or adverse chronos. |
| 7-19-94 to 7-18-95 | O | | Remained at DVI in the general population under Medium A Custody. Continued assignment in Vocational Drafting. He transferred to Vocational Air Frame on 05-23-94 and remained until 10-18-94, advancing to Air Frame receiving satisfactory work reports.  On 07-27-94 appeared before UCC for Annual Review- continue present program (CPP).  On 12-23-94 appeared before UCC for Post Board Review based upon appearance before BPT on 06-19-94.  On 05-11-94 completed "Time and Money Management class of Parole Recidivism Prevention Program (PRPP)." On 06-11-95 received medical chrono CDC-128-C indicating attendance in "The Stress and Anger Management" program offered by the Psychology Department.  Received no rules violations or adverse chronos. Received four (4) laudatory chronos: one (1) for Participation in Arts In Correction program dated 05-01-95, one (1) for Participation in the Aeronautic Program dated 03-08-95, one (1) for Participation in Educational Services as a Tutor dated 01-16-95 and the last one for Participation in DVI's Trade Fair dated 06-02-95. |
| 7-19-95 to 7-18-96 | O | | Remained at DVI in the general population under Medium A Custody. Continued assignment in Vocational air Frame receiving satisfactory grades.  On 07-20-95 appeared before BPT for a Subsequent Hearing-Parole was denied two (2) years.  The BPT made the following recommendations Remain disciplinary free, upgrade educationally and vocationally, participate in self-help and therapy groups. On 07-28-95 received a CDC-128-C "for |

| CORRECTIONAL COUNSELOR SIGNATURE | | | | DATE | |
|---|---|---|---|---|---|
| | $\mathcal{R}e\mathcal{D}$ | | | 5-30-97 | |
| NAME | | CDC NUMBER | INSTITUTION | CALENDAR | HEARING DATE |
| SNODGRASS | | C-50459 | DVI | 07/97 | |

| POSTCONVICTION CREDIT | | | REASONS |
|---|---|---|---|
| YEAR | BPT | PBR | |

completion of 5 week Introduction to Stress and Anger Management offered by the Psychology Department. On 09-22-95 appeared before UCC for Post Board Review based on BPT appearance of 07-20-95. On 09-27-95 appeared before UCC for Annual Review-CPP. ON 11-13-95 completed "Health Relationship Class of PRPP. On 01-24-96 appeared before UCC for family visit approval. Received no rules violations or adverse chronos. Received one (1) laudatory chrono for "Participation in Alcoholics Anonymous dated 05-13-96. On 07-04-96 assigned to Voc Air Engine.

**7-19-96**
**O**
**RESENT**
**5-29-97**

Remained at DVI in the general population under Medium A Custody. Continued assignment in Vocational air Engine receiving satisfactory grades. On 08-21-96 appeared before UCC for Annual Review-CPP. On 12-02-96 completed "Career Development Class of PRPP. On 04-21-97 completed "Conflict Resolution Class" of PRPP. Received no rules violations or adverse chronos. Received one (1) laudatory chrono for "Performance in Vocational Air Frame for maintaining a 95% average dated 08-21-96.

G. KINNARD, CC-I

D. JETT, CC II

D. ITEN, C &PR

DER:

☐ BPT date advanced by _____ months.    ☐ BPT date affirmed without change.

☐ PBR date advanced by _____ months.    ☐ PBR date affirmed without change.

ECIAL CONDITIONS OF PAROLE:

☐ Previously imposed conditions affirmed.

☐ Add or modify _____

☐ Schedule for Progress hearing on appropriate institutional calendar.

| ME | CDC NUMBER | INSTITUTION | CALENDAR | HEARING DATI |
|---|---|---|---|---|
| ODGRASS | C-50459 | DVI | 07/97 | |

# EXHIBIT W

## 09-00-1998 LIFE PRISONER EVALUATION

# EXHIBIT W

LIFE PRISONER EVALUATION REPORT
SUBSEQUENT PAROLE CONSIDERATION HEARING
AUGUST 1998 CALENDAR

I.    COMMITMENT FACTORS:

A.    Life Crime: Murder 2nd, (187 PC) case # CC26252, 15 years to Life, MEPD: 9-28-
90; Victim: John Naulen

1.    Offense Summary:    All relevant documents from the previous hearings
including transcripts, have been considered and that information appears valid
and the writer has no further information to add.

2.    Prisoner's Version: Remains the same as stated in the previous hearings.

3.    Aggravating Circumstances:    Remains the same as stated in the previous
hearings.

4.    Mitigating Circumstances:    Remains the same as stated in the previous
hearings.

II.    PRECONVICTION FACTORS:    Documents from the previous hearings have been
considered and that information remains valid.

III.    POSTCONVICTION FACTORS:    Documents from the previous Documentation Hearing
has been considered and that information remains valid.  During the period of time since then
Snodgrass's behavior has remained the same in that he continued to remain disciplinary free.
He has continued in the Vocational Air Engine Program and he continues to earn satisfactory
work reports.  He has also participated in and completed the Parolee Recidivism Prevention
Program in May 1998.

IV.    FUTURE PLANS:  Remains the same as indicated in the previous Board Reports.

V.    SUMMARY:

A.    Considering the commitment offense, prior record and prison adjustment, this writer
believes that Snodgrass would probably pose a moderate degree of threat to the
public, if released from prison at this time.

B.    Prior to release, the inmate could benefit from maintaining his disciplinary free record
continuing his positive programming and being an active participant in the Vocational
Air Engine Program.

C.    This Report is based upon an interview with Snodgrass and through review of the Central File.

_L. KUYKENDALL, CCI_    6-2-98

_R. KUWAHARA, CC-II_

_Arlene Best, C&PR (A)_    6-3-98
D. ITEN, C&PR

DOCUMENTATION HEARING

PAROLE CONSIDERATION HEARING

PROGRESS HEARING

RUCTIONS

) CDC STAFF:   DOCUMENT EACH 12-MONTH PERIOD FROM THE DATE THE LIFE TERM STARTS TO PRESENT.
) BPT STAFF:   FOR EACH 12-MONTH INCREMENT APPLY THE GUIDELINES UNDER WHICH THE PAROLE DATE WAS ORIGINALLY
ESTABLISHED. i.e., 0-2 MONTHS FOR PBR AND 0-4 MONTHS FOR BPT. SEE BPT §§2290 - 2292, 2410 AND 2439.

| POSTCONVICTION CREDIT | | | REASONS |
|---|---|---|---|
| YEAR | BPT | PBR | |
| 30-97 | | | Remained at DVI, under Medium A custody with 0 points. Continued assignment in Vocational Aircraft Engine receiving satisfactory work reports. |
| 18-98 :sent) | | | He appeared before UCC on 5-21-97 for an Annual Review (which was not noted on the previous Progress Report). He was continued in his present program in Vocational Aircraft Engine. On 8-13-97, he appeared before the Board of Prison Terms and was denied parole for one (1) year. The recommendations were to remain disciplinary free and participate in self-help and therapy. On 10-9-97, he appeared before UCC for a Post Board Review. The recommendations of the Board of Prsion Terms were reiterated and he was continued in his present program. He remained disciplinary free during this period and there is documentation to support participation in self-help citing his certificate of completion for the Parolee Recidivism Prevention Program which includes; Time and Money Management, Ethics and Values, Personal Devotions, Healthy Relationsips, Career Development and Conflict Resolution, dated May 1998. |

*L. KUYKENDALL, CCI*    6-2-98

*R. KUWAHARA, CCII*

*Darlene Best*
D. ITEN, C&PR

| RECTIONAL COUNSELOR SIGNATURE | | | | DATE 6·2·98 | |
|---|---|---|---|---|---|
| 4E | | CDC NUMBER | INSTITUTION | CALENDAR | HEARING DATE |
| )DGRASS | | C-50459 | | DVI | 09/98 |

# EXHIBIT X

## 09-00-1999 LIFE PRISONER EVALUATION

# EXHIBIT X

LIFE PRISONER EVALUATION REPORT
SUBSEQUENT PAROLE CONSIDERATION HEARING
SEPTEMBER 1999 CALENDAR


I.    COMMITMENT FACTORS:


   A.    Life Crime:  Murder 2nd, (187 PC) 1 Count, Case #CC26252, 15 years to Life;
         MEPD, 09-28-90; Victim: John Nailen, age 60.


      1.    Offense Summary:  On the 18th of November 1981, in Pinole, California
            Snodgrass shot his stepfather, Mr. John Nailen (age 60), in the chest area with
            Mr. Nailen's 7 millimeter hunting rifle. Mr. Nailen fell to the ground.
            Snodgrass then walked up to Mr. Nailen's position and shot him a second time
            in the neck.  Mr. Nailen was transported to a hospital where he was
            pronounced dead.  Source documents considered Probation Officer's Report
            (POR) dated 06-18-82, pages 4, 5, 6, 7 & 18.


      2.    Prisoner's Version:  As established in the Initial Probation Officer's Report of
            06-18-82.  "Constant harassment, belittlement, antagonism by stepfather and
            my family, has had a negative effect on my mental state of mind.  I reached my
            breaking point after more than ten years of it. I broke and shot and killed my
            stepfather with a hunting rifle. I got involved by my mother marrying into the
            deceased victim's family.  The way in which I was involved is as follows:  I am
            the youngest in my mother's family.  I was molested by the 17 year old son of
            the deceased when I was 7 years old.  This went on for about two years and it
            has had a negative effect on my mind.  That, in addition to terrorization by
            stepbrother and stepfather, over protectiveness by my mother has give me
            some mental problems I need to have taken care of.  I'm not crazy, but I know
            I need help with these problems including depression and anxiety as well as
            others. I feel that the sooner I get help, the sooner I'll be able to feel normal
            and lead a normal life.  Being that this whole predicament was domestic in
            origin, I feel that it couldn't happen again.  I'm a bit older and wiser now, and
            I'm trying to see things in their true light.  I can be helped, and I want to be rid
            of these problems (I can be rid of these problems).  I feel sentencing without
            probation could only complicate my problems."

            "My long-range plans are to feel better about myself, learn a skill and find a
            decent job.  To marry, have kids, and to love them and give the things in life I
            never had, which I so desperately needed."

me


Snodgrass stated he felt ignored, belittled and verbally harassed by his step-father. He graduated from Pinole Valley High School in 1979. Attended Contra Costa Junior College for "a couple of months" before dropping out due to domestic problems and anxieties. He has no documented history of military service. He was 20 years old at the time of the offense and reportedly in good health. His employment prior to the instant offense consisted of 6 months with Grand Auto Stores and of "small jobs" in gas stations, a pharmacy and landscaping services for friends. He states he drank a lot of alcohol to escape reality. After the instant offense, his use of marijuana reached alarming proportions.

III.    POSTCONVICTION FACTORS:    During his incarceration with CDC, Snodgrass has received one (1) administrative CC-115 and six 6) documented episodes of custodial counseling (CDC-128-A's). he completed the Vocational Mill and Cabinet Program in January of 1990 , and one semester course of business math through the San Joaquin Delta Community College District in the Fall of 1986. He has received his FAA license for both Air Engine and Air Frame through the vocational program at DVI. He is currently gaining experience in welding through the Vocational Welding program here at DVI. His work reports and vocational grades are constantly above average and/or excellent. He has received many references about his positive attitude and his eagerness and willingness to learn. His courtesy towards his peers and staff are also often mentioned. Snodgrass participated in and completed a Category "T" program while at CMF-Main from October 1987 through June 1990. His psychiatric reports indicate he has matured significantly. He completed a CAT X program in the fall of 1991. The Board of Prison Terms (BPT) had previously recommended he completed CAT "X" and "T" programs and participate in self help groups such as Alcoholics and/or Narcotics Anonymous. He has completed those BPT recommendations. (See attached Postconviction Progress Report for details.)

IV.    FUTURE PLANS:    Snodgrass upon release plans to reside temporary with his mother Marietta Snodgrass, 2664 Emma Drive, Pinole, CA 94564. Telephone (510) 724-7090. Once he establishes himself, he plans to live on his own. His employment plans appear to be straight forward. He received his Federal Aviation Administration (FAA) License in Air Engine and Air Frame and will be very employable.    As a back-up, he does possess employable skills in Mill & Cabinet, and Welding.

V.    SUMMARY:

A.    Considering Snodgrass' commitment offense, lack of a prior record and institutional adjustment, this caseworker believes the prisoner would probably pose a moderate degree of threat to the public at this time, if released from prison.

B.    Prior to release, Snodgrass could benefit from remaining disciplinary free and maintaining his excellent work record and continuing to upgrade his education and vocational skills.

for S. NOWLING, CCI (A)

J. CHAVEZ, CC-II (A)        CCII(A)

J. T. ROWE, C&PR        C&PR(A)

**INSTRUCTIONS**

TO CDC STAFF:    DOCUMENT EACH 12-MONTH PERIOD FROM THE DATE THE LIFE TERM STARTS TO PRESENT.
TO BPT STAFF:    FOR EACH 12-MONTH INCREMENT APPLY THE GUIDELINES UNDER WHICH THE PAROLE DATE WAS ORIGINALLY
ESTABLISHED, i.e., 0-2 MONTHS FOR PBR AND 0-4 MONTHS FOR BPT.  SEE BPT §§2290 - 2292, 2410 AND 2439.

| POSTCONVICTION CREDIT | | | |
|---|---|---|---|
| YEAR | BPT | PBR | REASONS |
| 05-19-98 TO 05-18-99 (Present) | | | Subject remained at DVI under Medium A Custody with a classification score of zero. He continued earning excellent work reports from his Vocational Air Engine Supervisor. On 05-21-99, he received a CDC-128-B citing his participation in AA. On 05-22-98, he appeared before UCC for his Annual Review and was continued in his present program. He received a CDC-128-B dated 07-09-98, citing his completion of 52 home study lessons and 26 classes on "Mental Health Through Will Training." He received a CDC-128-B Laudatory chrono citing his knowledge, dependability and conscientiousness while working in the PIA Woodshop. On 09-2-98, he appeared before the BPT and was denied parole for one (1) year. The BPT made the recommendations to remain disciplinary free, upgrade educationally, vocationally and participate in self-help/therapy. He received a CDC-128-B dated 09-22-99 citing his participation in Narcotics Anonymous. On 10-23-98, he appeared before UCC for his Post Board Review. The BPT recommendations were reiterated and he was continued in his present program. On 03-09-99, he entered the Vocational Welding program and according to the supervisor, he has made a "Good Start." He appeared before UCC on 05-06-99 for his Annual Review and was continued in his present program. Subject remained disciplinary free, has participated in self help/therapy and continues to upgrade vocationally/educationally. Subject programmed well during this period of time. |

S. NOWLING, CCI (A)

J. CHAVEZ, CCII (A)

J.T. ROWE, CCIII

CORRECTIONAL COUNSELOR SIGNATURE    DATE  12-14-99

NAME  SNODGRASS    CDC NUMBER  C-50459    INSTITUTION  DVI    CALENDAR  09/99  HEARING DATE

COPY SENT TO INMATE  1-21-00

PAGE  1  OF  1

# EXHIBIT Y

## 04-00-2001 LIFE PRISONER EVALUATION


EXHIBIT Y

LIFE PRISONER EVALUATION REPORT
SUBSEQUENT PAROLE CONSIDERATION HEARING
APRIL 2001 CALENDAR

I.    COMMITMENT FACTORS:

A.    Life Crime:    Murder 2nd, 187 PC, Count 1, Case #CC26252, sentenced to 15 Years to Life. MEPD: 09-28-90. Victim: John Nailen, age 60.

B.    Prisoner's Version: Remains the same as stated in the previous hearings.

C.    Aggravating and Mitigating Circumstances: Remains the same as stated in the previous hearings.

II.    PRECONVICTION FACTORS:

Documents from the previous hearings have been considered and that information remains valid.

III.    POSTCONVICTION FACTORS:

Documents from the previous hearings have been considered and the information remains valid. During the period of time since the last hearing, the prisoner's behavior has remained the same in that he continues to remain disciplinary free. His last CDC 115 was in 1989. He continues in the Vocational Welding Program earning satisfactory grades, where he has also earned several certifications. He continues his participation in Alcoholic's Anonymous and has completed a self-confrontation class offered by the Parolee Recidivism Prevention Program. Overall, he continues to positively program. (See attached Postconviction Progress Report for details).

III.    FUTURE PLANS:

Snodgrass continues to plan temporary residence with his mother, Marietta Snodgrass, 2664 Emma Drive, Pinole, CA 94564, (510) 724-7090. He has received his Federal Aviation Administration (FAA) License in Air Engine and Air Frame and plans to find employment in that field. He also has employable skills in Mill and Cabinet and Welding.

COPY SENT TO INMATE 8-21-01

| NAME | CDC # | INSTITUTION | CALENDAR | HEARING DATE |
|------|-------|-------------|----------|--------------|
| SNODGRASS | C-50459 | DVI | APRIL 2001 | |

Case 3:08-cv-03322-JSW    Document 4-2    Filed 07/09/2008    Page 75 of 79

IV.   SUMMARY:

A.   Considering the commitment offense, prior record and prison adjustment, the writer
     believes the prisoner would pose a moderate degree of threat to the public, at this time,
     if released from prison.

B.   Prior to release, the prisoner could benefit from maintaining his disciplinary free record,
     continuing his work assignment earning satisfactory ratings and continuing his
     participation in Alcoholic's Anonymous and other self-help programs, as they become
     available.

C.   This Board Report is based upon a review of the central file and an interview with the
     inmate.

D.   The inmate was afforded an opportunity to review his central file and declined.


_____  8/13/01
L. JEFFERY
Correctional Counselor I
Program Unit II

_____  8/13/01
S. MARQUEZ
Correctional Counselor II (A)
Program Unit II


_____  6/20/01
J.E. ZUNIGA
Facility Captain (A)
Program Unit II

_____  8-21-01
JANE T. ROWE
Classification & Parole Representative


NAME          CDC #          INSTITUTION          CALENDAR          HEARING DATE
SNODGRASS     C-58459        DVI                  APRIL 2001

PAGE 2 OF 2

☐ DOCUMENTATION HEARING

☒ PAROLE CONSIDERATION HEARING

☐ PROGRESS HEARING

INSTRUCTIONS

TO CDC STAFF:   DOCUMENT EACH 12-MONTH PERIOD FROM THE DATE THE LIFE TERM STARTS TO PRESENT.

TO BPT STAFF:   FOR EACH 12-MONTH INCREMENT APPLY THE GUIDELINES UNDER WHICH THE PAROLE DATE WAS ORIGINALLY ESTABLISHED, i.e., 0-2 MONTHS FOR PBR AND 0-4 MONTHS FOR BPT. SEE BPT §§2290 - 2292, 2410 AND 2439.

| POSTCONVICTION CREDIT | | | |
|---|---|---|---|
| YEAR | BPT | PBR | REASONS |
| 05-19-99 TO 05-18-00 | | | PLACEMENT: Remained at DVI in the General Population. |
| | | | CUSTODY: Medium A. |
| | | | VOCATIONAL TRAINING:   Continues his Vocational Welding earning satisfactory grades. |
| | | | ACADEMICS: None. |
| | | | WORK RECORD: None. |
| | | | GROUP ACTIVITIES:   CDC 128B of 07-29-99, citing participation in Alcoholic's Anonymous. |
| | | | PSYCHIATRIC TREATMENT: None noted. |
| | | | PRISON BEHAVIOR: Disciplinary free during this period. |
| | | | OTHER: None. |

COPY SENT TO INMATE 8.21.01

CORRECTIONAL COUNSELOR SIGNATURE

DATE 8/13/01

NAME: SNODGRASS   CCC

CDC NUMBER: C-50459

INSTITUTION: DVI-III

CALENDAR: APRIL 2001

HEARING DATE

PAGE 1 OF 2

| POST CONVICTION CREDIT | | | |
|---|---|---|---|
| YEAR | BPT | PBR | REASONS |
| 05-19-00 TO PRESENT | | | PLACEMENT: Remains at DVI in the General Population. CUSTODY: Medium A. VOCATIONAL TRAINING: Continues in the Vocational Welding earning satisfactory grades. ACADEMICS: None. WORK RECORD: None. GROUP ACTIVITIES: CDC 128B of 08-01-00, citing continued participation in Alcoholic's Anonymous. PSYCHIATRIC TREATMENT: None noted. PRISON BEHAVIOR: Disciplinary free this period. |
| | | | OTHER: CDC 128B of 03-13-01, citing completion of "Self-Confrontation Class" offered by the Parolee Recidivism Prevention Program. Certificate of 02-14-01, for participation in Bottle Stoppers AA Program. |

L. JEFFERY, CC1                8/13/01

S. MARQUEZ, CCI(A)            8/13/01

J. E. ZUNIGA, VC (A)          8/20/01

JANE ROWE, C & PR             8/21/01

ORDER:

☐ BPT date advanced by _____ months.     ☐ BPT date affirmed without change.

☐ PBR date advanced by _____ months.     ☐ PBR date affirmed without change.

SPECIAL CONDITIONS OF PAROLE:

☐ Previously imposed conditions affirmed.

☐ Add or modify _____

☐ Schedule for Progress hearing on appropriate institutional calendar.

| NAME: S. SNODGRASS | CDC NUMBER: C-50459 | INSTITUTION: DVI-III PAGE 2 OF 2 | CALENDAR: APRIL 2001 | HEARING DATE |

# EXHIBIT Z

## 11-00-2002 LIFE PRISONER EVALUATION

# EXHIBIT Z

# LIFE PRISONER EVALUATION REPORT
## SUBSEQUENT PAROLE CONSIDERATION HEARING# 9
### NOVEMBER 2002 CALENDAR

### SNODGRASS, GARY

C50459

### I.    COMMITMENT FACTORS:

A.    **Life Crime**: All relevant documents from the previous hearings have been considered, and that information appears valid. The writer has no further information to add.

B.    **Prisoner's Version**: In an interview for this report, Inmate Snodgrass indicated that his version remains the same as stated in the previous hearings.

C.    **Aggravating and Mitigating Circumstances**:

    1.    The following factor in aggravation was noted per DOM Section 62090.11.2.1.1:

        • During the commission of the crime, the inmate had a clear opportunity to cease but instead continued.

    2.    The following factors in mitigation were noted per DOM Section 62090.11.2.1.2:

        • The inmate has a minimal or no history of criminal behavior.

        • The crime was committed during or due to an unusual situation unlikely to recur.

II.    **PRECONVICTION FACTORS**: Documents from the previous hearings have been considered, and that information appears valid. The writer has no further information to add.

III.    **POSTCONVICTION FACTORS**: Documents from the previous hearings have been considered, and the information remains valid. During the period of time since the last hearing, the prisoner's behavior has remained the same, in that Snodgrass has remained disciplinary free, active in AA group (until his transfer to CTF) and has continued average or above performance in his work assignments. See Postconviction Progress Report for details.

IV.    **FUTURE PLANS**: Remain the same as indicated in the previous Board Report.

V.    SUMMARY:

A.    Considering the commitment offense, lack of prior record and positive prison adjustment, this writer believes that the prisoner would probably pose a low degree of threat to the public at this time, if released from prison.

B.    Prior to release, the prisoner could benefit from remaining disciplinary free.

C.    No accommodation for the purposes of effective communication was required per the Armstrong Remedial Plan.

D.    This Board Report is based upon a one hour interview, a thorough review of the Central File, and two and a half months incidental contact in the housing unit. Inmate Snodgrass was afforded an opportunity to review his Central File, per the Olson Decision, on 10/2/02.

☐  DOCUMENTATION HEARING

☒  PAROLE CONSIDERATION HEARING

☐  PROGRESS HEARING                    (Life term started 7/19/82)

INSTRUCTIONS
TO CDC STAFF: DOCUMENT EACH 12-MONTH PERIOD FROM THE DATE THE LIFE TERM STARTS TO PRESENT
TO BPT STAFF: FOR EACH 12-MONTH INCREMENT APPLY THE GUIDELINES UNDER WHICH THE PAROLE DATE WAS ORIGINALLY
ESTABLISHED, ie., 0-2 MONTHS FOR PBR AND 0-4 MONTHS FOR BPT. SEE BPT §§2290 - 2292, 2410 AND 2439.

| POSTCONVICTION CREDIT | | | |
|---|---|---|---|
| YEAR | BPT | PBR | REASONS |
| 7/00 to 7/01 | | | **PLACEMENT:** Remained at DVI during this period. **CUSTODY:** Medium A **CLASSIFICATION SCORE:** 0. **MEDICAL:** TB Alert Code 22 dated 4/30/01. **ACADEMIC:** None during this period. Took the T.A.B.E. on 8/15/00 with reading, math and language skills all measured at 12.9, per 128-B dated 8/15/00. **WORK:** Assigned to vocational training during this period. **VOCATION:** Assigned to Voc Welding during this period with positive ratings on 128-E chronos. **GROUP ACTIVITIES:** Continued participation in AA group (since 2/26/92) per 128-B dated 8/1/00. Completed the eight-week "Self-Confrontation Class" per 128-B dated 3/13/01. **PSYCH TREATMENT:** None during this period. **PRISON BEHAVIOR:** Remained disciplinary free during this period. |

| CORRECTIONAL COUNSELOR'S SIGNATURE | | | DATE |
|---|---|---|---|
| SNODGRASS, GARY | C50459 | CTF-SOLEDAD | 10/30/02 NOV/2002 |

| POSTCONVICTION CREDIT | | | |
|---|---|---|---|
| YEAR | BPT | PBR | REASONS |
| 7/01 to 7/02 | | | **PLACEMENT:** Transferred to CTF on 4/15/02. |
| | | | **CUSTODY:** Medium A. |
| | | | **CLASSIFICATION SCORE:** 0. |
| | | | **MEDICAL:** Met inclusion criteria for the MH Treatment Population (CCCMS) due to medical necessity, per 128-C dated 9/5/01. Removed from CCCMS on 4/3/02. TB Alert Code 22 dated 4/17/02 and 5/6/02. Fit for full duty, 4/19/02 and 4/23/02. |
| | | | **ACADEMIC:** None during this period. |
| | | | **WORK:** Assigned to Plant Operations on 12/18/01. 128-B dated 3/6/02 requested Snodgrass be retained at DVI due to his skills in drafting and as a certified welder. After transfer to CTF, assigned to PIA Wood Products (East Dorn) as Furniture Finisher from 5/1/02 to 5/29/02. Reassigned as Machine Operator (East Dorm) from 5/29/02 to the end of the period. Satisfactory ratings on CDC 101 chron dated 7/1/02 (30 day evaluation/pay increase). |
| | | | **VOCATION:** Completed Voc Welding program per 128-E dated 1/3/02. |
| | | | **GROUP ACTIVITIES:** Continued participation in AA group (since 2/26/92) per 128-B chronos dated 8/2/01, 12/24/01 and 4/11/02. |
| | | | **PSYCH TREATMENT:** None during this period. |
| | | | **PRISON BEHAVIOR:** Remained disciplinary free during this period. |

ORDER:

☐ BPT date advanced by _____ months.     ☐ BPT date affirmed without change.
☐ PBR date advanced by _____ months.     ☐ PBR date affirmed without change.

SPECIAL CONDITIONS OF PAROLE:
☐ Previously imposed conditions affirmed.
☐ Add or modify

☐ Schedule for Progress Hearing on appropriate institutional calendar

SNODGRASS, GARY          C50459                          CTF SOLEDAD                    NOV/2002

| POSTCONVICTION CREDIT | | | |
|---|---|---|---|
| YEAR | BPT | PBR | REASONS |
| 7/02 to Present (10/03/02) | | | **PLACEMENT:** Remained at CTF during this period. Transferred from Z Wing to the East Dorm on 8/9/02. **CUSTODY:** Medium A. **CLASSIFICATION SCORE:** 0. **MEDICAL:** None during this period. **ACADEMIC:** None during this period. **WORK:** Remained in PIA Wood Products assignment (Machine Operator) in East Dorm during this period. **VOCATION:** None during this period, other than working in PIA Wood Products assignment. **GROUP ACTIVITIES:** None during this period. **PSYCH TREATMENT:** None during this period. **PRISON BEHAVIOR:** Remained disciplinary free during this period. |

ORDER:

☐ BPT date advanced by _____ months.      ☐ BPT date affirmed without change.
☐ PBR date advanced by _____ months.      ☐ PBR date affirmed without change.

SPECIAL CONDITIONS OF PAROLE:

☐ Previously imposed conditions affirmed.
☐ Add or modify

☐ Schedule for Progress Hearing on appropriate institutional calendar

SNODGRASS, GARY          C50459                    CTF-SOLEDAD                  NOV/2002

G. Peabody

Correctional Counselor I

10/30/02
Date

C. Plymesser

Correctional Counselor II

10/30/02
Date

L. Trexler

Facility Captain(A)

10/31/02
Date

D.S. Levorse

Classification and Parole Representative

10/31/02
Date

# EXHIBIT AA

## 11-00-2003 LIFE PRISONER EVALUATION

# EXHIBIT AA

LIFE PRISONER EVALUATION REPORT
SUBSEQUENT PAROLE CONSIDERATION HEARING
NOVEMBER 2003 CALENDAR

## SNODGRASS, GARY

C-50459

I. COMMITMENT FACTORS:

A.  **Life Crime:** Murder 2nd Degree, PC 187, from Contra Costa County Case #25252. Received by CDC on 7/19/82 with a sentence of 15years to Life and an MEPD of 9/11/90. Weapon; rifle, victim; John Daniel Nailen, 60 years old.

   1.  **Summary of Crime:** The defendant's mother, Marietta Snodgrass, married John Nailen in 1969 when the defendant was approximately seven years old. The marriage was some what tempestuous and the couple separated on several occasions before the marriage terminated in divorce in 1976. The defendant relates that his stepfather constantly belittled and verbally harassed him. His anxiety increased when his mother remarried John Nailen again, in 1979. Over the ensuing years, his distress and anxiety developed into a consuming hatred of John Nailen. He fantasized about killing the victim months before the crime took place. On November 18, 1981, he secreted his stepfather's rifle behind some plasterboard in the garage. When his stepfather returned home from dropping off his wife and daughter at work, he told Gary to put out the cat. The defendant complied with this order and as he went outside, he retrieved the weapon. As he was preparing the weapon it accidentally discharged. Mr. Nailen came outside to investigate the disturbance and was shot twice by the defendant. He subsequently died that morning at the hospital. Source; POR pg. 3 – 7.

   2.  **Prisoner's Version:** As established in the Initial Probation Officer's Report of 6/18/82. "Constant harassment, belittlement, antagonism by stepfather and my family, has had a negative effect on my mental state of mind. I reached my breaking point after more than ten years of it. I broke and shot and killed my stepfather with a hunting rifle. I got involved by my mother marrying into the deceased victim's family. The way in which I was involved is as follows: I am the youngest in my mother's family. I was molested by the 17 year old son of the deceased when I was 7 years old. This went on for about two years and it has had a negative effect on my mind. That, in addition to terrorization by stepbrother and stepfather, over protectiveness by my mother has given me some mental problems I

SENT TO INMATE ON 6.9.04

need to have taken care of. I'm not crazy, but I know I need help with these problems I need to have taken care of. I'm not crazy, but I know I need help with these problems including depression and anxiety as well as others. I feel that the sooner I get help, the sooner I'll be able to feel normal and lead a normal life. Being that this whole predicament was domestic in origin, I feel that it couldn't happen again. I'm a bit older and wiser now, and I'm trying to see things in their true light. I can be helped, and I want to be rid of these problems (I can be rid of these problems). I feel sentencing without probation could only complicate my problems."

"My long-range plans are to feel better about myself, learn a skill and find a decent job. To marry, have kids, and to love them and give the things in life I never had, which I so desperately needed."

3.  **Aggravating/Mitigating Circumstances:**

a.    **Aggravating Factors:**

1)    Use of weapon.

b.    **Mitigating Factors:**

1)    Crime was committed during or due to an unusual situation unlikely to reoccur.

2)    Prisoner has minimal or no history of criminal behavior.

B.    **Multiple Crime(s):** None.

1.    **Summary of Crime:** N/A.

2.    **Prisoner's Version:** N/A.

## II. PRECONVICTION FACTORS:

A.    **Juvenile Record:** None.

B.    **Adult Convictions and Arrests:** None.

C.    **Personal Factors:** Snodgrass was born August 4, 1961 in Oakland, California to the union of Harold Nathan Snodgrass and Marietta Montgomery. He was the youngest of three children. His father died when he was five years old. Three years later his mother remarried to Mr. John Nailen, the victim in the instant

SNODGRASS, GARY          C-50459               CTF-SOLEDAD          NOV/2005

offense. Their marriage was described as turbulent, and included several separations, ultimately ending in divorce in 1976. In December of 1979 they remarried once again. Snodgrass states that the stress of his stepfather's abuse led to his decisions that ended in Mr. Nailen's murder. Snodgrass graduated from Pinole Valley High School in 1979, and did not serve in any branch of the military.

## III.    POSTCONVICTION FACTORS:

A.    **Special Programming /Accommodations:** None.

B.    **Custody History:** Since his last board hearing, Snodgrass has remained at the Correctional Training Facility under Medium A custody with zero (0) classification points. He has continued working full time as a machine operator in the PIA Wood Products Factory, building furniture. Grades for this time period are satisfactory to above average. Supervisor comments include, "Inmate Snodgrass is a good, hard worker. He is eager to learn and complete his assignmed tasks in a timely manner."

C.    **Therapy and Self-Help Activities:** Inmate Snodgrass has voluntarily participated in a four hour video/discussion of issues related to successfully re-engaging into society. This discussion was under the auspices of the Inmate Employability Program, per C. D. Walker, I.E.P. Coordinator at CTF Prison Industry Authority. (8/30/02) It should be noted that therapy opportunities are limited at CTF. (AA currently closed).

D.    **Disciplinary History:**

CDC 128A's:

| | | |
|---|---|---|
| 2/15/83 | SQ | Failure to report to school. |
| Unknown | DVI | Possession of contraband. |
| 10/24/83 | DVI | Possession of contraband. |
| 3/10/91 | SQ | Failure to make his lock up. |
| 12/11/91 | CMF | Smuggling wood into CMF-Main. |
| 9/29/95 | DVI | Disordered clothing in cell. |

CDC 115's:

| | | |
|---|---|---|
| 8/31/89 | CMF | Administrative 115 for Out of Bounds in Mod. "S" found Guilty: warned and counseled. |

E.    Other: Snodgrass was seen by the Board of Prison Terms on November 22, 2002 and was denied parole for one year. In addition the board recommended that Snodgrass remain disciplinary free since (see report) 1989. He has also completed a voluntary self-help discussion group revolving around the issues of re engaging back into society, through the auspices of the IEP Coordinator, Charlie D. Walker. (9/30/02)

## IV.    FUTURE PLANS:

A.    Residence: Snodgrass has plans to reside with his Mother, Marietta Snodgrass, at 2664 Emma Drive, Pinole, CA. 94564. Telephone number (510) 724-7090.

B.    Employment: Snodgrass has completed several vocational programs including FAA certification in Aircraft, Airframe and Powerplant Technology, Mill and Cabinet, Vocational Welding and Vocational Drafting (including CAD). Also noted were several certificates for various welding processes. Snodgrass also states that since 1988 he has earned his own spending money by selling his wood working handicraft (until his transfer to CTF).

C.    Assessment: Snodgrass has several vocational skills that could provide for his own maintenance upon release. He has an offer of residence from his mother in his county of residence. Though very few opportunities exist for therapeutic intervention or development through self-help programs, Snodgrass has completed an X-Program and a T-Program and has assured this writer that he would be willing to undertake any requirements that the Board may deem necessary.

## V.    USINS STATUS: Snodgrass is a United States citizen.

## VI.    SUMMARY:

A.    Considering the commitment offense, prior record and prison adjustment this writer believes the prisoner would probably pose a low degree of threat to the public at this time if released from prison. My contact with inmate Snodgrass has been limited to this board report, though we did have an extensive discussion about the instant offense. He expressed remorse for taking the victim's life. My assessment is that due to immaturity and a lack of psychological support, Snodgrass could not grasp any other solution out of his problems other than the one he chose. I believe he would make a different choice if faced with the same circumstances today.

B.    Prior to release the prisoner could benefit from maintaining his disciplinary free behavior and taking advantage of any therapy programs that may be offered by CDC.

C.    This report is based on an interview with the prisoner on 7/22/03 lasting approximately 1 ½ hour(s) and a review of the Central File lasting four hours.

D.    Prisoner was afforded an opportunity to review his Central File on 7/22/03 which he declined per the CDC 128-B of the same date.

E.    No accommodation was required per the Armstrong vs. Davis BPT Remedial Plan for effective communication.

☐ DOCUMENTATION HEARING

☒ PAROLE CONSIDERATION HEARING

☐ PROGRESS HEARING

INSTRUCTIONS
  TO CDC STAFF: DOCUMENT EACH 12-MONTH PERIOD FROM THE DATE THE LIFE TERM STARTS TO PRESENT
  TO BPT STAFF: FOR EACH 12-MONTH INCREMENT APPLY THE GUIDELINES UNDER WHICH THE PAROLE DATE WAS ORIGINALLY
    ESTABLISHED, ie., 0-2 MONTHS FOR PBR AND 0-4 MONTHS FOR BPT. SEE BPT §§2290 - 2292, 2410 AND 2439.

| POSTCONVICTION CREDIT | | | |
|---|---|---|---|
| YEAR | BPT | PBR | REASONS |
| 11/02 to Present | | | **PLACEMENT:** Remained at the Correctional Training Facility (CTF). <br> **CUSTODY:** Remains at Medium A. <br> **VOC. TRAINING:** None noted. <br> **ACADEMICS:** None noted. <br> **WORK RECORD:** Continued full time assignment working as a machine operator in the PIA Wood Products Factory. Grades for this period are satisfactory to above average. <br> **GROUP ACTIVITIES:** Completed four hour video instruction/discussion related to issues of successfully re-engaging back into society. Said discussion proctored by C.D. Walker, Inmate Employability Program Coordinator. <br> **PSYCH. TREATMENT:** None noted. <br> **PRISON BEHAVIOR:** Snodgrass has remained disciplinary free this period. <br> **OTHER:** None. |

| CORRECTIONAL COUNSELOR'S SIGNATURE | | | | DATE |
|---|---|---|---|---|
| | | | | 7.31.03 |
| SNODGRASS, GARY | C-50459 | | CTF-SOLEDAD | NOV/2003 |

☐ DOCUMENTATION HEARING

☒ PAROLE CONSIDERATION HEARING

☐ PROGRESS HEARING

INSTRUCTIONS
TO CDC STAFF: DOCUMENT EACH 12-MONTH PERIOD FROM THE DATE THE LIFE TERM STARTS TO PRESENT
TO BPT STAFF: FOR EACH 12-MONTH INCREMENT APPLY THE GUIDELINES UNDER WHICH THE PAROLE DATE WAS ORIGINALLY
ESTABLISHED, ie., 0-2 MONTHS FOR PBR AND 0-4 MONTHS FOR BPT. SEE BPT §§2290 - 2292, 2410 AND 2439.

| POSTCONVICTION CREDIT | | | |
|---|---|---|---|
| YEAR | BPT | PBR | REASONS |
| 12/02 to 12/03 | | | **PLACEMENT**: Remained at the Correctional Training Facility II and housed in the general population. **CUSTODY**: Medium A **VOC. TRAINING**: None during this review period. **ACADEMICS**: None during this review period. **WORK RECORD**: Assigned to PIA Wood Furniture Factory as a Machine Operator as a full time assignment. He earned satisfactory to above average grades per CDC 101's dated 2/1/03, 5/1/03, 8/1/03 and 9/1/03. **GROUP ACTIVITIES**: None noted during this review period. **PSYCH. TREATMENT**: None noted during this review period. **PRISON BEHAVIOR**: None noted during this review period. **OTHER**: N/A |

CORRECTIONAL COUNSELOR'S SIGNATURE

DATE  3-15-04

SNODGRASS          C50459                    CTF-SOLEDAD

SENT TO INMATE ON : 3/30/04

G. Williams                    8·5·03
Correctional Counselor I       Date

1. L.R. Baker   COI (A) 8-6-03
W. Stewart              Date
Correctional Counselor II

L. Trexler              8-6-03
Facility Captain        Date

D. S. Levorse           8-7-03
Classification and Parole Representative    Date

SNODGRASS, GARY          C-50459          CTF-SOLEDAD          NOV/2003

# EXHIBIT BB

## 2006 BPT PAROLE TRANSCRIPT

# EXHIBIT BB

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS

In the matter of the Life )
Term Parole Consideration ) CDC Number C-50459
Hearing of: )
)
GARY SNODGRASS )
_____)

CORRECTIONAL TRAINING FACILITY

SOLEDAD, CALIFORNIA

DECEMBER 27, 2006

4:04 P.M.

PANEL PRESENT:

Ms. Janice Eng, Presiding Commissioner
Mr. David Yacono, Deputy Commissioner

OTHERS PRESENT:

Mr. Gary Snodgrass, Inmate
Correctional Officers, Unidentified

CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____ No        See Review of Hearing
_____ Yes       Transcript Memorandum


Patricia Chapin          Vine, McKinnon & Hall

ii

## INDEX

                                                                Page

        Proceedings ........................................ 1

        Case Factors ......................................15

        Pre-Commitment Factors ...........................20

        Post-Commitment Factors ..........................46

        Parole Plans .....................................53

        Closing Statements ...............................68

        Recess ...........................................69

        Decision .........................................70

        Adjournment ......................................77

        Transcriber Certification ........................78

--oOo--

1                    P R O C E E D I N G S

2          **DEPUTY COMMISSIONER YACONO:**  Okay.  We're on.

3          **PRESIDING COMMISSIONER ENG:**  Okay.  This is a

4    subsequent parole consideration hearing for Gary

5    Snodgrass, S-N-O-D-G-R-A-S-S, CDC No. P-50459.  Today's

6    date is December 27th, 2006, and the time is 4:04 in the

7    afternoon.  We are located at CTF Soledad.  The inmate

8    was received on July 19th, 1982, from Contra Costa

9    County.  His life term began on September 19th, 1982.

10   The minimum eligible parole date is September 11th, 1990.

11   The controlling offense for which the inmate has been

12   committed is Murder Two, Case No. 26252, Count One, Penal

13   Code 187.  The inmate received a total term of 15 years

14   to life.  This hearing is being tape recorded, so for the

15   purpose of voice identification, each of us will be

16   required to state our first and last name, spelling out

17   our last names.  And when it's your turn, sir, please

18   provide us with your CDC number also.  Okay?  So I'll

19   begin, and we've move to my left.  My name is Janice

20   E-N-G, Commissioner.

21         **DEPUTY COMMISSIONER YACONO:**  And I'm David Yacono,

22   that's Y-A-C-O-N-O, Deputy Commissioner.

23         **INMATE SNODGRASS:**  And I'm Gary Snodgrass,

24   S-N-O-D-G-R-A-S-S.

25         **DEPUTY COMMISSIONER YACONO:**  Your number?

26         **INMATE SNODGRASS:**  C-50459.

27         **PRESIDING COMMISSIONER ENG:**  Thank you.  We also

1    have two correctional officers present for security

2    purposes, and they will not be participating in the

3    hearing.  Sir, before we begin, I'm going to ask that you

4    read that ADA statement that is in front of you.

5        **INMATE SNODGRASS:**  Okay.  This is entitled ADA,

6    Americans With Disabilities Act.  The Americans With

7    Disabilities Act is a law to help people with

8    disabilities.  Disabilities are problems that make it

9    harder for some people to hear, breathe, talk, walk,

10   learn, think, work, or take care of themselves than it is

11   for others.  Nobody can be kept out of public places or

12   activities because of a disability.  If you have a

13   disability, you have the right to ask for help to get

14   ready for your Board of Prison Terms hearing, get to the

15   hearing, talk, read forms and papers, and understand the

16   hearing process.  The Board of Parole, BPT, Board of

17   Parole will look at what you ask for to make sure -- will

18   look at what you ask for to make sure that you have a

19   disability that is covered by the ADA and that you have

20   asked for the right kind of help.  If you do not get help

21   or if you don't think you got the kind of help you need,

22   ask for a BPT 1074 grievance form.  You can also get help

23   to fill it out.

24       **PRESIDING COMMISSIONER ENG:**  Okay.  Thank you.  The

25   record also reflects, sir, that you did sign a BPT form

26   1073, and that form was the Reasonable Accommodations

27   Notice and Request in Accordance with the Provisions of

1    the Americans With Disabilities Act.  And it indicates on

2    this form that you indicated that you do not have any

3    disabilities as identified in the ADA; is that correct?

4         **INMATE SNODGRASS:**  Yes, it is.

5         **PRESIDING COMMISSIONER ENG:**  Okay.  So the

6    information -- and again, you signed this on August 15th

7    of this year, 2006.  So this information is still current

8    and correct?

9         **INMATE SNODGRASS:**  Yes.

10        **PRESIDING COMMISSIONER ENG:**  Okay.  So I still have

11   to go through some standard questions which I'm sure

12   you're familiar with by now.

13        **INMATE SNODGRASS:**  Okay.

14        **PRESIDING COMMISSIONER ENG:**  Okay?  Do you have any

15   problems walking up or down stairs or for a distance of a

16   hundred yards or more?

17        **INMATE SNODGRASS:**  No.

18        **PRESIDING COMMISSIONER ENG:**  Okay.  Do you need

19   glasses or a magnifying device in order to see or read

20   documents?

21        **INMATE SNODGRASS:**  No.

22        **PRESIDING COMMISSIONER ENG:**  Okay.  Do you have any

23   hearing impairments?

24        **INMATE SNODGRASS:**  No.

25        **PRESIDING COMMISSIONER ENG:**  Have you ever been

26   included in the Triple CMS or EOP programs?

27        **INMATE SNODGRASS:**  Yes.

4

1        **PRESIDING COMMISSIONER ENG:**  Okay.  Which?

2        **INMATE SNODGRASS:**  Triple CMS for a short time, but

3    was never prescribed medications.  I was only part of

4    that program to obtain some self-help and counseling.

5        **PRESIDING COMMISSIONER ENG:**  Okay.  Yeah.  I think I

6    notated that it was back in -- oh, that's a nine --

7    September '01 through approximately March of '02.  Does

8    that sound about right?

9        **INMATE SNODGRASS:**  It does.

10       **PRESIDING COMMISSIONER ENG:**  Okay.  So you obviously

11   know what those terms are.  And have you ever taken

12   psychotropic medications either in prison or on the

13   streets?

14       **INMATE SNODGRASS:**  No.

15       **PRESIDING COMMISSIONER ENG:**  Okay.  And while you

16   were in school, sir, were you ever enrolled in special

17   education classes while you were growing up?

18       **INMATE SNODGRASS:**  No.

19       **PRESIDING COMMISSIONER ENG:**  So do you suffer from

20   any disability that would prevent you from participating

21   in today's hearing?

22       **INMATE SNODGRASS:**  No.

23       **PRESIDING COMMISSIONER ENG:**  Okay.  The other couple

24   questions I want to be sure that we're clear on is that

25   you did -- I have a copy where you withdraw your request

26   for an attorney.

27       **INMATE SNODGRASS:**  Yes.

1        **PRESIDING COMMISSIONER ENG:**  Okay.  And that was

2     back on October 16th of this year, correct?

3        **INMATE SNODGRASS:**  That's sounds about right.

4        **PRESIDING COMMISSIONER ENG:**  Okay.  And then we also

5     received this new packet.  And they had -- for some

6     reason they --- I think Mr. Snodgrass is going to have to

7     have a copy of this report.

8        **DEPUTY COMMISSIONER YACONO:**  Well, then we'll look

9     for the attorney's version.

10       **PRESIDING COMMISSIONER ENG:**  We have a packet of

11    updated material that we received that has official

12    letters of support and your hearing rights.  And for some

13    reason they included the hearing rights, which I already

14    have in my packet, which I think you have in that packet.

15       **INMATE SNODGRASS:**  I'm sure I do.

16       **PRESIDING COMMISSIONER ENG:**  Okay.

17       **INMATE SNODGRASS:**  If it's what I signed with my

18    counselor.

19       **PRESIDING COMMISSIONER ENG:**  Right.  Okay.  Is there

20    any specific reason why you withdrew your request for an

21    attorney?

22       **INMATE SNODGRASS:**  Because I never really -- well,

23    you never really know what you're going to get, and I --

24    well, can I just leave it at that?

25       **PRESIDING COMMISSIONER ENG:**  Sure.

26       **DEPUTY COMMISSIONER YACONO:**  Have you met with the

27    assigned attorney?

1       **INMATE SNODGRASS:**  No.

2       **DEPUTY COMMISSIONER YACONO:**  So you withdrew before?

3       **INMATE SNODGRASS:**  Yes.

4       **DEPUTY COMMISSIONER YACONO:**  Okay.  And do you have

5       any concerns at this point?

6       **INMATE SNODGRASS:**  No.  Actually, part of the reason

7       that I wanted to go it alone this time -- not because I'm

8       a legal beagle by any means, but because I really don't

9       want you to believe that I would need an attorney to run

10      interference with what I might have to say to you all.  I

11      would be willing to speak directly with you two about

12      anything that you want to talk about.  And I wouldn't

13      want an attorney to inadvertently be misunderstood by you

14      all as interfering.

15      **PRESIDING COMMISSIONER ENG:**  I think Mr. Snodgrass

16      is fully aware.

17      **DEPUTY COMMISSIONER YACONO:**  I have no concerns on

18      his education level.  His TAB scores are as high as you

19      go.  Articulate, bright.  He can see and hear, he can

20      walk.  The Triple CMS was more than five years ago for a

21      six month time frame.  The things that we have to make

22      sure that somebody who thinks they want to represent

23      themselves and really is not capable.

24      **INMATE SNODGRASS:**  Right.

25      **DEPUTY COMMISSIONER YACONO:**  Is there any reason

26      that you can think of that you're not capable?

27      **INMATE SNODGRASS:**  I believe I'm capable, although

1    I'm sure you all are much more familiar with the process

2    itself and possibly know your way through the files.

3    Probably can run circles around me.  But I believe I can

4    get through this all right.

5        **DEPUTY COMMISSIONER YACONO:**  Well, you have got

6    plenty of tabs which is what we do, and so we'll direct

7    you through, and obviously take all the extra time.

8        **INMATE SNODGRASS:**  Well, thank you.

9        **PRESIDING COMMISSIONER ENG:**  Yeah.  And plus, you've

10   been through this process I think numerous times already?

11       **INMATE SNODGRASS:**  Yeah.  Yeah.

12       **PRESIDING COMMISSIONER ENG:**  Okay.  So this isn't a

13   trial.  It's just an administrative hearing.

14       **INMATE SNODGRASS:**  Right.

15       **PRESIDING COMMISSIONER ENG:**  And like I said, you're

16   familiar with the process.  So if at any time you don't

17   understand something and you need clarification, et

18   cetera, just ask.  Okay?

19       **INMATE SNODGRASS:**  Okay.

20       **PRESIDING COMMISSIONER ENG:**  All right.  So we shall

21   move on, and I have to -- let's see -- okay.  So again,

22   this hearing is being conducted pursuant to the Penal

23   Code and the rules and regulations of the Board of Parole

24   Hearings governing parole suitability hearings for life

25   inmates.  The purpose of today's hearing is to once again

26   consider your suitability for parole, and in doing so,

27   we'll consider the number and nature of the crimes for

1    which you were committed, your prior criminal and social

2    history, your behavior and programming since your

3    commitment, and your plans if released.  Now, we've had

4    the opportunity to review your Central File, and you'll

5    also have the opportunity to correct or to clarify the

6    record.  We will consider your progress since your

7    commitment, your counselor's reports, and your mental

8    health evaluations.  We'll focus on your progress and any

9    new reports since your last hearing.  So any changes in

10   parole plans should be brought to our attention.  We will

11   reach a decision today and inform you of whether or not

12   we find you suitable for parole and the reasons for our

13   decision.  And if you are found suitable for parole, the

14   length of your confinement will be fully explained to you

15   at that time.  Before we recess for deliberations, we do

16   not have a representative from the District Attorney's

17   Office nor your attorney, so you, yourself, will be given

18   the opportunity to make a final statement regarding your

19   parole suitability.  Okay?

20        **INMATE SNODGRASS:**  Okay.

21        **PRESIDING COMMISSIONER ENG:**  And then we'll recess,

22   we'll clear the room, and we'll do our deliberations.

23   And once we complete our deliberations, we'll resume the

24   hearing and announce our decision.  The California Code

25   of Regulations states that regardless of time served, a

26   life inmate shall be found unsuitable for and denied

27   parole if in the judgment of the panel the inmate would

1    pose an unreasonable risk or danger to society if

2    released from prison.  Sir, you have certain rights, and

3    those rights include the right to a timely notice of this

4    hearing, the right to review your Central File, and the

5    right to present relevant documents.  So far, sir, have

6    your rights been met?

7         **INMATE SNODGRASS:**  Yes.  I'm a little worried about

8    the timeliness of this C File letter that I was just

9    presented with just now.  This is the first time I've

10   seen it, and I haven't even had a chance to read it.  But

11   up to now, that's the only thing I'm worried about.

12        **PRESIDING COMMISSIONER ENG:**  Yeah.  The letter dated

13   November 17th, and I -- yeah.  Okay.  Unfortunately, a

14   lot of times when they pull these packets together and

15   send them out well in advance, they don't have all the

16   information or they haven't processed it.  So a lot of

17   times we get last minute information in these packets for

18   legal counsel, et cetera.  However, your point is taken

19   on that.  Okay?  But I see that you did have a chance to

20   review your Central File, correct?

21        **INMATE SNODGRASS:**  Yes.

22        **PRESIDING COMMISSIONER ENG:**  Okay.  And I believe

23   that was around the same -- August 15th of this year.  Do

24   you have any other documents that you would like to

25   present?

26        **INMATE SNODGRASS:**  Yes, I do.  One of them I

27   believe -- one of them is included in this packet you

```
 1    handed me a moment ago from my mother.  So you have that

 2    copy.

 3         PRESIDING COMMISSIONER ENG:  Right.

 4         INMATE SNODGRASS:  Just a moment.  I wrote down kind

 5    of a thumbnail parole plan and --

 6         PRESIDING COMMISSIONER ENG:  All right.

 7         INMATE SNODGRASS:  I was hoping you all would have a

 8    chance to look at this.

 9         PRESIDING COMMISSIONER ENG:  Uh-huh.

10         INMATE SNODGRASS:  As well as a letter from a

11    facilitator of an inmate employability program that was

12    given through my employment workplace.

13         PRESIDING COMMISSIONER ENG:  Okay.

14         INMATE SNODGRASS:  And I assume you all have in the

15    packet, a letter from Glenn Webber.

16         PRESIDING COMMISSIONER ENG:  I believe I recall

17    that.

18         INMATE SNODGRASS:  Right.

19         PRESIDING COMMISSIONER ENG:  If that -- yes.

20         INMATE SNODGRASS:  And also one from my cousin,

21    Sandi Bowman.  I didn't see it in the packet that you

22    just gave me.

23         PRESIDING COMMISSIONER ENG:  I have a letter from

24    Marietta.

25         INMATE SNODGRASS:  That's my mother.

26         PRESIDING COMMISSIONER ENG:  Your mother.  I thought

27    I saw a letter from them in the packet.
```

1          **DEPUTY COMMISSIONER YACONO:**  In the -- was it in

2     this one?

3          **PRESIDING COMMISSIONER ENG:**  No.  The Board packet.

4          **INMATE SNODGRASS:**  It is in my packet, yes.

5          **DEPUTY COMMISSIONER YACONO:**  Yes.

6          **PRESIDING COMMISSIONER ENG:**  Yeah.  We have the same

7     thing.  So I do have Sandi Bowman.

8          **INMATE SNODGRASS:**  Okay.

9          **PRESIDING COMMISSIONER ENG:**  I remember -- yes.  I

10    remember that.  Okay.  We have those.  Okay.  Sir, you

11    have the additional right to be heard by an impartial

12    panel.  God bless you.

13         **DEPUTY COMMISSIONER YACONO:**  Thank you.

14         **PRESIDING COMMISSIONER ENG:**  You've been introduced

15    to this panel.  Do you have any objections?

16         **INMATE SNODGRASS:**  No.

17         **PRESIDING COMMISSIONER ENG:**  Okay.  So if you find

18    any other documents, just let us know, and you can

19    present those to us.

20         **INMATE SNODGRASS:**  Okay.  Thank you.

21         **PRESIDING COMMISSIONER ENG:**  Okay.  So you will

22    receive a copy of our written tentative decision today,

23    and that decision becomes final within 120 days.  A copy

24    of the decision and a copy of the transcript will be sent

25    to you.  On May 1st, 2004, the regulations regarding your

26    right to appeal a decision made at this hearing were

27    repealed.  So the current policy is entitled

1    Administrative Appeals Correspondence and Grievances

2    Concerning Board of Prison Terms Decisions.  And

3    basically, if you have any questions about that policy,

4    you can review that at your prison law library to appeal

5    a decision.

6        **INMATE SNODGRASS:**  Okay.  So would you clarify

7    please for me.  Is the ten-point process back in play, or

8    is the ten-point process done away with for now?

9        **PRESIDING COMMISSIONER ENG:**  I don't know what the

10    ten-point process is.  Do you?

11        **INMATE SNODGRASS:**  It's the administrative appeal

12    for parole hearings.

13        **DEPUTY COMMISSIONER YACONO:**  That's exactly what

14    we're saying.

15        **PRESIDING COMMISSIONER ENG:**  That's what we're

16    talking about.

17        **INMATE SNODGRASS:**  It is in place, or it's not in

18    place?

19        **DEPUTY COMMISSIONER YACONO:**  It's done.

20        **INMATE SNODGRASS:**  It's gone.  Thank you.  Thank you

21    for clarifying that.

22        **PRESIDING COMMISSIONER ENG:**  It's gone.  Yeah.  That

23    was in 2004.

24        **INMATE SNODGRASS:**  Yes.

25        **PRESIDING COMMISSIONER ENG:**  So that's what we meant

26    that you have to go through the courts now.  Okay.

27        **INMATE SNODGRASS:**  Thank you.

1       **PRESIDING COMMISSIONER ENG:**  All right.  So see

2   there's some things that you know more than we do.  This

3   is my first -- okay, so you're not required to admit to

4   or discuss your offense; however, the panel does accept

5   as true the findings of the court.  Do you understand

6   what that means?

7       **INMATE SNODGRASS:**  I believe I need you to rephrase

8   that.

9       **PRESIDING COMMISSIONER ENG:**  Okay.  We're not here

10  to retry to case.

11      **INMATE SNODGRASS:**  Uh-huh.

12      **PRESIDING COMMISSIONER ENG:**  Whatever the court

13  stated and is in your packets, that's what we rely on.

14      **INMATE SNODGRASS:**  Okay.

15      **PRESIDING COMMISSIONER ENG:**  Okay?  We're not going

16  to reopening it.  It's not going to be another trial.  So

17  the bottom line is that you were found guilty of murder

18  in the second degree.

19      **INMATE SNODGRASS:**  Okay.

20      **PRESIDING COMMISSIONER ENG:**  Okay?

21      **INMATE SNODGRASS:**  Thank you.

22      **PRESIDING COMMISSIONER ENG:**  All right.  Let's see.

23  Is there any -- Commissioner, is there any confidential

24  information, material in the C File that will be

25  considered today?

26      **DEPUTY COMMISSIONER YACONO:**  No, I don't believe any

27  of this will be considered.

1      **PRESIDING COMMISSIONER ENG:**  Okay.  All right, sir.

2      I'm going to pass this hearing checklist over to you and

3      mark it Exhibit 1.  And I just want you to check with

4      yours to see if we have the same documents.  We should.

5          **INMATE SNODGRASS:**  Okay.

6          **PRESIDING COMMISSIONER ENG:**  Okay.  And once you see

7      that, I need you to initial it.  Okay?

8          **INMATE SNODGRASS:**  Uh-huh.  Yes.  Just initial it

9      anywhere?

10         **PRESIDING COMMISSIONER ENG:**  Just initial it

11     anywhere in the blank area up top.  You can do it up top

12     somewhere there.  Yeah.  That's fine.  Okay.  And then I

13     also initial it, and this does become Exhibit 1.  Okay?

14     And this ensures that we are operating off the same set

15     of documents.  So if you had legal counsel here, and if

16     there was a DA representative, everybody would initial it

17     to make sure that we have the same documents.

18         **INMATE SNODGRASS:**  Okay.

19         **PRESIDING COMMISSIONER ENG:**  Okay.  So I've already

20     asked you if there's any additional documents to be

21     submitted, and you've already submitted a few of them.

22     Right now, do you have any preliminary objections?

23         **INMATE SNODGRASS:**  No.

24         **PRESIDING COMMISSIONER ENG:**  Okay.  And will you be

25     speaking to the panel on everything today?

26         **INMATE SNODGRASS:**  Yeah.  I'm open to anything you

27     guys want to discuss.

15

1    **PRESIDING COMMISSIONER ENG:**  Okay.  So what I'll

2    have to do is swear you in.  So raise your right hand,

3    please.  Okay.  Do you solemnly swear or affirm that the

4    testimony you give at this hearing will be the truth, the

5    whole truth, and nothing but the truth?

6    **INMATE SNODGRASS:**  Yes, I do.

7    **PRESIDING COMMISSIONER ENG:**  Okay.  All right.  So

8    we'll move on now.  And what I'm going to do, sir, is I'm

9    going to read into the record the Statement of Facts

10   which are the crime facts.  You can follow along.  And

11   I'm going to take this, and go to your Board Reports

12   section, and I'm taking this from the December '06 Board

13   Report.  Okay?  Where it says Summary of the Crime.  And

14   just to notate that the source for the Board Report is

15   the probation officer's report pages three through seven.

16   Okay.  This states the defendant's mother, Marietta,

17   M-A-R-I-E-T-T-A, Snodgrass, married John Mailen,

18   M-A-I-L-E-N, in 1969 when the defendant was approximately

19   seven years old.  The marriage was somewhat tempestuous,

20   and the couple separated on several occasions before the

21   marriage terminated in divorce in 1976.  The defendant

22   relates that his stepfather consistently belittled and

23   verbally harassed him.  His anxiety increased when his

24   mother remarried John Mailen again in 1979.  Over the

25   ensuing years, his distress and anxiety developed into a

26   consuming hatred of John Mailen.  He fantasized about

27   killing the victim months before the crime took place.

1    On November 18th, 1981, he secreted his stepfather's

2    rifle behind some plaster board in the garage.  When his

3    stepfather returned home from dropping off his wife and

4    daughter at work, he told Gary to put out the cat.  The

5    defendant complied with this order, and as he went

6    outside, he retrieved the weapon.  As he was preparing

7    the weapon, it accidentally discharged.  Mr. Mailen came

8    outside to investigate the disturbance and was shot twice

9    by the defendant.  He subsequently died that morning at

10   the hospital.  However, I do want to add in it was very

11   difficult to read the probation officer's report from the

12   back.  And that's why I took it from the Board Report.

13       **INMATE SNODGRASS:**  You're looking at what section?

14       **PRESIDING COMMISSIONER ENG:**  Okay.  Go into the

15   Legal Note Documents.

16       **INMATE SNODGRASS:**  Okay.

17       **PRESIDING COMMISSIONER ENG:**  Okay?  And I'm trying

18   to see what page this is.  Go back at least say six

19   pages.

20       **INMATE SNODGRASS:**  To Defendant's Statement?

21       **PRESIDING COMMISSIONER ENG:**  No.  It is the sixth

22   page.

23       **INMATE SNODGRASS:**  So I'm looking at what's entitled

24   the Defendant's Statement.

25       **PRESIDING COMMISSIONER ENG:**  Where it says --on line

26   one, it says, "do it then, and the defendant told John

27   Mailen."

1    **INMATE SNODGRASS:**  Oh.  Hold on.  I'm not on that

2    page.  Do it then?  Okay.

3    **PRESIDING COMMISSIONER ENG:**  It has your name at the

4    very top.  It's page six.  It does say page six at the

5    top.  On the top right.

6    INMATE SNODGRASS:  Okay.  I'm on page eight.

7    **PRESIDING COMMISSIONER ENG:**  Okay.  Just go back two

8    pages.  It's okay.

9    **INMATE SNODGRASS:**  Okay.

10   **PRESIDING COMMISSIONER ENG:**  Do you see that?

11   **INMATE SNODGRASS:**  Okay.  Yes.

12   **PRESIDING COMMISSIONER ENG:**  Okay.  Well, I'm going

13   to start with the sentence where it says the defendant

14   told John Mailen that the police had arrived.  Are you

15   there?

16   **INMATE SNODGRASS:**  Yes.

17   **PRESIDING COMMISSIONER ENG:**  Okay.  And the next

18   sequence of events is not entirely clear to the probation

19   officer.  However, it seems that in learning that the

20   police had arrived, Mr. Mailen came out from the area in

21   which he had sought cover, and Gary Snodgrass shot him in

22   the chest area.  John Mailen fell backwards to the ground

23   and began yelling at the defendant.  Officer Hodges,

24   H-O-D-G-E-S, recalled hearing a male voice say quote,

25   "Gary, you've done it now," unquote.  The defendant

26   recalls that Mailen was yelling obscenities at him.  In

27   any case, the defendant walked towards the wounded victim

18

1    and shot him a second time, wounding him in the neck

2    area.  Okay.  Sir, did you want me to read into the

3    record what we see here as the prisoner's version?  Or do

4    you want to talk about it?  I can read it into the

5    record, and then we can also talk about it.  It's up to

6    you.

7          INMATE SNODGRASS:  Are you looking at page eight

8    then?

9          PRESIDING COMMISSIONER ENG:  Well, no.  Actually I'm

10   looking at the Board Report, back in the Board Report,

11   December 2006.

12         INMATE SNODGRASS:  Okay.

13         PRESIDING COMMISSIONER ENG:  Under Summary of Crime.

14   Unless you want to take it out of the probation officer's

15   report.

16         INMATE SNODGRASS:  Well, what's your preference?

17         PRESIDING COMMISSIONER ENG:  Well, I'm willing to

18   leave that to you.  I was going to read it from -- I

19   believe it's the same.  It looks like it's the same.

20   Yeah.  It's just easier to read it from the December '06

21   Board Report.

22         INMATE SNODGRASS:  We can do that.

23         PRESIDING COMMISSIONER ENG:  Okay.  So you want me

24   to read that into the record, and then we can have a

25   little discussion about it?

26         INMATE SNODGRASS:  If you prefer that, sure.

27         PRESIDING COMMISSIONER ENG:  Okay.  All right.  And

```
 1    again, this states that it was established by the initial

 2    probation officer's report of June 18th, 1982.  Quote,

 3    "Constant harassment, belittlement, and antagonism by

 4    stepfather in the family has had a negative effect on my

 5    mental state of mind.  I reached my breaking point after

 6    more than ten years of it.  I broke and shot and killed

 7    my stepfather with a hunting rifle.  I got involved by my

 8    mother marrying into the deceased victim's family.  The

 9    way in which I was involved is as follows:  I'm the

10    youngest in my mother's family.  I was molested by the

11    17-year-old son of the deceased when I was seven years

12    old.  This went on for about two years, and it had a

13    negative effect on my mind.  That, in addition to

14    terrorization from my stepbrother and my stepfather, over

15    protectiveness by my mother has given me some mental

16    problems I need to have taken care of.  I'm not crazy,

17    but I know I need help with these problems I need to have

18    taken care of.  I'm not crazy, but I know -- no.  I need

19    help with these problems and the depression and anxiety

20    as well as others.  I feel that the sooner I get help,

21    the sooner I'll be able to feel more normal and lead a

22    normal life.  Being that this whole predicament was

23    domestic in origin, I feel that it couldn't happen again.

24    I'm a bit older and wiser now, and I'm trying to see

25    things in their true light.  I can be helped, and I want

26    to be rid of these problems.  I can be rid of these

27    problems.  I feel sentencing without probation would only
```

1   complicate my problems," unquote.  Quote, "My long range

2   plans are to feel better about myself, learn a skill, and

3   find a decent job, to marry, have kids, and to love them

4   and give them things in life I never had, which I do

5   desperately need." unquote.  Does that about sum it up

6   properly?

7        **INMATE SNODGRASS:**  I don't disagree with anything

8   you just read.

9        **PRESIDING COMMISSIONER ENG:**  Uh-huh.  Okay.  Now,

10  your mother -- okay, married John Mailen twice.  She

11  first married him when you were seven; is that correct?

12       **INMATE SNODGRASS:**  I was seven, yeah.  Yeah, it was

13  two months before my 8th birthday.

14       **PRESIDING COMMISSIONER ENG:**  Okay.  And at that time

15  he came into the marriage, and he had other children?

16       **INMATE SNODGRASS:**  Yes.

17       **PRESIDING COMMISSIONER ENG:**  And he had the older

18  son?

19       **INMATE SNODGRASS:**  He had two children living at his

20  house.  One was Colleen, the older of the two children.

21  She was maybe 17 or so.  And the junior one was John

22  Mailen, Jr.  He was a year younger than his sister, so

23  that would make him about 16.

24       **PRESIDING COMMISSIONER ENG:**  Okay.  And so when your

25  mother married Mr. Mailen, was it just you and your

26  mother moving into Mr. Mailen's house?

27       **INMATE SNODGRASS:**  No.  My two older sisters also

1    moved there with us.

2         **PRESIDING COMMISSIONER ENG:**  Okay.  So you had two

3    older sisters?

4         **INMATE SNODGRASS:**  Yes.

5         **PRESIDING COMMISSIONER ENG:**  Was this a large house

6    that you were moving into?

7         **INMATE SNODGRASS:**  Well, let's see.  There was a

8    master bedroom, and John Jr. had his own bedroom.  My

9    eldest sister, Kathy, and Colleen, the deceased's

10   daughter -- they shared a room.  And me and my sister,

11   Diane, who is two years older than myself -- we shared a

12   garage that had been made into kind of like a rumpus room

13   bedroom.

14        **PRESIDING COMMISSIONER ENG:**  Okay.  So all of a

15   sudden you were living with just your two sisters and

16   your mother, right?  And you ended up moving into this

17   house.  When this happened, how did you feel?

18        **INMATE SNODGRASS:**  When we melded together as a

19   family?

20        **PRESIDING COMMISSIONER ENG:**  Initially.  Uh-huh.

21        **INMATE SNODGRASS:**  Well, it was completely

22   different.  And I never experienced anything like it.  I

23   didn't know what to expect.  It was a strange

24   environment.

25        **PRESIDING COMMISSIONER ENG:**  Uh-huh.

26        **INMATE SNODGRASS:**  It was very different from the

27   household that I had grown up in up to that point.

1      **PRESIDING COMMISSIONER ENG:**  Up to that point, had

2   you had a father present or not ever?

3      **INMATE SNODGRASS:**  Well, my father died in 1966 when

4   I was five.  He died of Hodgkin's Disease, and so that

5   was -- that's a no, I guess.

6      **PRESIDING COMMISSIONER ENG:**  Right.  Okay.  So you

7   were used to having your mother to yourself, and all of a

8   sudden --

9      **INMATE SNODGRASS:**  Well, I was sharing my mother

10  with my two sisters too.

11     **PRESIDING COMMISSIONER ENG:**  Right.  Right.  But

12  still then once you meld these two families together and

13  now you've got -- okay, five children.  You stated that

14  John Jr. molested you.

15     **INMATE SNODGRASS:**  He did that, yes.

16     **PRESIDING COMMISSIONER ENG:**  Okay.  Was that when

17  you first moved in?

18     **INMATE SNODGRASS:**  I don't remember exactly when it

19  started.  It did start at the time where we were living

20  in that house, yes.

21     **PRESIDING COMMISSIONER ENG:**  Okay.  Did you tell

22  your mother?

23     **INMATE SNODGRASS:**  I attempted to.  There was a time

24  when it was just she and I at the house, and she was

25  doing some housework, and I approached her, and I said,

26  mom, when you're gone, meaning that when no one else was

27  around.

1        **PRESIDING COMMISSIONER ENG:**  Right.

2        **INMATE SNODGRASS:**  Johnny would make me do bad

3    things.  And that was my attempt to break into that, to

4    broach that whole subject.  And it seemed like she really

5    didn't comprehend what I was coming to her with, you

6    know?  And I felt like it was just passed off.  And I

7    think at the time it's too bad that it got passed off

8    like that because it could have been resolved.

9        **PRESIDING COMMISSIONER ENG:**  Did he do anything to

10    your sister?

11        **INMATE SNODGRASS:**  No, not to my knowledge.  It's

12    too bad.  I cut my mother some slack though, because her

13    situation was probably a lot more to the general melding

14    of the two families.  She was probably juggling a lot of

15    different relationships in her mind at that point trying

16    to understand the whole sphere of the household.

17        **PRESIDING COMMISSIONER ENG:**  Was your mother

18    working?

19        **INMATE SNODGRASS:**  Um --

20        **PRESIDING COMMISSIONER ENG:**  Or just being home and

21    taking care of the kids?

22        **INMATE SNODGRASS:**  Well, you know, there was a time

23    when she was working at the grammar school or the junior

24    high school which was joined to the elementary stool.

25    But I'm not sure if that was at that time or not.

26        **PRESIDING COMMISSIONER ENG:**  Okay.  How --

27        **INMATE SNODGRASS:**  Oh, I can clarify that.  As a

1    matter of fact, yes, she would be gone afternoons, and in

2    the afternoons when I was home from school and she was

3    not home yet, that's when the abuse would take place.  So

4    I can answer that with yes, she was probably working at a

5    secretarial job at a local school.

6          **PRESIDING COMMISSIONER ENG:**  Okay.  And it also had

7    stated here that you felt like you were terrorized, not

8    just by your stepbrother, but by your stepfather.  How

9    did your stepfather terrorize you?

10         **INMATE SNODGRASS:**  Well, that would be in later

11   years.  In the years when we were living in Concord in

12   his home, the terrorization and intimidation that

13   happened by the stepbrother, John Jr.

14         **PRESIDING COMMISSIONER ENG:**  So that was -- okay.

15   But he was what, 16 or 17?

16         **INMATE SNODGRASS:**  He was about ten years my senior.

17         **PRESIDING COMMISSIONER ENG:**  Right.  But when you

18   first merged the families, when you first started living

19   together, correct?

20         **INMATE SNODGRASS:**  Yeah.

21         **PRESIDING COMMISSIONER ENG:**  So he was, like, 17.

22   How old did he stay living with the family?

23         **INMATE SNODGRASS:**  I believe he was 16 or 17.  There

24   may be some minor inaccuracies about the age.

25         **PRESIDING COMMISSIONER ENG:**  Right.

26         **INMATE SNODGRASS:**  But he was definitely about ten

27   years my senior when I moved over there.

1      **PRESIDING COMMISSIONER ENG:**  When you were --

2         **INMATE SNODGRASS:**  Probably right after they got

3      married in June of '69, when we moved over there.  And

4      your question is?

5         **PRESIDING COMMISSIONER ENG:**  Well, how long did John

6      Jr. stay living with the family?  Because at that age, if

7      he wasn't a senior in high school, he was pretty close to

8      it, so he should have been getting out of school soon.

9      Did he stay living with the family, or did he move out

10     after he got out of high school?

11        **INMATE SNODGRASS:**  You know, I'm not completely

12     sure.  I think that he was probably still living there at

13     the house when my mother and my stepfather and my two

14     sisters and myself moved back to Pinole.  There was a

15     separation -- I could be wrong.  But I believe John Jr.

16     was still at the house, although I could be mistaken.  I

17     haven't even thought about this for a few years.

18        **PRESIDING COMMISSIONER ENG:**  Okay.  So they were

19     married from '69 to '76 thereabouts?

20        **INMATE SNODGRASS:**  Yes.

21        **PRESIDING COMMISSIONER ENG:**  So for about seven

22     years that say -- let's say six or seven years that you

23     were living -- is that correct, under the same roof?

24        **INMATE SNODGRASS:**  Well, when he and my mother

25     separated, we moved to Pinole, and he stayed in Concord.

26        **PRESIDING COMMISSIONER ENG:**  Okay.

27        **INMATE SNODGRASS:**  And apparently they were getting

1    marital counseling by a local pastor I'm told by my
2    mother.  He would come over on Wednesday evenings after
3    he got off work and would also spend weekends there at
4    our house in Pinole while they were getting marital
5    counseling I believe.
6            **PRESIDING COMMISSIONER ENG:**  Okay.  During this
7    first marriage between the '69 and '76 time, how was your
8    stepfather towards you?
9            **INMATE SNODGRASS:**  He seemed to me -- he was not
10   abusive to me at that point.  He was uninvolved I would
11   say.  As a parent, he was really uninvolved.  If I may
12   project what may have been on his mind, what it may have
13   been was that my mother's kids are hers to take care of
14   and to discipline, et cetera.  And he would be in charge
15   of disciplining and taking care of his own kids.  And so
16   there wasn't much parental involvement at all.  And
17   really wasn't much interaction at all for that matter.
18           **PRESIDING COMMISSIONER ENG:**  Okay.  So when did it
19   start?
20           **INMATE SNODGRASS:**  The abuse are you talking about?
21           **PRESIDING COMMISSIONER ENG:**  Yeah.  And that --
22   because you stated that you became I guess very anxious
23   when she remarried him.  So it gives me the indication
24   that you didn't care for him even during the first
25   marriage.  So that's what I want you to explain to me is
26   that how did this start, this dislike, this almost hatred
27   for your stepfather?  You know?  When did it start, and

1    how did it grow to bring you to the life crime?  Does

2    that make sense to you?

3         **INMATE SNODGRASS:**  Yes, it does.

4         **PRESIDING COMMISSIONER ENG:**  Okay.

5         **INMATE SNODGRASS:**  At the time of their first

6    marriage, I did not have any feelings of hate towards my

7    stepfather.  I understood him to be very different from

8    other paternal figures in my life that I'd had before.

9    And I didn't quite know how to -- of course, I was only

10   seven or eight years old at the time.  I didn't know how

11   to bridge the gap, so to speak.  I really didn't know how

12   to initiate a better relationship than we had.  No, the

13   hatred didn't start until after their second marriage.

14   During the time that they were divorced, John Mailen, the

15   deceased, had come down with, I believe it was pancreatic

16   cancer.

17        **PRESIDING COMMISSIONER ENG:**  Uh-huh.

18        **INMATE SNODGRASS:**  And had surgery to remove, I

19   believe part of his pancreas and his spleen and some of

20   his intestine.  And my mother would commute to Concord or

21   Walnut Creek where the hospital was and to his home in

22   Concord after he was to (inaudible).  And I think maybe

23   because of that proximity and maybe because my mother had

24   not gotten involved with another man in a serious way and

25   had not become married, I think they may have decided

26   to -- obviously they did decide to get married at some

27   point.  And I guess they really cared about each other

1    more than what they had when they got divorced.  And at a

2    point, apparently they decided to get married, and they

3    went up to, I believe it was Reno and got married.  And

4    you know, I wasn't even told about it until after it

5    happened.  And so I wasn't comfortable with it because

6    basically, he and I really didn't appreciate each other.

7    We didn't really like each other as far as I could tell.

8    We had never established a positive relationship.  And so

9    I had misgivings about him coming over to our house in

10   Pinole to live with us while he rented out his home in

11   Concord.  And so we really didn't care for each other,

12   and there he was, now he was living in the home with me

13   and my mother.  I believe at that point both my sisters

14   were out of the house.  So in the house there, it was

15   me --

16       **PRESIDING COMMISSIONER ENG:**  So it was just you and

17   your mother?

18       **INMATE SNODGRASS:**  It was me and my mother and then

19   my stepfather, John Mailen.  And you asked me about

20   basically when did the hatred start.  Well, it never got

21   off on a good footing to begin with.  Even when I was a

22   kid, you know?  And I think that maybe in his mind he saw

23   my mother as being a little protective and maybe me being

24   a momma's boy.

25       **PRESIDING COMMISSIONER ENG:**  Uh-huh.

26       **INMATE SNODGRASS:**  And him being a -- having the

27   experiences in life that he did, growing up in an

1    orphanage and going to war, World War II, and coming

2    back.

3         **PRESIDING COMMISSIONER ENG:**  Uh-huh.

4         **INMATE SNODGRASS:**  And being of a much greater

5    physique than myself, he was, like, I believe he was,

6    like, six-two or six-three, and he had a physique to

7    match, like his son also.  And this was part of the

8    reason that I was intimidated by them because in -- with

9    much hindsight I don't revise my opinion of them as being

10   bullies.  They were bullies, and I think that's a big

11   reason why I was put off by him and why I was stand-

12   offish to him and why we just couldn't have a meeting of

13   the minds.  We could never get established because that's

14   never what I expected a father or a paternal figure to

15   be.

16        **PRESIDING COMMISSIONER ENG:**  Was he trying to

17   toughen you up so to speak?

18        **INMATE SNODGRASS:**  I don't think he ever actively

19   tried to toughen me up.  I think that maybe my mother was

20   running interference, because I think -- I really believe

21   that my mother understood him to be a bully.  And maybe

22   she had to sort of insulate me from his -- from his --

23   the way he is, or the way he was.

24        **PRESIDING COMMISSIONER ENG:**  Yeah.

25        **INMATE SNODGRASS:**  So she was kind of running

26   interference for a long time.

27        **PRESIDING COMMISSIONER ENG:**  But you were near

1    18 years old when they remarried.

2        **INMATE SNODGRASS:**  I believe that's true.

3        **PRESIDING COMMISSIONER ENG:**  Okay.  And at that

4    time, what type of plans were you making for yourself in

5    your own life?

6        **INMATE SNODGRASS:**  I didn't have plans.  I was

7    living at home, living off my mother, basically.  And I

8    was behind in my development.

9        **PRESIDING COMMISSIONER ENG:**  Okay.  That's fair.

10       **INMATE SNODGRASS:**  I really was.

11       **PRESIDING COMMISSIONER ENG:**  So do you think that

12   there was some resentment or animosity between you and

13   your stepfather about that issue?

14       **INMATE SNODGRASS:**  I believe there was.  Yes.  I

15   believe that was a major issue with him.

16       **PRESIDING COMMISSIONER ENG:**  In what way?  Did he

17   expect you to move out?

18       **INMATE SNODGRASS:**  I believe he had a fair

19   expectation that I would be out of the house by that

20   time, 18 or 19 maybe.

21       **PRESIDING COMMISSIONER ENG:**  Okay.  Did he ever say

22   that to you?

23       **INMATE SNODGRASS:**  In specific terms, no.  But he --

24   I mean, not to my recollection, but he may have said that

25   to me.

26       **PRESIDING COMMISSIONER ENG:**  Okay.

27       **INMATE SNODGRASS:**  But I want you to understand that

1    in all the years that he and I were under the same roof,

2    he and I never sat down together and had a conversation.

3    That's how far apart we were on the communication level.

4        **PRESIDING COMMISSIONER ENG:**  Uh-huh.

5        **INMATE SNODGRASS:**  We just -- we didn't like each

6    other, and we resented each other.  And it just got worse

7    and worse until he was going about pushing my buttons and

8    maybe venting some of his frustrations in the way that he

9    did.  And I was being irresponsible.  I wasn't getting on

10   with my life, you know.  And I think that there was some

11   degree on my part of a resentment of him for invading,

12   quote, "my space, my household."  And he resented me, I

13   believe -- or I'm sure he did, that I should be out on my

14   own by now.  And I was probably holding up plans for him.

15   And he probably just wanted me out of the house and was

16   tired of looking at me probably.  And I can understand

17   that.

18       **PRESIDING COMMISSIONER ENG:**  Well, did the two of

19   you get into heated arguments, verbal arguments?

20       **INMATE SNODGRASS:**  No.

21       **PRESIDING COMMISSIONER ENG:**  So you didn't talk at

22   all?

23       **INMATE SNODGRASS:**  We didn't talk.  That was the

24   problem.

25       **PRESIDING COMMISSIONER ENG:**  Even yelling or

26   anything or?

27       **INMATE SNODGRASS:**  No.  Never.

1      **PRESIDING COMMISSIONER ENG:**  So I don't understand
2      how he terrorized you.

3      **INMATE SNODGRASS:**  He would be disrespectful to me.
4      He would embarrass me in front of relatives and friends.

5      **PRESIDING COMMISSIONER ENG:**  What would he say, or
6      what would he do?

7      **INMATE SNODGRASS:**  A good example and in a case of
8      the months prior to my having committed the murder, there
9      was an occasion where me and my mother and my stepfather
10     were vacationing with my aunt, my uncle, and their
11     daughter.  And there was a time where we had parked the
12     trailer that we were towing, and we were leveling the
13     trailer.  And in the course of leveling the trailer, we
14     had to get out crowbars and jacks and things like that.
15     And there was a time where he set me up to go -- he
16     wanted me to go get a jack or a tool.  The very specifics
17     I don't really recall, but I remember the incident for
18     sure.  He wanted me to go get a tool or a jack or
19     something or to perform a certain duty of maybe cranking
20     up the jack to help level the trailer.  And I felt like
21     he set me up for humiliation, like he told me to do the
22     wrong thing and I did what he asked, and then he blamed
23     me for having done something wrong.  And it doesn't sound
24     like a lot now, but at that point, you know, things were
25     pretty tense between us, and I really felt like he set me
26     up for humiliation in front of my relatives.  And he
27     berated me for that for a few moments, and I didn't feel

33

1    like I deserved that.  That's one incident.  There were

2    times where we would be sitting at the kitchen table

3    together, and he would not really even acknowledge my

4    presence.  We would sit at the same table -- that tells

5    you something right there.  We would sit at the same

6    table, and he would have the TV on, and it would be

7    behind me somewhere, and he would be, like, looking right

8    through me.  He wouldn't even move to see around me, he

9    would just, like, look through like I shouldn't be

10   there.  You know what I mean?  There were times where I

11   would do something, like, misbehave in some way, and he

12   would tell me that I needed my head flushed out in the

13   toilet.  And basically, he -- I never established

14   self-confidence in that kind of environment, and even up

15   to that time when they were separated, and he wasn't in

16   the household.  I just didn't grow up with confidence.

17   And being in close proximity with him under that roof,

18   during those last months, it just was very intense for

19   me.

20        PRESIDING COMMISSIONER ENG:  So you blame him for

21   you not having the self-confidence?

22        INMATE SNODGRASS:  At that time I blamed him.  And I

23   think that his behavior was a contributing factor.  Yes.

24        PRESIDING COMMISSIONER ENG:  Uh-huh.

25        INMATE SNODGRASS:  I also know that I was behind in

26   development because I was basically insecure.  I was

27   hanging onto my mother's apron.

1      **PRESIDING COMMISSIONER ENG:**  Uh-huh.

2      **INMATE SNODGRASS:**  Because at that time she was the

3      only stable presence in my life through the death of my

4      father and the subsequent deaths of my grandfather and a

5      close friend of the family who lived locally there.  We

6      called him uncle, again.  From her I understand that they

7      all died within a year or a year and a half.  And those

8      were like episodes of having the rug pulled out from

9      under me with the paternal figures.

10     **PRESIDING COMMISSIONER ENG:**  Uh-huh.

11     **INMATE SNODGRASS:**  And so with an expectation being

12     after they got married that I had formed an expectation

13     that the man my mother would marry would be a good

14     person, a positive person who would take an interest in

15     me.  And it seemed like he was just the opposite of what

16     I wanted, what I felt that I deserved.  And maybe -- I'm

17     sure in some ways, he was.  But I don't blame him

18     entirely for what I did.  I take responsibility for

19     having picked up the gun and for having shot him.  I did

20     that.  And you know, I'll always regret that for him and

21     his family and for myself and my family.  I mean, I've

22     caused a lot of grief, a lot of hurt, much more than he

23     ever caused me.  And it just wasn't fair what I did.  And

24     I didn't have a right to do it.

25     **PRESIDING COMMISSIONER ENG:**  What did your mother

26     say?

27     **INMATE SNODGRASS:**  Um --

1          PRESIDING COMMISSIONER ENG:  What was her reaction

2    towards you?

3          INMATE SNODGRASS:  Towards me?  Anger and sympathy I

4    think, as well as she felt blame.  She felt some blame

5    too.  But towards me, I think that she was angry.  She

6    was hurt that I would do it to her and basically cause

7    the whole situation of the homicide and what ensued

8    afterwards.  But I think that she takes on some of the

9    blame herself for having stood by and allowing the

10   situation to develop.  But --

11         PRESIDING COMMISSIONER ENG:  Has she told you that?

12         INMATE SNODGRASS:  Yes.  She has.

13         PRESIDING COMMISSIONER ENG:  What about your

14   sisters?

15         INMATE SNODGRASS:  I think they were hurt.  But

16   they've never -- they've never been so angry with me that

17   they cut off a relationship with me.

18         PRESIDING COMMISSIONER ENG:  Did they talk to you

19   after this happened?

20         INMATE SNODGRASS:  Yes.  But you mean about

21   the incident itself?

22         PRESIDING COMMISSIONER ENG:  Yeah.

23         INMATE SNODGRASS:  Not at length, no.

24         PRESIDING COMMISSIONER ENG:  They were both living

25   outside the house, correct?

26         INMATE SNODGRASS:  Yes.

27         PRESIDING COMMISSIONER ENG:  Were they in the area,

1    in the same area, or were they out of state?

2         **INMATE SNODGRASS:**  The oldest sister, Kathy, I

3    believe she was living up in Chico at the time.  And --

4         **PRESIDING COMMISSIONER ENG:**  Were you close with

5    either one of your sisters?

6         INMATE SNODGRASS:  Close?  No.

7         **PRESIDING COMMISSIONER ENG:**  Okay.

8         **INMATE SNODGRASS:**  And my other sister, Diana, two

9    years older, I believe she was in Southern California.  I

10   could be mistaken.  But they both were out of the house.

11        **PRESIDING COMMISSIONER ENG:**  And you weren't close

12   with them?

13        **INMATE SNODGRASS:**  Close, no.  On an intimate level?

14   No.  No.  Close.

15        **PRESIDING COMMISSIONER ENG:**  That you could talk to

16   them if you were frustrated with your stepfather, so you

17   just held it to yourself?

18        **INMATE SNODGRASS:**  I held it in.  That's what I did

19   in life.  I held things in.  And that was a major

20   contributing factor in my life, and this is true.  I had

21   nobody in my life that I could talk to.  And I was so

22   bottled up and inarticulate and insecure that I was

23   just -- I was just so strained and so isolated

24   emotionally and psychologically.  And I felt I didn't

25   have any -- I didn't understand that I had options.  I

26   didn't understand that I could ask for help.  At that

27   time I didn't even know who to ask for help.  Aside from

1    my mother.  One week prior to the homicide, the murder --

2         **PRESIDING COMMISSIONER ENG:**  Uh-huh.

3         **INMATE SNODGRASS:**  -- I let my mother know that I

4    was extremely angry with my stepfather because I felt

5    that he was being unfair to me on some level.  And I told

6    her that, you know, I was having real problems, and I

7    felt like picking up one of his wine bottles and smacking

8    him over the head with it.  And she and I sat down in my

9    bedroom and sat on the bed, and I explained to her how

10   much of a problem this was becoming for me.  And at that

11   point she went and confronted my stepfather with things

12   that I had said.  And he was incredulous throughout the

13   whole thing.  And so she was frustrated by that, and I

14   was disappointed that he would be incredulous because

15   here I was trying to get help again, trying to -- you

16   know, I went to my mother again for assistance in

17   resolving something, and it just seemed like it wasn't

18   working.  It didn't work.

19        **PRESIDING COMMISSIONER ENG:**  You were trying to

20   resolve -- what was it you were trying to resolve?

21        **INMATE SNODGRASS:**  Basically, I was -- I was -- I

22   don't know if resolve is the right term.  But I was

23   speaking up about the way I was feeling inside, and I was

24   having a problem with my relationship with my stepfather.

25        **PRESIDING COMMISSIONER ENG:**  So were you asking your

26   mother to make a choice between her son or her husband at

27   that point?

1      **INMATE SNODGRASS:**  No.

2      **PRESIDING COMMISSIONER ENG:**  What did you expect

3   your mother to do?

4      **INMATE SNODGRASS:**  To intercede on some level

5   because I couldn't communicate with him, and I was hoping

6   that maybe she could help defuse the situation,

7   basically.

8      **PRESIDING COMMISSIONER ENG:**  Okay.  So describe to

9   me what was the real situation that caused all these

10   feelings to really bubble up to the surface that pushed

11   you to go to your mother because of your extreme

12   frustration.  What was the incident that we're talking

13   about specifically?

14      **INMATE SNODGRASS:**  I'm sorry.  What was the specific

15   incident that --

16      **PRESIDING COMMISSIONER ENG:**  There had to be

17   something that pushed you to a point where you sat down

18   with your mother, that you were very angry with your

19   stepfather.

20      **INMATE SNODGRASS:**  Oh.  I realized --

21      **PRESIDING COMMISSIONER ENG:**  So what was the one

22   thing that brought you to this point where you said that

23   you were hoping that your mother would step in, and you

24   wanted to get some sort of resolution.  So you didn't

25   identify what was the problem?

26      **INMATE SNODGRASS:**  When I realized I was having such

27   a problem with the situation that I was contemplating

1    doing some great bodily injury.

2           PRESIDING COMMISSIONER ENG:  But why?

3           INMATE SNODGRASS:  Because I couldn't deal with my

4    anger, my anger at my stepfather.

5           PRESIDING COMMISSIONER ENG:  But what did your

6    stepfather do that pushed your anger to that point?

7           INMATE SNODGRASS:  My security.  I felt threatened

8    for my security in the place where I was living and by

9    his -- I felt that he was treating me unfairly and

10   cruelly.  In my mind at that time I felt that he was

11   treating me unfairly and cruelly.  And like I said, my

12   security was being threatened because I was told that I

13   would need to get out of the house and get out on my own

14   because plans had been made for, apparently, that the

15   house that we rented out or used by my sister and

16   basically, it was coming to a head because the roof over

17   my head was being threatened.  My security in that

18   regard, yes.

19          PRESIDING COMMISSIONER ENG:  Okay.  Okay.  So you --

20          INMATE SNODGRASS:  In my mind, I blamed him for

21   that.

22          PRESIDING COMMISSIONER ENG:  Okay.  And I'm guessing

23   that your mother didn't resolve the situation to your

24   liking.  Is this why you planned this about getting the

25   gun and hiding it and planning out how you were going to

26   kill him?

27          INMATE SNODGRASS:  Well, if I may clarify the

1    sequence of events.

2         **PRESIDING COMMISSIONER ENG:**  Certainly.

3         **INMATE SNODGRASS:**  After the dialogue between myself

4    and my mother and her confrontation with my stepfather,

5    she suggested and I agreed that I would see a

6    psychologist.  And I did on November 11th of that year.

7    And that was basically, just a sit down orientation with

8    a psychologist there in Pinole.  And the day that I

9    committed the murder was the same day that I had a second

10   appointment with that psychologist.

11        **PRESIDING COMMISSIONER ENG:**  So you'd already met

12   with the psychologist, and then you committed the murder?

13        **INMATE SNODGRASS:**  Yes.

14        **PRESIDING COMMISSIONER ENG:**  Okay.  The other thing

15   is, had you told your mother that you were fantasizing

16   about killing him or doing something that extreme?  Is

17   that why she wanted you to see a psychologist?

18        **INMATE SNODGRASS:**  I believe so.  When I sat her

19   down on my bed and we talked, I told her that I was so

20   angry with him and the way I felt that he was acting

21   towards me that I felt like picking up one of those wine

22   bottles there in the kitchen and hitting him.

23        **PRESIDING COMMISSIONER ENG:**  Okay.  Not the rifle.

24   But you knew where he kept his rifle?

25        **INMATE SNODGRASS:**  Yes, I did.

26        **PRESIDING COMMISSIONER ENG:**  Okay.  So what

27   triggered you to take that next step on the 18th of

1    November?

2        INMATE SNODGRASS:  I felt time was getting short,

3    and I felt more pressure that I would be getting kicked

4    out of the house very soon.  I didn't have a job, didn't

5    have a place to go.  And I felt that my stepfather was

6    continuing to diminish me.  I felt destroyed by him.  And

7    I just -- I came to a place in my mind where I wanted to

8    destroy him and basically maybe turn things around and

9    act out towards him in a way that in reality wasn't

10    deserved, but I just felt vengeance and hatred and rage.

11    And it took a long time for this to develop, for this to

12    develop, these feelings.

13        PRESIDING COMMISSIONER ENG:  So when you sit back

14    now at the age of 45 and you look back, what have you

15    learned or what do you think?

16        INMATE SNODGRASS:  Well, he didn't deserve what I

17    did to him.  Neither did anybody deserve to get hurt by

18    my action.  I believe I understand to a much greater

19    degree what his problems were with me.  And these were

20    understandable because I was behind in my development.  I

21    was not getting out of the house and becoming my own

22    person.  It wasn't happening.  And so I understand his

23    resentment of me.  And what do I think now?  Well, I just

24    can't -- there's no way I can justify what I did.  He

25    didn't deserve it.  And I'm just very sorry about the

26    whole situation.  The vast majority of the blame was

27    right here.  There were some disappointments in the

1    ability of my mother to nurture me emotionally and to

2    look out for me and protect me.  And you know, but, I

3    mean, I have to be responsible for what I did.  And I

4    picked up the gun.  It was my decision.  Nobody told me

5    to do it, and it was because I didn't -- because I could

6    not articulate, I could not communicate with my

7    stepfather because we did not have any kind of working

8    relationship at all on a communication level.  I

9    understand that.  I understand how important that is to

10   be able to communicate with someone when you're having a

11   problem and maybe sit down and have some sort of

12   understanding or at least some sort of discussion about

13   what a problem might be.

14        **PRESIDING COMMISSIONER ENG:**  Uh-huh.

15        **INMATE SNODGRASS:**  You know, basically I learned to

16   not bottle things up and let things fester.

17        **PRESIDING COMMISSIONER ENG:**  Commissioner, do you

18   have any questions you want to ask at this time?

19        **DEPUTY COMMISSIONER YACONO:**  No.  I don't think so.

20        **PRESIDING COMMISSIONER ENG:**  Okay.

21        **INMATE SNODGRASS:**  I also learned -- if I may add.

22        **PRESIDING COMMISSIONER ENG:**  Sure.

23        **INMATE SNODGRASS:**  I also learned now looking back,

24   if I'm having such a problem and there's no resolution in

25   sight, just get out of the situation.  Just walk away.

26   At that time I could have called local relatives there in

27   town, and I could -- they would have taken me in in a

1   moment had they known that there was a real problem at

2   the house.  I could have taken myself physically out the

3   situation, and I didn't do that.  And I wouldn't do that

4   again.  It's something that I've learned.

5       PRESIDING COMMISSIONER ENG:  Well, let me ask you

6   this:  Either during that time or even in the last

7   25 years, have you thought about that the problem

8   centered around you and not your stepfather?

9       INMATE SNODGRASS:  My problem was my lack of

10   development and my inability to express my anger

11   verbally.

12       PRESIDING COMMISSIONER ENG:  Uh-huh.  Do you feel

13   you were justified to be angry?

14       INMATE SNODGRASS:  Angry that I wasn't protected as

15   a child, yes.  Angry at my stepfather for the ways he

16   acted towards me, yes.  But I also believe that they had

17   reason to be angry with me as well for not becoming a

18   more mature person.

19       PRESIDING COMMISSIONER ENG:  Okay.  That's fair.

20   Because when you take a look back at what could have led

21   you up to this, you don't have any juvenile record, okay?

22   And you don't have any adult convictions or arrests.  I

23   didn't see anything, unless and you can correct me if I'm

24   wrong.  Did you have a drinking problem or a drug problem

25   when you were growing up?

26       INMATE SNODGRASS:  I believe I was heading towards

27   alcoholism.

44

1          **PRESIDING COMMISSIONER ENG:**  So you were drinking a

2     lot?

3          **INMATE SNODGRASS:**  I was drinking a lot.  Yes, I

4     was.

5          **PRESIDING COMMISSIONER ENG:**  Okay.  I must have

6     missed that somewhere.  When did you start drinking?

7          **INMATE SNODGRASS:**  Oh, I believe my first drink was

8     probably --

9          **PRESIDING COMMISSIONER ENG:**  It says moderately on a

10    social basis.  So maybe that's why I missed it.  But you

11    say that you drank a lot?

12         **INMATE SNODGRASS:**  I did tend to minimize it

13    sometimes.  But I did drink too much.  Looking back on

14    it, it was too much.  And I was obviously under age, so

15    it was illegal too.

16         **PRESIDING COMMISSIONER ENG:**  Uh-huh.  Okay.

17         **INMATE SNODGRASS:**  And I was also smoking pot.

18         **PRESIDING COMMISSIONER ENG:**  Okay.

19         **INMATE SNODGRASS:**  Didn't have a lot of money but --

20         **PRESIDING COMMISSIONER ENG:**  Did you ever work when

21    you were, you know --

22         **INMATE SNODGRASS:**  I had some odd jobs, but I was

23    not on a career track of any sort.  I worked at various

24    gas stations, a landscaping job.  I worked at an oil

25    refinery for a short time.  But I was not on a career

26    path.

27         **PRESIDING COMMISSIONER ENG:**  Okay.  But you did

45

1    graduate from high school, correct?

2        **INMATE SNODGRASS:**  Yes, I did.

3        **PRESIDING COMMISSIONER ENG:**  Okay.  Did you have

4    plans to go on to college at that point, or just you

5    didn't think about anything?

6        **INMATE SNODGRASS:**  Well, in my -- I had such a dim

7    view of life, and I was depressed.

8        **PRESIDING COMMISSIONER ENG:**  Okay.

9        **INMATE SNODGRASS:**  I was depressed.  And I just

10   couldn't see over the horizon.  I didn't have a

11   direction.

12       **PRESIDING COMMISSIONER ENG:**  Okay.  Let me ask you

13   something else.

14       **INMATE SNODGRASS:**  Okay.

15       **PRESIDING COMMISSIONER ENG:**  Unless I missed it -- I

16   don't believe -- have you ever been married?

17       **INMATE SNODGRASS:**  No.

18       **PRESIDING COMMISSIONER ENG:**  Okay.  So no children

19   either?

20       **INMATE SNODGRASS:**  True.

21       **PRESIDING COMMISSIONER ENG:**  Okay.  But you're

22   mother is still alive, correct?

23       **INMATE SNODGRASS:**  Yes.

24       **PRESIDING COMMISSIONER ENG:**  Okay.  And your

25   sisters.  Did you ever -- since you did the life crime,

26   has John Jr. ever contacted you?

27       **INMATE SNODGRASS:**  Since the crime occurred, he

1   showed up in court during the trial, but there's never

2   been any dialogue.

3        **PRESIDING COMMISSIONER ENG:**  Okay.  Have I missed

4   anything so far in terms of your past?  I think we

5   covered your family.  It's sort of all mixed up with the

6   whole sequence of events about your siblings, et cetera,

7   and how you grew up, and what brought you to the life

8   crime.  Did I miss anything?

9        **INMATE SNODGRASS:**  Nothing comes to mind at this

10  point.

11       **PRESIDING COMMISSIONER ENG:**  Okay.  And about your

12  past history.  Commissioner, do you have any additional

13  questions right now?

14       **DEPUTY COMMISSIONER YACONO:**  No, ma'am.

15       **PRESIDING COMMISSIONER ENG:**  Okay.  Well, I think

16  I'm going to pass the baton over to my fellow

17  commissioner.  He's going to review with you your Post-

18  Conviction Factors.

19       **INMATE SNODGRASS:**  Okay.

20       **DEPUTY COMMISSIONER YACONO:**  All right.  Primarily

21  we're going the cover the period since your last hearing.

22  And the actual last hearing was May 20th of 2004, at

23  which time a one-year denial was made, but we did note

24  that on December 7th of '05, you did a one-year

25  stipulation to -- well, it was actually written to

26  tighten up your parole plans.  So what I've used here is

27  the Central File, the Life Prisoner Evaluation Report

     1    prepared for the December of '06 calendar, and because it
     2    straddled that time, I've also used the report from the
     3    May of 2005.  They were both by Correctional Counselor 1,
     4    H. Stanton.  The most current was signed off on 10/11 of
     5    2006.  The same counselor completed the Post-Conviction
     6    Progress Reports, and those covered a period 2/3/05
     7    through 2006.  That was signed 8/31 of '06.  A March 10th
     8    of '04 through February 2nd of '05, signed off 2/17/05,
     9    and then 12 of '02 through 12 of '03, which was signed
    10    off 3/14 of '04.  And because they straddle, basically
    11    I'm using the '03 progress report.  That one should be in
    12    your package as well.  The psychological report -- we're
    13    still using the October 20th of 2003 by Dr. J. Reed,
    14    Ph.D.  At the last hearing, it was noted that you
    15    remain -- or recommendations that you remain
    16    disciplinary-free, and participate in self-help and
    17    obtain positive chronos.  You're currently a Medium-A,
    18    A-1-A.  Your score is 19, which is minimal for your
    19    classification life crime for the last few years up to
    20    this period.  No enemies noted.  No gang affiliation.
    21    The vocational instruction I'm going to kind of add
    22    several things into this area.  And trying to go back to
    23    the older C File.  I'm showing that you participated in
    24    PIA Mill and Cabinet, and one document shows me December
    25    of '88 through May 5th of '92, proceeded by work in the
    26    wood shop from September 10th of '84.  So probably a good
    27    eight years in the field.  Then I'm showing

1   certifications for Welding completed 3/16 of 2001.  I see
2   work for Drafting in '94.  But I don't see a completion.
3   The FAA education for Aircraft/Air Frame, completed 7/1
4   of '96 and for Power Plant Engine, 9/18 of '98.  Another
5   reference again in '99.  Do you have to renew your FAA
6   certifications on those?

7       **INMATE SNODGRASS:**  The certification is good for
8   life.  But going out into the field for the first six
9   months, I would work under the umbrella of a current
10  maintenance technician until I became what they call
11  current.  And then I can sign off my own work up to a
12  point.

13      **DEPUTY COMMISSIONER YACONO:**  All right.  Okay.  As
14  far as academics was concerned, of course a high school
15  graduate and some college.  Work participation:  Showing
16  PIA Wood Furniture and some variation of positions
17  starting May 1st of '02.  And I'm showing you got
18  satisfactory to above average or better evaluations for
19  the full year of 2003, the full year 2004, the full year
20  of 2005.  And I'm saying that you've got March, June, and
21  September evaluation, and then you go to the next year.
22  And the same thing with 2006; again, March 10th,
23  June 1st, September the 1st.  This is the last evaluation
24  for this year that is in the Central File.  One notation
25  done in 3/7 of '06 is a chrono written up an incident
26  where it was noted that this was unsafe about a saw.  So
27  you got slapped a little bit, but we've already talked

1    about you were in and out of Triple CMS.  Of course, then

2    it was Cat X.

3        **INMATE SNODGRASS:**  No.

4        **DEPUTY COMMISSIONER YACONO:**  No?

5        **INMATE SNODGRASS:**  It was Triple CMS, but it more or

6    less enabled me to obtain group therapy.  Because it was

7    not widely available at that time.  No, in past years --

8    in previous years, I was in Category X at CMF at

9    Vacaville Main, and also I did the Category T program in

10   Vacaville -- excuse me, the Category T in Vacaville

11   first, and then the Category X at San Quentin.

12       **DEPUTY COMMISSIONER YACONO:**  Of course, we don't

13   have those anymore, but anyhow -- okay.  Part of this I'm

14   also going to throw in that the -- let's see my notes

15   outside -- a three-hour video on employability which also

16   included some facet of Anger Management.  And that was

17   December 2nd of 2005.  Right?  Before the last

18   stipulation.  The self-help participation showing -- I've

19   got a lot of chronos that show really lengthy time frames

20   in AA.  And the longest one I ever saw was February the

21   14th of 2001 showing 15 years.  But the last chrono I see

22   for participation was April 11th of '02.  You haven't

23   been doing AA for the last four years?

24       **INMATE SNODGRASS:**  That's true.  Not since I arrived

25   here.

26       **DEPUTY COMMISSIONER YACONO:**  Okay.  And let me

27   finish off the specifics on the psychological report.

1    October 20th of 2003, hitting the high points on it.   The

2    clinical assessment under the Current Diagnostic

3    Impressions.   Axis I:   Cannabis Abuse in Sustained Full

4    Remission in a Controlled Environment.   Axis II:   No

5    Contributory Personality Disorder.   The Review of the

6    Life Crime:   Accepts full responsibility for the death of

7    the victim noting subject to significant emotional abuse

8    by the stepfather.   Under the Assessment of Dangerousness

9    and Risks:   The violent behavior within a controlled

10   setting is considered to be low relative to the inmate

11   population.   And it goes on for a full paragraph which

12   speaks to no gang, no juvenile, no adult prior history

13   with, no disciplinaries, a dozen years in NA and AA,

14   certifications and vocations in Mill Cabinet, Drafting,

15   Aircraft Maintenance, Power Plant, and Welding.   And

16   above average in work performance.   Two tests previously

17   administered suggest a low prediction of future violence

18   for this individual in a controlled setting relative to

19   the level of other inmates.   And no suggestion of the

20   presence of sociopathy.   Unique Facts indicated that

21   (inaudible) such behavior does not appear likely to

22   happen again.   Therefore risk factors of violence in a

23   controlled setting is considered to be low relative to

24   this level of inmate population.   If released to the

25   community, if clinical assessed, his violence potential

26   is considered to be no more than that of the average

27   citizen in the community.   The prior evals go back,

1    obviously, for years and years and years, and some are in

2    quite different formats, and some go a lot more detailed

3    into the life crime.  But most of them pretty much

4    parallel with relevant information to that particular

5    time frame, a similar diagnosis that we don't have any

6    significant psychological concerns.  And then for

7    disciplinaries, one CDC 115, which was back in '89 for

8    out of bounds.

9         **INMATE SNODGRASS:**  Is that in the legal documents

10   section?

11        **DEPUTY COMMISSIONER YACONO:**  Usually it's in the

12   very bottom of the Miscellaneous.  It's also contained in

13   the Board Report.

14        **INMATE SNODGRASS:**  Okay.

15        **DEPUTY COMMISSIONER YACONO:**  I need to go straight

16   to the C File, but in your package, our package, second

17   from the bottom, all the way to the back.

18        **INMATE SNODGRASS:**  Okay.  Just the history?

19        **DEPUTY COMMISSIONER YACONO:**  Right.  So and actually

20   this is an administrative counsel on that 115.  You

21   didn't lose any time on that one.  And then the 128s,

22   three in '83: failure to participate, failure to report

23   to assignment, and use of food.  A couple in '91: failure

24   to lock up, smuggling food.  And '95: (inaudible).  The

25   one that kind of gets us is actually during this current

26   period, but it's showering without permit, 6/14/2005.

27   So --

1      **INMATE SNODGRASS:**  If I may ask, how does that get
2    you?
3      **DEPUTY COMMISSIONER YACONO:**  Hang on.  Let me read
4    it.
5      **INMATE SNODGRASS:**  Okay.
6      **DEPUTY COMMISSIONER YACONO:**  June 13th, 2005, at
7    approximately 1915 hours, while performing my duties
8    according to officer observed Inmate Snodgrass take a
9    shower without permission while the count light was on
10   during lockdown.  He circumvented the plan of operation
11   that was issued on June 11th of 2005 that states no
12   showers on the (inaudible) unless directed otherwise by
13   captain or above.  Inmate will be notified of any
14   changes.  The inmate was aware of the report, and any
15   further violation of this nature will result in further
16   disciplinary action.  So now is the time -- is there any
17   other in what you brought documentation, certification,
18   certificates, any other issues that I've just covered
19   that I didn't cover?  Any other work evals, any other
20   certificates of completion, vocational?
21     **INMATE SNODGRASS:**  No.  Vocational, no.  My answer
22   is no.
23     **DEPUTY COMMISSIONER YACONO:**  Okay.  And
24   Commissioner, any questions?
25     **PRESIDING COMMISSIONER ENG:**  Not offhand.  Okay.
26   Ready to move on?
27     **DEPUTY COMMISSIONER YACONO:**  Yes.

1        PRESIDING COMMISSIONER ENG:   Okay.   Let's talk about

2    your parole plans.   Okay?

3        INMATE SNODGRASS:   Okay.

4        PRESIDING COMMISSIONER ENG:   Let's see -- we have in

5    here as outlined in the December '06 Board Report, what

6    page is this?   Near the end of it, Future Plans, under

7    Roman Numeral four.   Okay?   They state that you have

8    plans to reside with your mother, Marietta, in Pinole,

9    California, and there's a phone number.   And they state

10   that there's a support letter in the Central File dated

11   10/18/02, and I don't believe -- it's not in this one.

12   It's in this one.   Okay.   The updated materials, and

13   we'll go ahead, and this is when we take a look and read

14   these into the record.   Okay.   I do have a letter dated

15   November 8th, 2006, from Marietta Snodgrass, who is your

16   mother.   And she's stating that you have her wholehearted

17   support upon parole in the form of a place of residence.

18   And she's also offering transportation and help with

19   outfitting him with necessary clothing for employment.

20   Okay.   Does your mother own this home?

21       INMATE SNODGRASS:   Yes.

22       PRESIDING COMMISSIONER ENG:   Okay.   How long has she

23   been living here?

24       INMATE SNODGRASS:   I believe she's -- she and my

25   father bought the place thanks to the vet benefits

26   because my father was a Korean veteran.

27       PRESIDING COMMISSIONER ENG:   So this was the

54

1    original home that you lived in?

2        **INMATE SNODGRASS:**  Not the first home I lived in,

3    but my mother's present home.  She's lived in that home

4    and has owned it since '63, I think.

5        **PRESIDING COMMISSIONER ENG:**  A long time.  Okay.

6    All right.  So this is that letter, and she's also asking

7    that we put that letter into your Central File.

8        **INMATE SNODGRASS:**  Uh-huh.

9        **PRESIDING COMMISSIONER ENG:**  Okay.  So I think

10    that's the only letter in this new packet; is that

11    correct?

12        **INMATE SNODGRASS:**  Yes.

13        **PRESIDING COMMISSIONER ENG:**  Okay.  Then we also --

14    all right.  We also have a couple letters that are in the

15    Board packet.  Okay?  And one is dated October 16th of

16    2006, and this is from your first cousin, Sandi,

17    S-A-N-D-I, Bowman, B-O-W-M-A-N.  And this is a general

18    support letter.  And Sandi is referring to your expertise

19    in welding, and it states that this is one of your

20    interests; is that correct?

21        **INMATE SNODGRASS:**  Yes, that's true.

22        **PRESIDING COMMISSIONER ENG:**  Okay.  That she says my

23    partner works at a raceway and has contacts with

24    associated businesses there, and in the racing business

25    he always needs help especially from someone who knows

26    welding.  But it's a general support, correct?

27        **INMATE SNODGRASS:**  Yes.

55

1    **PRESIDING COMMISSIONER ENG:**  Okay.  I think there's

2    a few copies of the same letter.

3    **INMATE SNODGRASS:**  Yeah.  I believe there's a

4    photocopy, and then I have the original.

5    **PRESIDING COMMISSIONER ENG:**  And then we have a

6    letter dated October 10th, 2006, from Glenn, G-L-E-N-N,

7    Webber, W-E-B-B-E-R.  And it states that he and his wife

8    are friends, and they keep in touch with Gary for his

9    long incarceration and has -- he's the one that's known

10   you since you were a small child?

11   **INMATE SNODGRASS:**  Yes.  He knew my father in high

12   school, and they grew up together, and they knew each

13   other for, like, forever.  And we used to go -- our

14   family used to go visit his family in San Jose.

15   **PRESIDING COMMISSIONER ENG:**  So this was your birth

16   father that passed away when you were a baby?

17   **INMATE SNODGRASS:**  Yes.  This man knew my birth

18   father.  He and my birth father were in high school

19   together.

20   **PRESIDING COMMISSIONER ENG:**  Wow.  Okay.

21   **INMATE SNODGRASS:**  And after that.

22   **PRESIDING COMMISSIONER ENG:**  Okay.  So and he states

23   that if Gary wishes, he can relocate to Oregon, our

24   second home.  Or he could chose to stay with us in Santa

25   Clara County.  He states many jobs are available in both

26   of these areas.  And he states that if you want to

27   relocate to central Oregon, there's room for -- he could

1   have his own mobile home on our property and could give
2   you immediate employment in taking care of the acreage
3   and the horses.  He states that his wife's son is a
4   building contractor in Santa Clara County and would be
5   willing to give Gary employment upon his release if he
6   wishes to remain there.  We will offer Gary temporary
7   housing and financial assistance, and spend time with him
8   upon his release.  And I'm guessing that's in their home
9   in Los Altos.
10          **INMATE SNODGRASS:**  Los Gatos.
11          **PRESIDING COMMISSIONER ENG:**  Oh, I'm sorry.  Los
12   Gatos.  That is correct.  Okay.  So they are offering you
13   a room.
14          **INMATE SNODGRASS:**  Place of residence in Los Gatos
15   living with them or in central Oregon at their second
16   property with -- I think that may be after I land a job,
17   when that happens.  I'd have to arrange that afterwards,
18   I think.
19          **PRESIDING COMMISSIONER ENG:**  Yes.  Because the Board
20   has the ability and the authority to order a parole to a
21   county that's different from the commitment county if
22   there's documentation that shows that the inmate would
23   have the best chance of success in another county other
24   than the commitment county.  But we have our hands tied
25   when it comes to out of state.
26          **INMATE SNODGRASS:**  Right.  I, basically, have three
27   letters here.  I'm covering the bases.

58

1    **INMATE SNODGRASS:**  Sure.

2    **DEPUTY COMMISSIONER YACONO:**  How's it going to make

3    you feel and your mother feel?  Because you're going back

4    into the same location that this crime occurred in.

5    **INMATE SNODGRASS:**  While I was out on bail for six

6    months, we were living in the same home, walking through

7    the same garage where I shot my stepfather.  And although

8    it was kind of eerie in some ways, it was tolerable.  And

9    to answer your question, no, it wasn't a problem then.

10    **DEPUTY COMMISSIONER YACONO:**  Okay.

11    **INMATE SNODGRASS:**  Was that something you made

12    reference to earlier?  Okay.  I assume that you made

13    reference to that.

14    **DEPUTY COMMISSIONER YACONO:**  Well, you know what?

15    Because of the chrono that noted that you did the

16    video -- the video training part of the inmate

17    employability program.  But this letter I haven't seen

18    before.

19    **INMATE SNODGRASS:**  Right.  And that's something that

20    (inaudible).

21    **PRESIDING COMMISSIONER ENG:**  Uh-huh.  I'm sorry I

22    forgot about it.  I just found it.  My apologies.  That's

23    why I wanted you to take a look.  I'm also taking a look

24    at your -- which is nice that you had written out parole

25    plans for yourself.  So would you -- okay.  If you were

26    to parole to your mother's house, you would need your

27    mother to provide transportation, correct?

1      **INMATE SNODGRASS:**  Initially.

2      **PRESIDING COMMISSIONER ENG:**  And financial -- and

3   you're going to need her financial support, correct?

4      **INMATE SNODGRASS:**  Yeah.  As little as possible, but

5   yeah, that's true.  I mean, she's up there, and she's

6   retired, fixed income and all that.  And you know, I'd

7   have to get a bike.  But yes, that's true.  I'd get a

8   bike.  To get around town, I could use a bike.  And I

9   believe that it would not take me too long to save up for

10   a car and get insurance and things.  I expect to be

11   employed not long after I would parole.

12      **PRESIDING COMMISSIONER ENG:**  Okay.  So you're

13   stating here that the initial employment plan is to get

14   employment in any field that will pay the bills.  Okay?

15   Wood working, welding hold the greatest potential for

16   initial employment upon release.

17      **INMATE SNODGRASS:**  And when I work up a positive

18   work history, I would apply to the various aircraft

19   maintenance facilities.  Maybe Oakland Metro, maybe

20   Concord where my father learned to fly as a matter of

21   fact, thanks to the vet benefits.  And that's my first

22   love really is aircraft maintenance.

23      **PRESIDING COMMISSIONER ENG:**  Are those union jobs?

24      **INMATE SNODGRASS:**  You know, I don't know.

25      **DEPUTY COMMISSIONER YACONO:**  It depends on who you

26   work for.  Because somebody as big as Northwest is

27   supposed to be union versus the Mechanic Locals.  So it's

1    both.

2          **INMATE SNODGRASS:**  And if I may interject, I would

3    not go -- in all probability would not go to work

4    straight away for a major airline or something like that.

5    Especially since I would just be coming out of prison.  I

6    probably would be starting off small like in Concord or

7    something like that and build up a positive work history

8    and get good recommendations and take that to the

9    regionals.

10         **PRESIDING COMMISSIONER ENG:**  Uh-huh.

11         **DEPUTY COMMISSIONER YACONO:**  Real quickly, this

12   letter that was presented from PIA speaks about the

13   Inmate Eligibility Program and the different components

14   of it.  And you've participated over a three-year period,

15   and the one that I noted that you had participated in --

16   have you done all five of these?

17         **INMATE SNODGRASS:**  Everything on there I

18   participated in.  They broke it up into sections, and

19   each section, depended on what module you're in.  I went

20   to my third or fourth one recently.  And it's an ongoing

21   kind of program.  And this last section was about

22   understanding your own resentments and your own

23   addictions, where they apply, and not letting them bring

24   you down when it comes to making that transition when you

25   get out there.

26         **DEPUTY COMMISSIONER YACONO:**  Okay.  And this is

27   obviously not a quick and easy three-hour kind of thing.

61

1    This is ongoing -- they've got it as four sections now

2    and three- to four-hour discussion dialogue as well as

3    video components, sometimes six-part video components.

4    Re-engaging in Society, Focus on Community Re-Entry,

5    Finding Employment, How to Succeed on the Job, and Anger

6    Management.  This is specifically from Charlie B. Walker,

7    Superintendent 1 of the IEP program.  He's the

8    coordinator here at Soledad.  And it is written

9    specifically in regards to our inmate.  It does cover

10   generic what the programs are, but it speaks specifically

11   about his participation over a three-year period.

12       **PRESIDING COMMISSIONER ENG:**  I think that covers all

13   the documents you presented to us, correct?

14       **INMATE SNODGRASS:**  I believe so.

15       **PRESIDING COMMISSIONER ENG:**  Okay.  But I do have a

16   couple comments or questions to ask you.

17       **INMATE SNODGRASS:**  Okay.

18       **PRESIDING COMMISSIONER ENG:**  You had been -- okay.

19   You had been living with your mother.  Okay?  Pretty much

20   all your life up to the life crime.

21       **INMATE SNODGRASS:**  Yes.

22       **PRESIDING COMMISSIONER ENG:**  And then you committed

23   the life crime, and you came into the institution.  Now,

24   your parole plans are to return back to your mother's.

25       **INMATE SNODGRASS:**  And get out on my own as soon as

26   I can, or maybe an alternate residence.  Her being

27   elderly right now, and it's just kind of weird being 45

```
 1    plus and living at home with Mom.  It is kind of weird.
 2    And believe me, it's just a temporary thing.  It's as
 3    temporary as I can make it without, you know, without
 4    well, hamstringing myself.  I mean that.  If I were to
 5    parole to that house and then discover that things
 6    weren't working in the relationship or the relationship
 7    wasn't working or something wasn't working, I would
 8    probably give Glenn a call and see if he would be
 9    amendable to me living there with him.  Because he's
10    retired, and he has time to mentor me in life.
11         PRESIDING COMMISSIONER ENG:  Uh-huh.
12         INMATE SNODGRASS:  So if it didn't work with my
13    mother, I would try to go over to Glenn's place in Los
14    Gatos.
15         PRESIDING COMMISSIONER ENG:  Sir, what's changed
16    besides your 24 years of incarceration in terms of --
17    what incentive do you have for yourself to get out on
18    your own so that you wouldn't come up with the same type
19    of situation as before where you were faced with having
20    to move on with your life on your own?  Okay?  And you
21    took some drastic steps to prevent yourself from having
22    to face that.  Are you with me so far?  Does that make
23    sense to you?
24         INMATE SNODGRASS:  Yeah.  I shot my stepfather
25    because in one way I felt I was eliminating a threat to
26    my security.
27         PRESIDING COMMISSIONER ENG:  Exactly.
```

1      **INMATE SNODGRASS:**  Yeah.

2      **PRESIDING COMMISSIONER ENG:**  So what has changed

3  between that and the new situation arising for the time

4  that you do get released and that you are again, not able

5  to live on your own but will be either living with your

6  mother or someone else and what incentive is there for

7  you to get out on your own?

8      **INMATE SNODGRASS:**  I want to become my own person,

9  because life is being out on your own and being

10  responsible for yourself and taking care of yourself.

11  That's what we're here for, to become better people.

12      **PRESIDING COMMISSIONER ENG:**  Uh-huh.

13      **INMATE SNODGRASS:**  And I can't do that if I'm stuck

14  in the past or stuck in some rudimentary stage of

15  development.  I want to mature.  And being responsible

16  and making a living and getting out on my own and having

17  my own relationships and being around women again.  That

18  will be nice, you know?  That's what I want to do.

19      **PRESIDING COMMISSIONER ENG:**  Well, understand I'm

20  not saying that this is the case, but I want you to think

21  about it, because saying it and being able to do it are

22  two different things.  Okay?  It can be difficult.  It

23  can be scary if you've never been out on your own before.

24      **INMATE SNODGRASS:**  Yeah.  I understand that too.

25  I've never been out on my own.  I don't have the

26  experience of knowing what it is to be out on my own.

27  And I will need to be mentored, and I think that's what

1    Glenn would be prepared to do.  He and his wife too.

2        **PRESIDING COMMISSIONER ENG:**  Okay.

3        **INMATE SNODGRASS:**  More so than my mother, but my

4    mother is in the same county of commitment.  But you

5    know, if the county of commitment were not an issue, if

6    you can go either way, I would probably choose to go with

7    Glenn.

8        **PRESIDING COMMISSIONER ENG:**  Well, sir, you could

9    state the case that where you feel you would have the

10   best chance of success.  Remember what I said to you.  A

11   panel can order parole to a county different from your

12   commitment county if it's in the best interest of the

13   inmate's success on the outside.

14       **INMATE SNODGRASS:**  Right.

15       **PRESIDING COMMISSIONER ENG:**  Okay.  Do you have any

16   other questions?

17       **DEPUTY COMMISSIONER YACONO:**  There's one document

18   that we didn't cover.  (Inaudible) and Mr. Snodgrass may

19   not have had a chance to review it.

20       **PRESIDING COMMISSIONER ENG:**  We have to ask you,

21   Mr. Snodgrass, if you object to this letter from the City

22   of Pinole Police Department.

23       **INMATE SNODGRASS:**  If you just give me a minute or

24   so to read it.

25       **PRESIDING COMMISSIONER ENG:**  Okay.

26       **INMATE SNODGRASS:**  Although I don't think the

27   timeliness is the best, you may read it into the record.

 1          **PRESIDING COMMISSIONER ENG:**  Okay.

 2          **DEPUTY COMMISSIONER YACONO:**  Well, I have one issue

 3     with the attached.  This speaks to a juvenile record that

 4     is not really reflected.  Oftentimes the rap sheet does

 5     not show a juvenile record, but this is supplied by them

 6     in lieu of, but being a suspect versus being arrested

 7     during this time frame, and you're like 14, 15, 13 on

 8     some of these.  But this time that you were arrested and

 9     do you have a conviction resulting from any of these

10     crimes?

11          **INMATE SNODGRASS:**  I've never been convicted in

12     court prior to this instant offense.

13          **DEPUTY COMMISSIONER YACONO:**  Okay.  So you were

14     never on probation, parole, or supervision?

15          **INMATE SNODGRASS:**  No.  I've never been prosecuted.

16          **DEPUTY COMMISSIONER YACONO:**  Did you ever spend any

17     time in juvenile hall or foster?

18          **INMATE SNODGRASS:**  No.

19          **DEPUTY COMMISSIONER YACONO:**  That's a dilemma.  We

20     can read it off a rap sheet but (inaudible) you can't

21     read it off of some preformed letter.

22          **INMATE SNODGRASS:**  No.

23          **DEPUTY COMMISSIONER YACONO:**  So that's my only

24     concern with that again.

25          **PRESIDING COMMISSIONER ENG:**  Okay.  Are any of these

26     incidences in this?

27          **DEPUTY COMMISSIONER YACONO:**  No.  Because they were

1    juvenile.

2        **PRESIDING COMMISSIONER ENG:**  These were all

3    juvenile?

4        **DEPUTY COMMISSIONER YACONO:**  Yes.

5        **PRESIDING COMMISSIONER ENG:**  Okay.  But sir, you had

6    a chance to take a look at these.  So these were just

7    arrests?

8        **INMATE SNODGRASS:**  I think so.

9        **PRESIDING COMMISSIONER ENG:**  Or one was -- oh.  The

10    other was -- take a look at these.

11        **INMATE SNODGRASS:**  One was a citizen's arrest for

12    trespassing.  And I was a kid who was in the wrong place

13    at the wrong time.  Some older kids had been throwing

14    some dirt clods into some guy's swimming pool, and

15    because the guy came around in back of his house and saw

16    me in the area, in proximity to these, we all got in his

17    car and drove down.  And that was the citizen's arrest.

18    But the other things, I don't have any problems with.  I

19    believe that they're accurate.

20        **PRESIDING COMMISSIONER ENG:**  Okay.  Well, the only

21    thing that I'm going to note into the record anyway is

22    the basic letter which was in response to the 3042

23    notices.  So sir, this is at the point where we have sent

24    out Penal Code 3042 notices, and those notices go to

25    agencies that have a direct interest in your case.  And

26    again, we've got a letter from the City of Pinole Police

27    Department, dated November 17, 2006, and it's signed by

1   James W. Rose, R-O-S-E, Chief of Police.  And basically

2   this states that it is -- it is the Department's position

3   and opinion that Gary Snodgrass should remain in prison.

4   So the net of it is that they are opposed to your parole.

5   Okay?  And that's all I'm going to state about that

6   letter.  Okay?

7           INMATE SNODGRASS:  Okay.

8           PRESIDING COMMISSIONER ENG:  And because you were

9   originally scheduled --

10          INMATE SNODGRASS:  For tomorrow.

11          PRESIDING COMMISSIONER ENG:  For tomorrow morning,

12  and that there was going to be, I believe, a

13  representative from the District Attorney's Office that

14  we had tried desperately to reach today and were unable

15  to.  Any comments about that, Commissioner?

16          DEPUTY COMMISSIONER YACONO:  Well, we were informed

17  that the Deputy DA assigned was on vacation.  And so our

18  dilemma is whether or not she's going to appear tomorrow

19  because we haven't been able to contact her.

20          PRESIDING COMMISSIONER ENG:  But we just note for

21  the record that she is not present because we were not

22  able to reach her, and we had to do some moving around of

23  the schedule.

24          DEPUTY COMMISSIONER YACONO:  Okay.  One second.

25  Okay.  We're back on.

26          PRESIDING COMMISSIONER ENG:  Okay.  So I don't have

27  any other questions or comments.  Do you, Commissioner?

1      **DEPUTY COMMISSIONER YACONO:**  No.

2      **PRESIDING COMMISSIONER ENG:**  Okay.  So on that note,

3      I think, unless you have any other comments, we can go

4      right to your closing statement.

5      **INMATE SNODGRASS:**  I have no comments other than I

6      have a very short closing statement.

7      **PRESIDING COMMISSIONER ENG:**  Okay.  Go ahead.

8      **INMATE SNODGRASS:**  I have not rehearsed any closing

9      statement, excuse me.  But I would just like to say that

10     I understand that I did a great wrong on November 18th of

11     '82 -- of '81, excuse me.  And I shot and killed my

12     stepfather.  It was murder.  I don't disagree on that,

13     and I agree with what I was convicted of, and I deserved

14     to be convicted of that.  And I just want to say that,

15     you know, it was -- I brought this on through my having

16     murdered him.  And I'm sorry for him having lost his life

17     to me and for his family and for myself and my family and

18     for society in general for another murderer in prison in

19     my circumstance.  I would like to say that after having

20     done that, that I've done the best that I -- I think I've

21     done well to salvage the life I was left with, and I've

22     tried very hard to become a better person, to understand

23     myself much more, and to live a sober and upright life.

24     I would like to believe that others can see the salvage-

25     ability in my life, if there is such a word, and to see

26     that I have tried very hard to salvage my life and to

27     understand my past and my mistake.  And I'm just hoping

1    for a second chance.  And my family is too, and I'm

2    hoping that people that don't even know me yet would be

3    thankful that I was given a second chance at some point.

4    And so I just ask that you consider these things that

5    we've talked about here today and give it it's due and

6    your own personal discretion.  I'll take that for

7    granted.  Okay.  Thank you.

8         **PRESIDING COMMISSIONER ENG:**  Thank you, sir.  We'll

9    now recess for deliberations.  The time is 5:45.

10        **INMATE SNODGRASS:**  I'll leave this in here for now.

11        **PRESIDING COMMISSIONER ENG:**  Absolutely.

12                         **R E C E S S**

13                           --o0o--

14

15

16

17

18

19

20

21

22

23

24

25

26

27

1      **CALIFORNIA BOARD OF PAROLE HEARINGS**

2      **D E C I S I O N**

3      **DEPUTY COMMISSIONER YACONO:**  We're back on.

4      **PRESIDING COMMISSIONER ENG:**  Okay.  The time is

5      6:02.  Everyone who was in the room prior to our recess

6      for deliberations has since returned.  In the matter of

7      Gary Snodgrass, CDC No. C-50459, the panel has reviewed

8      all the information received from the public and relied

9      on the following circumstances in concluding that the

10     prisoner is not suitable for parole and would pose an

11     unreasonable risk of danger to society or a threat to

12     public safety if released from prison.  We find that the

13     commitment offense was carried out in a very cruel and

14     callous manner.  It was carried out in a dispassionate

15     and very calculated manner, very much like an execution

16     style murder in which the inmate, basically, laid in wait

17     in the garage for his stepfather to come in and then

18     ended up shooting him twice.  It was carried out in a

19     manner that demonstrates an exceptionally callous

20     disregard for human suffering.  He -- the victim was shot

21     first in the chest, fell backwards, was yelling something

22     to the inmate to the effect that he'd done it now, and

23     the inmate walked up and shot him once again, this time

24     hitting him in the neck.  The motive for the crime was

25     somewhat trivial in relation to the offense.  As stated

26     and discussed with Mr. Snodgrass, he felt that his

27     **GARY SNODGRASS   C-50459   DECISION PAGE 1   12/27/06**

1    security was being threatened by his stepfather and that

2    he was being asked to move out of the home and to start a

3    life.  And at that point in Mr. Snodgrass's life, he

4    didn't feel like he was ready to move on.  These

5    conclusions are drawn from the Statement of Facts wherein

6    the prisoner again, had developed a consuming hatred of

7    his stepfather, John Mailen.  He had fantasized about

8    killing the victim months before the crime took place,

9    and then on November 17, 1981, he secreted his

10   stepfather's rifle behind some plaster board in the

11   garage.  When his stepfather returned home from dropping

12   off his wife and daughter at work, he told Gary to put

13   out the cat, at which time the defendant complied with

14   this order, and as he went outside, he retrieved the

15   weapon.  As he was preparing the weapon, it accidentally

16   discharged.  When Mr. Mailen came outside to investigate

17   the disturbance, he was shot twice by the defendant.  He

18   subsequently died that morning at the hospital.

19   Regarding the institutional behavior, again, we find that

20   the inmate has programmed in a limited manner in the last

21   about two and a half years while incarcerated.  In the

22   last two and a half years, we find that he's taken one

23   class in Anger Management, and he's not sufficiently

24   participated in beneficial self-help and/or therapy

25   programs, at least not in the last two and a half years.

26   And again, we stated that we take a look at your progress

27   **GARY SNODGRASS   C-50459   DECISION PAGE 2   12/27/06**

 1    since your last hearing.  And as my colleague has said,

 2    he felt that you almost shut down at a certain point in

 3    time.  In terms of his conduct while incarcerated, it

 4    includes around seven 128(a) counseling chronos, the last

 5    one being in June of 2005 for showering without

 6    permission.  And then there was one 115 disciplinary,

 7    which was really administrative in August of 1989, for

 8    being out of bounds.  Okay.  In reference to

 9    Mr. Snodgrass's parole plans, sir, you do have parole

10    plans; however, we highly advise that you firm them up

11    and focus it and think back about what we were discussing

12    about what's in your best interest for success.  So you

13    may want to think about switching the order of your

14    choices.  Does that make sense to you?

15           **INMATE SNODGRASS:**  Yeah.

16           **PRESIDING COMMISSIONER ENG:**  Again, what's going to

17    make sense to you -- you have a lot of different

18    experiences that you have gained while being

19    incarcerated.  Focus -- try to focus on areas -- sorry

20    about that.  Try to focus on areas that make most sense

21    for you to be able to get a viable job to be able to give

22    yourself some financial security.  You have to understand

23    and draw up this plan about the transition.  You've been

24    incarcerated for 24 years.  It's going to take you some

25    time to get everything together on the outside, to be

26    able to find a job, or to get yourself to a position

27    **GARY SNODGRASS   C-50459   DECISION PAGE 3   12/27/06**

1    where you're financially able to get out on your own.  So

2    there's nothing wrong with drawing something out to, say,

3    you know, in 18 months I plan to do this with some goals,

4    et cetera.  In other words, we want you to focus, and we

5    want you to get some well thought out backup plans,

6    because if one plan doesn't work out, what's your backup

7    plan?  Does that make sense to you?  Because don't

8    forget, this is the first line.  All right?  Once you're

9    given -- when you see a hearing panel, that's the first

10   step.  When you're given a date -- when anyone is given a

11   date, the next step is all the information and the

12   documentation that an inmate provides has to be verified.

13   The more documentation, the more detail you provide, the

14   better off you're going to be, especially if you have

15   Plan A, Plan B, and Plan C, and you have everything lined

16   up, you have all the documentation.  Likewise, with any

17   letters of support that you get, have them be as specific

18   as possible.  Specifically, Gary will have his own room

19   and bathroom.  You know, he will be supported financially

20   for X number of years, or whatever it might be.  All

21   right?  We will take care of his medical needs,

22   transportation in this way or that way, as specific as

23   possible.  Does that make sense?

24        **INMATE SNODGRASS:**  Yeah.

25        **PRESIDING COMMISSIONER ENG:**  Okay.  So again, as

26   much as you can, and with the employment -- you've got

27   **GARY SNODGRASS    C-50459    DECISION PAGE 4    12/27/06**

```
 1   Vocational Welding, et cetera.  Start focusing on
 2   specific areas and backups where you might be able to --
 3   where you have the best chances of getting a position.
 4   And come in with even copies of the letters that you're
 5   sending out.  I've seen people come in with a notebook
 6   stating that these are all the letters, these are the
 7   dates that they sent them, these are the ones that they
 8   received responses back whether they're either yeses or
 9   nos.  I mean, this is part of life.  When you go out
10   looking for jobs, sometimes for every hundred letters
11   that you send out, you're lucky if you get one or two
12   responses.  That's just the nature of the beast and the
13   way things are.  So the more documentation you can show
14   the panel as to your taking total control, and it's well
15   thought out, and this is what you're going to do, it
16   works to your benefit.  Okay?  Regarding the 3042
17   responses, we do note that we did receive a letter from
18   the City of Pinole Police Department, the law enforcement
19   agency that investigated the case, and they did state
20   that they are opposed to parole at this time.  The panel
21   makes the following findings:  That the inmate needs to
22   sort of -- I wrote in here pick up and continue with
23   documented self-help and/or therapy to help you face,
24   discuss, understand, and cope with stress in a
25   nondestructive manner.  Until progress is made, the
26   prisoner continues to be unpredictable and a threat to
27   GARY SNODGRASS    C-50459    DECISION PAGE 5    12/27/06
```

1    others.  Basically, sir, it comes back to where we see
2    that all of a sudden it seemed like you just stopped, and
3    you gave up.  And we don't think that that's in your best
4    interest to do that.  We also state though, that you
5    should be commended for -- you have an exemplary work
6    record, you know, over a long period of time, and you
7    should be commended for that.  You have multiple
8    certified trades that include Aircraft Maintenance, the
9    Vocational Welding, and the Mill and Cabinet.  And the
10   fact that you have no real record of any serious 115s,
11   you should be commended for that.  So you've been doing a
12   lot of good things.  But the positive aspects do not
13   outweigh the factors of unsuitability.  Sir, this is a
14   one-year denial.  And we hope that in the next 12 months
15   you'll be able to pull all of this together.  And I think
16   if you focus, you'll be able to.  The panel does
17   recommend that you remain disciplinary-free.  Again, you
18   have done very, very well, and continue with that.  And
19   if available, try to participate in any and all self-help
20   that you can.  Okay?  It'll just help make you stronger
21   and be able to deal with some of the stresses that you'll
22   be faced with if and when you get a date.  That doesn't
23   mean that you have to go to AA and NA.  It means that
24   there's other types.  Get some books.  Read them, write
25   reports, brief reports about how that's helping you to
26   cope and to live and for you to make decisions so you
27   **GARY SNODGRASS   C-50459   DECISION PAGE 6   12/27/06**

1    don't end up in the same situation again.  Okay?  And

2    also if available, which is difficult often, any

3    additional therapy that can help make you stronger to be

4    able to cope.  Okay?  That really concludes the reading

5    of the decision.  I'm going to ask my fellow commissioner

6    if he has any other comments.

7         **DEPUTY COMMISSIONER YACONO:**  You did get your

8    documents back, right?  Okay.  That PIA -- if that's what

9    you want to do, if that's available to you, that's very

10   structured.  Get your chronos for that one.  You have

11   family, you have friends, and they've written support

12   letters for you.  Now ask them to help you a little bit

13   more, because somebody is willing to give you

14   transportation, residence, potential job.  You can walk

15   in anywhere and weld.  You can potentially find jobs

16   doing woodwork, et cetera.  Let them help you look and

17   see what's available to plug in.  If they have something

18   specific that they want you to do, they can write it down

19   and structure it on a letterhead, their business in

20   effect.  Let them present it that way.  It's structured.

21   And again, we can send you out of county.  Other states

22   have their own jurisdiction.  We can't control the other

23   states.  So let's concentrate here and get focused on

24   that.  You're going to look a lot tighter on that.  Okay?

25        **INMATE SNODGRASS:**  Uh-huh.  Yes.

26        **DEPUTY COMMISSIONER YACONO:**  Okay.

27   **GARY SNODGRASS   C-50459   DECISION PAGE 7   12/27/06**

1       **PRESIDING COMMISSIONER ENG:**  Okay.  Good luck, sir.

2    That concludes the hearing.  The time is now 6:14.

3                           --o0o--

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22    **PAROLE DENIED ONE YEAR**

23    **THIS DECISION WILL BE FINAL ON:** April 26, 2007

24    **YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO THAT**

25    **DATE, THE DECISION IS MODIFIED.**

26    **GARY SNODGRASS  C-50459  DECISION PAGE 8  12/27/06**

## CERTIFICATE AND

## DECLARATION OF TRANSCRIBER

I, Patricia Chapin, a duly designated transcriber, VINE, MCKINNON & HALL, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total one in number and cover a total of pages numbered 1 - 77, and which recording was duly recorded at CORRECTIONAL TRAINING FACILITY, at SOLEDAD, CALIFORNIA, in the matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING of GARY SNODGRASS, CDC No. C-50459, on DECEMBER 27, 2006, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape(s) to the best of my ability.

I hereby certify that I am a disinterested party in the above-mentioned matter and have no interest in the outcome of the hearing.

Dated JANUARY 25, 2007, at Sacramento County, California.


Patricia Chapin
Transcriber
**VINE, MCKINNON & HALL**