GARY SNODGRASS, C-50459
CTF-SOLEDAD
P O BOX 689
SOLEDAD, CA 93960-0689

PETITIONER IN PRO SE

# VOLUME 2 of 2

## EXHIBITS CC thru WW

E-filing

RECEIVED
JUL - 9 2008
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

(PR)

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

Gary Snodgrass, Petitioner,

v.

Ben Curry, Warden, California Training Facility, Soledad, CA., Respondent.

No. 08 3322 JSW

**PETITIONER'S EXHIBITS TO PETITION FOR WRIT OF HABEAS CORPUS**

Former Crim. # 26252

Honorable Judge of the Northern District of California

| EXHIBIT # | DESCRIPTION | |
|---|---|---|
| A | Abstract of Judgment .......... | 2 |
| B | Sentencing transcript .......... | 2,22,23 |
| C | CDCR's Legal Status documents .......... | 2 |
| D | 1990 Life Prisoner Evaluation report .......... | 5,16 |
| E | 1985 Mental Health Evaluation report .......... | 7 |
| F | 1988 Mental Health Evaluation report .......... | 7 |
| G | 1990 Mental Health Evaluation report .......... | 8 |

| | | |
|---|---|---|
| **H** | 1991 Mental Health Evaluation report (Cat-X) ........... | 8 |
| **I** | 1992 Mental Health Evaluation report ......................... | 12 |
| **J** | 1993 Mental Health Evaluation report ......................... | 12 |
| **K** | 1994 Mental Health Evaluation report ......................... | 12 |
| **L** | 1995 Mental Health Evaluation report ......................... | 13 |
| **M** | 1997 Mental Health Evaluation report ......................... | 13 |
| **N** | 1998 Mental Health Evaluation report ......................... | 14 |
| **O** | 1999 Mental Health Evaluation report ......................... | 14 |
| **P** | 2003 Mental Health Evaluation report ......................... | 15 |
| **Q** | 1991 Life Prisoner Evaluation report ........................... | 17 |
| **R** | 1992 Life Prisoner Evaluation report ........................... | 17 |
| **S** | 1993 Life Prisoner Evaluation report ........................... | 17 |
| **T** | 1994 Life Prisoner Evaluation report ........................... | 17 |
| **U** | 1995 Life Prisoner Evaluation report ........................... | 17 |
| **V** | 1997 Life Prisoner Evaluation report ........................... | 17 |
| **W** | 1998 Life Prisoner Evaluation report ........................... | 17 |
| **X** | 1999 Life Prisoner Evaluation report ........................... | 17 |
| **Y** | 2001 Life Prisoner Evaluation report ........................... | 17 |
| **Z** | 2002 Life Prisoner Evaluation report ........................... | 18 |
| **AA** | 2003 Life Prisoner Evaluation report ........................... | 18 |
| **BB** | 2006 Board of Parole Hearings transcript ..................... | 18, passim |
| **CC** | 1990 BPT parole denial decision only .......................... | 39 |
| **DD** | 1992 BPT parole denial decision only .......................... | 39 |
| **EE** | 1993 BPT parole denial decision only .......................... | 39 |

## EXHIBIT INDEX – CONT'D

| | | **Pages** |
|---|---|---|
| **FF** | 1994 BPT parole denial decision only .......................... | 31, 39 |
| **GG** | 1995 BPT parole denial decision only .......................... | 31-32, 39 |
| **HH** | 1997 BPT parole denial decision only .......................... | 32, 39 |
| **II** | 1998 BPT parole denial decision only .......................... | 32, 39 |
| **JJ** | 2000 BPT parole denial decision only .......................... | 33, 40 |
| **KK** | 2001 BPT parole denial decision only .......................... | 34, 40 |
| **LL** | Probation Officers Report .......................................... | 6, 22 |
| **MM** | [ *This Exhibit Removed* ] | |
| **NN** | Gubernatorial Misconduct: Pressuring Commissioners to Deny Parole .......................................................... | 3 |
| **OO** | *In re Criscione,* Santa Clara Superior Court case .......... | 4, MPA 25 |
| **PP** | 2005 Life Prisoner Evaluation report .......................... | 18 |
| **QQ** | *In re Cortez / In re Aremu* case documents ................. | 18 |
| **RR** | Letters from Sandi Bowman & Glenn Webber ........... | 19 |
| **SS** | 2002 BPT parole denial decision only ........................ | 33, 40 |
| **TT** | 2004 BPT parole denial decision only .......................... | 34, 40 |
| **UU** | 2005 BPT denial stipulation by Gary Snodgrass .......... | 40 |
| **VV** | *Coleman v. CA. Bd. of Prison Terms* case ........................ | MPA 5 |
| **WW** | *Dennis Kimble* case: Declaration by Knox, Attorney .... | MPA 7 |

///

# EXHIBIT CC

## 1990 BPT PAROLE DECISION PAGES

EXHIBIT CC

CALIFORNIA BOARD OF PRISON TERMS

In the Matter of the Hearing of — Life Prisoner Initial Parole Consideration

SNODGRASS, Gary — Denied

C-50459

CMF-M

This matter was heard before the Board of Prison Terms (BPT) on March 9, 1990, at the California Medical Facility-Main. The hearing panel was composed of D. Brown, Commissioner; W. Morgan, Commissioner; and E. Luttrell, Deputy Commissioner.

Present at the hearing were: G. Snodgrass, Prisoner; N. Starr, Counsel for Prisoner; and V. George, Deputy District Attorney, Contra Costa County.

Any others present are identified in the transcript.

Oral and documentary evidence was submitted and after due consideration of all the evidence, the panel makes the following findings:

Legal Status

On July 19, 1982, the prisoner was received in prison pursuant to Penal Code (PC) §1168 for a violation of PC §187 second degree murder (Contra Costa County Case No. CC-26252, Count 1). The controlling minimum eligible parole date (MEPD) is September 28, 1990.

USE Pre-prison Credit

PC §3041(a) provides that the BPT shall meet with persons sentenced under PC §1168 and shall normally set a parole release date unless, pursuant to PC §3041(b), the Board determines that a parole date cannot be fixed at this hearing.

This hearing is conducted pursuant to Title 15, California Code of Regulations (15 CCR), Division 2, Chapter 3, Article 5/11, which sets forth parole consideration criteria and guidelines for life prisoners implementing PC §3041.

Statement of Facts

On November 17, 1981, the prisoner asked his mother to awake him in the following morning prior to her leaving for work. After she awoke him, he waited until his stepfather left the house to take his wife to work. At that time, the prisoner took his stepfather's 7 millimeter hunting rifle from his closet, hid it in the garage, and then went back to bed.

When the stepfather returned home, he order the prisoner to get out of bed and put the cat outside. The prisoner complied with the order, and then went to the garage area and retrieved the rifle. He then went out of the garage to a woodpile and attempted to determine the weapon's operation. While doing so, the rifle discharged.

USE Pre-prison Credit

When his stepfather came out of the garage door to investigate the gunshot, the prisoner pointed the rifle at him and pulled the trigger; however, the safety prevented the rifle from firing. During this time, a neighbor had heard the shot, observed the prisoner holding the rifle and called the police.

Mr. Nailen, the victim, had gone back into the garage and shut the door. The prisoner and his stepfather conversed from their separate locations. When the prisoner observed the police arrive, he told his stepfather that the police had arrived, and his stepfather emerged from the garage. At that time, the prisoner shot his stepfather in the chest area. His stepfather fell to the ground and began yelling at the prisoner. The prisoner then walked to the victim and shot him in the neck area.

The prisoner then placed another shell in the chamber with the intention of killing himself. At that point, the officers gave orders for him to come out with his hands up. The prisoner then unloaded the weapon, placed it on the woodpile, exited the yard through the gate and was taken into custody without resistance. When the police asked him who he had been talking to, he stated "My dad, my stepfather, I just killed him." The victim was found by the police in an unconscious state and transported to the

USE
Pre-prison
Credit

hospital, but pronounced deat at the hospital.

Parole Suitability

15 CCR §2402(a) requires that the panel first determine whether the prisoner is suitable for release on parole. Regardless of the length of time served, a life prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison. 15 CCR §2402(c) sets forth circumstances tending to show unsuitability and 15 CCR §2402(d) sets forth circumstances tending to show suitability. These regulations are guidelines only.

The panel relied on the following circumstances in determining whether or not the prisoner is suitable for parole:

1. Commitment Offense. The commitment offense involved the brutal murder of the prisoner's stepfather after several years of harboring hate toward the stepfather as a result of what the prisoner describes as years of emotional abuse. The prisoner planned the murder prior to its commission. After obtaining a rifle which he had previously concealed, the prisoner shot his stepfather once in the chest. His stepfather fell to the ground and began yelling at the prisoner. The prisoner then walked up to

USE
Pre-prison
Credit

his stepfather and shot him again in the neck area. The murder was committed by lying in wait. During the commission of the crime the prisoner had several opportunities to cease the criminal conduct but instead continued.

2. Previous Record. The prisoner has an unstable social history which includes a disfunctional family, emotional abuse and substance abuse.

3. Psychiatric Factors. The Psychological Evaluation dated January 25, 1990, authored by Sharon K. Halpern, Ph.D., while favorable, is not totally supportive of release and indicates a need for continued psychotherapy.

The prisoner does not appear to have come to terms with the underlying causes of the crime as he appears to at least partially in discussing the crime, shift responsibility to others.

The panel finds that the prisoner appears to need continuing therapy in order understand the underlying causes of the crime.

The prisoner should be commended for remaining disciplinary free of any serious disciplinaries since reception, for completing Vocational Mill and Cabinet, for his academic upgrading and for his participation in therapy.

USE
Pre-prison
Credit

Based on the information contained in the record and considered at this hearing, the panel concludes and states, as required by PC §§3043 and 3043.5, that the prisoner would pose a threat to public safety if released on parole.

Therefore, the prisoner is found unsuitable for parole.

Recommendation

PC §3041.5(b)(2) provides that within 20 days following any meeting where a parole date has not been set, the Board shall send the prisoner a written statement setting forth the reason or reasons for refusal to set a parole date and when the prisoner can reasonably expect to be considered again for the setting of a parole date and in what beneficial activities the prisoner might participate.

This case shall be scheduled for hearing for parole consideration as provided in 15 CCR §2270(c).

In preparation for the next parole consideration hearing, the panel recommends that the prisoner:

1. Remain disciplinary free.

2. Continue to upgrade vocationally and/or educationally.

3. Participate in selfp-help and/or therapy programming such as Alcoholics Anonymous (AA) or Narcotics Anonymous (NA).

4. Cooperate with clinicians and staff and/or the

USE
Pre-prison Credit

Psychiatric Council in a Category X Program.

NOTE TO CDC STAFF

The panel recommends the prisoner be transferred to San Quentin or the California Mens Colony for the purposes of a Category X Program and/or Psychiatric Council to explore:

1. Violence potential in the free community.

2. The significance of alcohol/drugs as it relates to the commitment offense and an estimate of the prisoner's ability to refrain from use/abuse from same when released.

3. The extent to which the prisoner has explored the commitment offense and come to terms with the underlying causes and the relationship with his mother and its causative affect.

4. The need for therapy programs while incarcerated.

Order

Based on the foregoing findings and reasons, parole is denied.

EFFECTIVE DATE OF THIS DECISION APR 02 1990.

FE PRISONER: PAROLE CONSIDERATION
PROPOSED DECISION (BPT §2041)

[✓] PAROLE DENIED one year

If this proposed decision denying parole is approved, the Board will send you a copy of the approved decision, including the reasons for denial of parole, within 30 days of the hearing.

[ ] PAROLE GRANTED

A. Base Period of Confinement . . . . . . . . . . . . ________ Months

Case No. Count No. Offense

B. Firearm Enhancement . . . . . . . . . . . . + ________ Months

C. Other Crimes Total . . . . . . . . . . . . + ________ Months

Case No. Count No. Offense ________ mos.

Case No. Count No. Offense ________ mos.

Case No. Count No. Offense ________ mos.

D. Total Term . . . . . . . . . . . . = ________ Months

E. Postconviction Credit From ________ (Date) To ________ (Date) — ________ Months

F. Total Period of Confinement. . . . . . . . . . . . = ________ Months

The period of confinement indicated is a tentative decision proposed by this panel. The decision will be reviewed pursuant to BPT §2041, and, if approved, a copy of the approved decision will be sent to you within 30 days. At that time appropriate pre-prison credits will be applied and a parole release date computed.

You will not engage in any conduct specified in BPT §2451. Such conduct may result in rescission or postponement of your parole date.

If the proposed decision denying or granting parole is disapproved, you will receive a copy of the proposed decision and the reasons for disapproval. You will then receive a copy of the modified decision or will be scheduled for a new hearing, as appropriate.

PANEL HEARING CASE

| | Date |
|---|---|
| [signature] | 3/9/90 |
| [signature] | Date |
| [signature] | Date |

| | CDC NUMBER | INSTITUTION | HEARING DATE |
|---|---|---|---|
| SNODGRASS, GARY | C-50459 | CMF-MAIN | 3-9-90 |

Distribution: White–C. File

(RECORDS OFFICER USE ONLY)

| | YR | MO | DAY |
|---|---|---|---|
| usted Period of Confinement | | | |
| ption Date (See BPT §2289) | + | | |
| arge Time | + | | |
| OLE DATE | = | | |

**MISCELLANEOUS**

one year Denial

Transfer to either S.Q. or CMC for Cat X program

L CODE NOTICES

SECTION 3042 [X] SENT FEBRUARY 1, 1990 (DATE)

ITMENT OFFENSE

P187 / 12022.5 (CODE SECTION) — MURDER 2nd. W/USE OF RIFLE (TITLE)

CC 26252 (CASE NUMBER) — 01 (COUNT NUMBER)

eceived by CDC — Controlling MEPD 9-28-90

earing [X] INITIAL [ ] SUBSEQUENT ____ (HEARING NO.) — If Subsequent Hearing, Date of Last Hearing

ment Representative

l for Prisoner NINA STARR — Address 968 ADMIRAL CALLAGHAN LANE #167 VALLEJO, CA. 945

Attorney Representative — County CONTRA COSTA COUNTY

**PAROLE HEARING CALENDAR**

*The following represents the findings, determination, and order of the Board of Prison Terms, State of California.*

| | Date |
|---|---|
| g (Name) [signature] | 3/9/90 |
| ing (Name) [signature: W. H. Morgan] | |
| ng (Name) [signature] | |

| | CDC NUMBER | INSTITUTION | CALENDAR | HEARING DATE |
|---|---|---|---|---|
| ODGRASS, GARY | C-50459 | CMF-MAIN | 3-90 | 3-9-90 |

(Rev. 8/1/81) PERMANENT APPENDIX

# EXHIBIT DD

## 1992 BPT PAROLE DECISION PAGES

EXHIBIT DD

CALIFORNIA BOARD OF PRISON TERMS

| In the Matter of the Hearing of SNODGRASS, Gary C-50459 | Life Prisoner Subsequent Parole Consideration (1) Denied |
|---|---|

DVI

This matter was heard before the Board of Prison Terms (BPT) on March 11, 1992, at the Deuel Vocational Institution - Main. The hearing panel was composed of M. O'Connell, Commissioner; E. Tong, Commissioner; and E. Coldren, Deputy Commissioner.

Present at the hearing were G. Snodgrass, prisoner; N. Starr, counsel for prisoner; and B. Haynes, Deputy District Attorney Contra Costa County.

Any others present are identified in the transcript.

Oral and documentary evidence was submitted and after due consideration of all the evidence, the panel makes the following findings:

**Legal Status**

On July 19, 1982, the prisoner was received in prison pursuant to Penal Code (PC) § 1168 for a violation of PC § 187, second degree murder (Contra Costa County Case No. CC26252, count 1). The controlling minimum eligible parole date (MEPD) was September 28, 1990.

PC § 3041(a) provides that the BPT shall meet with persons sentenced under PC § 1168 and shall normally set a parole release date unless, pursuant to PC § 3041(b), the Board determines that a parole date cannot be fixed at this hearing.

This hearing is conducted pursuant to Title 15, California Code of Regulations (15 CCR), Division 2, Chapter 3, Article 11, which sets forth parole consideration criteria and guidelines for life prisoners implementing PC § 3041.

**Statement of Facts**

Incorporated by reference as if fully set forth herein from the BPT hearing of March 9, 1990, pages two through four.

**Parole Suitability**

15 CCR § 2402(a) requires that the panel first determine whether the prisoner is suitable for release on parole. Regardless of the length of time served, a life prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison. 15 CCR § 2402(c) sets forth circumstances tending to show unsuitability and 15 CCR § 2402(d) sets forth circumstances tending to show suitability. These regulations are guidelines only.

The panel relied on the following circumstances in determining whether or not the prisoner is suitable for parole:

1. Commitment offense. The offense was carried out in an especially heinous, atrocious, cruel, dispassionate and calculated manner which exhibits a callous disregard for the life and suffering of others.

These conclusions are drawn from the Statement of Facts wherein the prisoner prepared a plan to kill his stepfather. This plan was more than one day in the making. On the day in question, the prisoner took the rifle from his stepfather's closet. He waited for him to come back home from dropping off several members of the family at their locations that morning. He leaned how to work the rifle on that day and then shot him.

The prisoner deliberately brought the victim out to the garage for the shooting. While the victim was down, he shot him again.

2. Previous record. The prisoner has an unstable social history which includes being molested by his stepbrother for approximately a year and a half until a separation occurred, then he moved back with just his mother. He began a pattern of drug and alcohol abuse coupled with continual problems with his stepfather who his mother remarried.

4. Psychiatric factors. The Category X report dated May 30, 1991, by H. Ishida, Ph.D., and R. Bruce, Ph.D., is very positive and indicates no major mental disorder, but he does have cannabis abuse and alcohol abuse. There is no diagnosis.

The panel finds the prisoner should be commended for his good work reports, for his mill and cabinet completion, for his participation in Category T and Alcoholics Anonymous (AA) and for being disciplinary free. However, these positive aspects of his behavior do not outweigh the factors of unsuitability.

Based on the information contained in the record and considered at this hearing, the panel concludes and states, as required by PC §§ 3043 and 3043.5, that the prisoner would pose a

threat to public safety if released on parole.

Therefore, the prisoner is found unsuitable for parole.

**Recommendation**

PC § 3041.5(b)(2) provides that within 20 days following any meeting where a parole date has not been set, the Board shall send the prisoner a written statement setting forth the reason or reasons for refusal to set a parole date and when the prisoner can reasonably expect to be considered again for the setting of a parole date and in what beneficial activities the prisoner might participate.

This case shall be scheduled for hearing for parole consideration as provided in 15 CCR § 2270(c).

In preparation for the next parole consideration hearing, the panel recommends that the prisoner:

1. Remain disciplinary free.
2. Upgrade vocationally.
3. Participate in self-help and therapy programming.

**Order**

Based on the foregoing findings and reasons, parole is denied.

**EFFECTIVE DATE OF THIS DECISION** JUN 23 1992

[X] PAROLE DENIED One yr

If this proposed decision denying parole is approved, the Board will send you a copy of the approved decision, including the reasons for denial of parole, within 30 days of the hearing.

[ ] PAROLE GRANTED

A. Base Period of Confinement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ________ Months

Case No. Count No. Offense

B. Firearm Enhancement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . + ________ Months

C. Other Crimes Total . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . + ________ Months

________ mos.
Case No. Count No. Offense

________ mos.
Case No. Count No. Offense

________ mos.
Case No. Count No. Offense

D. Total Term . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . = ________ Months

E. Postconviction Credit From ________ (Date) To ________ (Date) — ________ Months

F. Total Period of Confinement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . = ________ Months

The period of confinement indicated is a tentative decision proposed by this panel. The decision will be reviewed pursuant to BPT §2041, and, if approved, a copy of the approved decision will be sent to you within 30 days. At that time appropriate pre-prison credits will be applied and a parole release date computed.

You will not engage in any conduct specified in BPT §2451. Such conduct may result in rescission or postponement of your parole date.

If the proposed decision denying or granting parole is disapproved, you will receive a copy of the proposed decision and the reasons for disapproval. You will then receive a copy of the modified decision or will be scheduled for a new hearing, as appropriate.

PANEL HEARING CASE

| | |
|---|---|
| Daniel O'Connell | Date 3/11/92 |
| [signature] | Date |
| E. Young | Date |

| | CDC NUMBER | INSTITUTION | HEARING DATE |
|---|---|---|---|
| DGRASS, GARY | C50459 | DVI-MAIN | 3-11-92 |

Distribution: White—C. Fil
Canary—BP

ARD OF PRISON TERMS — STATE OF CALIFORNIA

FE PRISONER DECISION FACE SHEET

## PERIOD OF CONFINEMENT

(RECORDS OFFICER USE ONLY)

| | YR | MO | DAY |
|---|---|---|---|
| Adjusted Period of Confinement | | | |
| Date Life Term Begins | + | | |
| At Large Time | + | | |
| PAROLE DATE | = | | |

## MISCELLANEOUS

One year Denial.

PENAL CODE SECTION 3042 NOTICES [X] SENT (Date) 2-15-92

COMMITMENT OFFENSE

PC 187 (Code Section) — MURDER 2nd (Title)

CC26252 (Case Number) — COUNT 1 (Count Number)

| Date Received by CDC | Date Life Term Begins | Controlling MEPD |
|---|---|---|
| 7-19-82 | 7-19-82 | 9-28-90 |

Type of Hearing: [ ] INITIAL [X] SUBSEQUENT (Hearing No.) 1

If Subsequent Hearing, Date of Last Hearing: 3-9-90

Department Representative: Joe Dawson, C&PR(A)

Counsel for Prisoner: NINA STARR — Address: 968 ADMIRAL CALLAGHNA LN.#167 VALLEJO CA 9459[illegible]

District Attorney Representative: BRIAN HAYNES — County: CONTRA COSTA

## PAROLE HEARING CALENDAR

*This form and the panel's statement at the conclusion of the hearing constitute a* ***proposed*** *decision and order of the Board of Prison Terms. The decision becomes effective when issued following the decision review process.*

Presiding (Name): [signature] Lawrence O'Connell — Date: 3/11/92

Concurring (Name): [signature] — Date

Concurring (Name): [signature] E. Jong — Date

| NAME | CDC NUMBER | INSTITUTION | CALENDAR | HEARING DATE |
|---|---|---|---|---|
| SNODGRASS, GARY | C50459 | DVI-MAIN | 3-92 | 3-11-92 |

1001 (REV. 1/91) — COPY SENT TO INMATE 7/1/92 [initials] — PERMANENT ADDENDUM

# EXHIBIT EE

## 1993 BPT PAROLE DECISION PAGES

EXHIBIT EE

CALIFORNIA BOARD OF PRISON TERMS

D E C I S I O N

PRESIDING BOARD COMMISSIONER NIELSEN: Panel stands back on record in the Subsequent Parole Consideration Hearing for Mr. Gary Snodgrass. All parties previously present in the room have returned for the decision. Mr. Snodgrass, the panel has reviewed all the information that we have received and from the public and all that has been presented today and we conclude that you're yet unsuitable for the granting of a date and yet pose an unreasonable risk of danger to society and a threat to public safety if you were released from prison.

Your offense was carried out in an especially heinous, atrocious, cruel, and callous manner; in a manner exhibiting a callous disregard for the life and suffering of another. It was carried out in an especially calculating and calculated manner.

Conclusions are drawn from the Statements of Facts. When the prisoner having extensively pre-planned the death of his step-father, in fact, committed this offense on a particular given day. He took the bruise of his mother leaving, obtained a weapon that was his step-father's own. When the step-father returned home and awakened the prisoner, the prisoner retrieved the weapon and tried to get it to operate when it discharged. Then, when he was confronted by the step-father, he shot the step-father one time and then again, as the step-father fell complaining and uttering

PRESTON'S LEGAL SUPPORT SERVICES
P.O. BOX 340157, SACRAMENTO, CA 95834-0157
(916) 567-0880

copyright ©

obscenities, walked up and shot the step-father again.

Witnesses had been present, had notified police and police were present right at the conclusion of this life crime. Prisoner, at the time of the crime, accepted responsibility but did not indicate remorse for the crime.

The prisoner's previous record is clear with the exception of an unstable social history. It was, including a very difficult time experienced when his mother brought the victim step-father and his children into the family unit. Sexual abuse from the step-brother ensued. In the eighth grade, he began experiencing marijuana gravitating towards alcohol and other drugs. His mother divorced the step-father, later to remarry him again whereupon the difficulties between the prisoner and the victim escalated to the commitment of life crime.

As to institutional behavior, though making recognizable progress in many areas, the prisoner has yet to explore the depth and breadth of his yet undiminished, unresolved hatred for his step-father. His mixed feelings towards his mother and his need to be more motivated about his life and any additional causative driving forces that effected his cold and calculating act.

The psychological evaluations of the most recent date, occurring both in '91 and '92, and the Cat. X authored by several evaluators, generally appear favorable reporting, but minor concerns regarding the facets of the prisoner's response

PRESTON'S LEGAL SUPPORT SERVICES
P.O. BOX 340157, SACRAMENTO, CA 95834-0157
(916) 567-0880

copyright ©

to social situations, his relationship with his mother, his tendency to isolate himself. The panel deduced a greater than minor concern regarding these factors particularly as to the qualities and components of his overall being that would prevent any repetition of past violent behavior and the seething hatred.

The prisoner himself evinced an attitude of yet unmet rehabilitative needs. To his credit, he professed these to the panel in the instant hearing.

The panel makes the following findings: that the prisoner needs additional therapy in order to face, discuss, understand and cope with stress in a nondestructive way. Until more progress is made, the prisoner -- particularly as related to the points discussed under psychiatric factors in this decision, the prisoner continues to be unpredictable and a threat to others. In view of the prisoner's callous life crime and continued therapy needs, there is no indication the prisoner would behave differently if paroled. Nevertheless, the prisoner should be recommended for disciplinary free behavior, his participation in AA, his efforts in the Bradshaw seminar and the 12-Step Focus Group.

However, these positive aspects do not yet outweigh the factors of unsuitability. A significant, committed effort towards insight development, the gaining of life resources to deal with the difficulties that may visit his life as well as strategies and techniques to deal therewith, remain as

PRESTON'S LEGAL SUPPORT SERVICES
P.O. BOX 340157, SACRAMENTO, CA 95834-0157
(916) 567-0880

copyright ©

challenges for this prisoner's very capable mind and personality.

The denial is for a one-year period. We are recommending that you remain disciplinary free, continue your vocational -- continue your educational upgrading and maintain your vocational gains, participate in self-help and therapy programming with focus on issues outlined in this decision and in other psychological evaluations.

That will conclude the reading of the decision. Here is your tentative written copy. Mr. Snodgrass, I'll have to tell you that your admissions to the panel today did, at least, afford this individual some feelings that you do have insights. Those factors that we did mention and that other evaluators have commented on: vis-a-vis your mother, the hatred that built up over time of your step-dad, the ways you chose to deal with that needs to be explored a bit more. But it is my impression you have a good mind and a personality that certainly is making progress and likely will make more progress. So we wish you good luck.

INMATE SNODGRASS: Thank you.

BOARD COMMISSIONER KOENIG: Good luck to you.

PRESIDING BOARD COMMISSIONER NIELSEN: That concludes the hearing.

PAROLE DENIED 1 YEAR.

EFFECTIVE DATE OF THIS DECISION MAY 05 1993.

//

SNODGRASS C-50459 DECISION PAGE 4 03/04/93

copyright ©

CERTIFICATION AND

DECLARATION OF TRANSCRIBER

I, J. B. MURPHY, a duly designated transcriber of PRESTON'S LEGAL SUPPORT AND COURT REPORTING SERVICES, do hereby declare and certify under penalty of perjury that I have transcribed Tape(s) which total one in number and cover a total of pages numbered 1 - 48 and which recording was duly recorded at Tracy, California, in the Matter of SUBSEQUENT PAROLE CONSIDERATION HEARING OF GARY SNODGRASS, C.D.C. NUMBER C-50459 on the 4th day of March, 1993, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape(s) to the best of my ability.

I hereby certify that I am a disinterested part in the above captioned matter and have no interest in the outcome of the hearing.

Dated this 18th day of March, 1993, at Sacramento, California.

J. B. MURPHY
TRANSCRIBER

copyright ©

FE PRISONER: PAROLE CONSIDERATION
IOPOSED DECISION (BPT §2041)

[ ] PAROLE DENIED 1 year

If this proposed decision denying parole is approved, the Board will send you a copy of the approved decision, including the reasons for denial of parole, within 30 days of the hearing.

[ ] PAROLE GRANTED

A. Base Period of Confinement .......... ______ Months

Case No. Count No. Offense

B. Firearm Enhancement .......... + ______ Months

C. Other Crimes Total .......... + ______ Months

Case No. Count No. Offense ______ mos.

Case No. Count No. Offense ______ mos.

Case No. Count No. Offense ______ mos.

D. Total Term .......... = ______ Months

E. Postconviction Credit From ______ (Date) To ______ (Date) − ______ Months

F. Total Period of Confinement .......... = ______ Months

The period of confinement indicated is a tentative decision proposed by this panel. The decision will be reviewed pursuant to BPT §2041, and, if approved, a copy of the approved decision will be sent to you within 30 days. At that time appropriate pre-prison credits will be applied and a parole release date computed.

You will not engage in any conduct specified in BPT §2451. Such conduct may result in rescission or postponement of your parole date.

If the proposed decision denying or granting parole is disapproved, you will receive a copy of the proposed decision and the reasons for disapproval. You will then receive a copy of the modified decision or will be scheduled for a new hearing, as appropriate.

PANEL HEARING CASE

| | |
|---|---|
| me James W. Nielsen | Date 3/4/93 |
| me [signature] | Date |
| me [signature] | Date |

| ME | CDC NUMBER | INSTITUTION | HEARING DATE |
|---|---|---|---|
| ODGRASS, GARY | C-50459 | DVI-MAIN | 3-4-93 |

Distribution: White-C

'E PRISONER DECISION FACE SHEET

PERIOD OF CONFINEMENT

(RECORDS OFFICER USE ONLY)

| | YR | MO | DAY |
|---|---|---|---|
| ısted Period of Confinement | | | |
| ɜ Life Term Begins | + | | |
| .arge Time | + | | |
| ƗOLE DATE | = | | |

MISCELLANEOUS

1 year denial

AL CODE SECTION 3042 NOTICES [X] SENT (Date) 2-1-93

ɱMITMENT OFFENSE

PC 187 (Code Section) Murder 2nd (Title)

CC 26252 (Case Number) count I (Count Number)

| Received by CDC | Date Life Term Begins | Controlling MEPD |
|---|---|---|
| 7-19-82 | 7-19-82 | 9-28-90 |

of Hearing
[ ] INITIAL [X] SUBSEQUENT (Hearing No.) 2

If Subsequent Hearing, Date of Last Hearing 3-11-92

.rtment Representative Phyllis Moore, C&PR(A)

sel for Prisoner Nina Starr, Attorney

Address 968 Admiral Callaghan Ln. #167 Vallejo, CA 945?

ct Attorney Representative Daniel Cabral

County Contra Costa

PAROLE HEARING CALENDAR

*This form and the panel's statement at the conclusion of the hearing constitute a proposed decision and order of the Board of Prison Terms. The decision becomes effective when issued following the decision review process.*

TENTATIVE COMPUTATION Subject to BPT Action

| | Signature | Date |
|---|---|---|
| ing (Name) | James W. Nielsen | 3/4/93 |
| rring (Name) | [signature] | |
| rring (Name) | [signature] | |

| | CDC NUMBER | INSTITUTION | CALENDAR | HEARING DATE |
|---|---|---|---|---|
| GRASS, GARY | C-50459 | DVI-MAIN | 3/93 | 3/4/93 |

# EXHIBIT FF

## 1994 BPT PAROLE DECISION PAGES

EXHIBIT FF

CALIFORNIA BOARD OF PRISON TERMS

D E C I S I O N

PRESIDING COMMISSIONER GILLIS: -- All those who were previously identified have returned. The Panel has unanimously determined that you're not suitable for parole and would pose an unreasonable risk of danger and a threat to public safety if released.

The commitment offense was especially cruel and calloused and premeditated. And the motive -- the motive for the murder cannot be fully explained by the prisoner. These conclusions are drawn from the Statement of Facts wherein the prisoner thought about how he was going to kill the victim, his step-father, over an extended period of time. The prisoner shot the victim once in the chest with a rifle, and as the victim lay on the ground, the prisoner walked over and fired a second shot into the victim's neck causing his death.

The prisoner had a history of tumultuous family relationships. An unstable social history which includes a non-directed lifestyle, and heavy substance abuse.

The prisoner has not participated in sufficient beneficial self-help and therapy programs.

The psychiatric report dated April the 8, 1994, authored by Dr. Kotila, that's K-o-t-i-l-a, is

not totally supportive of release. He states that regarding this type of ambiguous stress, he seems to react with feelings of being victimized. For example, stating that he felt he was being victimized by current politics. Although this may or may not be true of the factual situation, it would seem to this examiner that Mr. Snodgrass ought to try to find ways to nevertheless find a deeper inner-calmness.

Under Remarks: The Panel finds that the prisoner needs therapy in order to face, discuss, and understand, and cope with stress in a non-destructive manner.

Nevertheless, the prisoner should be commended for no serious disciplinaries since inception; for participation in the Arts and Corrections Program; and for completion of the mill and cabinet; and for obtaining his drafting certificate. However, these positive aspects of his behavior do not outweigh the factors of unsuitability.

This is a one year denial. And in preparation for your next hearing, the Panel recommends that you remain disciplinary free; and that you continue to participate in self-help and therapy programs. The one year denial is a majority opinion. I was of the impression -- impression that it should have been two years. Although, you are programming

well, I think your insight into the offense and -- and why you committed it is sort of lacking. And although you expressed remorse today and you have expressed, verbally, remorse in other hearings, I don't feel that you quite understand what remorse is. And -- and I think you need a little insight into why you committed the crime and -- and your actions that lead up to that.

Anyhow, that terminates the hearing. The time is now 11:45. I'll give you a copy of the tentative decision. Good luck to you. And we'll see you in one year.

---o0o---

PAROLE DENIED ONE YEAR ✓

EFFECTIVE DATE OF DECISION NOV 02 1994

CERTIFICATION AND

DECLARATION OF TRANSCRIBER

I, TERRI RADOVICH, a duly designated transcriber of Legal Typing Services, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total one in number and cover a total of pages numbered 1 - 67, and which recording was duly recorded at DEUEL VOCATIONAL INSTITUTION-MAIN, TRACY, CALIFORNIA, in the matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING of GARY SNODGRASS, CDC-Number C-50459, on June 16, 1994, and the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape(s) to the best of my ability.

I hereby certify that I am a disinterested party in the above-captioned matter and have no interest in the outcome of the hearing.

DATED: September 23, 1994, at Sonora, California.

Terri Radovich

TERRI RADOVICH, TRANSCRIBER

# BPT DECISION REVIEW CORRECTIVE SHEET

INMATE: Snodgrass, Gary
CDC NUMBER: C-50459
TYPE OF HEARING: Lifer Sub
DATE OF HEARING: 6/16/94

A review of the hearing transcript and parole decision by the Decision Review Unit (DRU) has revealed the following error(s)

1. Page #1 Line #12 stayed enhancement omitted

Recommendation: To correct the error(s) set forth above in the hearing transcript, read the following language into the record at the next scheduled parole consideration hearing:

1. Page #1 Line #12 "The Prisoner was found in violation of P.C. 12022.5, Use of a Firearm, said enhancement stayed by the court".

APPROVED BY: COMMISSIONER/DEPUTY COMMISSIONER

[signature]

DATE: 11/2/94

**PERMANENT ADDENDA**

[2/94]

IFE PRISONER: PAROLE CONSIDERATION
ROPOSED DECISION (BPT §2041)

I. [X] PAROLE DENIED 1 Year

If this proposed decision denying parole is approved, the Board will send you a copy of the approved decision, including the reasons for denial of parole, within 30 days of the hearing.

I. [ ] PAROLE GRANTED

A. Base Period of Confinement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ________ Months

Case No. Count No. Offense

B. Firearm Enhancement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .+ ________ Months

C. Other Crimes Total . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .+ ________ Months

Case No. Count No. Offense ________ mos.

Case No. Count No. Offense ________ mos.

Case No. Count No. Offense ________ mos.

D. Total Term . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .= ________ Months

E. Postconviction Credit From ________ (Date) To ________ (Date) – ________ Months

F. Total Period of Confinement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . = ________ Months

The period of confinement indicated is a tentative decision proposed by this panel. The decision will be reviewed pursuant to BPT §2041, and, if approved, a copy of the approved decision will be sent to you within 30 days. At that time appropriate pre-prison credits will be applied and a parole release date computed.

You will not engage in any conduct specified in BPT §2451. Such conduct may result in rescission or postponement of your parole date.

If the proposed decision denying or granting parole is disapproved, you will receive a copy of the proposed decision and the reasons for disapproval. You will then receive a copy of the modified decision or will be scheduled for a new hearing, as appropriate.

PANEL HEARING CASE

| Name | | Date |
|---|---|---|
| [signature] | (2 years) | 6-16-94 |
| [signature] | Ahar DC | |
| [signature] | | |

| NAME | CDC NUMBER | INSTITUTION | HEARING DATE |
|---|---|---|---|
| SNODGRASS, GARY | C-50459 | DVI | 6-16-94 |

Distribution: White—C. Fi
Canary—BP

ARD OF PRISON TERMS — STATE OF CALIFORNIA

LIFE PRISONER DECISION FACE SHEET

PERIOD OF CONFINEMENT

(RECORDS OFFICER USE ONLY)

| | YR | MO | DAY |
|---|---|---|---|
| Adjusted Period of Confinement | | | |
| Date Life Term Begins | + | | |
| At Large Time | + | | |
| PAROLE DATE | = | | |

TENTATIVE COMPUTATION
Subject to CRB Action

MISCELLANEOUS

PANEL RECOMMENDATIONS AND REQUESTS — Denied 1 year

- ___ BECOME ✓ REMAIN DISCIPLINARY FREE.
- ___ WORK TOWARDS REDUCING HIS/HER CUSTODY LEVEL
- ___ UPGRADE ___ VOCATIONALLY ___ EDUCATIONALLY.
- ✓ PARTICIPATE IN ✓ SELF-HELP (AND) ___ THERAPY.
- ___ TRANSFER TO ___ CAT. X ___ CAT. T.

PENAL CODE SECTION 3042 NOTICES ☒ SENT (Date) April 25, 1994

COMMITMENT OFFENSE

| PC 187 | Murder 2nd |
|---|---|
| (Code Section) | (Title) |
| CC 26252 | 1 |
| (Case Number) | (Count Number) |

| Date Received by CDC | Date Life Term Begins | Controlling MEPD |
|---|---|---|
| 7-19-82 | SAME | 9-28-90 |

Type of Hearing: ☐ INITIAL ☒ SUBSEQUENT (Hearing No.) 3

If Subsequent Hearing, Date of Last Hearing: 3-4-93

Department Representative: Phyllis Moore, C &PR(A)

Counsel for Prisoner: Jeff Champlain — Address: P.O. Box 223088 Carmel, Ca. 93922

District Attorney Representative: Jeff Waddell — County: CONTRA COSTA

PAROLE HEARING CALENDAR

*This form and the panel's statement at the conclusion of the hearing constitute a proposed decision and order of the Board of Prison Terms. The decision becomes effective when issued following the decision review process.*

| | | Date |
|---|---|---|
| Presiding (Name) | [signature] (2 years) | 5 |
| Concurring (Name) | [signature] | 8 |
| Concurring (Name) | [signature] | 9 |

| | CDC NUMBER | INSTITUTION | CALENDAR | HEARING DATE |
|---|---|---|---|---|
| SNODGRASS, GARY | C-50459 | DVI | 3/94 | 6-16-94 |

STATE OF CALIFORNIA

D OF PRISON TERMS

# PRISONER PAROLE CONSIDERATION WORKSHEET

INITIAL HEARING ☒ SUBSEQUENT HEARING

| ONER'S NAME | CDC NUMBER |
|---|---|
| SNODGRASS, GARY | C-50459 |
| OF HEARING June 16, 1994 | LOCATION DVI-MAIN |

## LEGAL STATUS

| RECEIVED | DATE LIFE TERM STARTS (IF DIFFERENT) | COUNTY |
|---|---|---|
| 7-19-82 | SAME | CONTRA COSTA |
| NSE Murder 2nd | | CASE NUMBER CC 26252 |
| NT NUMBER(S) 1 | PENAL CODE SECTION(S) VIOLATED PC 187 | |
| AS 15-life | MEPD 9-28-90 | |

## OTHER COMMITMENT OFFENSES OR STAYED COUNTS

| ED | OFFENSE | CODE SECTION | COUNTY | CASE NUMBER | COUNT NUMBER |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |

## PRESENT AT HEARING

| EL MEMBER | PANEL MEMBER | PANEL MEMBER |
|---|---|---|
| T. Gillis | C. MAR | S. BAKER |

ERS PRESENT:

PRISONER (IF ABSENT, WHY?) ______

ATTORNEY J. Champlin

DEPUTY D. A. J. WADDell COUNTY OF Contra Costa

OTHERS: ______

## STATEMENT OF FACTS

THE HEARING PANEL INCORPORATES BY REFERENCE FROM THE DECISION OF THE HEARING HELD ON 3-9-90, PAGES 2 THROUGH 3.

THE STATEMENT OF FACTS IS

☐ QUOTED FROM THE BOARD REPORT, DATED ______, PAGE(S) ______.

☐ QUOTED FROM THE PROBATION OFFICER'S REPORT, PAGE(S) ______.

☐ QUOTED FROM THE COURT OPINION, PAGE(S) ______.

1000 (Rev. 8/90)

# EXHIBIT GG

## 1995 BPT PAROLE DECISION PAGES

EXHIBIT GG

CALIFORNIA BOARD OF PRISON TERMS

D E C I S I O N

**PRESIDING COMMISSIONER VAN COURT:** Mr. Snodgrass, the Panel reviewed all information received from the public and relied on the following circumstances in concluding that the prisoner is not suitable for parole and would pose an unreasonable risk of danger to society and a threat to public safety if released from prison. The offense was carried out in an especially heinous and cruel and callous manner. The offense was carried out in a dispassionate and calculated manner. These conclusions are drawn from the Statement of Facts where the prisoner took his stepfather's hunting rifle early in the morning and hid it in the wood pile. While trying to learn to use it, he fired one shot. The stepfather came out and he shot his stepfather in the chest. When the stepfather continued to shout at him, the prisoner shot the victim in the throat with a deer rifle, a 7 mm rifle gun. The prisoner has an unstable social history, an unstable social history and prior -- an unstable social history. From his involvement with drugs and alcohol. You had one CDC 115 early on for simply being out of bounds. His psychological/psychiatric report from 01/11/95, by Dr. Brunla Van Cleve, Ph.D., and I'll read from her

statement. It says, "The diagnostic impression is alcohol dependence by history. On Axis II, narcisstic passive/aggressive and depressive traits are greatly improved. During observation in the institution, the subject has improved psychiatrically and greatly and in a less controlled setting such as a return to the community, he is considered likely to maintain this improvement. Violence potential at this time of the crime is estimated to have been above average due to the alcohol and is now considered average. Conclusions: Mr. Snodgrass is an intelligent young man who has made good use of therapy, opportunities and subsequently has made excellent personal growth progress. It is notable that following his breakthrough regarding responsibility and remorse, his sights now are expanding to include the (inaudible) of humanities especially philosophy by which he hopes to still further understand himself in his relationship to others. Recommendations: parole decisions should be made on correctional rather than psychiatric factors." And that's signed Brunla Van Cleve, Ph.D, Brunla being B-r-u-n-l-a. Van Cleve, V-a-n C-l-e-v-e. Okay. The prisoner needs therapy in order to face, discuss and understand and cope with stress in a non-destructive manner. Until progress is made, the prisoner continues to be unpredictable and a threat to

others. Nevertheless, the prisoner should be commended for vocational and educational progress and being disciplinary free since 1989. The prisoner is denied parole for a period of two years. The Hearing Panel finds it is not reasonable to expect parole to be granted at a hearing during the following two years. The specific reasons for this findings are as follows: the prisoner committed the offense in an especially heinous and cruel manner specifically he shot and killed his stepfather, shot him once in the chest and then shot him one more time in the neck. As a result, a longer period of observation and evaluation is required before the Board can set a parole date. And the second reason for denial, the prisoner has not completed necessary programming which is essential to his adjustment and needs additional time to gain such programming. He needs to complete additional therapy and self-help and to complete vocational training. The Panel recommends that the prisoner remain disciplinary free, work towards reducing -- no, scratch that -- remain disciplinary free, upgrade vocationally and educationally, participate in self-help and therapy programming.

And that concludes the hearing. The time is now 1:45 p.m. I believe just stating from old dad here, I think that the -- it's going to take about a

year and a half to get -- complete your AV --

---o0o---

PAROLE DENIED TWO YEARS

EFFECTIVE DATE OF THIS DECISION ______________________

CERTIFICATE AND

DECLARATION OF TRANSCRIBER

I, LAUNA ATKINSON, a duly designated transcriber, PETERS SHORTHAND REPORTING CORPORATION, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total one in number and cover a total of pages numbered 1 - 40, and which recording was duly recorded at DEUEL VOCATIONAL INSTITUTION, TRACY, CALIFORNIA, in the matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING OF GARY SNODGRASS, CDC No. C-50459, on JULY 20, 1995, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape(s) to the best of my ability.

I hereby certify that I am a disinterested party in the above-captioned matter and have no interest in the outcome of the hearing.

Dated October 21, 1995, at Sacramento, California.

LAUNA ATKINSON
TRANSCRIBER

-E PRISONER: PAROLE CONSIDERATION
OPOSED DECISION (BPT §2041)

[✓] PAROLE DENIED   2 years.

If this proposed decision denying parole is approved, the Board will send you a copy of the approved decision, including the reasons for denial of parole, within 30 days of the hearing.

[ ] PAROLE GRANTED

A. Base Period of Confinement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ________ Months

Case No. Count No. Offense

B. Firearm Enhancement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . + ________ Months

C. Other Crimes Total . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . + ________ Months

Case No. Count No. Offense ________ mos.

Case No. Count No. Offense ________ mos.

Case No. Count No. Offense ________ mos.

D. Total Term . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . = ________ Months

E. Postconviction Credit From ________ (Date) To ________ (Date) — ________ Months

F. Total Period of Confinement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . = ________ Months

The period of confinement indicated is a tentative decision proposed by this panel. The decision will be reviewed pursuant to BPT §2041, and, if approved, a copy of the approved decision will be sent to you within 30 days. At that time appropriate pre-prison credits will be applied and a parole release date computed.

You will not engage in any conduct specified in BPT §2451. Such conduct may result in rescission or postponement of your parole date.

If the proposed decision denying or granting parole is disapproved, you will receive a copy of the proposed decision and the reasons for disapproval. You will then receive a copy of the modified decision or will be scheduled for a new hearing, as appropriate.

PANEL HEARING CASE

| | |
|---|---|
| A.F. Van Court | Date 7/20/95 |
| Ron Carey | Date |
| Carol J. Bentley | Date |

| | CDC NUMBER | INSTITUTION | HEARING DATE |
|---|---|---|---|
| GRASS, GARY RANDALL | C-50459 | DVI | 7-20-95 |

Distribution. White–C. Fi

E PRISONER DECISION FACE SHEET

PERIOD OF CONFINEMENT

(RECORDS OFFICER USE ONLY)

| | YR | MO | DAY |
|---|---|---|---|
| usted Period of Confinement | | | |
| e Life Term Begins + | | | |
| Large Time + | | | |
| ROLE DATE = | | | |

MISCELLANEOUS

✓ ✓ [illegible] REQUESTS
✓ [illegible] DISCIPLINARY FREE:
[illegible] CUSTODY LEVEL:
✓ [illegible] ✓ EDUCATIONALLY:
✓ [illegible] ✓ THERAPY
[illegible] C/V. T:

Denied 2 years.

AL CODE SECTION 3042 NOTICES [X] SENT (Date) 6-20-95

MMITMENT OFFENSE

P187 — (Code Section) MURDER 2ND — (Title)

CC 26252 — (Case Number) 1 — (Count Number)

| Received by CDC | Date Life Term Begins | Controlling MEPD |
|---|---|---|
| 9-82 | 7-19-82 | 9-28-90 |

e of Hearing ☐ INITIAL [XX] SUBSEQUENT (Hearing No.) ______

If Subsequent Hearing, Date of Last Hearing 6-16-94

artment Representative

nsel for Prisoner Mc Raineri — Address

ict Attorney Representative KAREN Zelis — County C.C.

PARAOLE HEARING CALENDAR

*This form and the panel's statement at the conclusion of the hearing constitute a proposed decision and order of the Board of Prison Terms. The decision becomes effective when issued following the decision review process.*

| | | |
|---|---|---|
| ding (Name) | A. F. Van Court | Date 7/20/95 |
| urring (Name) | Carol J. Bentley | Date |
| urring (Name) | Ron [illegible] | Date |

| E | CDC NUMBER | INSTITUTION | CALENDAR | HEARING DATE |
|---|---|---|---|---|
| )GRASS, GARY RANDALL | C-50459 | DVI | 7/95 | 7-20-95 |

[illegible] 8-8-95

STATE OF CALIFORNIA

OF PRISON TERMS

# PRISONER PAROLE CONSIDERATION WORKSHEET

[ ]NITIAL HEARING [X] SUBSEQUENT HEARING

| [PRISON]ER'S NAME SNODGRASS, GARY RANDALL | CDC NUMBER C-50459 |
|---|---|
| [DATE O]F HEARING JULY 20, 1995 @ 2:30 P.M. | LOCATION DVI-MAIN |

## LEGAL STATUS

| [DATE R]ECEIVED 7-19-82 | DATE LIFE TERM STARTS (IF DIFFERENT) SAME | COUNTY CONTRA COSTA |
|---|---|---|
| [OFFEN]SE MURDER 2ND | | CASE NUMBER CC-26252 |
| [COUN]T NUMBER(S) | | PENAL CODE SECTION(S) VIOLATED P187 |
| [...]S | | MEPD 6-16-94 |

## OTHER COMMITMENT OFFENSES OR STAYED COUNTS

| [...]ED | OFFENSE | CODE SECTION | COUNTY | CASE NUMBER | COUNT NUMBER |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |

## PRESENT AT HEARING

| [PANE]L MEMBER | PANEL MEMBER | PANEL MEMBER |
|---|---|---|
| VAN COURT | C. BENTLEY | R. KOENIG |

[OTHE]RS PRESENT:

[P]RISONER (IF ABSENT, WHY?) __________

[A]TTORNEY MARK RAINERI

[D]EPUTY D. A. KAREN Ellison COUNTY OF CONTRA COSTA

[O]THERS: __________

## STATEMENT OF FACTS

[T]HE HEARING PANEL INCORPORATES BY REFERENCE FROM THE DECISION OF THE HEARING HELD

[O]N __________, PAGES ____ THROUGH ____.

[T]HE STATEMENT OF FACTS IS

[✓] QUOTED FROM THE BOARD REPORT, DATED 3/9/90, PAGE(S) 2 & 3.

[ ] QUOTED FROM THE PROBATION OFFICER'S REPORT, PAGE(S) __________.

[ ] QUOTED FROM THE COURT OPINION, PAGE(S) __________.

# EXHIBIT HH

**1997 BPT PAROLE DECISION PAGES**

EXHIBIT HH

CALIFORNIA BOARD OF PRISON TERMS

D E C I S I O N

PRESIDING COMMISSIONER VAN COURT: Okay, Mr. Snodgrass, the panel reviewed all information received from the public and relied on the following circumstances in concluding that the prisoner is not suitable for parole and would pose an unreasonable risk of danger to society and a threat to public safety if released from prison.

The offense was carried out in an especially cruel and callous manner. The offense was carried out in a manner which exhibits a callous disregard for the life and suffering of another. These conclusions are drawn from the Statement of Facts where the prisoner got a rifle and shot and killed his stepfather. He shot him a second time making sure the victim was dead and it did require some degree of planning to get the weapon, learn to load it, and then kill the victim.

The -- the prisoner doesn't -- did not have any kind of a criminal background at all, and he's only -- he's demonstrated real good discipline since he's been in prison. He only had that one CDC 115 and that was reduced to an administrative 115, and he had about five 128A's.

The -- however, the panel makes the following findings, that the prisoner needs therapy in order to

face and gain insight into why he committed this crime, why it went to that point, why it got that far, why he didn't bring up the original or possibly the molestation by the older stepbrother the very minute that it happened with your mother, why you didn't feel like you could bring these things to the surface early on. Nevertheless, the prisoner should be commended for programming very well and getting good work reports and remaining practically disciplinary free.

The prisoner is denied parole for one year. The crime, the degree of planning used to -- prior to committing the crime and the crime itself. In this one year, we want you to complete that aviation and get your license.

**INMATE SNODGRASS:** I'll do everything I can do to do that.

**PRESIDING COMMISSIONER VAN COURT:** Yeah, and continue in the programs that you are doing now because you're doing so well. And every one of us agree and are impressed with the progress that you've made, but we all agree that we'd like to see you stay one more year to get that -- get those licenses under your belt so that you can go out and get instant -- you know, a good job. And also, gain a little bit more insight on the crime, the crime itself.

So with that --

ATTORNEY HURST: Mr. Van Court, may I make a comment for the record? Just a comment?

PRESIDING COMMISSIONER VAN COURT: Certainly.

ATTORNEY HURST: Okay, with respect to the molestation by John, Jr., I believe that the record shows or -- and the Category X shows and possibly even the POR that that -- that issue was raised with his mother, maybe not very assertively, but that he had said to her when you and John leave, John, Jr., makes me do bad things. And how far he carried that I don't know, but she was not particularly responsive to it. But I just think it's important that you know --

PRESIDING COMMISSIONER VAN COURT: Yeah.

ATTORNEY HURST: -- that he did try to convey that information at the appropriate time when he was eight or thereabouts.

PRESIDING COMMISSIONER VAN COURT: Yeah, simply, you know, it's just a shame that -- that families can't communicate. Of course, you're learning that now.

INMATE SNODGRASS: (Overlapping.)

ATTORNEY HURST: Obviously this family couldn't.

PRESIDING COMMISSIONER VAN COURT: Yeah, and you'll -- you'll do a much better job, I'm sure. Anyway, that ends the hearing and I hope to see you

again in another one year. Okay?

INMATE SNODGRASS: Thank you all for your consideration.

--oOo--

PAROLE DENIED ONE YEAR

EFFECTIVE DATE OF THIS DECISION NOV 19 1997

CERTIFICATE AND

DECLARATION OF TRANSCRIBER

I, KATHLEEN GABRIELLA JONES, a duly designated

transcriber, PETERS SHORTHAND REPORTING CORPORATION,

do hereby declare and certify under penalty of perjury

that I have transcribed tape(s) which total one in

number and cover a total of pages numbered 1 - 54 and

which recording was duly recorded at the DEUEL

VOCATIONAL INSTITUTION, TRACY, CALIFORNIA, in the

matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING

OF GARY SNODGRASS, CDC No. C-50459, on AUGUST 13,

1997, and that the foregoing pages constitute a true,

complete, and accurate transcription of the

aforementioned tape(s) to the best of my ability.

I hereby certify that I am a disinterested

party in the above-captioned matter and have no

interest in the outcome of the hearing.

Dated September 12, 1997, at Sacramento,

California.

KATHLEEN GABRIELLA JONES
TRANSCRIBER

LIFE PRISONER: PAROLE CONSIDERATION
PROPOSED DECISION (BPT §2041)

I. [✓] PAROLE DENIED. 1 year

If this proposed decision denying parole is approved, the Board will send you a copy of the approved decision, including the reasons for denial of parole, within 30 days of the hearing.

II. [ ] PAROLE GRANTED

A. Base Period of Confinement .................... ______ Months

Case No. Count No. Offense

B. Firearm Enhancement .................... + ______ Months

C. Other Crimes Total .................... + ______ Months

Case No. Count No. Offense ______ mos.

Case No. Count No. Offense ______ mos.

Case No. Count No. Offense ______ mos.

D. Total Term .................... = ______ Months

E. Postconviction Credit From ______ (Date) To ______ (Date) – ______ Months

F. Total Period of Confinement .................... = ______ Months

The period of confinement indicated is a tentative decision proposed by this panel. The decision will be reviewed pursuant to BPT §2041, and, if approved, a copy of the approved decision will be sent to you within 30 days. At that time appropriate pre-prison credits will be applied and a parole release date computed.

You will not engage in any conduct specified in BPT §2451. Such conduct may result in rescission or postponement of your parole date.

III. If the proposed decision denying or granting parole is disapproved, you will receive a copy of the proposed decision and the reasons for disapproval. You will then receive a copy of the modified decision or will be scheduled for a new hearing, as appropriate.

PANEL HEARING CASE

| Name | Date |
|---|---|
| A. F. Van Court | 8/13/97 |
| [signature] | |
| M E Ortega | |

| NAME | CDC NUMBER | INSTITUTION | HEARING DATE |
|---|---|---|---|
| SNODGRASS, GARY | C-50459 | DVI_MAIN | 8/13/97 |

Distribution: White—C. File
Canary—BPT

[illegible] (Rev. 8/1/81)

PERIOD OF CONFINEMENT

(RECORDS OFFICER USE ONLY)

| | YR | MO | DAY |
|---|---|---|---|
| ed Period of Confinement | | | |
| Life Term Begins | + | | |
| rge Time | + | | |
| LE DATE | = | | |

MISCELLANEOUS

PANEL RECOMMENDATIONS AND REQUESTS

Denied 1 year

REMAIN DISCIPLINARY FREE.

WORK TOWARDS REDUCING HIGHER CUSTODY LEVEL

✓ VOCATIONALLY EDUCATIONALLY.

PARTICIPATE IN ✓ SELF-HELP (AND) ✓ THERAPY.

TRANSFER TO ____ CAT. X ____ CAT. I.

. CODE SECTION 3042 NOTICES ☒ SENT (Date) JUNE 29, 1997

ITMENT OFFENSE

PC 187 (Code Section) — MURDER 2ND (Title)

CC 26252 (Case Number) — COUNT: 1 (Count Number)

| ...ed by, CLC | Date Life Term Begins | Controlling MEPD |
|---|---|---|
| 32 | 7-19-82 | 9-28-90 |

| f Hearing | If Subsequent Hearing, Date of Last Hearing |
|---|---|
| INITIAL ☒ SUBSEQUENT (Hearing No.) ____ | 7-20-95 |

ment Representative

| l for Prisoner | Address |
|---|---|
| Attorney Representative | County |

PAROLE HEARING CALENDAR

*This form and the panel's statement at the conclusion of the hearing constitute a proposed decision and order of the Board of Prison Terms. The decision becomes effective when issued following the decision review process.*

| | | |
|---|---|---|
| g (Name) | Arthur F. Van Court | Date 8/13/97 |
| ing (Name) | [signature] | Date |
| ng (Name) | [signature] | Date |

| | CDC NUMBER | INSTITUTION | CALENDAR | HEARING DATE |
|---|---|---|---|---|
| ASS, GARY | C-50459 | DVI MAIN | 7/1997 | 8/13/97 |

# EXHIBIT II

## 1998 BPT PAROLE DECISION PAGES

EXHIBIT II

CALIFORNIA BOARD OF PRISON TERMS

DECISION

**PRESIDING COMMISSIONER SHELTON:** We're back on record at 3 minutes past 2:00 p.m. And all the parties are present that were here when we took the recess. The Panel reviewed all information received from the public and relied on the following circumstances in concluding the prisoner not suitable for parole and would pose an unreasonable risk of danger to society and a threat to public safety if released from prison. And the reasons are that the offense was carried out in an especially heinous and callous manner, the offense was carried out in a manner which exhibits a callous disregard for the life and suffering of another, and the offense was carried out and dispatched in a calculated manner. These conclusions regarding the statement of facts were that the prisoner coldly planned the execution of the victim, and after wounding the victim with a shot from a rifle, he walked up to the victim and shot him again in the neck and the victim later died from that wound. Although the prisoner has a -- admitted to other -- has no record of convictions, he has admitted to the use of alcohol and the illegal use of marijuana prior to this conviction. The prisoner has not participated in beneficial self-help and therapy programs to gain

insight into dealing with the crime and dealing with the use of drugs and alcohol. The prisoner needs therapy in order to face, discuss, understand and cope with stress in a nondestructive manner. Until progress is made, the prisoner continues to be unpredictable and a threat to others. Nevertheless, the prisoner should be commended for having only one 15 since incarceration, the last being -- that being in 1989, having good work habits, and upgrading vocationally since his being institutionalized. The prisoner is denied parole for one year. The Panel would like to recommend to the prisoner for that one year to remain disciplinary free, to continue upgrading vocationally and educationally, and continue participating in self-help and therapy programs. It was the Panel's discussion that you're almost there, but it's such a horrible, well-planned crime, cold, that you need more time. We'd like to see you again in a year from now. The time is concluded at 2:05 p.m.

**ATTORNEY SKIPPER-DOTTA:** Excuse me, is there anything specifically given the recommendations that you'd like for him to focus on in the next year?

**PRESIDING COMMISSIONER SHELTON:** Yes, we still want to see him in AA, continuing that in his progressive steps, and more in-depth study of himself and the nature of the crime.

ATTORNEY SKIPPER-DOTTA: Thank you.

PRESIDING COMMISSIONER SHELTON: Thank you.

ATTORNEY SKIPPER-DOTTA: Can we have (inaudible)

COMMISSIONER VAN COURT: Good luck

PRESIDING COMMISSIONER SHELTON: Yes, you may.

--o0o--

PAROLE DENIED FOR ONE YEAR

EFFECTIVE DATE OF THIS DECISION DEC 2 1998

CERTIFICATE AND

DECLARATION OF TRANSCRIBER

I, PATRICIA M. JOHNSON, a duly designated transcriber, CAPITOL ELECTRONIC REPORTING, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total two in number and cover a total of pages numbered 1 through 44, and which recording was duly recorded at DEUEL VOCATIONAL INSTITUTION, at TRACY, CALIFORNIA, in the matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING of GARY SNODGRASS, CDC No. C-50459, on September 22, 1998, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape(s) to the best of my ability.

I hereby certify that I am a disinterested party in the above-captioned matter and have no interest in the outcome of the hearing.

Dated October 16, 1998, at Folsom, California.

Patricia M. Johnson
Transcriber
**CAPITOL ELECTRONIC REPORTING**

LIFE PRISONER: PAROLE CONSIDERATION
PROPOSED DECISION (BPT §2041)

I. [X] PAROLE DENIED 1 year

If this proposed decision denying parole is approved, the Board will send you a copy of the approved decision, including the reasons for denial of parole, within 30 days of the hearing.

II. [ ] PAROLE GRANTED

A. Base Period of Confinement .................................... ______ Months

Case No. | Count No. | Offense

B. Firearm Enhancement ........................................ + ______ Months

C. Other Crimes Total ......................................... + ______ Months

______ mos.
Case No. | Count No. | Offense

______ mos.
Case No. | Count No. | Offense

______ mos.
Case No. | Count No. | Offense

D. Total Term ................................................. = ______ Months

E. Postconviction Credit From ______ (Date) To ______ (Date) — ______ Months

F. Total Period of Confinement ................................ = ______ Months

The period of confinement indicated is a tentative decision proposed by this panel. The decision will be reviewed pursuant to BPT §2041, and, if approved, a copy of the approved decision will be sent to you within 30 days. At that time appropriate pre-prison credits will be applied and a parole release date computed.

You will not engage in any conduct specified in BPT §2451. Such conduct may result in rescission or postponement of your parole date.

If the proposed decision denying or granting parole is disapproved, you will receive a copy of the proposed decision and the reasons for disapproval. You will then receive a copy of the modified decision or will be scheduled for a new hearing, as appropriate.

PANEL HEARING CASE

| | |
|---|---|
| ne D. Shelton | Date 9-22-1998 |
| ne A. F. Van Court | Date |
| ne [signature] | Date |

| NAME | CDC NUMBER | INSTITUTION | HEARING DATE |
|---|---|---|---|
| DGRASS, GARY | C-50459 | DVI MAIN | 09-22-1998 |

1005 (Rev. 8/1/81)

Distribution: White—C. File
Canary—BPT
Pink—Prisoner

INMATE Tony J. Delgrosso C-50859

TYPE OF HEARING Sub DATE OF HEARING 9/22/98

A review of the hearing transcript and parole decision by the Decision Review Unit (DRU) has revealed the following error(s):

Title Page should read "Alan Shelton, Presiding Comm"

Page 2 in 17 should read "Alan Shelton"

Recommendation: To correct the error(s) set forth above in the hearing transcript, read the following language into the record at the next scheduled parole consideration hearing:

APPROVED BY: [signature] Date: 12/3/98

[9/93] PERMANENT ADDENDA

COPY SENT TO INMATE 12-11-98 (cw)

BOARD OF PRISON TERMS STATE OF CALIFORNIA

# LIFE PRISONER PAROLE CONSIDERATION WORKSHEET

☐ INITIAL HEARING ☒ SUBSEQUENT HEARING

| PRISONER'S NAME | CDC NUMBER |
|---|---|
| SNODGRASS, GARY | C50459 |
| DATE OF HEARING 9-22-98 | LOCATION DVI |

## LEGAL STATUS

| DATE RECEIVED | DATE LIFE TERM STARTS (IF DIFFERENT) | COUNTY |
|---|---|---|
| 07-19-82 | 07-19-82 | CONTRA COSTA |

| OFFENSE | CASE NUMBER |
|---|---|
| MURDER 2ND | CC26252 |

| COUNT NUMBER(S) | PENAL CODE SECTION(S) VIOLATED |
|---|---|
| ONE | PC 187 |
| TERMS | MEPD 09-28-90 |

## OTHER COMMITMENT OFFENSES *OR STAYED COUNTS*

| STAYED | OFFENSE | CODE SECTION | COUNTY | CASE NUMBER | COUNT NUMBER |
|---|---|---|---|---|---|
| ☐ | | | | | |
| ☐ | | | | | |
| ☐ | | | | | |

## PRESENT AT HEARING

| PANEL MEMBER | PANEL MEMBER | PANEL MEMBER |
|---|---|---|
| SHELTON | VAN COURT | GILLIS |

OTHERS PRESENT

☐ PRISONER (IF ABSENT, WHY?) ____

☑ ATTORNEY SKIPPER DOTTA

☑ DEPUTY D. A. RUANNE CASTRO COUNTY OF CONTRA COSTA

☐ OTHERS: ____

## STATEMENT OF FACTS

☐ THE HEARING PANEL INCORPORATES BY REFERENCE FROM THE DECISION OF THE HEARING HELD

ON ____, PAGES ____ THROUGH ____

☐ THE STATEMENT OF FACT IS

☐ QUOTED FROM THE BOARD REPORT, DATED ____, PAGE(S) ____

☑ QUOTED FROM THE PROBATION OFFICER'S REPORT, PAGE(S) 4 thru 7 & 18

☐ QUOTED FROM THE COURT OPINION, PAGE(S) ____

BOARD OF PRISON TERMS — STATE OF CALIFORNIA

LIFE PRISONER DECISION FACE SHEET

**PERIOD OF CONFINEMENT**

*(RECORDS OFFICER USE ONLY)*

| | YR | MO | DAY |
|---|---|---|---|
| Adjusted Period of Confinement | | | |
| Date Life Term Begins + | | | |
| At Large Time + | | | |
| PAROLE DATE = | | | |

**MISCELLANEOUS**

PANEL RECOMMENDATIONS AND REQUESTS
REMAIN DISCIPLINARY FREE.
WORK TOWARDS REDUCING HIS/HER CUSTODY LEVEL. ✓
UPGRADE VOCATIONALLY ✓ EDUCATIONALLY. ✓
PARTICIPATE IN SELF-HELP (AND) ✓ THERAPY. ✓
TRANSFER TO CAT. X CAT. T.

Denied 1 year
set next hearing for
Sept 1999

PENAL CODE SECTION 3042 NOTICES ☐ SENT (Date)

COMMITMENT OFFENSE

PC 187 — (Code Section) MURDER 2ND — (Title)

CC 26252 — (Case Number) ONE — (Count Number)

| Date Received by CDC | Date Life Term Begins | Controlling MEPD |
|---|---|---|
| 07-19-82 | 07-19-82 | 09-28-90 |

Type of Hearing ☐ INITIAL ☒ SUBSEQUENT (Hearing No.) ______

If Subsequent Hearing, Date of Last Hearing

Department Representative

Counsel for Prisoner SKIPPER DOTTA — Address

District Attorney Representative R. CASTRO — County CONTRA COSTA

**PAROLE HEARING CALENDAR**

*This form and the panel's statement at the conclusion of the hearing constitute a proposed decision and order of the Board of Prison Terms. The decision becomes effective when issued following the decision review process.*

Presiding (Name) D. Shelton — Date 9-23-98

Concurring (Name) A. F. Van Court — Date

Concurring (Name) [signature] — Date

| NAME | CDC NUMBER | INSTITUTION | CALENDAR | HEARING DATE |
|---|---|---|---|---|
| SNODGRASS, GARY | C50459 | DVI | | |

COPY SENT TO INMATE

BPT 1001 (REV. 1/91) — PERMANENT ADDENDA

# EXHIBIT JJ

## 2000 BPT PAROLE DECISION PAGES

EXHIBIT JJ

CALIFORNIA BOARD OF PRISON TERMS

D E C I S I O N

PRESIDING COMMISSIONER GIAQUINTO: Okay, we're back on record at 9:10. We denied your parole for one year. The Panel reviewed all the information received from the public and relied on the following circumstances in concluding that the prisoner is not yet suitable for parole and would pose an unreasonable risk of danger to society and a threat to public safety if released from prison: The offense was carried out in an especially cruel and callous manner, and the motive for the crime was very trivial in relation to the offense. And it was carried out with a dispassionate -- in a dispassionate manner. These conclusions are drawn from the Statement of Facts wherein -- These conclusions are drawn from the Statement of Facts wherein the prisoner had become upset with his stepfather, and the prisoner armed himself with a weapon and on the day of the murder the prisoner shot the victim, disabling him. The victim was still alive and the prisoner walked over to him and shot him again and ended up killing him. The prisoner experimented with LSD and marijuana and alcoholic beverages prior to incarceration. He has not sufficiently participated in self-help and therapy. The Panel finds that continued therapy is

needed so that he might further delve into the causative factors related to the life offense, and until progress is made he continues to be unpredictable and a threat to others. He does not have viable parole plans. He should be commended for having been disciplinary-free and completing mill and cabinet, airframe engine, he's got FAA certification, and drafting, and he's also been in auto mechanics and he's doing TIG welding, and AA as a treasurer. Classification score is zero. He's completed Cat T and Cat X in the past. However, these positive aspects of his behavior do not outweigh the factors of unsuitability. As I indicated, it's a one year denial and we want you to remain disciplinary-free and participate in self-help and therapy, solidify your parole plans. Get good parole plans. Get a job lined up if you can, and get letters of support from family that say that they're willing to support you or you can live in a particular place. Good, solid parole plans on housing, transportation, and job opportunities, okay? All right, I want to wish you good luck. Commissioner Lawin?

**COMMISSIONER LAWIN:** No, just that those parole plans are really necessary.

**PRESIDING COMMISSIONER GIAQUINTO:** All right. Mr. Harmon?

DEPUTY COMMISSIONER HARMON: You said something in your closing that you, quote unquote, mishandled the options in the past. Okay, you mishandled your options and you did that again today. I hope you're not still making them because you know what, you look really good. You got a lot going for you. And I would hope that you take a good amount of time to look at your future and see that there's a lot of good things happening to you. You're staying out of trouble, you've completed vocations and all that. You need to reassess where you're going because I think you are definitely a candidate. That's all I have.

PRESIDING COMMISSIONER GIAQUINTO: All right, that ends this hearing at about 9:13. Good luck to you.

--o0o--

PAROLE DENIED ONE YEAR

EFFECTIVE DATE OF THIS DECISION MAY 11 2000

CERTIFICATE AND

DECLARATION OF TRANSCRIBER

I, PATRICIA M. JOHNSON, a duly designated transcriber, CAPITOL ELECTRONIC REPORTING, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total one in number and cover a total of pages numbered 1 through 31, and which recording was duly recorded at DEUEL VOCATIONAL INSTITUTION, at TRACY, CALIFORNIA, in the matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING of GARY SNODGRASS, CDC No. C-50459, on APRIL 19, 2000, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape(s) to the best of my ability.

I hereby certify that I am a disinterested party in the above-captioned matter and have no interest in the outcome of the hearing.

Dated April 28, 2000, at Folsom, California.

Patricia M. Johnson
Patricia M. Johnson
Transcriber
**CAPITOL ELECTRONIC REPORTING**

I. [X] PAROLE DENIED 1 year

If this proposed decision denying parole is approved, the Board will send you a copy of the approved decision, including the reasons for denial of parole, within 30 days of the hearing.

II. [ ] PAROLE GRANTED

A. Base Period of Confinement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ________ Months

Case No. ________ Count No. ________ Offense ________

B. Firearm Enhancement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . + ________ Months

C. Other Crimes Total . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . + ________ Months

Case No. ________ Count No. ________ Offense ________ ________ mos.

Case No. ________ Count No. ________ Offense ________ ________ mos.

Case No. ________ Count No. ________ Offense ________ ________ mos.

D. Total Term . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . = ________ Months

E. Postconviction Credit From ________ (Date) To ________ (Date) − ________ Months

F. Total Period of Confinement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . = ________ Months

The period of confinement indicated is a tentative decision proposed by this panel. The decision will be reviewed pursuant to BPT §2041, and, if approved, a copy of the approved decision will be sent to you within 30 days. At that time appropriate pre-prison credits will be applied and a parole release date computed.

You will not engage in any conduct specified in BPT §2451. Such conduct may result in rescission or postponement of your parole date.

If the proposed decision denying or granting parole is disapproved, you will receive a copy of the proposed decision and the reasons for disapproval. You will then receive a copy of the modified decision or will be scheduled for a new hearing, as appropriate.

**PANEL HEARING CASE**

| Name | Date |
|---|---|
| [signature] | 4/19/00 |
| [signature] Robert Harmon | |
| [signature] Sharon Lawin | |

| NAME | CDC NUMBER | INSTITUTION | HEARING DATE |
|---|---|---|---|
| DGRASS, GARY | C50459 | DVI MAIN | 04-2000 |

Distribution: White—C. File
Canary—BPT
Pink—Prisoner

1005 (Rev. 8/1/81)

LIFE PRISONER DECISION FACE SHEET

PERIOD OF CONFINEMENT

(RECORDS OFFICER USE ONLY)

| | YR | MO | DAY |
|---|---|---|---|
| Adjusted Period of Confinement | | | |
| Date Life Term Begins | + | | |
| At Large Time | + | | |
| PAROLE DATE | = | | |

MISCELLANEOUS

Denied: 1 Year

PANEL RECOMMENDATIONS AND REQUESTS

- ___ BECOME ✓ REMAIN DISCIPLINARY FREE.
- ___ WORK TOWARDS REDUCING HIS/HER CUSTODY LEVEL.
- ___ UPGRADE ___ VOCATIONALLY ___ EDUCATIONALLY.
- ✓ PARTICIPATE IN ✓ SELF-HELP (AND) ✓ THERAPY.
- ___ TRANSFER TO ___ CAT. X ___ CAT. T.

PENAL CODE SECTION 3042 NOTICES ☐ SENT (Date)

COMMITMENT OFFENSE

| 187 2ND | MURDER 2ND |
|---|---|
| (Code Section) | (Title) |
| 26252 | 1 |
| (Case Number) | (Count Number) |

| Date Received by CDC | Date Life Term Begins | Controlling MEPD |
|---|---|---|
| 7-19-82 | 7-19-82 | 9-11-90 |

Type of Hearing ☐ INITIAL ☒ SUBSEQUENT (Hearing No.) 7

If Subsequent Hearing, Date of Last Hearing 9-22-1998

Department Representative

Counsel for Prisoner | Address

District Attorney Representative | County

PAROLE HEARING CALENDAR

*This form and the panel's statement at the conclusion of the hearing constitute a proposed decision and order of the Board of Prison Terms. The decision becomes effective when issued following the decision review process.*

BY:

Presiding (Name) [signature] Date 4/19/00

Concurring (Name) Robert Hamm [signature] Date

Concurring (Name) Sharon Lawin [signature] Date

| NAME | CDC NUMBER | INSTITUTION | CALENDAR | HEARING DATE |
|---|---|---|---|---|
| SNODGRASS, GARY | C-50459 | DVI | 04-2000 | 04-19-2000 |

BPT 1001 (REV. 1/91) PERMANENT ADDENDUM

BOARD OF PRISON TERMS STATE OF CALIFORNIA
LIFE PRISONER HEARING - EXTRAORDINARY ACTION AND DECISION BPT 1001A (Rev. 10/89)

ACTION TYPE (select one): ☐ Waiver of Appearance ☐ Request for Postponement ☐ Waiver of Parole Consideration Hearing-Stipulation of Unsuitability

HEARING TYPE (select one): ☐ Parole Consideration ☐ Progress ☐ Rescission | Hearing Date

## WAIVER OF RIGHT TO ATTEND HEARING

I understand that I am scheduled for the Board of Prison Terms hearing indicated above.

☐ I do not wish to attend my Board hearing and do not wish to be represented at the hearing. The hearing will be held in my absence.

☐ I do not personally wish to attend my hearing but I do wish to be represented by counsel at the hearing.

☐ I will employ counsel to represent me at the hearing.

☐ I cannot afford counsel and wish counsel appointed to represent me.

## POSTPONEMENT

I understand that I am scheduled for the Board of Prison Terms hearing indicated above.

☐ I hereby request that the hearing indicated above be Postponed to ______________.

The reasons for my request for a postponement are stated below.

## WAIVER OF HEARING AND STIPULATION TO UNSUITABILITY

I understand that I am scheduled for the Board of Prison Terms hearing indicated above.

☐ I waive my right to a parole consideration hearing and I waive the right to have an attorney represent me at a hearing in my absence. I find that I am unsuitable for parole based on my reasons given on this form and therefore request that you find me unsuitable.

☐ One-year Denial ☐ Two-year Denial ☐ Three-year Denial

PRISONER'S REASON(S) FOR REQUEST:
(For Example: Psychiatric Evaluation Not Supportive, Programming Inadequate, Cat X Incomplete, etc.)

| Signature of Prisoner | Date |
|---|---|
| Signature of Attorney (if applicable) | Date |
| Signature and Title of Witness (CDC) | Date |

| NAME | CDC NUMBER | INSTITUTION | CALENDAR | DATE |
|---|---|---|---|---|
| NODGRASS, GARY | C-50459 | DVI-MAIN | 4-2000 | |

# EXHIBIT KK

## 2001 BPT PAROLE DECISION PAGES

EXHIBIT KK

CALIFORNIA BOARD OF PRISON TERMS

DECISION

PRESIDING COMMISSIONER HEPBURN: Okay. The parties have returned to the room. It's 3:21 P.M. And Mr. Snodgrass, the Panel did consider your case. We did deny your parole for a year. Let me read the decision to you. The Panel reviewed all information received from the public and relied on the following circumstances in concluding that the prisoner is not yet suitable for parole and would pose an unreasonable risk of danger to society or a threat to public safety if released from prison. Number one was the gravity and timing of the commitment offense itself. It was carried out in a dispassionate and calculated manner. And these conclusions are drawn from the Statement of Facts wherein the prisoner was angry at his stepfather, the victim in this case, Mr. Nailand. And he planned to kill him as a result of that. Went to Mr. Nailand's closet, removed his hunting rifle and then took it out to the garage. He was trying to figure out how to make it work. He had an accidental discharge which brought Mr. Nailand out. The gun was pointed at him. Mr. Snodgrass attempted to shoot him but the gun didn't operate and Mr. Nailand went and hid momentarily. Then

COPY SENT TO INMATE 12/26/01

Mr. Snodgrass got the gun to work. Mr. Nailand came walking out when he though the police were there and he was shot by Mr. Snodgrass causing him to fall. And then Mr. Snodgrass went over and shot him a second time resulting in his death. On the positive side, he didn't have any previous record to speak of, no sustained petitions as a juvenile, no convictions as an adult, although he was only 20 years old at the time of the conviction on this particular case. Regarding his institutional behavior, he has programmed very well while he's been incarcerated. He's picked up a lot of vocational skills which will serve him well when he does get released on parole and he has continued to do that right up to this time. He does have a high school diploma and he has participated in some self-help programs including consistent participation in AA. Recent psychological evaluation didn't indicate any problem areas that would prevent him from being a successful candidate for parole. His parole plans are a little bit tentative. He needs to firm those up. He does indicate that his mother would be willing to give him a place to live. There's some question of -- in the Board's mind about his ability -- her ability to do that and provide

 34

support in any meaningful fashion. But in any event, we would like to see him firm up his plans, get a letter of support and if he has any alternative plans either with a half-way house or some other support system outside the institution, that would certainly work to his benefit. In response to 3042 Notices, we had a letter from the Pinole Police Department, the investigating agency which voiced opposition to parole. And we had a representative from the District Attorney's Office who is present at the hearing and voiced opposition to parole. Prior to his next hearing, the Panel just recommend that he firm up those parole plans and continue his program, remain disciplinary free, participating in self-help and therapy to the extent that it's available. And that completes the reading of the decision. Commissioner Coldren, do you have any comments you'd like to add?

**DEPUTY COMMISSIONER COLDREN:** Just a couple, for what they're worth. It's not all that common that a District Attorney gives relatively positive comments to the progress that you've made. I think you should pay attention to that. I also think you should pay attention to what the Chairman said about getting good parole plans

available and I would make every effort I could to get myself in an up attitude and try to get rid of any depression and did the very best you can to present the best case you can when you come up for a parole hearing because I think that things -- you know, you got 20 years in and you got a lot of things going for you. All right?

**PRESIDING COMMISSIONER HEPBURN:** Okay. And that'll conclude this hearing at 3:25 P.M. Good luck to you.

--oOo--

PAROLE DENIED ONE YEAR

EFFECTIVE DATE OF THIS DECISION 12-14-01

CERTIFICATE AND

DECLARATION OF TRANSCRIBER

I, NATALIE NEWTON, a duly designated transcriber, CAPITOL ELECTRONIC REPORTING, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total one in number and cover a total of pages numbered 1 through 35, and which recording was duly recorded at DEUEL VOCATIONAL INSTITUTION, at TRACY, CALIFORNIA, in the matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING of GARY SNODGRASS, CDC No. C-50459, on NOVEMBER 6, 2001, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape(s) to the best of my ability.

I hereby certify that I am a disinterested party in the above-captioned matter and have no interest in the outcome of the hearing.

Dated December 7, 2001, at Sacramento County, California.

Natalie Newton
Transcriber
**CAPITOL ELECTRONIC REPORTING**

LIFE PRISONER: PAROLE CONSIDERATION
PROPOSED DECISION (BPT §2041)

I. [X] PAROLE DENIED 1 year

If this proposed decision denying parole is approved, the Board will send you a copy of the approved decision, including the reasons for denial of parole, within 30 days of the hearing.

II. [ ] PAROLE GRANTED

A. Base Period of Confinement .......................................... ________ Months

Case No. ________ Count No. ________ Offense ________

B. Firearm Enhancement .......................................... + ________ Months

C. Other Crimes Total .......................................... + ________ Months

Case No. ________ Count No. ________ Offense ________ ________ mos.

Case No. ________ Count No. ________ Offense ________ ________ mos.

Case No. ________ Count No. ________ Offense ________ ________ mos.

D. Total Term .......................................... = ________ Months

E. Postconviction Credit From ________ (Date) To ________ (Date) − ________ Months

F. Total Period of Confinement .......................................... = ________ Months

The period of confinement indicated is a tentative decision proposed by this panel. The decision will be reviewed pursuant to BPT §2041, and, if approved, a copy of the approved decision will be sent to you within 30 days. At that time appropriate pre-prison credits will be applied and a parole release date computed.

You will not engage in any conduct specified in BPT §2451. Such conduct may result in rescission or postponement of your parole date.

III. If the proposed decision denying or granting parole is disapproved, you will receive a copy of the proposed decision and the reasons for disapproval. You will then receive a copy of the modified decision or will be scheduled for a new hearing, as appropriate.

PANEL HEARING CASE

| Name | Date |
|---|---|
| [signature] | 11-6-01 |
| [signature] | 11 |
| | |

| NAME | CDC NUMBER | INSTITUTION | HEARING DATE |
|---|---|---|---|
| SNODGRASS, GARY | C50459 | DVI-MAIN | 11-06-01 |

Distribution: White—C. File
Canary—BPT
Pink—Prisoner

BPT 1005 (Rev. 8/1/81)

# LIFE PRISONER DECISION FACE SHEET

PERIOD OF CONFINEMENT

(RECORDS OFFICER USE ONLY)

| | YR | MO | DAY |
|---|---|---|---|
| Adjusted Period of Confinement | | | |
| Date Life Term Begins + | | | |
| At Large Time + | | | |
| PAROLE DATE = | | | |

MISCELLANEOUS

Parole denied 1 year

PANEL RECOMMENDATIONS AND REQUESTS
___ BECOME X REMAIN DISCIPLINARY FREE.
___ WORK TOWARDS REDUCING HIS/HER CUSTODY LEVEL.
___ UPGRADE ___ VOCATIONALLY ___ EDUCATIONALLY.
X PARTICIPATE IN X SELF-HELP (AND) X THERAPY.
___ TRANSFER TO ___ CAT X ___ CAT. T.

PENAL CODE SECTION 3042 NOTICES ☐ SENT (Date)

COMMITMENT OFFENSE

PC 187 — (Code Section)

MURDER 2ND — (Title)

CC 26252 — (Case Number)

01 — (Count Number)

| Date Received by CDC | Date Life Term Begins | Controlling MEPD |
|---|---|---|
| 07-19-1982 | 07-19-1982 | 09-11-1990 |

Type of Hearing ☐ INITIAL ☒ SUBSEQUENT (Hearing No.) 8

If Subsequent Hearing, Date of Last Hearing 04-19-2000

Department Representative

Counsel for Prisoner: R. SKIPPERDOTA

Address

District Attorney Representative

County: CONTRA COSTA

PAROLE HEARING CALENDAR

*This form and the panel's statement at the conclusion of the hearing constitute a* *proposed* *decision and order of the Board of Prison Terms. The decision becomes effective when issued following the decision review process.* By:

| | | Date |
|---|---|---|
| Presiding (Name) | [signature] | 11-6-01 |
| Concurring (Name) | | 11 |
| Concurring (Name) | | |

| NAME | CDC NUMBER | INSTITUTION | CALENDAR | HEARING DATE |
|---|---|---|---|---|
| SNODGRASS, GARY | C50459 | DVI/TRACY | 11/2001 | 11/06/2001 |

BPT 1001 (REV. 1/91)

PERMANENT ADDENDA

SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF CONTRA COSTA

FILED
JUN 23 1982
J. R. OLSSON, County Clerk
CONTRA COSTA COUNTY
By [signature] DEPUTY

THE PEOPLE OF THE STATE OF CALIFORNIA) Plaintiff )

vs. )

GARY RANDALL SNODGRASS (20) )

DOB: 8/4/61 Defendant )

Department No. 1

Docket No. 26252

PROBATION OFFICER'S REPORT AND RECOMMENDATION

| | |
|---|---|
| CHARGED WITH: | Section 187 PC(Murder) It is further alleged that the defendant used a firearm within the meaning of Section 12022.5 PC. |
| GUILTY OF: | Section 187 PC(Murder in the Second Degree) With use of a firearm within the meaning of Section 12022.5 PC. |
| GUILTY BY: | Jury Verdict |
| DATE OF OFFENSE: | November 18, 1981 |
| DATE OF ARREST: | November 18, 1981 |
| CUSTODIAL STATUS: | In Custody(credit for 64 days computed as follows: 11/18/81 to 12/9/81 - 22 days; 5/13/82 to 6/23/82 - 42 days) |
| DATE REFERRED TO PROBATION OFFICER: | May 13, 1982 |
| PROBATION REPORT DUE: | June 23, 1982 at 9:00 a.m. |
| ATTORNEY FOR DEFENDANT: | Thomas Shelby, P.O. Box 35, San Pablo, California 94806-0035 |

RECOMMENDATION:

It is respectfully recommended that probation be denied.

BEST AVAILABLE COPY

PRIOR RECORD:

CII NUMBER: A07137757

DMV NUMBER: N8899119

Sources of Information:

Bureau of Identification, Sacramento
Concord Police Department
Contra Costa Sheriff's Office
Contra Costa Probation Records
Department of Motor Vehicles
Pinole Police Department

Adult Record:

Record checks of the above-listed agencies indicate that Mr. Snodgrass had no adult convictions prior to the present offense.

Juvenile History:

The defendant has resided in Pinole all of his life. The Contra Costa County Probation Department does not have any record of contact with Mr. Snodgrass as a juvenile. The Pinole Police Department had contact with the defendant on three occasions when he was a juvenile, but none of these contacts resulted in prosecution. Thus, it appears that Mr. Snodgrass does not have any record of delinquency as a juvenile.

Driving Record:

Records from the Department of Motor Vehicles indicate that Gary Randall Snodgrass currently holds a valid Class 3 driver's license which is due to expire in 1985. The license additionally contains authorization to operate motorcycles. There are two infractions on his record, one for running a stop sign and the other for speeding.

BEST AVAILABLE COPY

INVESTIGATION:

Gary Randall Snodgrass is a 20-year-old man who killed his stepfather, John Daniel Nailen, on November 18, 1981. The information pertaining to the offense was obtained from review of the preliminary hearing transcript and the police reports pertinent to the case, interviews with the defendant and a psychologist who extensively interviewed Mr. Snodgrass, and a review of information provided by written references that have been provided on behalf of both the defendant and the victim. The sequence of events described below is a synopsis of the available information.

The defendant's mother, Marietta Snodgrass Nailen, married John Nailen in 1969 when the defendant was approximately eight years old. The marriage was somewhat tempestuous and the couple separated on several occasions before the marriage terminated in divorce in 1976. According to the defendant, he was always opposed to the marriage and constantly felt ignored, belittled, and verbally harassed by John Nailen. At the time of the divorce, Gary Snodgrass was approximately 15 years of age. In December of 1979 when the defendant was 17, his mother remarried John Nailen, an event causing renewed anxiety for Gary Snodgrass. Over the next few years, his distress and anxiety developed into a consuming anger and hatred toward John Nailen. The defendant states that he thought about killing Nailen several months before the actual crime took place.

A few weeks prior to the event, John Nailen had retired from

BEST AVAILABLE COPY

his career with P. G. & E. Presumably, his constant presence at home increased the defendant's distress and hatred. Mr. Snodgrass indicates that he entertained fantasies about various ways to kill Nailen. In his taped confession following arrest, he related that on one occasion, he constructed a weapon made from a baseball bat with spikes inserted within, a weapon he fantasized about using on John Nailen.

On November 17, 1981, Gary Snodgrass decided that he would kill John Nailen on the following day. He asked his mother to awaken him before she left for work so that he could obtain John Nailen's hunting rifle. Mr. Nailen drove his wife and stepdaughter to their various places of employment and while he was gone, the defendant arose and took Nailen's 7 millimeter rifle from Nailen's closet and hid it in the garage behind some plasterboard in the wall. He then went back to bed. When John Nailen arrived home, he ordered the defendant to get out of bed and to put the cat outside. Gary Snodgrass complied with these orders and eventually went out to the garage and retrieved the rifle. Opening the side garage door, he took the rifle outside and sat on a woodpile to try to figure out how to operate the weapon. He had also obtained ammunition from Nailen's closet and while examining the rifle, it discharged accidentally. The defendant recalls that he knew John Nailen would come outside to investigate the sound of the rifle discharging and that "all hell would break loose." When Nailen appeared at the open door, the defendant jumped up, pointed the rifle at him and pulled the

BEST AVAILABLE COPY

trigger; however, the safety mechanism on the rifle was activated and the rifle did not discharge. In the meantime, hearing the rifle blast, a neighbor, Mrs. Abbie Bebich, was checking her residence to determine the source of the loud noise. Looking out a bedroom window, she saw Gary Snodgrass holding the rifle and pointing it toward the garage door. Although she could not hear what he was saying, she observed that he was talking to someone. Mrs. Bebich telephoned the Pinole Police Department and reported her observations.

Within a very short period of time, Officer Hodges of the Pinole Police Department arrived at the scene. Mrs. Bebich came out of her house and directed him to the Nailen residence. As he began walking up the driveway of the Nailen home which is located at 2664 Emma Drive, he heard a gunshot. And shortly thereafter, within seven to ten seconds, he heard a second shot go off.

According to Gary Snodgrass, when he shot at John Nailen and the rifle did not discharge, Mr. Nailen slammed the door shut, breaking the glass in the window. He then took cover within the garage which apparently was filled to the rafters with various items in storage. The defendant continued holding the rifle toward Mr. Nailen and the two men exchanged conversation. From his location outside of the garage door, Gary Snodgrass could see the street area over the fence and he saw Officer Hodges arrive in his patrol vehicle. He indicates that at this point in time, he thought that if he was going to do it, he had to

BEST AVAILABLE COPY

do it then. The defendant told John Nailen that the police had arrived, and the next sequence of events is not entirely clear to the Probation Officer; however, it seems that in learning that the police had arrived, Mr. Nailen came out from the area in which he had sought cover and Gary Snodgrass shot him in the chest area. John Nailen fell backward to the ground and began yelling at the defendant. Officer Hodges recalled hearing a male voice say "Gary, you've done it now." The defendant recalls that Nailen was yelling obscenities at him. In any case, the defendant walked toward the wounded victim and shot him a second time, wounding him in the neck area.

Gary Snodgrass walked through the garage door to the side yard and retrieved the live cartridge that had been thrown from the rifle when he tried to shoot it while the safety was activated. He reloaded the rifle with the intention of shooting himself. At this point, Officer Hodges was verbally commanding the defendant to come out with his hands up. Gary Snodgrass recalled that he did not want the police officersto think that he would shoot them, so he unloaded the cartridge and following the disarming orders of Officer Hodges, put the rifle down on a woodpile. He came out of the yard through the gate and was taken into custody without any resistence. Officer Hodges asked the defendant if anyone else was in the house, and he responded negatively. Officer Hodges advised the defendant that he thought he heard the defendant talking to someone else, and Gary Snodgrass stated that "my dad, my stepfather, I just killed him."

BEST AVAILABLE COPY

Officer Hodges was assisted by Officer Dargie in placing Gary Snodgrass in the back of a patrol vehicle.

In returning to the garage, Officer Hodges found the wounded John Nailen and determined that he had a very weak carotid pulse. He called for the fire department and ambulance service and attempted to administer CPR to Mr. Nailen. However, Mr. Nailen subsequently died at the hospital.

During the arrest process, Officer Hodges noticed that the defendant did not appear to be nervous at all. His hands were not sweating, and he appeared to be calm. At approximately 11:05 a.m., Gary Snodgrass was admonished of his constitutional rights at the Pinole Police Department and he agreed to discuss the events that had just transpired that morning. Essentially he provided a full confession and explanation of the crime and some of the events leading to his decision to commit it. When asked how he felt after having shot John Nailen, he responded that he felt relieved.

Following a preliminary hearing held on February 18 and 19 of 1982, Gary Randall Snodgrass was held to answer for violation of Section 187 PC, murder, with use of a firearm within the meaning of Section 12022.5 PC. A jury trial began on May 3, 1982. On May 13, 1982, the jury found the defendant guilty of murder in the second degree and found that the defendant had used a firearm during the commission of the offense. The matter was referred to the Probation Department for preparation of a presentence report due for submission on June 23, 1982 at 9:00 a.m.

BEST AVAILABLE COPY

**DEFENDANT'S STATEMENT:**

"Constant harassment, belittlement, antagonisim by stepfather and his family has had a negitive effect on my mental state of mind. I reached my breaking point after more than ten years of it. I broke and shot and killed my stepfather with a hunting rifle. I got involved by my mother marrying into the deceased victim's family. The way in which I was involved is as follows: I am the youngest in my mother's family. I was molested by 17 year-old son of deceased when I was 7 years old. This went on for about two years and it has had a negitive effect on my mind. That, in addition to terrorization by stepbrother and stepfather, overprotectiveness by my mother has given me some mental problems I need to have taken care of. I'm not crazy, but I know I need help with these problems including depression and anxiety as well as others. I feel that the sooner I get help, the sooner I'll be able to feel normal and lead a normal life. Being that this whole perdicament was domestic in origin, I feel that it couldn't happen again. I'm a bit older and wiser now, and I'm trying to see things in their true light. I can be helped, and I want to be rid of these problems (I can be rid of these problems). I feel sentenceing without probation could only complicate my problems.

"My long-range plans are to feel better about myself, learn a skill and find a decent job. To marry, have kids, and to love them and give them the things in life I never had, which I so desperately needed."

BEST AVAILABLE COPY

9

"I know I will have to spend time in jail or a hospital, but I need exposure to the outside in order to get on with leading a normal life." Signed/Gary Snodgrass.

THE VICTIM:

The following information regarding John Nailen was [illegible] in a letter written by James P. Nailen, a brother of the victim. John Nailen was born in Herrin, Illinois on January 19, 1922, making him 60 years of age at his death. He was one of six children born to a coalminer's family. His mother died in 1932 when he was ten years of age, and he was sent to St. Anne's Orphanage in Salt Lake City, Utah. After two years, he returned to the coalmining town where he finished grade school and resided with his father. While in Utah, he attended one year of junior college and then relocated in California, eventually settling in Oakland, and worked as a machine operator. Joining the International Guard in 1942, he later entered the Army in 1943 and was sent to Europe where he was wounded. In 1945 he was discharged and went to work for P. G. & E. in 1947. He married for the first time in 1948 or 1949 and reared three children, one of which was a stepdaughter. He reportedly had seven grandchildren. During the 1950's, he went to college and earned his AA degree and during the 1960's, earned an equivalent to an engineering degree. His wife died of a heart attack during 1966. In 1969, he married Marietta Snodgrass and in 1970, he was appointed to be a supervisor within P. G. & E. According to James Nailen, "between 1969 and 1975 they separated many times and

60 years

BEST AVAILABLE COPY

Case 3:08-cv-03322-JSW Document 5-2 Filed 07/09/2008 Page 12 of 55

eventually divorced in [illegible]." James Nailen indicates that the divorce was rather acrimonious, particularly in regard to the financial settlement.

In January of 1979, John Nailen underwent surgery for cancer of the spleen and spent the majority of that year receiving radiation treatment. In December of that year, he remarried Marietta Snodgrass. During 1980, he underwent three operations for removal of an appendix, and for repair of damage to some of his organs from the radiation treatments. However, in October of 1981 he was given a clean bill of health."

SOCIAL DATA:

Gary Randall Snodgrass was born on August 4, 1961 in Oakland, California, to the marriage of Harold Nathan Snodgrass and Marietta Montgomery Snodgrass. He was the youngest of three children, having two older sisters. When the defendant was five years of age, his father died, reportedly from Hodgkins disease. Mr. Snodgrass had been a printer by profession and employed at the Richmond Independent. As indicated previously, when the defendant was eight years of age, his mother married John Daniel Nailen who had two daughters and a son by his previous marriage. The marriage between Marietta Nailen and John Nailen terminated in divorce in 1976 after numerous separations. According to the defendant, when he was eight years of age, he was abused sexually by John Nailen's son who was at that time 17 years of age. The defendant apparently always felt that the stepfather knew about this abuse, although according to Dr. Dwight Murray, Psychologist,

BEST AVAILABLE COPY

whether or not John Nailen knew about this abuse has never been established. As indicated previously, Marietta Snodgrass Nailen remarried John Nailen in 1979. Marietta Nailen is currently approximately 48 years of age and is employed as a secretary with the Richmond Unified School District. The defendant's eldest sister works for P. G. & E. and his other sister is an interpreter for the deaf. The defendant's stepsisters and brother are in their late twenties and thirties and the defendant did not have very much information pertaining to their respective situations at present. According to the defendant, none of his family members has ever posed any community problems.

Gary Randall Snodgrass has spent the majority of his life in the Pinole area, residing for one or two years in Concord during the first years of his mother's marriage to John Nailen. He graduated from Pinole Valley High School in 1979 and reports that he attended Contra Costa Junior College for "a couple of months." He terminated his attendance because of "domestic problems and anxieties."

The defendant reports that he is in good general health, never having suffered from any serious illnesses nor injuries. There is a substantial amount of information pertaining to his mental status from two psychologists which will be addressed in the section entitled Collateral Contacts. When questioned regarding his personal habits related to intoxicating substances, the defendant reports that he drinks "moderately" on a social basis. He indicated, however, that prior to the present offense,

BEST AVAILABLE COPY

he would go up to Tara Hills and drink a lot in an attempt to "avoid his problems and escape." He admits to the occasional use of marijuana, [illegible] denies the use of any other illicit drugs. It should be noted that Dr. Dwight Murray indicates that following the commission of the instant offense, the defendant was released on bail and it was Dr. Murray's observation and concern that Gary Snodgrass began using marijuana on a regular basis and it reached alarming proportions. Both he and the defense attorney attempted to intervene to terminate this destructive behavior.

In his leisure time, Gary Snodgrass indicates that he enjoys riding motorcycles and working on them. He also enjoys bicycling, exercising, and socializing with friends. He indicates that he is affiliated with the Pinole Valley Baptist Church.

MARITAL STATUS:

According to the defendant, he has never been married nor has he fathered any children.

MILITARY RECORD:

None.

EMPLOYMENT RECORD:

It has been verified that from July 21, 1979 until January 23, 1980, the defendant was employed with the Grand Auto Store in San Pablo. He was a part-time salesman and the personnel assistant of Grand Auto indicates that the defendant voluntarily terminated his employment.

The defendant reports that he has also had a series of "small jobs" in gas stations, at a pharmacy for one month, and

BEST AVAILABLE COPY

providing landscaping services for friends. When asked what his vocational interests would be for the future, he indicated that he has an aptitude for mechanics and would like to pursue a career in that field. He also indicates an interest in social work.

FINANCIAL STATUS:

Mr. Snodgrass states that he does not have any regular source of income, is devoid of any reportable assets, and is not in debt. Prior to the offense, it appears that he was financially dependent on his mother and stepfather.

RESTITUTION:

Restitution does not appear to be an issue in this case.

COLLATERAL CONTACTS:

Mr. Marvin Lawson submitted a letter of reference indicating that he was a brother-in-law to the defendant's natural father. He wrote, "I have always had a good relationship with Gary. He was always good with his hands and shows patience in working with them. However he never mentioned any other problems he may have had. I do not find him difficult to get along with. He has respect for others and expects them to return same. This young man must be treated as an adult. Talked across to and not down to. He must be convinced that he has a life ahead to look forward to. I think this young man should be kept busy and preoccupied with some kind of work that he likes."

///

Mrs. Ruth Lawson submitted a reference in which she indicated that she is his aunt, a sister to his natural brother. She verified that the defendant's father died when he was only five years of age. She writes, "Gary has always been a quiet boy. He has always shown to have respect for me. He has never given me any problems. He is very good at working with his hands. He has always loved animals and I have never seen him mistreat one. He has always been willing to help both myself and my husband anytime we have asked him for his help. He likes to please people. I think Gary's problem is that he has no respect for himself because of his earlier treatment and because of the way his stepfather treated him. He needs to be told that what happened to him in his earlier life was not his fault. He needs to be told that he

BEST AVAILABLE COPY

can be helped. He doesn't need to be put down anymore. He needs to have love and respect."

///

Mr. Mitch Lawson, cousin to the defendant, has written, "Gary is very shy and passive. He is creative and inventive. But he is the kind of person that holds his feelings in and he has very seldom talked about them with me. He is very sensitive and caring. He loves animals. He likes machines and likes to fix things. Up until the time he shot John, I had never seen him get angry or emotional to that point. He has always been calm and collected. Gary can't seem to let his feelings show. He just lets everything build up. He can't communicate very well and can't seem to talk things out. Even with me, and I felt that we were very close. In my opinion, Gary needs group therapy and a lot of professional guidance to help him communicate. He needs time to think and time to readjust."

///

Mr. Bruce Malone submitted a reference letter in which he indicated that he has known the defendant for seven years and that the defendant is a good friend. "He has never been violent in any way he came over to see me regular. He never got in any trouble as far as I know. I know he went to church when he was younger. He was always smart in school and liked everyone. He was a good friend and I don't know what could have bapend. I don't know much about his family so I couldn't tell you, but I didn't think he had any problems."

///

Approximately one week prior to the offense, Gary Snodgrass was seen, for the first time, by Dr. Aaron Cooper, a psychologist. The defendant's mother was concerned about his mental state and had suggested that he see Dr. Cooper. Dr. Cooper indicates that he only saw Gary Snodgrass on the one occasion and at that time, the defendant appeared to be depressed and it was the doctor's impression that the defendant was in trouble in a lot of areas of his life. He was not functioning well in most social areas and was not behaving very effectively. Inasmuch as he only saw the defendant on one occasion, he could not provide further information.

///

Dr. Dwight Murray, Psychologist, provided extensive psychological information pertaining to the defendant. The following are excerpts from this report: ????

"Gary Snodgrass is a frail, 'pretty' Caucasian male, 20 years of age. He was seen for both psychotherapy and psychological

BEST AVAILABLE COPY

testing in our office over a period of time from December 17, 1981 until his trial in May of 1982. He is a sensitive, inarticulate person, whose affect was rather flat throughout our relationship. In many ways, he related as would a child - not fully grasping his circumstances or the gravity of the situation in which he found himself. He never fully trusted the evaluator or his therapist.

"From age seven to nine, Gary was sexually molested by a step-brother, ten years his senior. Gary reports that the abuse occurred approximately once per week over a two year period, and included forced anal and oral intercourse. The step-brother, who was over six feet tall at the time, threatened physical violence if Gary did not comply. Gary apparently attempted to tell his mother what was going on, but did not actually do so until after she had divorced his step-father. Gary always assumed that his step-father knew of the sexual abuse, choosing to do nothing about it; and it was for this reason that it was incomprehensible that his mother would marry the same man again. As Gary grew older, the clashes with his step-father became more frequent. An overbearing, argumentative man, the step-father was a 'self-made man, who did not understand why Gary could not 'pull himself up by his boot-straps.' He constantly badgered, belittled, and verbally abused Gary, as well as his sisters. Gary, finding himself increasingly inept at functioning in an adult world, began to withdraw and deteriorate. He sought help (at his mother's urging) with Dr. Aaron Cooper, who saw Gary as having depression and anxiety, and being 'enmeshed' in the family system. Gary indicated that he was suicidal for a period of approximately four months, and then gradually (through a process of 'magical thinking') decided to kill his step-father, instead of himself. Gary said, 'I felt like I was going crazy, and I had to do something about it.'

"According to the MMPI, Gary has been or will be psychotic; he was seen as poorly organized, full of emotional conflicts, moody, suspicious, guarded, preoccupied, bitter, inadequate, incompetent, lacking the wherewithal to sustain work, and finding criticism too painful to bear. The MMPI diagnosis was Paranoid Schizophrenia, with a Depressive Reaction.

"Based on all the data, a double diagnosis seems appropriate: Schizotypal Personality Disorder and Borderline Personality Disorder. In terms of the first diagnostic category, Gary exhibits 'magical thinking', ideas of reference, social isolation recurrent illusions, odd speech, inadequate rapport face-to-face, suspiciousness or paranoid ideation, and hypersensitivity to criticism. This condition is not episodic, rather effecting both current and long-term functioning; and it impairs social and/or occupational functioning."

///

BEST AVAILABLE COPY

"SUMMARY AND RECOMMENDATIONS:

"The seeds for Gary's crime were planted early in childhood. At the crucial age when gender identity is normally formed, he was 'fatherless.' Those to whom he turned either rejected or berated him, or sexually abused him. It is no wonder that Gary is mistrusting and probably over-identified with his mother, lacking clear gender identity to this day. As pressures to 'grow-up' increased, he was faced with his many inadequacies - he could not sustain a job, he did not know how to approach women, and he did not know how to deal with his arch-rival, his step-father. He became obsessed with the thought that he was becoming like, or perhaps becoming, the man he hated. (He said things like, 'John was coming into me; I couldn't look him in the eyes.') Pressure continued to build until he finally rid himself of the hated individual, and also rid himself of that part of himself that he hated and could not abide. As he approached the psychotic break, which he avoided by killing his step-father, he genuinely felt as he had no option. In an Oedipal sense, he had to rid himself of that part (of himself) which was unthinkable - that part who was a rival for his mother's affection. He now feels relieved.

"Since the trial, Gary has begun to express remorse that he has taken a human life. But he still has no mature grasp of the gravity of his act or of the societal constraints which prohibit such acts. His thinking and emotions are too disordered to permit that level of mature reflection.

"Gary is easily intimidated by authority and by physical size. He should present no behavioral problems while incarcerated. In fact, the likelihood of his ever running afoul of the law again is extremely low. Of genuine concern, however, is his 'pretty' appearance, which may make him an easy target for homosexual activity in prison. Since the early abuse is such a loaded topic for him, and since his own sexual identity is yet unresolved, the prospect of his being further abused is potentially very destructive. Possible suicide or a full-blown psychosis might result from such trauma. Psychotherapy, possibly psychotropic medication, and a benign setting are recommended."

///

Thomas G. Shelby, defense attorney in this case, submitted the following factors in mitigation for the Court's consideration: "It appears that the victim was continually verbally abusive and threatening by size to the defendant over a long period of time and therefore was somewhat provocative of this incident. It appears that this offense was committed because of the unusual circumstances in the relationship of step-parent to step-child, and therefore it would be highly unlikely that this defendant would engage in any further criminal conduct. The defendant

BEST AVAILABLE COPY

further exercised caution after the shooting to avoid doing any harm to the police officers who arrived on thescene. I am further quite convinced that the defendant was unaware of the gravity of the act he was about to commit. In regard to facts relating to the defendant, I find that he has no prior criminal record and was suffering from a mental condition which I believe significantly reduced his culpability. The defendant further voluntarily acknowledged to the police officers immediately after the incident what he had done and why he did it. I further find that upon conviction of this charge, the defendant may be ineligible for probation, but for that possible ineligibility, I believe he would be an excellent probationer, as I find it highly unlikely that he would engage in any further criminal conduct."

///

Mr. Robert Kochly, prosecutor in this case, was also contacted but inasmuch as the punishment for this offense is specified by statute, Mr. Kochly did not submit any factors in mitigation and/or aggravation.

///

Officer Larry Hodges, the initial police officer at the scene, was contacted by telephone. It was his impression that the offense was a "cold-blooded murder" and that the defendant showed no remorse for what he did and appeared to have no social conscience. He feels that the defendant should probably be sentenced to the maximum term possible.

///

It should be noted that the Probation Officer contacted the Intake Unit of the California Youth Authority (916-445-3803) to determine whether CYA could even be a sentencing consideration. CYA has a classification system using points for nature of an offense, prior record, and prior institutional behavior. Although Mr. Snodgrass has no prior record, it was indicated that the nature of this offense would exceed the point total. CYA excludes murder convictions from Adult Court except in "extenuating circumstances." These circumstances have only pertained to felony-related murders in which the person convicted did not actually kill the victim. On that basis, it is highly doubtful that Mr. Snodgrass could be considered for commitment to the California Youth Authority.

EVALUATION:

The circumstances of the present offense are tragic indeed. Gary Randall Snodgrass is a 20-year-old man who has no criminal

BEST AVAILABLE COPY

record and no prior history of violence. It is certainly a tragedy for Mr. Snodgrass that because of his psychological and/or emotional deficiencies, he could see only one solution to a problem which he felt was producing frustration, anger and antagonism of enormous proportion; namely, the behavior of his stepfather. The offense is also a tragedy for the victim, who is now deceased, and for the members of his family who grieve his loss. The defendant appears to be poorly equipped, both physically and psychologically, to face an extended period of incarceration in the California Department of Corrections; however, there appear to be no suitable alternative dispositions.

It appears that the defendant is statutorily ineligible for probation pursuant to Section 1203.06 PC which establishes ineligibility for probation for a murder committed with use of a firearm. Inasmuch as it has been pled and proven that Mr. Snodgrass used a firearm in this offense, this preclusion appears established. The acceptance policies for the California Youth Authority would appear to exclude consideration of Mr. Snodgrass. Moreover, the recent passage of Proposition 8 might also preclude such a consideration. Thereby, it is respectfully recommended that probation be denied and that the defendant be committed to the California Department of Corrections.

Circumstances in Mitigation (Rule 423):

A. Facts relating to the crime:

It could be argued that the victim contributed to the provocation of the.

he had it coming

BEST AVAILABLE COPY

incident; however, there does not appear to be any specific act of provocation but rather, a long-term development of hostilities and problems between the victim and the defendant (A-2). This offense does appear to be a crime committed because of an unusual circumstance which is unlikely to recur (A-3).

B. Facts relating to the defendant:

He has no prior record of criminal behavior (B-1). It would appear that the defendant was suffering from psychological/ emotional problems at the time of the offense (mental condition) for which it could be argued that his culpability for the crime is somewhat reduced (B-2). The defendant voluntarily acknowledged his wrongdoing immediately upon arrest (B-3).

Circumstances in Aggravation(Rule 421):

A. Facts relating to the crime:

The crime involved great violence in that a person is now deceased (A-1). The facts of the offense suggest that the victim was particularly vulnerable, having few avenues of retreat when the defendant pointed the rifle at him (A-3). The available information pertaining to the offense establish

BEST AVAILABLE COPY

premeditation (A-8).

B. Facts relating to the defendant:

None.

Enhancements:

It has been charged and proven that the defendant used a firearm within the meaning of Section 12022.5 PC and a term of imprisonment in the Department of Corrections could thereby be enhanced by an additional two years.

Respectfully submitted,

GERALD S. BUCK, COUNTY PROBATION OFFICER

BY: Magdeline E. Jensen
MAGDELINE E. JENSEN, DEPUTY PROBATION OFFICER
ADULT DIVISION, MARTINEZ

APPROVED: [signature]
RICHARD A. CANCURA, UNIT SUPERVISOR
ADULT DIVISION, MARTINEZ

MEJ:al
Dictated:6/18/82
Typed:6/18/82

READ AND CONSIDERED: Robert H. McHeod
JUDGE

BEST AVAILABLE COPY

# EXHIBIT MM

- REMOVED -

EXHIBIT MM

# EXHIBIT NN

EXHIBIT NN

**Documents regarding Governor's Office Pressuring Board Commissioner Harris-Ritter to Resign for giving too many parole dates.**

# EXHIBIT ___

1 of 6

# Harris-Ritter Exposé

# PAROLE BOARD POLITICS AND DEEP-SEEDED PROBLEMS DETAILED BY FORMER BPH COMMISSIONER

On June 5th, former BPH Commissioner Belinda Harris-Ritter wrote a detailed 5-page letter to the Senate Rules Committee and "To Whom it May Concern" to enlighten interested parties on some of the serious problems at the heart of the Board's ineptitude. Mr. Ritter-Harris, who resigned six months earlier in January 2007 after chairing lifer suitability hearings for six months, graciously gave her permission to publish her expose in full:

## DO NOT BLAME THE COMMISSIONERS FOR PAROLE BOARD PROBLEMS

Last July I began my term as a Commissioner on the Board of Parole Hearings, an appointee of Governor Schwarzenegger. I was naive in thinking that the Board would be allowed to do its job. I left the Board in January of this year frustrated by the inability of the Board to function, exhausted from the out of control travel schedule and still weak from the flu and norovirus picked up in prison facilities crawling with disease.

I left, not because I had given up, but because I received a telephone call from Alberto Roldan, a deputy appointment's secretary, in which he told me I was being given the opportunity to resign because the Governor wanted to go in another direction and appoint someone else in my place. I was told that I was forbidden to tell anyone of the call, forbidden to attend the upcoming Board meeting and if I did not do what I was told, I would be terminated. I asked what I had done to cause this to occur and was told I had done nothing wrong. I knew that if the Governor wanted to put someone new on the Board there was an open seat so clearly I was considered a problem. There was no opposition to me on record and I was often told by victim advocates/relatives and inmate counsel alike that I did an excellent job. I had been unaware that there was opposition to me from the people responsible for my being there in the first place.

I am not the only Commissioner to have met that fate. Recently, another excellent Commissioner was confirmed by the Senate but only after an attack on her by people in the Governor's office, the District Attorney's Association and spearheaded by Senator Jeff Denham. Senator Denham sent out press releases saying he was appalled by early releases due to grants. A grant of parole is not an early release. The penal code specifically states that Parole shall be granted unless there is a public safety reason not to grant it. They forget not only the actual law that controls what Commissioners must do but also that the Commissioner does not make the Decision alone. A civil service Deputy Commissioner is involved in every case and must agree with the Commissioner to grant parole or it is a split vote that goes to the full Board sitting en banc. The Commissioner has no say in who the deputy Commissioner will be or what prison he or she is assigned to each week. That is all manipulated by the Executive Officer who answers to the Governor and /or CDCR.

When the Governor and legislature reorganized the Department of Corrections effective July, 2005, they destroyed any independence of the Board of Parole Hearings. The Board was no longer free-standing but was stuffed into the newly named California Department of Corrections and Rehabilitation (CDCR).

The Board itself has no control over the hiring of the civil service staff. The legal counsel will tell you they work for CDCR and the Executive Officer is appointed by the Governor, not the Board. He, like the Board, is part of CDCR. Although he is not appointed by the Board the role of the administrator should still be to take direction from the Board he or she serves, not to dictate what is done. This is because the Executive Officer is not a member of the Board. That reality was lost in the transition. He acts on direction from somewhere other than the Board, unknown to the Commissioners. Commissioners are assigned to various prisons weeks in advance then at the last minute-without explanation, the Executive Officer tells scheduling to change the schedule and inform the Commissioners of the switch. That is just one example.

Add to the reorganization problems the fact that the legal staff considers itself to work for CDCR, apparently not understanding who the client is (the Board) regardless of who pays their salaries (CDCR) and that the legal staff has, in my opinion, absolutely no understanding of the Bagley –Keene Open Meeting Act and you have a recipe for disaster.

Regulations are presented for approval by the Board when the Board has not considered or voted on whether regulations are needed. Although there is an item on each agenda for the legal report and the Executive Officer report those have at times consisted of announcing the number of cases in the backlog for the legal staff and introducing the new deputy commissioners by the Executive Officer.

Never, during my time on the Board, did either present any report of substance. The Board members are never told how the number in the backlog is calculated and there is no acknowledgement of cases that are on appeal or problems that come up in panel decisions except in illegal closed sessions allegedly to consider litigation. However, the Bagley- Keene Act is very clear that to be considered under this litigation exception there must be "...an adjudicatory proceeding before a court, administrative body, hearing officer or arbitrator. Litigation is considered to be pending if, (1) it has been initiated formally (e.g. a complaint, claim or petition has been filed) or (2) based on existing facts and circumstances and on the advice of its legal counsel, the state body believes there is significant exposure to litigation against it, or it is meeting to decide whether a closed session is authorized because of significant exposure to litigation or (3) based on existing facts and circumstances the state body has decided or is deciding whether to initiate legislation. (Bagley –Keene Act section 11126). Further, a memo must be sent to the Board members by the staff and after the litigation is resolved that memo becomes a publicly accessible document. Under the Act, "the agency's legal counsel must submit a memorandum which complies with the requirements of Section 11126(e)(2)(C)(ii) prior to the closed session. This

document is confidential until the pending litigation has been finally adjudicated or otherwise settled.

There was never any discussion of the Board budget nor was a budget ever approved while I was on the Board. I was told by the Executive Officer in December that "the Board is working on the budget" apparently meaning his civil service staff. Also in December I was told by him that the names of three potential deputy commissioners (civil service employees) were run through the Governor's office prior to any hiring decision being made. I am not mentioning their names out of respect for the three individuals involved. Two were hired and one was not. Why is the Governor's office involved in civil service hiring outside his office?

The scheduling of the Commissioners at the various institutions is a process without input from the individuals involved and appears to me to benefit certain Commissioners while punishing others. In a semi-mutiny all the Board members agreed that the scheduling needed to be addressed along with some other housekeeping issues. This was presented to the Board Chair following a closed session in December. He tried to say the issues could not be discussed because of the Bagley-Keene Act. This made it clear to me that he had, just like the legal staff, no understanding of the Act or its purpose. Needless to say the scheduling was not improved. I was told I could not be scheduled at the prisons near my home because it was not fair to the Commissioners who lived far away from prisons. Repeatedly I was told that everyone had to travel three to four hours. Other Commissioners were, however, routinely scheduled at prisons near their homes.

Many times hearings had to be canceled because of disease at the institutions. These diseases included norovirus, tuberculosis, chicken pox and the flu. I am not the only Commissioner to have contracted the flu and norovirus. I have canceled hearings of prisoners who were vomiting in the holding cells while waiting to have their hearings and taken flak for the postponements.

At one facility the Commissioner was told by CDCR staff that even though six of the inmates were in quarantine the hearings should go forward and the Commissioner and Deputy Commissioner could wear masks. The Commissioner and Deputy Commissioner refused to hold the hearings under those circumstances. Clearly if the inmate is too ill to stand up there are due process considerations being violated.

Another problem related to this is that under Penal Code section 5080 the Board can ask CDCR to move a prisoner because of health reasons. I had a case where the inmate absolutely needed to be moved to a facility where he could have mental health treatment and medical intervention. I cited this section in the postponement of his hearing. Under that code section CDCR must report to BPH within 30 days why he cannot be moved for the medical treatment or move him. In this particular case he was not moved and did not receive the medical attention and CDCR gave no reason.

The Commissioner who followed me ignored these serious considerations and denied the parole for 5 years without addressing the medical issues.

At an open- to- the-public training session in December, I asked our legal staff about the application of this code section. The reply from the attorney training us was that she was still getting up to speed and would get back to me. She never did.

In that same training we were repeatedly told "the Board wants it done this way" or the Board wants you to do this". I finally raised the point that we **were** the Board and we had given no such direction and I questioned who had. There was no answer. The Chair, however, did go to two other Commissioners (both women) and tell them to please let me know to stop asking questions in open session. I find it incredible first, that he would say that and second, that he could not he could not talk to me himself.

All the Commissioners have many similar stories about problems with CDCR but problems with CDCR are never addressed at the Board or at the Senate Rules Committee.

The Commissioners have become merely hearing officers. At most state Boards the trial level is conducted by administrative law judges and/or hearing officers and appeals are taken by the Board itself. At the BPH the Commissioners are the hearing officers and while I was on the Board there was no appeals process. It had been removed following some court action indicating it was a problem because no appeal was ever granted.

I understand the appeals process is being reinstituted. How do you do that after a court has told you to stop? This implementation of the appeals process was not done at the behest of the Board. The Board never discussed it nor voted on it.

The agenda is put together by staff but the Board members are never asked if they have items for the agenda. Items on the agenda include cases where there was a split decision between the Deputy Commissioner and the Commissioner and referrals of non murder cases from the Governor for en banc review of a panel decision. These are the only Board meetings I have ever been to where no one on the Board says anything except the Chair who is running the meeting. Board business is rarely ever addressed by the members of the Board.

The problem of untimely psychological evaluations was to end when the Board took over responsibility from CDCR for preparation of the reports. It has not changed. At some institutions it appears the union of psychologists has instigated a work slow down or stoppage by not preparing the reports timely. This causes legitimate reasons for inmates to request postponements and Commissioners are told by their legal staff to do the hearings anyway.

Add to all of this the track record of CDCR in every other area. Across the Board headline after headline shows it is the same response as stated in a report from

the State Bureau of Audits in follow-up to an audit done in 2005 to see if there had been any changes. In the March 27, 2007 letter from state auditor Elaine Howle to the Governor and legislative leaders it was stated that there was still a lack of validity in the projections of the prison population. This report, titled "Department of Corrections: It needs to better ensure against conflicts of interest and to improve its inmate population projections (2005-105)" was also copied to every member of the legislature.

It seems that nearly every week we in Sacramento read about CDCR not cooperating with a court or a special master related to conditions at the prisons whether it is health, overcrowding or some other area. I believe it is time to look at how badly CDCR has compromised the Parole process as well.

Let me be perfectly clear. I understand the need for public safety. It is paramount. I say that from the shoes of the victim's next of kin. My father and stepmother were murdered and I have worked for many years in the state where that occurred to ensure due process for victims and their families. I also believe that while protecting due process for victims we cannot throw out due process for the inmates. As an attorney, I understand the significance of due process and believe that it is the very foundation of our way of life in this country.

Due process should not be tossed aside because there is a backlog of hearings. The Governor should appoint the twelfth member of the Board- this was not done the entire time I was on the Board. Prior Commissioners should be recruited to come back for a limited period to take care of the backlog, but hearings should not be crammed down the throats of inmates who are ill, have not had an opportunity to appeal a serious discipline accusation or who have a habeas case at the appellate level or need time to meet with counsel. Postponements and continuances should not be allowed for the purpose of choosing a specific Commissioner or manipulating the process but legitimate reasons should not be ignored.

I would be fine with a law that stated convicted murderers shall never be released from prison. But that is not the law we have. The law states that when these life inmates come up for parole they are to be paroled unless it would be a public safety problem. The burden is on the state to show there is a public safety issue. Either follow this or change the law.

The legal staff should be trained in the Bagley-Keene Act and should be responsive to questions from Commissioners and cite authority for their opinions, all the while understanding the Board is their client, not CDCR. CDCR should also understand that the Board is the client. The legal staff should also understand that they merely advise the Board and the Board makes the decisions.

But most important, for the Board to actually function, there must be openness about who is doing what and at whose direction and if that cannot occur under

the present structure the Board should be removed from CDCR and allowed to hire its own Executive Officer and legal staff.

# EXHIBIT ___

2 of 6

Harris-Ritter Exposé

# Parole Board Crisis

"Protecting the rights of victims through positive actions"

Contact Information

(916) 273-3603 phone (888) 235-7067 toll free/fax

1809 S Street, Suite 101316, Sacramento, CA 95814

email us at - information@doristate.com

website last updated June 26, 2007

According to the Governor's Office - Since Governor Schwarzenegger took office on November 17, 2003 to date (June 2007), the Board of Parole Hearings (the commissioners appointed by Governor Schwarzenegger) have granted release dates to 751 inmates sentenced to life prison.

This is two-hundred and one (201) more grants given under the Schwarzenegger administration, than over the previous 14 years under two different Governors.

Of these life inmates released - over a dozen have violated their parole! These violations include possession of weapons, being at large (not checking in with their parole officer), traveling in and out of state, assaults on children and of course..drugs.

During the past two administrations, Governor Wilson, and then Governor Davis, took the issue of Public Safety very seriously. Under their leadership, appointees to the parole board were tough on crime and most had law enforcement backgrounds.

The current composition of the board is shifting to that of individuals whose professional background does not include law enforcement. The Senate Rules Committee, Chaired by Senator Don Perata, has called a moratorium on confirmations for any individual **with** law enforcement background appointed as a Parole Board Commissioner. They are looking for Commissioners with social work, clergy, and it was just suggested in a recent confirmation hearing, farming background.

It appeares that Governor **Schwarzenegger** has given in to the demands of the Senate Rules Committee, appointing Parole Commissioners who are under-qualified and more concerned about keeping their jobs than keeping the citizens of the state of California safe. Below are the number of inmates sentenced to life with the *possibility* of parole that have been released by Governor Schwarzenegger as well as the number of grants given by each commissioner currently seated on the Parole Board - All appointed by Governor Schwarzenegger.

Since taking office on November 17, 2003, Governor **Schwarzenegger** has allowed parole to go forward on **159** violent criminals sentenced to life with the possibility of parole.

Of **18** grants in 2003, he allowed **6** to parole.

In 2004 of **207** grants, he allowed **72** to parole. After "we are disappointed in you" commercials and pending elections, things change.

In 2005 of **179** grants, he allowed parole for **35**.

In 2006 of **205** grants, he has allowed parole to **25**.

So far this year (2007), the Governor has allowed the release of **21** life sentenced inmates. Though we hear that he is toughening up

and letting fewer lifer inmates out of prison - the proof is in the numbers. 21 life inmates released as of June 2007 - and the month is not over yet.

**By comparison,**

Governor Davis allowed parole for **8** out of **370** total grants sent to him by the Parole Board during his term in office.

Governor Wilson allowed parole for **132** out of **180** total grants sent to him by the Parole Board during his term of office (8 years).

---

## The Governor Has Appointed a Dangerous Parole Board

Here are the numbers of releases granted per Commissioner for 2007 - remember, these people were sentenced to life with the *possibility* of parole. We believe that the Governor is beginning to appoint Commissioners that put the public's safety above the needs of the inmate - time will tell. Commissioner A. Stanley Kubochi who was appointed in January 2007, Commissioners Prizmich and Woods were both appointed in March 2007.

| Commissioner | January | February | March | April | May | Total | Total Months on Board 2007 | Monthly Grant Average |
|---|---|---|---|---|---|---|---|---|
| Inglee | 0 | 1 | 1 | 4 | 3 | 9 | 4 | 2.25 |
| Bryson | 0 | 1 | 5 | 0 | 0 | 6 | 4 | 1.5 |
| Garner | 1 | 1 | 1 | 1 | 0 | 4 | 4 | 1 |
| Davis | 0 | 0 | 1 | 0 | 1 | 2 | 4 | 0.5 |
| Biggers | 1 | 1 | 1 | 0 | 1 | 4 | 4 | 1 |
| Shelton | 4 | 0 | 0 | 0 | 1 | 5 | 4 | 1.25 |
| Kubochi | 0 | 0 | 1 | 1 | 0 | 2 | 4 | 0.5 |
| Martinez | 0 | 2 | 2 | 0 | 0 | 5 | 4 | 1.25 |
| Eng | 0 | 1 | 1 | 2 | 1 | 5 | 4 | 1.25 |
| Prizmich | | | | | 1 | 1 | 1 | 1 |
| Woods | | | | | 3 | 3 | 1 | 3 |
| Total Grants | 6 | 7 | 13 | 8 | 11 | 46 | | |

We will update the above information monthly.

Numbers do not tell the whole story in this chart. As you look at the chart below you will notice that some Commissioners have low grant numbers, however, the caliber of criminal that they are deeming appropriate for release into society is more than questionable. Some of the inmates that have received grants are not suitable for release and cause a serious threat to society. A concern with granting release to inmates that are not suitable for release is that the Governor must then overturn the Parole Commissioner's decision. By doing this, the Commissioner, forcing the Governor to do their job for them, has now made it possible for the courts to intervene. It is common practice when a decision is overturned that an inmate attorney will file an appeal to reverse the Governor's decision. If they find a judge sympathetic to their case, the judge will force the state to release the inmate. This is why we are seeing so many court cases where the courts are ruling that inmates be released from prison.

There is also concern regarding the integrity of the Commissioners. A significant decline in grant numbers does not necessarily indicate a change in philosophy for a Commissioner.

## 2006 Commissioner Grant Numbers

Biggers began hearing cases in February of 2006. Davis did not begin to hear cases until March 2006. Williams began hearing cases in May of 2006. Shelton began hearing cases in April 2006. Martinez began hearing cases in July of 2006. Harris-Ritter did not begin to hear cases until August 2006.

Total #

| Commissioner | January | February | March | [illegible]ril | May | June | July | August | Sept | October | Nov | December | split/fav | Total | Mo | Mo Avg |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Inglee | 1 | 2 | 3 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 0 | 1 | | 14 | 12 | 1.17 |
| Bryson | 2 | 2 | 1 | 3 | 3 | 0 | 1 | 6 | 5 | 3 | 6 | 3 | | 35 | 12 | 2.9 |
| Garner | 5 | 0 | 8 | 2 | 4 | 2 | 4 | 2 | 0 | 4 | 1 | 1 | | 33 | 12 | 2.75 |
| Davis | | | 0 | 2 | 0 | 1 | 0 | 1 | 1 | 5 | 1 | 1 | | 12 | 10 | 1 |
| Williams | | | | | 1 | 0 | 2 | 6 | 2 | 6 | 2 | 6 | | 25 | 8 | 3.13 |
| Biggers | | 0 | 0 | 0 | 2 | 1 | 2 | 5 | 5 | 1 | 1 | 0 | | 17 | 11 | 1.5 |
| Shelton | | | | 0 | 3 | 2 | 3 | 1 | 0 | 1 | 1 | 1 | | 12 | 9 | 1.3 |
| **Harris-Ritter | | | | | | | | 4 | 1 | 6 | 1 | 1 | 2 | 12 | 5 | 2.4 |
| Martinez | | | | | | | 0 | 0 | 1 | 2 | 3 | 0 | | 6 | 6 | 1 |
| Eng | | | | | | | | | | 0 | 0 | 1 | | 1 | 3 | 0.3 |
| Poncabare | | | | | | | | | | | 0 | 0 | | 0 | 2 | 0 |

**Amongst the bad news we have been reporting in regards to the Parole Board, there is good news for victims! Recently appointed BPH Commissioner, Bilenda Harris-Ritter has resigned her position at the Parole Board effective January 19, 2007. Harris-Ritter, who we were told was a victim-advocate in Arkansas before coming to California, voted to grant parole to **fourteen** life inmates who appeared before her during her first three months as a Commissioner. In two of those cases, the Deputy Commissioner on the panel refused to agree with her, causing the decisions to be tied. Of those fourteen, **five were convicted of first degree murder, four second degree murder, two attempted first degree murder** and **three were convicted of kidnap.** She also voted, during closed meetings of the BPH Commissioners, to uphold the grant of release in 17 cases that had been returned to the board for a second look by Governor Schwarzenegger.

Here is a killer that Harris-Ritter found suitable to be released from prison:

**9/06 Thomas McCoy**

Mc Coy was convicted of First Degree Murder of 72-year-old security guard, Rufus Elliott. The murder was committed during the course of attempting to rob Mr. Elliott of his gun, and, in fact the gun that McCoy used in the murder had been taken in a previous robbery of another security guard. Elliott was shot several times.

In this particular case, the Deputy Commissioner serving on the panel with Harris-Ritter voted against parole, causing a tie-vote.

On November 21, 2006 this case was heard en banc before the entire Parole Board. All members of the Parole Board, except for Ms. Harris-Ritter, voted to deny parole for 1 year. Mr. Mc Coy is still in prison.

We are very pleased with Ms. Harris-Ritter's decision to resign from the Parole Board. The DTCVB believes that this was the right decision for victims and for public safety.

Click here to see the monthly en banc decisions by the Parole Board

## Your letters are important and your voices are being heard - please continue to write!

We are asking you to help us to stop this threat to public safety. We urge you, your family and friends, to write letters to the Governor to re-instate a "tough on crime" Board of Parole Hearings (Parole Board) and to only appoint new commissioners with strong "tough on crime" views and a seriousness in protecting public safety.

We urge you to send your letters in now, time is of the essence. Several Commissioner's terms are ending July 1, 2007. The Governor has 60 days from their term expiration date to decide if he will or will not reappoint them to the Board. This means that the current seated Commissioners whose terms expire can be removed and replaced with "tough on crime" Commissioners.

Please send your letter to ·

Governor Arnold Schwarzenegger
State Capitol Building
Sacramento, CA 95814

Or fax your letter to the number below

**Fax: 916-445-4633**

**Attn: Governor Schwarzenegger**

To ensure that your letter does not get misplaced at the Capitol, please also copy a letter to the Doris Tate Crime Victims Bureau. You may fax it to 888-235-7067, email it to information@doristate.com or mail it to the address listed above. If you need more information, please feel free to call us.

For information on recently confirmed Commissioners - click here

Here are just a few of the killers released by Governor Schwarzenegger:

**Luis Frias** (1st degree murder) In October 1977, 18-year-old Frias brutally attacked 78-year-old San Francisco resident Gertrude Roberts to steal her purse. The attack on the elderly victim knocked her out of her shoes. Frias kicked her in the head to quiet her once she was on the ground. He later characterized this act as "merciful...[doing] her a favor by killing her." Frias wanted money for gas and got $14 out of Ms. Roberts' purse.

**Dennis Riney** (1st degree murder ) In March 1973 in LA, he murdered a liquor store clerk during a robbery. He was arrested on suspicion of 11 counts of armed robbery and while in jail was charged with first degree murder of the clerk. Riney had escaped from a Colorado state prison before coming to Los Angeles.

**Randy Mendoza** (1st degree murder) On November 11, 1973 at the age of 18, Mendoza and a crime partner robbed and murdered Dan Montgomery who was a liquor store clerk in Fresno. Police found Montgomery in a stockroom. He was stabbed 5 times while lying incapacitated on the floor after being hit on the head with a bottle by Mendoza. Governor Davis reversed a grant in 2003 noting that the degree of violence and viciousness in the murder is exceptionally heinous and the motive was trivial. Montgomery was killed in the course of a planned robbery to get beer for a party. After hitting him on the head, Mendoza stole Montgomery's gold watch as he lay on the floor dying from stab wounds.

**Rocky LaBoa** (1st degree murder) On November 23, 1980 in Kern County, LaBoa with three crime partners robbed and killed Juan Morones after breaking into his home. The stole about 20 dollars from the unarmed victim who was shot in the face. At the time of the murder, LaBoa was on parole for a burglary conviction. Governor Davis reversed his parole grant in 2003 citing that he demonstrated a callous indifference to the lives and suffering of others in that he planned and participated in a home invasion robbery "for the thrill of it".

**Richard Rael** (2nd degree murder) On August 26, 1980, Rael and two crime partners robbed two hitchhikers they picked up from an A's baseball game. The trio beat and stabbed both men, killing one and leave the second to bleed to death in the street. Both victims were college honor students. One of the victims was found by a passerby. Police say this is the only thing that saved him from dying.

# EXHIBIT ___

3 of 6

Harris-Ritter Exposé



Please click here to return to the previous page.

# Press Release

OFFICE OF THE GOVERNOR

GAAS:264:06
FOR IMMEDIATE RELEASE
04/24/2006

## Gov. Schwarzenegger Creates Crime Victim Advocate to Help Families, Enhance Services

*For more information, please visit the new website www.SupportingCrimeVictims.com*

Governor's Remarks

By executive order, Governor Schwarzenegger today created the new position of Crime Victim Advocate (CVA) to be appointed to serve within the Governor's Office. This position will serve as California's lead advocate on state and federal policy impacting crime victims.

Play Video ▶

"Locking up criminals and putting cops on the streets to prevent crime is critical. But, we need to do more for the victims of crime," said Governor Schwarzenegger. "Crime victims in California need an advocate who will fight for their rights and enhance victim services throughout the many programs in state and local government. The Crime Victim Advocate will collaborate with law enforcement officials, state programs and other organizations to ensure that California crime victims have access to all the available resources and are getting everything they need to get through a very difficult period."

Once appointed, the CVA will review all state victim service programs to identify the needs of crime victims and propose ways to enhance services and eliminate duplication of administering and overseeing grants and contracts to local victim servicing organizations. The CVA will be required to provide recommendations on streamlining victims' services to the Governor within 150 days of being appointed.

The mission of the CVA includes coordination between state, local victim servicing organizations and other key stakeholders.

The CVA will seek input from state victim service programs, law enforcement, district attorneys, parole agents, probation officers, the courts, crime victim groups, and local victim servicing organizations in preparing short and long term strategic planning.

Currently, there is no statewide entity responsible for advocating on behalf of crime victims and for ensuring their rights are protected throughout the criminal justice process. Oversight of victim services funding and service delivery for crime victim programs is spread across four Cabinet-level agencies, the Governor's office, three other constitutional offices, and at least 10 different departments.

The Governor has been a strong advocate for crime victims. Among legislation he signed in 2005, he expanded the types of crimes eligible for reimbursement by the Victim Compensation Fund. He also signed legislation that required estate representatives to notify the Victims Compensation and Government Claims Board when inmates inherit money, and authorized judges to require that funds confiscated at the time of arrest be applied to restitution, unless they are required for spousal or child support.

Joining the Governor today in support of his announcement of the Crime Victim Advocate were state and local officials

and representatives of crime victim groups including:

- Susan Fisher, Chair, Board of Parole Hearings
- Collene and Gary Campbell, MOVE
- Harriet Salamo, Crime Victims United
- Chris Ward, Doris Tate Crime Victim Bureau
- Kim Petersen, Sund Carrington Foundation
- Paula Birdsong, California Executive Director, MADD

- Jim Nielsen, former state senator
- Steve Krull, Livermore Police Chief, and President, California Police Chiefs' Association
- Jerry Powers, Stanislaus County Chief Probation Officer, and President, Chief Probation Officers Associat California
- Sheriff Curtis Hill, San Benito County, Treasurer, California Sheriffs' Association
- Gary Lieberstein, Napa County District Attorney, California District Attorneys Association
- Jonathan Raven, Attorney General's Office of Victim Services
- Jennifer Shaffer, CDCR Office of Victim Services
- Scott Frizzie, Deputy Director, Law Enforcement and Victim Services Division, Office of Emergency Servic
- Karen McGagin, Executive Officer, Victims Compensation and Government Claims Board
- Suzanne Brown-McBride, Executive Director, California Coalition Against Sexual Assault
- Cindy Marie Absey, President, Victim-Witness Coordinating Council
- Marivic Mabanag, Executive Director, CA Partnership to End Domestic Violence

Back to Top of Page

**Please click here to return to the previous page.**



**Crime Victim Advocate Susan Fisher, right, with VCGCB Executive Officer Karen McGagin.**

# Advisory Committee Hears from Governor's Victim Advocate, Corrections

Governor Schwarzenegger's Crime Victim Advocate and a parole officer from the California Department of Corrections and Rehabilitation addressed members of the Victim Compensation Program Advisory Committee at its September quarterly meeting.

Susan Fisher, who was appointed in June by the Governor as California's first Crime Victim Advocate, shared her background as Executive Director of the Doris Tate Crime Victims Bureau, Chair of the Board of Parole Hearings and Commissioner on the Board of Prison Terms. She discussed her goals, saying she wants to be not simply a liaison but an active advocate who can raise the visibility of victims and the issues they face.

The Advisory Committee also heard from a parole officer who described the success of a two-year pilot project to track high-risk sex offenders with Global Positioning Satellite technology. The ankle tracking bracelets worn by parolees allow parole officers to continually monitor their whereabouts. The technology sends notification signals to the parole officer whenever parolees travel near park playgrounds, schools, a victim's residence, or any other location where they should not be present. On September 20th, the Governor signed legislation making the program permanent.

In addition to hearing the two presentations, the Advisory Committee received updates from member organizations and discussed the challenges of obtaining restitution orders. The Advisory Committee's next meeting is scheduled for December 6.

***Susan Fisher wants to be an active advocate who can raise the visibility of victims.***

 Office of the Governor    ARNOLD SCHWARZENEGGER
THE PEOPLE'S GOVERNOR

# PRESS RELEASE

06/27/2006  GAAS:409:06  FOR IMMEDIATE RELEASE

## Gov. Schwarzenegger Sponsors Crime Victims Bill of Rights and Announces New Crime Victim Advocate

Governor Schwarzenegger today took three aggressive steps to continue building on his commitment to public safety in California. Addressing local officials at the Alameda County Family Justice Center, the Governor announced that he is sponsoring the Crime Victims Bill of Rights, he has appointed Susan Fisher to fill the newly created position of Crime Victim Advocate, and he is expediting a program to track dangerous criminals using GPS.

"Being a victim of crime is a life-altering experience and I know that victims face challenges and hardships most of us cannot even imagine," said Governor Schwarzenegger. "Too often, we focus on just locking up the criminals and putting them behind bars, or putting more cops on the streets. But there's one very important part of the equation that is too often neglected and is missing, and those are the crime victims and their families."

The Crime Victims Bill of Rights is a comprehensive legislative proposal authored by Assemblymember Nicole Parra, (D-Hanford), to help crime victims overcome the hardships caused by criminal acts. This legislation will build upon the efforts of Senator Feinstein (D-CA) and Senator Kyl (R-AZ), who introduced a similar constitutional amendment at the federal level, by creating a strong set of rights for victims in our State Constitution. The legislation, (ACA 37) will give victims new rights, allowing them to:

- Have direct contact with the district attorney in serious, violent cases.

- Attend all public hearings and be present and heard at parole hearings.

- Receive information about their case, including sentencing and release data.

- To have a lawyer or the district attorney enforce their rights in court.

The Governor also directed the California Department of Corrections and Rehabilitation (CDCR) to place GPS monitors on 2000 offenders over the next two years instead of the originally scheduled four years, cutting the time in half.  Last year, the Governor signed the pilot program into law to better track the worst 2000 sex offenders and other criminals in California and enhance public safety.

Also announced today, Governor Schwarzenegger appointed Susan Fisher as his Crime Victim Advocate, a position created by Executive Order S-05-06 on April 24, 2006 to serve within the Governor's Office as California's lead advocate on state and federal policy impacting crime victims.

"Susan has a long history working with victim rights groups, and like many who have been touched by violent crime in their family, her experience was a call to help others," said Governor Schwarzenegger. "Now she will be the single leading advocate on state and federal policy regarding crime victims and I look forward to working with her in this new role for the people of California."

Susan L. Fisher, 53, of Sacramento, most recently served as chair of the Board of Parole Hearings. She was appointed to the Board in July 2005. Previously, she served as a commissioner on the Board of Prison Terms from January 2004 until July 2005. From 1999 to 2004 she served as executive director of the Doris Tate Crime Victims Bureau and, before that, served on the Bureau's board of directors for seven years. She also served as president of Citizens for Law and Order. This position is not subject to Senate confirmation. The compensation is $95,000.



Schwarzenegger.com

SCHWARZENEGGER.

NEWS

HOME
ARNOLD AUCTION
NEWS
SCHWARZENEGGER.COM ARCHIVE WEB SITE
GOVERNOR'S WEB SITE
AFTER-SCHOOL ALL-STARS & SPECIAL OLYMPICS
GOVERNOR'S COUNCIL

**February 26th, 2004**

**GOVERNOR SCHWARZENEGGER APPOINTS TWO MEMBERS OF THE BOARD OF PRISON TERMS**

Governor Arnold Schwarzenegger today announced the appointment of Margarita Perez as chairwoman of the Board of Prison Terms and Susan Fisher as a member of the board.

"Margarita and Susan bring a wealth of experience and knowledge of law enforcement and parole in California," said Governor Schwarzenegger. "I thank them for their willingness to serve the people of California."

Perez has 15 years of experience in Board of Prison Terms law enforcement. Since 2001 she has served as a senior investigator and parole agent in the investigations division. Perez served from 1996 to 2001 as a parole agent at the California Department of Corrections. She began her career in law enforcement as a correctional officer first at Avenal State Prison and later as a correctional sergeant at Folsom State prison. Perez is a former captain with the California Army National Guard. She served on active duty during Operation Desert Storm and volunteered for active duty following the terrorist attacks of September 11th.

Perez, 41, is a Democrat from Cameron Park, CA. She is a graduate of the University of New York with a Bachelor of Science in general business. This position requires Senate confirmation.

Fisher has more than a decade of experience working on behalf of crime victims. Since 1999 she has been the director of the Doris Tate Crime Victims Bureau. She served as a member of the board of directors of the Doris Tate Crime Victims Bureau for seven years. She has also been a member of several community crime victims' organizations including the Institute for Crime and Trauma Survivors, the San Diego County chapter of Parents of Murdered Children and since 2000 as president of Citizens for Law and Order.

Fisher, 50, is a Republican from Oceanside, CA. She is a graduate of the Pacific College of Nursing. This position requires Senate confirmation.

The Board of Prison Terms considers parole release and establishes the length and conditions of parole for all persons sentenced to the Department of Corrections under the indeterminate sentencing law and for persons sentenced to prison for a term of less than life and those serving a sentence of life without the possibility of parole.

Web Site by The Cimarron Group | Copyright © 2007 Oak Productions, Inc. FAQs

CALIFORNIA VCGCB
Victim Compensation & Government Claims Board

**Executive Officer's Statement**

**September 27, 2006**

---

**5th Anniversary Commemoration of September 11th**

Governor Schwarzenegger gave the keynote address at a ceremony commemorating the 5th anniversary of September 11th. A World Trade Center survivor from California and a New York City firefighter who worked in the hours and days after the collapse of the buildings to search for survivors also delivered moving comments on their experience at the Capitol event. Rosario Marin, Secretary, State and Consumer Services Agency, and our staff joined survivors and family members of victims from California at the event. The VCGCB hosted a follow-up session for the survivors and victim families with therapists from the U.C. San Francisco Trauma Center. The commemoration was an inspirational reminder of the horrific events that took place that day, a national tragedy that can never be forgotten.

**National Association Highlights Emerging Trends and Issues**

The National Association of Crime Victim Compensation Boards met in Seattle and held sessions on a variety of emerging compensation issues and national trends. It was an opportunity to meet with John Gillis, Director of the Office for Victims of Crime and his staff. Information about the new International Terrorism Victim Expense Reimbursement Program (ITVERP) was presented. The program is being launched on October 6, 2006 to help Americans who become victims of terrorism when they are overseas. The program is retroactive to cover terrorist events that occurred as early as 1988. The benefits of this program may be far-reaching for victims. Another emerging issue discussed at the conference is human trafficking and slavery, a growing national problem.

**Victim Compensation Program Advisory Committee Presentations**

The Governor's Victim Advocate, Susan Fisher, shared her compelling story with the Committee at its quarterly meeting this month. As the victim of a crime, Ms. Fisher brings not only expertise but also first-hand knowledge about the victim experience to her job. In addition to leading the Doris Tate Crime Victims Bureau, she chaired the Board of Prison Terms. She told the committee that her focus is to increase the visibility of crime victims and revitalize the advocacy role for the organizations that represent them. In addition, the California Department of Corrections and Rehabilitation gave a presentation about California's two-year pilot project on GPS tracking of high-risk sexual predators who are on parole. The devices track compliance and protect victims by satellite on a 24/7 basis.

**CaRES Moves Ahead**

The Victim Compensation Program Compensation and Restitution System (CaRES) is on track, with 1,000 claims entered into the system as of September 1. Most important, as of October 1st all new applications received at the VCGCB will be processed through CaRES. CaRES is being implemented in phases to avoid disrupting services to victims. Since June 30, a careful plan has been followed to implement CaRES functionality sequentially and to enter an increasing volume of new claims into the CaRES system over time.

**Family Picnic Kicks Off California State Employees Charitable Campaign**

The 2nd Annual Interagency Family Picnic promises an exciting and fun kickoff for the California State Employees Charitable Campaign. Hosted by the State and Consumer Services

Agency, the daylong event – which offers food, a softball tournament and many other family activities – is on September 29 in William Land Park. The VCGCB will be fielding a full softball team so we look forward to a great day in the park. Proceeds will be donated to the Campaign, providing momentum for this annual opportunity for employees to give to their favorite charities through payroll deductions.

**VCGCB Updates**

- The California Governor and First Lady's Conference on Women in Long Beach offered an impressive group of speakers, including Governor Schwarzenegger, First Lady Maria Shriver, and noteworthy authors, businesswomen and political pundits. Several VCGCB staff joined Secretary Marin in attending the September 26 event.

- The VCGCB participated in a number of important conferences in September, including:
  - The National Adult Protective Services Association's Elder Abuse Conference in San Francisco September 6-8.
  - The UC Davis Child Abuse and Neglect Conference in Sacramento September 11-13.
  - The Institute on Violence, Abuse and Trauma in San Diego September 14-19.

- McGeorge Law School invited the VCGCB to be an information resource for its Crime Victims Legal Clinic in Sacramento on September 18. Laura Hill, Deputy Executive Officer of the Revenue Recovery, Accounting and Government Claims Division, provided a presentation on restitution laws. She also focused on the VCGCB's partnership with counties, the California Department of Corrections and Rehabilitation, and the Franchise Tax Board to increase restitution collections.

- Restitution staff provided training about restitution laws and processes to probation and parole officers at the California Correctional Peace Officers Association conference in San Diego September 20.




**Schwarzenegger supports crime victim's Bill of Rights**

**By Jeff Shuttleworth, Bay City News Service**

**June 27, 2006**

**OAKLAND (BCN)** - Gov. Arnold Schwarzenegger said in Oakland today that he supports state legislation that would give crime victims new rights.

Accompanied by local police chiefs and several high profile crime victims, Schwarzenegger also said he has appointed **Susan** Fisher of Sacramento to the newly-created position of Crime Victim Advocate and that he is expediting a program to use global positioning systems to track dangerous criminals.

**Fisher**, 53, who attended the news conference at the Alameda County Family Justice Center, most recently served as chair of the state Board of **Parole** Hearings.

"Being a victim of crime is a life-altering experience and I know that victims face challenges and hardships most of us cannot even imagine," Schwarzenegger said.

He said he supports "The Crime Victims Bill of Rights," a comprehensive legislative proposal authored by Assemblywoman Nicole Parra, D-Hanford, to help crime victims overcome the hardships caused by criminal acts.

The legislation aims to build upon the efforts of Sen. Dianne Feinstein, D-Calif., and Sen. Jon Kyl, R-Ariz., who introduced a similar constitutional amendment at the federal level by creating a strong set of rights for victims in the state constitution.

If passed, the state legislation, ACA 37, would give victims new rights, allowing them to have direct contact with the district attorney in serious, violent cases, attend all public hearings and be present and heard at

parole hearings. Victims would also be allowed to receive information about their case, including sentencing and release data, and have a lawyer or the district attorney enforce their rights in court.

Schwarzenegger said he has directed the California Department of Corrections and Rehabilitation to place Global Positioning System monitors on 2,000 offenders over the next two years instead of the originally scheduled four years, cutting the time in half.

Last year, he signed a pilot program into law that he said will better track the worst 2,000 sex offenders and other criminals in California and enhance public safety.

Alameda County Chief Assistant District Attorney Nancy O'Malley said "today is a momentous day for the victims of crime" thanks to Schwarzenegger's advocacy for victims' rights.

Kim Petersen of the Sund/Carrington Foundation, which offers rewards to help solve crimes, said crime victims need support and resources because "they feel they have no voice and no rights."

Sharon Rocha, the mother of murder victim Laci Peterson, attended the news conference, as did Marc Klaas, the father of murder victim Polly Klaas.

Bay Area police chiefs who attended were Wayne Tucker of Oakland,

Ray Samuels of Newark, Ken James of Emeryville and Pete Dunbar of Pleasant Hill.

***Copyright © 2006 by Bay City News, Inc. -- Republication, Rebroadcast or any other Reuse without the express written consent of Bay City News, Inc. is prohibited.***

####

Ads by Google
View ads about:
»

Copyright FogCityJournal.com. All Rights Reserved.

# Capital Alliance

Building partnerships for a brighter future

January 18, 2005

The Honorable Don Perata
Member of the State Senate
State Capitol

Sacramento, CA 95814

Regarding: Confirmation of Susan Fisher, opposed

Dear Senator Perata:

On behalf of the Voters Corrections Reform Coalition, I request your opposition to confirming Susan Fisher on January 26 th . VCRC has adopted on oppose position due to Ms. Fisher's performance while on the Board. Ms. Fisher's apparent culpability in a pre-determined parole hearing, her baseless and excessive denials, and her biased decisions all make her an unsuitable Commissioner. Ms. Fisher either held a pre-determined parole hearing or at very best lacks important attention to detail. On November 16, 2004, CMC inmate Dean Stockton received a parole denial from Ms. Fisher. He knew beforehand that he would -- even the exact term -- because several hearings prior inmate Queseda was mistakenly handed Mr. Stockton's parole denial pink slip by Ms. Fisher. It is unbelievable that a Commissioner could spend more than 1 hour interviewing inmate Queseda and the details of his case, deliberate on the merits of Mr. Queseda's suitability, and then fill out "Dean Stockton" on Mr. Queseda's pink slip. Mr. Stockton was not even the next hearing; he was just another name somewhere down the list for later that day.

Determining parole suitability for rapists, murderers, and molesters requires great attention to detail. Ms. Fisher either lacks sufficient attention to detail or is guilty of holding pre-determined parole hearing. Ms. Fisher is an extremist on the Board. It stands to reason that absent some new derogatory information or adverse behavior by the inmate, some good cause to change a hearing outcome, that an inmate who had been consistently receiving 1-year denials by other Commissioners ought to soon be released or at very least continue receiving those same 1-year denials. However, even in cases where an inmate had received six prior 1-year denials, once Ms. Fisher was the presiding Commissioner she issued 4-year denials. The difference between Ms. Fisher issuing 1-year and 4-year denials was the presence of victim advocates at the hearings. Ms. Fisher is too influenced by her past and her extreme decisions clearly far outpace those of her colleagues on the Board. Prior to being a Commissioner Ms. Fisher made numerous statements in the press about how inmates ought to have no rights, including medical care, in addition to blanket statements about criminal intent for all crimes that fall within uncertain circumstances. If in fact she was truthful about her feelings in those statements to the public, then what significant event has occurred in Ms. Fisher's life between then and now to cause a change of heart? Has she

changed? She has not. As a Commissioner she began with a few tempered decisions and within only a few months fell into her previous punitive role as a responsive victims advocate instead of an objective Commissioner.

Lastly, Ms. Fisher is yet another victims advocate appointed to the Board. Thirty of the last thirty one Board of Prison Terms Commissioners, including all six of the current Commissioners, have all been either openly crime victims' advocates, law enforcement personnel, former legislators, or a combination thereof. Penal Code Â§ 5075 governs these appointment to the Board and explicitly states the intent in making such appointments is to have "a cross section of the racial, sexual, economic, and geographic features of the population of the state." To confirm Ms. Perez would only perpetuate the gross imbalance which already exists. Unless the Legislature changes the intent in that statute, then current law ought to be upheld and no further confirmations made unless they provide for a significantly diverse Board.

Sincerely,

Matt Gray
1029 K Street, Suite 25 ~ Sacramento, CA 95814-3815
Tel. 916-444-5551 ~ Fax 916-444-5553 ~ www.TheCapitalAlliance.com

THIS LETTER IS AN EXACT QUOTE REFORMATTED FROM A POSTING ON THE INTERNET, SEARCH TERMS USED: Susan Fisher, parole

# EXHIBIT ___

4 of 6

Harris-Ritter Exposé

ia WIC
urance for women, infants and children in California.

ans Software
Ads by Google

Sunday, July 1, 2007

# Perata Calls for Greater Examination of Parole Board Procedures

*California Political Desk*

June 14, 2007

(SACRAMENTO) – The forced resignation of a member of the state Board of Parole Hearings raises questions about the Board's independence and whether the Governor is committed to rehabilitation programs and giving deserving prison inmates a fair chance to earn parole, Senate President Pro Tem Don Perata (D-Oakland) said Wednesday.

In a letter to the state Senate, Board Commissioner Bilenda Harris-Ritter said she was instructed by a Governor's deputy appointment's secretary to resign earlier this year. The request came as a vocal victims' right group highlighted her votes in favor of granting parole.

"It's troubling, to say the least, that a member of the Parole Board is telling us she quit the board at the request of the administration," Perata said. "The Board is supposed to be independent, and current law gives the Governor authority to overturn its decisions.

"Stacking the Board with members who oppose releasing prisoners under almost any circumstance undercuts state rehabilitation efforts, adds to the prison system's overcrowding and allows the Governor to sidestep this critical issue without taking any political heat."

**California Political Desk**

The California Political Desk provides information, news releases, and announcements obtained from communication and public relations offices throughout the state.

author's email

author's web site

view author's other articles

**Join this author's mailing list**

Your Name:

E-mail Address:

Sign up

Ads by Google CSLB CA Gov CA Labor Law CA Lawyers CA Company

California State Law
Quickly Find California Law Info & Resources in Our Online Directory.
www.business.com

Soc. Security Disability
Free Disability Evaluation. Get Immediate Help Now.
www.binderandbinder.com

Calif. Health Insurance
Only $119.95/mo $35 Doctor Consults Hospitals, $10 Drugs, Dental-Vision
GoodHealthPlan.com

California Real Estate
Exam questions and answers online prep. Instant access! Free bonus.
UnitedRealEstateMedia.com

Ads by Google

Perata put over John Monday, the Parole Board's executive officer, to a later hearing pending more information on parole revocations. Monday appeared at Wednesday's Rules hearing and must be confirmed by the Senate by the end of August to remain on the job.

The Rules Committee approved Parole Board appointees Janice Eng and Ed Martinez on a 4-0 vote.

# EXHIBIT ___

5 of 6

Harris-Ritter Exposé



Senator Don Perata
CALIFORNIA STATE SENATE

Home
News Room
Legislation
Biography
District
Newsletters
Photo Gallery
Calendar
Contact Me
Violence Prevention Initiative
Health Care
Vote Us Out

SEARCH

GO
Full Site
This Section

Search Tips

**Perata Calls for Greater Examination of Parole Board Procedures, Questions Administration's Commitment to Rehabilitating Prisoners**

*Wednesday, June 13, 2007*

FOR IMMEDIATE RELEASE:
Contact: Alicia Trost
(916) 651-4188

(SACRAMENTO) – The forced resignation of a member of the state Board of Parole Hearings raises questions about the Board's independence and whether the Governor is committed to rehabilitation programs and giving deserving prison inmates a fair chance to earn parole, Senate President Pro Tem Don Perata (D-Oakland) said Wednesday.

In a letter to the state Senate, Board Commissioner Bilenda Harris-Ritter said she was instructed by a Governor's deputy appointment's secretary to resign earlier this year. The request came as a vocal victims' right group highlighted her votes in favor of granting parole.

"It's troubling, to say the least, that a member of the Parole Board is telling us she quit the board at the request of the administration," Perata said. "The Board is supposed to be independent, and current law gives the Governor authority to overturn its decisions.

"Stacking the Board with members who oppose releasing prisoners under almost any circumstance undercuts state rehabilitation efforts, adds to the prison system's overcrowding and allows the Governor to sidestep this critical issue without taking any political heat."

Perata put over John Monday, the Parole Board's executive officer, to a later hearing pending more information on parole revocations. Monday appeared at Wednesday's Rules hearing and must be confirmed by the Senate by the end of August to remain on the job.

The Rules Committee approved Parole Board appointees Janice Eng and Ed Martinez on a 4-0 vote.

# # #

Privacy Policy Accessibility Statement

Home | News Room | Legislation | Biography | District | Newsletters | Photo Gallery | Calendar | Contact Me | Violence Prevention Initiative | Health Care | Vote Us Out

powered by Avenet.net

Wednesday, June 13, 2007

FOR IMMEDIATE RELEASE:
Contact: Alicia Trost
(916) 651-4188

ention

(SACRAMENTO) – The forced resignation of a member of the state Board of Parole Hearings raises questions about the Board's independence and whether the Governor is committed to rehabilitation programs and giving deserving prison inmates a fair chance to earn parole, Senate President Pro Tem Don Perata (D-Oakland) said Wednesday.

In a letter to the state Senate, Board Commissioner Bilenda Harris-Ritter said she was instructed by a Governor's deputy appointment's secretary to resign earlier this year. The request came as a vocal victims' right group highlighted her votes in favor of granting parole.

GO

"It's troubling, to say the least, that a member of the Parole Board is telling us she quit the board at the request of the administration," Perata said. "The Board is supposed to be independent, and current law gives the Governor authority to overturn its decisions.

"Stacking the Board with members who oppose releasing prisoners under almost any circumstance undercuts state rehabilitation efforts, adds to the prison system's overcrowding and allows the Governor to sidestep this critical issue without taking any political heat."

Perata put over John Monday, the Parole Board's executive officer, to a later hearing pending more information on parole revocations. Monday appeared at Wednesday's Rules hearing and must be confirmed by the Senate by the end of August to remain on the job.

The Rules Committee approved Parole Board appointees Janice Eng and Ed Martinez on a 4-0 vote.

# # #

**Privacy Policy** | **Accessibility Statement**

ı | Legislation | Biography | District | Newsletters | Photo Gallery | Calendar | Contact Me | Violence Prevention Initiative | Health Care | Vote Us Out

powered by Avenet.net

# EXHIBIT ___

6 of 6

Harris-Ritter Exposé

# Parole board members feel pressure

### Those asked to resign deny that they're soft on crime

By JULIA REYNOLDS
Herald Staff Writer
Monterey County Herald

Article Last Updated:10/09/2007 09:16:49 PM PDT

"In 1981, my father and stepmother were murdered," Bilenda Harris-Ritter said matter-of-factly. She took a break from work, and was sitting in the noisy lobby of a Sacramento office building.

"It was an extraordinarily horrific thing to go through for my family, and we will never truly be over it," she said.

That's why she was shocked to be labeled soft on criminals in California.

Harris-Ritter said she feels she is a casualty in a battle over parole that this year is playing out in the state's courts.

For years, she worked to protect victims' rights in her home state of Arkansas before moving to Sacramento.

Last year, Gov. Arnold Schwarzenegger appointed her to the state's Board of Parole Hearings. A lawyer and a member of the California Bar Association, Harris-Ritter was thrilled. She said she would bring a crime victim's sensitivity and an attorney's respect for due process to the job.

But she'd only been a parole commissioner for a few months before a governor's aide called. Alberto Roldan, deputy appointments secretary in Schwarzenegger's office, told her the governor would like her resignation from the board.

"I said, 'Why, what have I done?' And his response was that I hadn't done anything, just the governor wanted to go in a different direction," she said.

Harris-Ritter said she was stunned.

"He said, 'You're forbidden,' that was the specific word he used — 'you're forbidden to tell anyone about this phone call, you're forbidden to attend the board meeting next week, and we need to know if you're going to resign or be terminated.'"

Given that ultimatum, Harris-Ritter felt she had no choice but to resign. But she said she never agreed to keep quiet.

Schwarzenegger's office confirmed last week that the governor asked Harris-Ritter to resign, but declined to give a reason.

She tried to figure out the reason she was let go, and the only thing that made sense, she said, was that a few months earlier she'd seen a Web site criticizing her for granting "too many" paroles to prisoners with life sentences.

In the six months she served, Harris-Ritter says she gave only 12 parole grants out of approximately 300 life cases — about four percent.

"I didn't find a public safety reason not to grant them parole and so I followed the law and I granted it," she said.

To the Doris Tate Crime Victims Bureau, 12 was far too many.

"We were concerned with her performance on the board," said Christine Ward, executive director of the nonprofit group that had posted the criticism.

Although Ward said the group doesn't oppose parole in principle for all lifers, the exceptions are few and very far between.



"Her numbers were extraordinarily high," Ward said. "And that concerned us."

Harris-Ritter said that surprised her.

"There was a lot ... on this particular victims' group Web site that people should write to the governor and demand that this liberal parole board be removed," she said. "I've never been called liberal in my life."

A lifelong Republican, Harris-Ritter said she is especially conservative when it comes to public safety.

"I am not someone who would be considered pro-parole," she said. "I am pro-due process. I believe that we need to follow and implement the laws that we have appropriately, and if we don't like the law, then we need to make concerted efforts to change it."

Mike Reynolds, known as the "godfather of Three Strikes" for the tougher sentencing law he pushed through in 1994, would agree on that last point.

At a rally last month outside the two state prisons in Soledad, he said life without parole or the death penalty for murderers would be far more fitting than expecting victims' families to endure the pain of attending parole hearings every two to five years, usually at their own expense.

Harriet Salarno, chairwoman of the advocacy group Crime Victims United of California, also attended the rally and criticized Schwarzenegger for allowing some convicted murderers to be paroled.

"It's shameful that victims and their families are re-victimized by his parole policies," Salarno said.

The rally was held to lend moral support to a mother who that afternoon attended the fourth parole hearing of her daughter's killer at the Correctional Training Facility.

While that man was once more denied, he is scheduled to come back before the board in four years.

Others asked to leave|

Harris-Ritter is not the only parole board member who was asked to leave her post. Tracey St. Julien, also of Sacramento, blames politics for her dismissal.

Appointed by Schwarzenegger in July 2005, St. Julien served on the board and was a few weeks away from her official Senate confirmation. But before that could happen, she was asked to step down.

The reason, she said, was that between hearings at the Correctional Training Facility in Soledad a conferencing microphone was accidentally left on.

Some district attorneys overheard her casually telling an inmate's lawyer she "loved" giving parole grants. Riverside County prosecutors complained about it in a letter to the board's executive director, while a state group of district attorneys wrote to the governor, St. Julien said.

St. Julien, who said she gave very few grants, defends her eavesdropped statement.

"You're dealing with murder," she said. "And if there is any glimmer of hope and humanity ... then yes, I love that. It didn't happen a lot, but when it happened it was a good feeling. So I made that statement and I would say it again. But apparently it was very unpalatable during the election cycle."

Harris-Ritter wrote a letter about her own dismissal to the state Senate Rules Committee last spring.

Around that time, Sen. Jeff Denham, R-Merced, had sent out a news release criticizing the "early release of inmates" under the SchwarzeneggerÐappointed board. Harris-Ritter says that phrase is inaccurate.

"I wanted to point out to the members of Rules that when someone gets a parole date and is paroled, it's not 'early release,'" she said. "That's the way the law is written — when you come up for your parole date, you shall be paroled unless there's a public safety issue that would trump that and would overrule it."

That's a point that a Santa Clara County judge took to heart recently when she issued a strongly worded ruling aimed at overhauling the Board of Parole Hearings.

"Something is certainly wrong" with the parole board, Superior Court Judge Linda Condron wrote when she ordered the "malfunctioning" board to come up with clear criteria for denying parole to lifer inmates.

In all of nearly 3,000 cases reviewed by the court, the board's reasons for denying parole to convicted murderers, Condron said, are "vague and all inclusive and thus truly meaningless."

Condron found that the board was ignoring previous Supreme Court rulings in which the board was found at fault for using overly-broad interpretations of the nature of the original offense for denying parole.

Several federal courts have held that unless public safety can be shown to be at specific risk, lifer inmates should be allowed to be paroled when their minimum release date comes up — for example, after 25 years on a 25-to-life sentence.

The problem came when the board, in every one of the thousands of cases examined by Condron's court, cited "the nature of the crime" as its reason for denying parole, calling each murder "especially heinous, atrocious or cruel."

"The board has continued to deny countless paroles, labeling the crime 'callous' without ever suggesting what crime would not qualify as 'callous,'" Condron wrote.

Such terms are "unconstitutionally vague," the judge ruled. Other states, she wrote, have come up with much more specific language to distinguish between parole-eligible crimes and those that truly represent a danger to public safety.

"The system is malfunctioning and must be repaired," she wrote in the Aug. 30 ruling. "The board must make efforts to comply with due process."

Harris-Ritter said she also had a hard time interpreting the board's criteria when she served as a commissioner.

"It is really a subjective thing whether the crime is horrible enough to fit the criteria," she said. "They're just saying every single case is horrific and that's not possible."

Gov. Schwarzenegger has used the same criteria when he overruled many of the rare board decisions in favor of parole, something he's done hundreds of times since he took office.

"It's my personal opinion that it's overused by the governor's office, but I also feel that if you're the victim, or your next of kin is the victim of a crime, it doesn't matter what the circumstances are. It's horrific to you," Harris-Ritter said. "That's a really tough place the court has put people in, making a decision about 'Well, this was a really horrible crime and this was just a regular murder.'"

An appeals court is reviewing Condron's order to the Board of Parole Hearings to come up with clearer definitions and better training within 90 days. The state Attorney General's Office is scheduled to present its opening brief Nov. 13.

If upheld, Condron's ruling could mean that many of the 3,000 lifers who come up for review each year might seek new hearings.

Meanwhile, the Senate Rules Committee, headed by Senate President Pro Tem Don Perata, D-Oakland, is looking into other complaints about parole board practices.

Harris-Ritter said she is not all that confident things will change soon — not as long as politicians are calling the shots.

"It appears," she said, "that there is a lot of pressure on the governor."

Julia Reynolds can be reached a[illegible]-1187 or jreynolds@montereyherald.com.

Share your thoughts To express your views about the state's Board of Parole Hearings, contact Governor Arnold Schwarzenegger: Phone: 916-445-2841 Fax: 916-445-4633 Address: State Capitol Building Sacramento 95814

Close Window Send To Printer

Prison Talk > U.S. REGIONAL FORUMS > CALIFORNIA > California General Prison Talk
Parole Trends of Lifers!

User Name | User Name | Remember Me?
Password | Log in

Register | FAQ | Members List | Calendar | Arcade | Chat Room

**California General Prison Talk** Topics & Discussions relating to Prison & the Criminal Justice System in California that do not fit into any other California subforum.

Send money now
WESTERN UNION
westernunion.com

Make the right choice, choose Prison Calls Online today.
Is your home phone blocked for collect calls?
keeping you connected since 1996

Thread Tools | Display Modes

03-18-2004, 03:52 PM #1

Kathy
PRAY on 13th of Month

Join Date: Aug 2002
Location: California
Posts: 2,500

**Parole Trends of Lifers!**

Parole Trends of Lifers*
Gov. Davis vowed not to let out any "murderers." Here's a look at how his "no parole" policy compared with previous California governors:

From 1950 to 1966, an average of 30 lifers were paroled every year.
From 1967 to 1990, an average of 54 lifers were paroled every year.
From 1991 to 1998, an average of 5 lifers were paroled every year.
From 1999 to 2002, an average of 0.5 lifers were paroled every year.
From 1950 to 1990, over 1850 first degree lifers were paroled:
From 1950 to 1966, Governors Knight, Warren, and Brown paroled over 500 first degree lifers

From 1967 to 1990, Governors Reagan, Brown, and Dukemajin paroled over 1,300 first degree lifers
From 1991 to 2002, Governors Wilson and Davis paroled 40 first-degree lifers:
Wilson:
TOTAL LIFERS PAROLED UNDER WILSON: 39

Davis:
1999 - 00
2000 - 00
2001 - 01 (Rose Ann Parker)
2002 - 03 (Cheryl Sellers and Marla Suarez, who were released in 2003)

TOTAL LIFERS PAROLED UNDER DAVIS: 7

FROM JAN. 2002 - NOV. 2003, DAVIS REVERSED THE PAROLE RECOMMENDATIONS OF THE FOLLOWING SURVIVORS WHO KILLED THEIR BATTERERS:

In January 2002: Genevieve "Toby" Yninguez -- incarcerated since 1984 (Davis pulled her date two years in a row)
On February 15, 2002: Henrietta Briones -- incarcerated since 1986
On April 10, 2002: Valere Boyd -- incarcerated since 1986 (Davis reversed her date the same day he approved parole for Cheryl Sellers; Schwarzenegger later reversed her parole the same day he approved parole for Jeri Becker in Dec. 2003)
On August 1, 2002: Mary Ramp -- incarcerated since 1988
On August 2, 2002: Flozelle Woodmore -- incarcerated since 1987 (Davis reversed her parole again in Sept. 2003)
On August 12, 2002: Jeanette Crawford -- incarcerated since 1982
On October 18, 2002: Caroline Anderson -- incarcerated since 1982
In February 2003: Ollie Johnson -- incarcerated since 1987
In August 2003: Nora Andrade -- incarcerated since 1987 (her second reversal)

*Note: FBW does not verify the accuracy of any of the following figures

Last updated Jan. 14, 2003

You can make a difference
Volunteer your skills and time to create change in your community.
www.CityTeam.org

Volunteer Ringtone
Send this complimentary ringtone to your phone right now!
RingRingMobile.com

Volunteer work in Ecuador
Health, environment, children... Quito, Cuenca, Coast and Galapagos
www.ecuadorvolunteers.o

Destroy Your Debt Forever
Turn Your Debt Into Wealth Using Only The Income You Currently Make!
SimplyClickThisLink.com/

http://www.prisontalk.com/forums/showthread.php?t=51501 10/27/2007



Ads by Google

**ABA Accredited Law School**
Are You Smart, Talented, Ready? Apply for Spring 2008 - Today!
Law.ULV.edu

**Online Law Degree**
Free Info on 10 Month Programs Plan for your Future Today
Law.SchoolsOnline.net

**Online Law Schools**
Directory of online law schools. Request free information today.
lawonlineschool.com

Ads by Google

03-18-2004, 06:36 PM #2

JaimeeLynn
Soulmate For My Inmate

Join Date: Jul 2003
Location: Too Far Away From Mark!
Posts: 827

And good riddance, Davis!

See it in print makes me so mad all over again!

~Jaimee

Loving My Inmate!

Quote

Post Reply

« Previous Thread | Next Thread »

**Currently Active Users Viewing This Thread: 1** (0 members and 1 guests)

Posting Rules

You **may not** post new threads
You **may not** post replies
You **may not** post attachments
You **may not** edit your posts

vB code is **On**
Smilies are **On**
[IMG] code is **On**
HTML code is **Off**

**Forum Jump**
California General Prison Talk Go

**Similar Threads**

| Thread | Thread Starter | Forum | Replies | Last Post |
|---|---|---|---|---|
| Danielle - Alabama Intro | danielle | Alabama Member Introductions | 15 | 09-15-2007 12:15 AM |
| Attorney Sirak has filed the appeals | bebopp7 | Ohio News & Events | 1 | 02-25-2006 04:40 PM |
| 'Dismantling Parole' | stormierainn | New York Prison News & Events | 5 | 02-03-2006 10:40 AM |

All times are GMT -6. The time now is 01:47 PM.

Contact Us - Prison Talk - Archive - Top

Powered by vBulletin Version 3.5.4
Copyright ©2000 - 2007, Jelsoft Enterprises Ltd.
(c)2001- 2005 Prison Talk Online

Background Checks? Search over 2 Billion Public Records Now!
•People Searches •Criminal History
•Background Checks •Bankruptcies and more!
PublicRecordsNow Information Made Easy
Search Public-records-now.com
Feedback - Ads by Google

http://www.prisontalk.com/forums/showthread.php?t=51501 10/27/2007

# EXHIBIT OO

EXHIBIT OO

***In re Criscione***

**Santa Clara Superior Court No. 71614**

**Order issued August 30, 2007**

**Stay granted**

**Sixth Appellate District September 14, 2007**

CALIFORNIA APPELLATE COURTS

Case Information

Welcome

Search

E-mail

Calendar

Help

Opinions

C|C home

## 6th Appellate District

Change court

Court data last updated: 10/13/2007 09:05 PM

Case Summary Docket Scheduled Actions Briefs Disposition Parties and Attorneys Trial Court

# Docket (Register of Actions)

**The People v. Criscione**
**Case Number H032048**

| Date | Description | Notes |
|---|---|---|
| 09/12/2007 | Petition for writ of supersedeas filed. | |
| 09/12/2007 | Note: | exhibits lodged in H032044 |
| 09/14/2007 | Stay order filed. | To permit further consideration raised by the petition for writ of supersedeas, the superior court's order filed on 8/30/07 is stayed in its entirety. Arthur Criscione may file on 10/4/07 an opposition to the writ of supersedeas. People may reply to the opposition in 10 days after it is filed in this court (PBM, NM) |
| 09/18/2007 | Telephone conversation with: | Atty Burlind will overnight letter requesting that our office appt SDAP |
| 09/18/2007 | Notice of appeal lodged/received (criminal). | filed on 9/10/07 by AG Yates |
| 09/19/2007 | Received letter from: | Atty Burland advising the court that respondent is indigent & to appoint SDAP as counsel for him |
| 09/19/2007 | Counsel appointment order filed. | |
| 09/25/2007 | Filed document entitled: | Conflict of interest request to vacate SDAP & appoint Atty Fargo to represent respondent |
| 09/26/2007 | Order filed. | A declaration of conflict of interest having been filed, the appt of SDAP as counsel for respondent Criscione is vacated. Barbara B. Fargo is independently apptd to represent said respondent. The Santa Clara superior court is directed to forward said respondent's copy of the record on appeal to the above named counsel |
| 10/02/2007 | Record on appeal filed. | C-6, R-2 |
| 10/02/2007 | Requested - extension of time | |
| | | |

| | | |
|---|---|---|
| 10/05/2007 | Gr[illegible]d - extension of time. | |
| 10/12/2007 | Opposition filed. | by respondent to writ of supersedeas |
| 10/12/2007 | Filed letter from: | Atty Fargo to inform the court she is no longer with the Putlic Defender's Office |
| 10/12/2007 | Request for judicial notice filed. | from Atty Fargo for respondent |

**Click here to request automatic e-mail notifications about this case.**

©2007 Judicial Council of California

CALIFORNIA APPELLATE COURTS

Case Information

Welcome

Search

E-mail

Calendar

Help

Opinions

home

## 6th Appellate District

Change court

Court data last updated: 10/13/2007 09:05 PM

Case Summary Docket Scheduled Actions Briefs
Disposition Parties and Attorneys Trial Court

## Future Scheduled Actions

**The People v. Criscione**
**Case Number H032048**

| Description | Due Date | Notes |
|---|---|---|
| Appellant's opening brief. | 11/13/2007 | |
| Reply filed to: | 10/22/2007 | by People on respondent's oppo to writ of supersedeas |
| To court. | 10/29/2007 | Respondent's request for judicial notice |

**Click here to request automatic e-mail notifications about this case.**

©2007 Judicial Council of California

CALIFORNIA APPELLATE COURTS

Case Information

Welcome
Search
E-mail
Calendar
Help
Opinions

C|C home

## 6th Appellate District

Change court

Court data last updated: 10/13/2007 09:05 PM

Case Summary Docket Scheduled Actions Briefs
Disposition Parties and Attorneys Trial Court

## Parties and Attorneys

**The People v. Criscione**
**Case Number H032048**

| Party | Attorney |
| --- | --- |
| The People : Plaintiff and Appellant | Denise Alayne Yates<br>Ofc Attorney General<br>455 Golden Gate Ave #11000<br>San Francisco, CA 94102-7004 |
| Criscione, Arthur S. : Defendant and Respondent | Barbara B. Fargo<br>P.O. Box 3872<br>Santa Cruz, CA 95063 |

**Click here to request automatic e-mail notifications about this case.**

© 2007 Judicial Council of California

CALIFORNIA APPELLATE COURTS

Case Information

Welcome
Search
E-mail
Calendar
Help
Opinions

## 6th Appellate District

Change court

Court data last updated: 10/13/2007 09:05 PM

Case Summary Docket Scheduled Actions Briefs
Disposition Parties and Attorneys Trial Court

## Trial Court

**The People v. Criscione**
**Case Number H032048**

| | |
|---|---|
| **Trial Court Name:** | Santa Clara County Superior Court |
| **County:** | Santa Clara |
| **Trial Court Case Number:** | 71614 |
| **Trial Court Judge:** | Condron, Linda |
| **Trial Court Judgment Date:** | 08/30/2007 |

**Click here to request automatic e-mail notifications about this case.**

© 2007 Judicial Council of California

http://appellatecases.courtinfo.ca.gov/search/case/trialCourt.cfm?dist=6&doc_id=938836... 10/13/2007





(ENDORSED)
FILED
AUG 3 0 2007
KIRI TORRE
Chief Executive Officer/Clerk
BRET MORROW
DEPUTY

SUPERIOR COURT OF CALIFORNIA

COUNTY OF SANTA CLARA

In re

ARTHUR CRISCIONE,

On Habeas Corpus

No.: 71614

ORDER

INTRODUCTION

Petitioner alleges that he has been denied due process of law because the Board has used standards and criteria which are unconstitutionally vague in order to find him unsuitable for parole. Alternatively, he argues that those standards, even if constitutionally sound, are nonetheless being applied in an arbitrary and meaningless fashion by the Board. He relies upon evidence that in one hundred percent of 2690 randomly chosen cases, the Board found the commitment offense to be "especially heinous, atrocious or cruel", a factor tending to show unsuitability under Title 15 §2402(c)(1).

Are the Board Criteria Unconstitutionally Vague?

Our courts have long recognized that both state and federal due process requirements dictate that the Board must apply detailed standards when evaluating whether an individual inmate is unsuitable for parole on public safety grounds. (See *In re Dannenberg* (2005) 34

p.2 Sep 07 07 11:30a Jacob Bunting

Cal.4th 1061 at p. 1096, footnote 16.). Those standards are found in 15 CCR §2402(c) (*Dannenberg, supra,* 34 Cal.4th at p. 1080,) and do include detailed criteria to be applied by the Board when considering the commitment offense:

> (c) Circumstances Tending to Show Unsuitability. The following circumstances each tend to indicate unsuitability for release. These circumstances are set forth as general guidelines; the importance attached to any circumstance or combination of circumstances in a particular case is left to the judgment of the panel. Circumstances tending to indicate unsuitability include:
>
> (1) Commitment Offense. The prisoner committed the offense in an especially heinous, atrocious or cruel manner. The factors to be considered include:
>
> (A) Multiple victims were attacked, injured or killed in the same or separate incidents.
>
> (B) The offense was carried out in a dispassionate and calculated manner, such as an execution-style murder.
>
> (C) The victim was abused, defiled or mutilated during or after the offense.
>
> (D) The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering.
>
> (E) The motive for the crime is inexplicable or very trivial in relation to the offense.

In response to Petitioners claim that the regulations are impermissibly vague, Respondent argues that while "especially heinous, atrocious or cruel" might be vague in the abstract it is limited by factors (A)-(E) of §2402(c)(1), and thus provides a 'principled basis' for distinguishing between those cases which are contemplated in that section and those which are not. An examination of cases involving vagueness challenges to death penalty statutes is instructive here and shows that Respondent's position has merit:

"Our precedents make clear that a State's capital sentencing

Sep 07 07 11:30a

scheme also must genuinely narrow the class of persons eligible for the death penalty. When the purpose of a statutory aggravating circumstance is to enable the sentencer to distinguish those who deserve capital punishment from those who do not, the circumstance must provide a principled basis for doing so. If the sentencer fairly could conclude that an aggravating circumstance applies to every defendant eligible for the death penalty, the circumstance is constitutionally infirm." (*Arave v. Creech* (1993) 507 U.S. 463, 474, citing *Maynard v. Cartwright* (1988) 486 U.S. 356, 364: "invalidating aggravating circumstance that 'an ordinary person could honestly believe' described every murder," and, *Godfrey v. Georgia* (1980) 446 U.S. 420, 428-429: "A person of ordinary sensibility could fairly characterize almost every murder as 'outrageously or wantonly vile, horrible and inhuman.'")

It cannot fairly be said that 'every murder' could be categorized as "especially heinous, atrocious or cruel" under the Board regulations, since the defining factors contained in subdivisions (A)-(E) clearly narrow the group of cases to which it applies. Although Petitioner also argues that the "vague statutory language is not rendered more precise by defining it in terms or synonyms of equal or greater uncertainty" (*People v. Superior Court (Engert)* (1982) 31 Cal.3d 797, 803, *Pryor v. Municipal Court* (1979) 25 Cal.3d 238, 249. *See also Walton v. Arizona* (1990) 497 U.S. 639, 654), the factors in those subdivisions are not themselves vague or uncertain. The mere fact that there may be some subjective component (such as "exceptionally callous" disregard for human suffering) does not render that factor unconstitutionally vague. The proper degree of definition of such factors is not susceptible of mathematical precision, but will be constitutionally sufficient if it gives meaningful guidance to the Board.

A law is void for vagueness if it "fails to provide adequate notice to those who must observe its strictures and impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and

Sep 07 07 11:30a

discriminatory application." (*People v. Rubalcava* (2000) 23 Cal.4th 322, 332, quoting *People ex rel. Gallo v. Acuna* (1997) 14 Cal. 4th 1090, 1116, quoting *Grayned v. City of Rockford* (1972) 408 U.S. 104, 108-109.)

A review of cases expressing approval of definitions to limit the application of otherwise vague terms in death penalty statutes leads inextricably to the conclusion that the limiting factors in §2402(c) easily pass constitutional muster. An Arizona statute was upheld that provided a crime is committed in an 'especially cruel manner' when the perpetrator inflicts mental anguish or physical abuse before the victim's death," and that "mental anguish includes a victim's uncertainty as to his ultimate fate." (*Walton v. Arizona* (1990) 497 U.S. 639, 654.) Similarly, the court in *Maynard v. Cartwright*, 486 U.S. at 364-365, approved a definition that would limit Oklahoma's "especially heinous, atrocious, or cruel" aggravating circumstance to murders involving "some kind of torture or physical abuse. In Florida, the statute authorizing the death penalty if the crime is "especially heinous, atrocious, or cruel," satisfied due process concerns where it was further defined as "the conscienceless or pitiless crime which is unnecessarily torturous to the victim." *State v. Dixon* (1973) 283 So. 2d 1 at p. 9.

Here, the factors in subdivisions (A)-(E) provide equally clear limiting construction to the term "especially heinous, atrocious, or cruel" in §2402(c).

**Has the Board Engaged in a Pattern of Arbitrary Application of the Criteria?**

As previously noted, 15 CCR §2402 provides detailed criteria for determining whether a crime is "exceptionally heinous, atrocious or cruel" such that it tends to indicate unsuitability for parole. Our

courts have held that to fit within those criteria and thus serve as a basis for a finding of unsuitability, the circumstances of the crime must be more aggravated or violent than the minimum necessary to sustain a conviction for that offense. (*In re Rosenkrantz* (2002) 29 Cal.4th 616, 682-683.) Where that is the case, the nature of the prisoner's offense, *alone*, can constitute a sufficient basis for denying parole. (*In re Dannenberg, supra*, 34 Cal.4th at p. 1095.)

Petitioner claims that those criteria, even if constitutionally sound, have been applied by the Board in an arbitrary and capricious manner rendering them devoid of any meaning whatever. The role of the reviewing court under these circumstances has been addressed previously in the specific context of Parole Board actions:

> "[Courts have] an obligation, however, to look beyond the facial validity of a statute that is subject to possible unconstitutional administration since a law though fair on its face and impartial in appearance may be open to serious abuses in administration and courts may be imposed upon if the substantial rights of the persons charged are not adequately safeguarded at every stage of the proceedings. We have recognized that this court's obligation to oversee the execution of the penal laws of California extends not only to judicial proceedings, but also to the administration of the Indeterminate Sentence Law." (*In re Rodriguez* (1975) 14 Cal.3d 639, 648, quoting *Minnesota v. Probate Court* (1940) 309 U.S. 270, 277.)

Similarly, in *In re Minnis* (1972) 7 Cal.3d 639, 645, the case closest on point to the present situation, the California Supreme Court stated: "This court has traditionally accepted its responsibility to prevent an authority vested with discretion from implementing a policy which would defeat the legislative motive for enacting a system of laws." Where, as here, the question is whether determinations are being made in a manner that is arbitrary and capricious, judicial oversight "must be extensive enough to protect

limited right of parole applicants 'to be free from an arbitrary parole decision... and to something more than mere pro-forma consideration.'" (*In re Ramirez* (2001) 94 Cal.App.4th 549 at p. 564, quoting *In re Sturm* (1974) 11 Cal.3d 258 at p. 268.)

This Court, therefore, now examines Petitioner's "as applied" void for vagueness challenge.

**The Evidence Presented**

A similar claim to those raised here, involving allegations of abuse of discretion by the Board in making parole decisions, was presented to the Court of Appeal in *In re Ramirez, supra*. The court there observed that such a "serious claim of abuse of discretion" must be "adequately supported with evidence" which should be "comprehensive." (*Ramirez, supra*, 94 Cal.App.4th at p. 564, fn. 5.) The claim was rejected in that case because there was not "a sufficient record to evaluate." (*Ibid.*) In these cases, however, there is comprehensive evidence offered in support of Petitioner's claims.

Discovery orders were issued in five different cases involving life term inmates (Petitioners) who all presented identical claims.[1]

---

[1] This Court takes judicial notice of the several other cases currently pending (Lewis #68038, Jameison #71194, Bragg #108543, Ngo #127611.) which raise this same issue and in which proof was presented on this same point. (Evidence Code § 452(d). See specifically, in the habeas corpus context, *In re Vargus* (2000) 83 Cal.App.4th 1125, 1134-1136, 1143, in which judicial notice was taken of the evidence in four other cases and in which the court noted: "Facts from other cases may assist petitioner in establishing a pattern." See generally *McKell v. Washington Mutual, Inc.* (2006) 142 Cal.App.4th 1457, 1491: "trial and appellate courts ... may properly take judicial notice of ... established facts from both the same case and other cases." And see *AB Group v. Wertin* (1997) 59 Cal.App.4th 1022, 1036: Judicial notice taken of other cases when matters are "just as relevant to the present [case] as they are to the others.")

The purpose of the discovery was to bring before the Court a comprehensive compilation and examination of Board decisions in a statistically significant number of cases. The Board decisions under examination consisted of final decisions of the Board for life-term inmates convicted of first or second degree murder and presently eligible for parole. Included were all such decisions issued in certain months, chosen by virtue of their proximity in time to the parole denials challenged in the pending petitions. All Board decisions in the months of August, September and October of 2002, July, August, September, October, November, and December of 2003, January and February of 2004, February of 2005, and January of 2006 were compiled. This resulted in a review of 2690 cases decided in a total of 13 months.

The purpose of the review was to determine how many inmates had actually been denied parole based in whole or in part on the Board's finding that their commitment offense fits the criteria set forth in Title 15 §2402(c)(1) as "especially heinous, atrocious or cruel." A member of the research team conducting the review, Karen Rega, testified that in its decisions the Board does not actually cite CCR rule §2402(c), but consistently uses the specific words or phrases ("verbiage from code") contained therein, so that it could easily be determined when that criteria was being applied. (For example, finding "multiple victims" invokes §2402(c)(1)(A); finding the crime "dispassionate" "calculated" or "execution style" invokes §2402(c)(1)(B); that a victim was "abused" "mutilated" or "defiled" invokes §2402(c)(1)(C); a crime that is "exceptionally callous" or demonstrated a "disregard for human suffering" fits criteria

§2402(c)(1)(D); and finding the motive for the crime "inexplicable" or "trivial" invokes §2402(c)(1)(E).)

Petitioners provided charts, summaries, declarations, and the raw data establishing the above in the cases of Lewis #68038, Jameison #71194, Bragg #108543, and Ngo #127611. In this case (Criscione #71614) the evidence was presented somewhat differently. Both to spread the burden of the exhaustive examination, and to provide a check on Petitioners' methods, this Court ordered Respondent to undertake an examination of two randomly chosen months in the same manner as Petitioner had been doing. Respondent complied and provided periodic updates in which they continued to report that at all "the relevant hearings the Board relied on the commitment offense as a basis for denying parole." (See "Respondent's Final Discovery Update" filed April 5, 2007.) At the evidentiary hearing on this matter counsel for Respondents stipulated that "in all of those cases examined [by Respondent pursuant to the Criscione discovery orders] the Board relied on the commitment offense as a basis for denying parole." (See pages 34-35 of the June 1, 2007, evidentiary hearing transcript.)

The result of the initial examination was that in over 90 percent of cases the Board had found the commitment offense to be "especially heinous, atrocious or cruel" as set forth in Title 15 §2402(c)(1). In the remaining 10% of cases either parole had been granted, or it was unclear whether §2402(c)(1) was a reason for the parole denial. For all such cases, the decisions in the prior hearing for the inmate were obtained and examined. In every case, the Board had determined at some point in time that every inmates

Sep 07 07 11:32a Jacob Burland

crime was "especially heinous, atrocious or cruel" under Title 15 §2402(c)(1).

Thus, it was shown that 100% of commitment offenses reviewed by the Board during the 13 months under examination were found to be "especially heinous, atrocious or cruel" under Title 15 §2402(c)(1).

A further statistic of significance in this case is that there are only 9,750 inmates total who are eligible for, and who are currently receiving, parole consideration hearings as life term inmates. (See "Respondent's Evidentiary Hearing Brief," at p. 4, filed April 16, 2007.)

**USE OF STATISTICS**

In *International Brotherhood of Teamsters v. United States* (1977) 431 U.S. 324, 338-340, the United States Supreme Court reaffirmed that statistical evidence, of sufficient "proportions," can be sound and compelling proof. As noted by the court in *Everett v. Superior Court* (2002) 104 Cal.App.4th 388, 393, and the cases cited therein, "courts regularly have employed statistics to support an inference of intentional discrimination."

More recently, the United States Supreme Court, in *Miller-El v. Cockrell* (2003) 537 U.S. 322, 154 L.Ed.2d 931, when examining a habeas petitioner's allegations that the prosecutor was illegally using his peremptory challenges to exclude African-Americans from the petitioner's jury, noted that "the statistical evidence alone" was compelling. The high court analyzed the numbers and concluded: "Happenstance is unlikely to produce this disparity." (See also *People v. Hofsheier* (2004) 117 Cal.App.4th 438 in which "statistical

Sep 07 07 11:55a Jacob Ruburg

evidence" was noted as possibly being dispositive. And see *People v. Flores* (2006) 144 Cal.App.4th 625 in which a statistical survey and analysis, combined into an "actuarial instrument" was substantial proof.)

A statistical compilation and examination such as has been presented in these cases is entirely appropriate and sufficient evidence from which to draw sound conclusions about the Board's overall methods and practices.

**THE EXPERT'S TESTIMONY**

Petitioners provided expert testimony from Professor Mohammad Kafai regarding the statistics and the conclusions that necessarily follow from them. Professor Kafai is the director of the statistics program at San Francisco State University, he personally teaches statistics and probabilities, and it was undisputed that he was qualified to give the expert testimony that he did. No evidence was presented that conflicts or contradicts the testimony and conclusions of Professor Kafai. By stipulation of the parties, Professor Kafai's testimony was to be admissible and considered in the cases of all five petitioners. (See page 35 of the June 1, 2007, evidentiary hearing transcript.)

Professor Kafai testified that the samples in each case, which consisted of two or three months of Board decisions, are statistically sufficient to draw conclusions about the entire population of life term inmates currently facing parole eligibility hearings. Given that every inmate within the statistically significant samples had his or her crime labeled "'particularly

egregious'" or "especially heinous, atrocious or cruel" under Title 15 §2402(c)(1), it can be mathematically concluded that the same finding has been made for every inmate in the entire population of 9,750. Although he testified that statisticians never like to state unequivocally that something is proven to a 100% certainty, (because unforeseen anomalies are always theoretically possible,) he did indicate the evidence he had thus far examined came as close to that conclusion as could be allowed. Not surprisingly, Professor Kafai also testified that "more than 50% can't by definition constitute an exception."

Having found the data provided to the expert to be sound this Court also finds the expert's conclusions to be sound. In each of the five cases before the Court over 400 inmates were randomly chosen for examination. That number was statistically significant and was enough for the expert to draw conclusions about the entire population of 9,750 parole eligible inmates. The fact that the approximately 2000 inmates examined in the other cases also had their parole denied based entirely or in part on the crime itself (§2402(c)(1)), both corroborates and validates the expert's conclusion in each individual case and also provides an overwhelming and irrefutable sample size from which even a non expert can confidently draw conclusions.

## DISCUSSION

Although the evidence establishes that the Board frequently says parole is denied "first," "foremost," "primarily," or "mainly," because of the commitment offense, this statement of primacy or weight is not relevant to the question now before the Court.

p.12 858-380-6791 Jacob Buland Sep 07 07 11:33a

Petitioners acknowledge that the Board generally also cites other reasons for its decision. The question before this Court, however, is not whether the commitment offense is the primary or sole reason why parole is denied -- the question is whether the commitment offense is labeled "'particularly egregious'" and thus could be used, under *Dannenberg*, primarily or exclusively to deny parole.

The evidence proves that in a relevant and statistically significant period where the Board has considered life term offenses in the context of a parole suitability determination, every such offense has been found to be "particularly egregious" or "especially heinous, atrocious or cruel."[2] This evidence conclusively demonstrates that the Board completely disregards the detailed standards and criteria of §2402(c). "Especially" means particularly, or "to a distinctly greater extent or degree than is common."[3] (EC § 451(e).) By simple definition the term "especially" as contained in section 2402(C)(1) cannot possibly apply in 100% of cases, yet that is precisely how it has been applied by the Board. As pointed out by the Second District Court of Appeal, not every murder can be found to be "atrocious, heinous, or callous" or the equivalent without "doing

[2] In a single case out of the 2690 that were examined Petitioner has conceded that the Board did not invoke §2402(c)(1). This Court finds that concession to be improvidently made and the result of over caution. When announcing the decision at the initial hearing of S. Fletcher (H-10330) on 4/6/06, the commissioner did begin by stating "I don't believe this offense is particularly aggravated..." However the commissioner proceeds to describe the crime as a drug deal to which Fletcher brought a gun so "we could say there was some measure of calculation in that." The commissioner continued by observing that the reason someone would bring a gun to a drug transaction was to make sure things went according to their plan "so I guess we can say that that represents calculation and perhaps it's aggravated to that extent." As is the Board's standard practice, by using the word 'calculated' from §2402(c)(1)(b) the Board was invoking that regulation. Certainly if Mr. Fletcher had brought a habeas petition Respondent's position would be that there is 'some evidence' supporting this. The ambiguity created by the commissioner's initial statement was cleared up several pages later when he announces that "based upon the crime coupled with ..." parole was denied for four years. (See *In re Burns* (2006) 136 Cal.App.4th 1318, 1326, holding §2402(c)(1) criteria are necessary for a multi-year denial.)

violence" to the requirements of due process. (*In re Lawrence* (2007) 150 Cal.App.4th 1511, 1557.) This is precisely what has occurred here, where the evidence shows that the determinations of the Board in this regard are made not on the basis of detailed guidelines and individualized consideration, but rather through the use of all encompassing catch phrases gleaned from the regulations.

**THE BOARD'S METHODS**

Because it makes no effort to distinguish the applicability of the criteria between one case and another, the Board is able to force every case of murder into one or more of the categories contained in §2402(c).

For example, if the inmate's actions result in an instant death the Board finds that it was done in a "dispassionate and calculated manner, such as an execution-style murder." At the same time the Board finds that a murder not resulting in near instant death shows a "callous disregard for human suffering" without any further analysis or articulation of facts which justify that conclusion. If a knife or blunt object was used, the victim was "abused, defiled, or mutilated." If a gun was used the murder was performed in a "dispassionate and calculated manner, such as an execution-style murder." If bare hands were used to extinguish another human life then the crime is "particularly heinous and atrocious."

Similarly, if several acts, spanning some amount of time, were necessary for the murder the Board may deny parole because the inmate had "opportunities to stop" but did not. However if the murder was

[3] Princeton University World Net Dictionary (2006).

Sep 07 07 11:34a Jacob Burland 898-300-0/81 p.14

accomplished quickly parole will be denied because it was done in a dispassionate and calculated manner and the victim never had a chance to defend themselves or flee. If the crime occurred in public, or with other people in the vicinity, it has been said that the inmate "showed a callous disregard" or "lack of respect" for the "community." However if the crime occurs when the victim is found alone it could be said that the inmate's actions were aggravated because the victim was isolated and more vulnerable.

In this manner, under the Board's cursory approach, every murder has been found to fit within the unsuitability criteria. What this reduces to is nothing less than a denial of parole for the very reason the inmates are present before the Board - i.e. they committed murder. It is circular reasoning, or in fact no reasoning at all, for the Board to begin each hearing by stating the inmate is before them for parole consideration, having passed the minimum eligible parole date based on a murder conviction, and for the Board to then conclude that parole will be denied because the inmate committed acts that amount to nothing more than the minimum necessary to convict them of that crime. As stated quite plainly by the Sixth District: "A conviction for murder does not automatically render one unsuitable for parole." (*Smith, supra,* 114 Cal.App.4th at p. 366, citing *Rosenkrantz, supra,* 29 Cal.4th at p. 683.)

In summary, when every single inmate is denied parole because his or her crime qualifies as a §2402(c)(1) exception to the rule that a parole date shall normally be set, then the exception has clearly swallowed the rule and the rule is being illegally interpreted and applied. When every single life crime that the Board

examines is "particularly egregious" and "especially heinous, atrocious or cruel" it is obvious that the Board is operating without any limits and with unfettered discretion.

Other examples of the failure to 'connect up' the facts of the individual case with the criteria and the ultimate findings abound in the decisions of the reviewing courts. Some of the state cases to have reversed Parole Board or Governor abuses of discretion in denying parole include *In re Roderick*, *In re Cooper*, *In re Lawrence*, *In re Barker*, *In re Gray*, *In re Lee*, *In re Elkins*, *In re Weider*, *In re Scott*, *In re Deluna*, *In re Ernest Smith*, *In re Mark Smith*, and *In re Capistran*.

When "the record provides no reasonable grounds to reject, or even challenge, the findings and conclusions of the psychologist and counselor concerning [the inmate's] dangerousness" the Board may not do so. (*In re Smith* (2003) 114 Cal.App.4th 343, 369.)

When an inmate, although only convicted of a second degree murder, has been incarcerated for such time that, with custody credits, he would have reached his MEPD if he had been convicted of a first, the Board must point to evidence that his crime was aggravated or exceptional even for a first degree murder if they are going to use the crime as a basis for denying parole. (*In re Weider* (2006) 145 Cal.App.4th 570, 582-583.)[4]

[4] This rule, rooted in Justice Moreno's concurrence in *Rosenkrantz, supra*, is particularly applicable in this case. Petitioner was convicted of second degree, but acquitted of first degree, murder over 25 years ago. (*People v. Criscione* (1981) 125 Cal.App.3d 275.) With his custody credits he is beyond the matrix even had he been convicted of a first. In a currently pending habeas petition in which he challenges his 2007 parole denial the first reason the Board gave was the crime itself and the presiding commissioner explained: "His actions go well beyond the minimum necessary for a conviction of murder in the second degree." (Decision page 2 of 4/2/07 transcript.) For the Board to penalize the Petitioner for the fact that he was acquitted of first degree is further proof of their willfulness and

p.16 888-350-6791 Jacob Burland Sep 07 07 11:56p

A "petitioner's young age at the time of the offense" must be considered. (*In re Elkins* (2006) 144 Cal.App.4th 475, 500, quoting *Rosenkrantz v. Marshall* (C.D.Cal. 2006) 444 F. Supp. 2d 1063, 1065, 1085: "The reliability of the facts of the crime as a predictor for his dangerousness was diminished further by his young age of 18, just barely an adult. 'The susceptibility of juveniles to immature and irresponsible behavior means their irresponsible conduct is not as morally reprehensible as that of an adult.'")[5]

The Board's formulaic practice of stating §2402(c)(1) phrased in a conclusory fashion, and then stating "this is derived from the facts" without ever linking the two together, is insufficient. (*In re Roderick*, (2007) ___ Cal.App.4th ___ (A113370): "At minimum, the Board is responsible for articulating the grounds for its findings and for citing to evidence supporting those grounds." (See also *In re Barker* (2007) 151 Cal.App.4th 346, 371, disapproving "conclusorily" announced findings.)

After two decades, mundane "crimes have little, if any, predictive value for future criminality. Simply from the passing of time, [an inmate's] crimes almost 20 years ago have lost much of their usefulness in foreseeing the likelihood of future offenses than if he had committed them five or ten years ago." (*In re Lee* (2006) 143 Cal.App.4th 1400, 1412.) It should be noted that this rule

---

bias. The jury had a reasonable doubt that Petitioner committed first degree murder but under the Board's 'reasoning' and 'analysis' this puts him in a worse position than if they had not. Had the jury convicted him of the greater offense Petitioner has served so much time that he would already be having subsequent parole hearings on a first and the Board would not have been able to use the 'some evidence' of first degree behavior against him. As observed previously, the Board's position in this regard is "so ridiculous that simply to state it is to refute it." (*Weider, supra*, 145 Cal.App.4th at p. 583.)

[5] This point is particularly significant in the case of Mike Ngo. Mr. Ngo was only 18 at the time of his crime. The impetus behind the shooting was youth group or

applies with even more force when the Board is relying on any criminality that occurred before the crime. In that situation, just as with the crime itself, the Board must explain why such old events have any relevance and especially when the inmate has spent a decade as a model prisoner.

Murders situationally related to intimate relationships are unfortunately commonplace because emotions are strongest in such domestic settings. When a murder occurs because of "stress unlikely to be reproduced in the future" this is a factor that affirmatively points towards suitability. (*In re Lawrence* (2007) 150 Cal.App.4th 1511 and cases cited therein.)

"The evidence must substantiate the ultimate conclusion that the prisoner's release currently poses an unreasonable risk of danger to the public. It violates a prisoner's right to due process when the Board or Governor attaches significance to evidence that forewarns no danger to the public." (*In re Tripp* (2007) 150 Cal.App.4th 306, 313.)

The Board "cannot rely on the fact that the killing could have been avoided to show the killing was especially brutal." (*In re Cooper* (2007) 153 Cal.App.4th 1043, 1064.)

The Board's focus must be upon how the inmate "actually committed his crimes" not the "incorporeal realm of legal constructs." (*Lee, supra,* 143 Cal.App.4th at p. 1413.) This is especially significant when the murder conviction is based on the felony murder rule, provocative act doctrine, or accomplice liability such that the inmate did not intend to kill or may not have even been

---

gang rivalries, posturing, and threats which mature adults would not have been

the actual killer.

The Board has ample guidance before it in the decisions of the various reviewing courts to constrain its abuse, but has failed to avail itself of the opportunity to do so.

**SEPARATION OF POWERS DOCTRINE**

The evidence presented, as discussed above, has established a void for vagueness "as applied" due process violation. That same evidence also proves a separate but related Constitutional violation -- an as applied separation of powers violation.

The separation of powers doctrine provides "that the legislative power is the power to enact statutes, the executive power is the power to execute or enforce statutes, and the judicial power is the power to interpret statutes and to determine their constitutionality." (*Lockyer v. City and County of San Francisco* (2004) 33 Cal.4th 1055, 1068.) Because the evidence has proven the Board is not executing/enforcing the legislature's statutes as intended it is this Court's duty to intervene. The question here is whether the Board is violating the separation of powers doctrine by appropriating to itself absolute power over parole matters and disregarding the limits and guidelines placed by the statute.[6]

"Government Code section 11342.2 provides: 'Whenever by the

caught up in.

[6] "It is settled that Administrative regulations that violate acts of the Legislature are void and no protestations that they are merely an exercise of administrative discretion can sanctify them. They must conform to the legislative will if we are to preserve an orderly system of government. Nor is the motivation of the agency relevant: It is fundamental that an administrative agency may not usurp the legislative function, no matter how altruistic its motives are." (*Agricultural Labor Relations Board v. Superior Court of Tulare County* (1976) 16 Cal.3d 392, 419 quoting *Morris v. Williams* (1967) 67 Cal.2d 733, 737, and *City of San Joaquin v. State Bd. of Equalization* (1970) 9 Cal.App.3d 365, 374.)

express or implied terms of any statute a state agency has authority to adopt regulations to implement, interpret, make specific or otherwise carry out the provisions of the statute, no regulation adopted is valid or effective unless consistent and not in conflict with the statute and reasonably necessary to effectuate the purpose of the statute.' Administrative regulations that alter or amend the statute or enlarge or impair its scope are void and courts not only may, but it is their obligation to strike down such regulations." (*Pulaski v. Occupational Safety & Health Stds. Bd.* (1999) 75 Cal.App.4th 1315, 1341, citations omitted.)

The vice of overbroad and vague regulations such as are at issue here is that they can be manipulated, or 'interpreted,' by executive agencies as a source of unfettered discretion to apply the law without regard to the intend of the people as expressed by the legislature's enabling statutes. In short, agencies usurp unlimited authority from vague regulations and become super-legislatures that are unaccountable to the people. As it has sometimes been framed and addressed in the case law, a vague or all encompassing standard runs the risk of "violat[ing] the separation of powers doctrine by 'transforming every [executive decisionmaker] into a "mini-legislature" with the power to determine on an ad hoc basis what types of behavior [satisfy their jurisdiction].'" (*People v. Ellison* (1998) 68 Cal.App.4th 203, 211, quoting *People v. Superior Court (Caswell)* (1988) 46 Cal.3d 381, 402.)

"It is concern about 'encroachment and aggrandizement,' the [United States Supreme Court] reiterated, that has animated its separation of powers jurisprudence. 'Accordingly, we have not

hesitated to strike down provisions of law that either accrete to a single Branch powers more appropriately diffused among separate Branches or that undermine the authority and independence of one or another coordinate Branch.'" (*Kasler v. Lockyer* (2000) 23 Cal.4th 472, 493, quoting *Mistretta v. United States* (1989) 488 U.S. 361, 382.) This articulation of the principle speaks directly to the situation at hand. The Board, by its enactment and interpretation of Title 15, §2402, has appropriated to itself absolute power over 'lifer' matters. Overreaching beyond the letter and spirit of the Penal Code provisions, Title 15, §2402(c)(1) has been interpreted by the Board to supply the power to declare every crime enough to deny parole forever. The fact that Title 15, §2402, has been invoked in every case, but then sometime later not invoked, tends to show either completely arbitrary and capricious behavior or that unwritten standards are what really determine outcomes. In either event, all pretenses of taking guidance from, or being limited by, the legislature's statutes have been abandoned. "[I]t is an elementary proposition that statutes control administrative interpretations." (*Ohio Casualty Ins. Co. v. Garamendi* (2006) 137 Cal.App.4th 64, 78.) Title 15 §2402 as applied, however, has no controls or limitations.

The PC § 3041(b) exception to the rule can only be invoked when the "gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual." The word "gravity" is a directive for comparison just as "more lengthy" indicates a deviation from the norm. While *Dannenberg* held there

p.21 888-660-6791 Jacob Bulnes Sep 07 07 11:31a

does not need to be intra case comparison for the purposes of term uniformity or proportionality, there necessarily has to be some sort of comparison for the purposes of adhering to the legislative mandate that parole is available. The Board employs no meaningful yardstick in measuring parole suitability. This is a violation of the separation of powers doctrine. (*People v. Wright* (1982) 30 Cal.3d 705, 712-713. And see *Terhune v. Superior Court* (1998) 65 Cal.App.4th 864, 872-873. Compare *Whitman v. Am. Trucking Ass'ns* (2001) 531 U.S. 457, 472, describing a delegation challenge as existing when the legislature fails to lay down "an intelligible principle to which the person or body authorized to act is directed to conform.")

**RESPONDENT'S POSITION**

The Attorney General has suggested, without pointing to any concrete examples, that it is possible that the Board, when invoking the crime as a reason to deny parole, is not placing it within §2402(c)(1) but instead using is as some sort of 'lesser factor' which, only when combined with other unsuitability criteria, can contribute to a valid parole denial. The two problems with this position are, first, there is no evidentiary support for this assertion, and second, it would have no impact on the constitutional infirmities outlined and proven above.

Even if Respondent had produced evidence that the Board was utilizing the crime as a 'lesser factor' which needs others to fully support a parole denial, the Board would then be admitting it was denying parole, in part, for the very reason that the person is

before the panel and eligible for parole in the first place - the commitment offense. Respondent's argument suggests that a crime that only qualified as the *Dannenberg* "minimum necessary" could still be invoked as a reason for denying parole. Respondent argues that when the crime is invoked 'not in the *Dannenberg* sense,' there must be other reasons for the parole denial and the crime alone would not be enough in this context. This position is inconsistent with the law and fundamental logic.

A crime qualifies under *Dannenberg* when it is "particularly egregious," or one where "no circumstances of the offense reasonably could be considered more aggravated or violent than the minimum necessary to sustain a conviction for that offense." (*Dannenberg, supra,* 34 Cal.4th at pp. 1094-1095.) These are the only two choices. If a crime consists of only the bare elements then it is not aggravated and it cannot, in and-of itself, serve as a basis for parole denials once the inmate becomes eligible for parole. It is the reason an inmate may be incarcerated initially for the equivalent of 15 or 25 years, and then examined to determination rehabilitation efforts when they come before the Board, but a crime that is no more than the bare minimum cannot be factored into the equation pursuant to PC $ 3041(b) or any of the case law interpreting it.

In oral argument Respondent suggested a second way the commitment offense can be used outside of §2402(c)(1). If for example a crime had its roots in gang allegiances or rivalries and the inmate continued to associate with gangs while incarcerated, then an aspect of the crime, even if the crime otherwise consisted of no more than the minimum elements, could be *combined* with other behavior

to support a parole denial. Similarly, if a crime was rooted in an inmate's then existing drug addiction, and the Board was to point to a recent 115 involving drugs, the evidence that the inmate's drug issues had not been resolved would justify a parole denial even if the crime itself was not aggravated. A finding that the inmate is not suitable for release under these circumstances, however, is not based on the facts of the commitment offense as tending to show unsuitability. It is based on the conclusion that can be drawn about Petitioner's lack of rehabilitation or change since the offense, and thus, his present dangerousness.

Respondent has not demonstrated any flaws in Petitioner's methodology or analysis, nor provided any actual evidence of the crime being invoked *other* than pursuant to §2402(c)(1). Drawing conclusions from the Board's direct statements, or its precise recitations of the §2402(c)(1) language, logically indicates an invocation of §2402(c)(1), and Respondent's suggestion otherwise is insupportable.

**THE QUESTION OF BIAS**

Because the issue has been squarely presented, and strenuously argued by Petitioners, this Court is obligated to rule on the charge that the Board's actions prove an overriding bias and deliberate corruption of their lawful duties.

In the discrimination and bias case of *USPS Bd. of Governors v. Aikens* (1983) 460 U.S. 711, the United States Supreme Court acknowledged "there will seldom be 'eyewitness' testimony as to the [] mental processes" of the allegedly biased decisionmaker. Instead,

an examination of other cases for trends or patterns can provide the necessary circumstantial evidence. (See *Aikens, supra,* at footnote 2.) Reaffirming that such circumstantial evidence will be sufficient the Court stated: "The law often obliges finders of fact to inquire into a person's state of mind. As Lord Justice Bowen said in treating this problem in an action for misrepresentation nearly a century ago, 'The state of a man's mind is as much a fact as the state of his digestion. It is true that it is very difficult to prove what the state of a man's mind at a particular time is, but if it can be ascertained it is as much a fact as anything else.'" (*Aikens,* at pp. 716-717, quoting *Edgington v. Fitzmaurice* (1885) 29 Ch. Div. 459, 483.)[7]

The discovery in these cases was granted in part due to the Petitioners' prima facie showing of bias and the necessity that it be "adequately supported with evidence" if such evidence is available. (*Ramirez, supra,* 94 Cal.App.4th at p. 564, fn. 5. See also *Nasha v. City of Los Angeles* (2004) 125 Cal.App.4th 470, 483: "A party seeking to show bias or prejudice on the part of an administrative decision maker is required to prove the same 'with concrete facts.'" And see *State Water Resources Control Bd. Cases* (2006) 136 Cal.App.4th 674, 841: "The challenge to the fairness of the adjudicator must set forth concrete facts demonstrating bias or prejudice." See also *Hobson v.*

[7] As occurred in *Aikens, supra,* and as suggested in prior orders of this Court, Respondent should have provided direct evidence from the decisionmakers. While the fact that a *Defendant* does not explain his or her actions cannot be held against him, (*Griffin v. California* (1965) 380 U.S. 609, *Doyle v. Ohio* (1976) 426 U.S. 610,) it is appropriate to give some weight to the consideration that the Board has failed to offer any direct evidence or explanation on its own behalf. While the case of *Hornung v. Superior Court* (2000) 81 Cal.App.4th 1095 stands for the proposition that Petitioner may not inquire into the Board members mental processes, Respondent is not precluded from offering such direct evidence if they were able to testify as to their good faith and conscientious efforts.

Hansen (1967) 269 F.Supp. 401, 502, the watershed Washington D.C. school desegregation case in which the court determined from a statistical and factual analysis that racial bias was influencing policy.)

In the case of *People v. Adams* (2004) 115 Cal.App.4th 243, 255, ~~a similar claim of biased decision making was asserted and it was~~ rejected because, although the defendant clearly articulated it, "he has not demonstrated it. Therefore, he has failed to bear his burden of showing a constitutional violation as a demonstrable reality, not mere speculation." In the present cases Petitioners have provided overwhelming concrete evidence. It is difficult to believe that the Board's universal application of §2402(c)(1) has been an inadvertent mistake or oversight on their part. It is hard to credit the Board's position that it does not know its own patterns and practices reveal a complete lack of standards or constraints on their power. Respondent's protestations ring hollow, and it seems a statistical impossibility, that the Board's use of "detailed" criteria in such a fashion that they are rendered meaningless is a result of good faith efforts on their part. That <u>every</u> murder is "especially heinous, atrocious or cruel," and can therefore be an exception to the rule that a parole date should be set, does not seem to be an accident on their part.

Although no court has thus far agreed with the accusation that the Board approaches its duties with a predetermination and a bias, no court has previously been presented the comprehensive evidence outlined herein. While this Court does not turn a blind eye to the reasonable conclusion that the Board's unconstitutional practices are

Sep 07 07 11:39a Jacob Bunland 858-350-6791 p.26

willful, there is another possibility. The pattern of errors demonstrated by the discovery in this case, and the continuously growing body of Court of Appeal opinions finding consistent and persistent abuse of discretion, may instead be caused by the fact that the Board is simply overworked and substantively untrained. The impossibility of the blanket applicability of §2402(c)(1) may be only the result of sloppy preparation and inadvertent carelessness.

The Board must first be given an opportunity to comply with the necessary remedy provided by this court before it is possible to enter a finding of conscious bias and illegal sub rosa policy. To do otherwise would ignore the complexities and magnitude of the largely discretionary duties with which that Board is vested.

## CONCLUSION

The conclusive nature of the proof in this case, and the suggestion of institutional bias do not preclude formulation of an remedy which will guarantee adequate restrictions on, and guidance for, the Board's exercise of discretion in making parole suitability determinations. The Board can be made to lawfully perform its duties if given explicit instructions.

As noted supra, a reason the proof in this case irrefutably establishes constitutional violations is because the Board does not, in actual fact, operate within the limiting construction of the regulations. The Board's expansive interpretation allows it to operate without any true standards. Although numerous rulings of both state and federal courts of appeal have invalidated the Board's application of the §2402(c) criteria to particular facts, the Board

Sep 07 07 11:40a Jacob Burland

does not take guidance from these binding precedents and ignores them for all other purposes. In the most recent of these cases, *In re Roderick*, (2007) ___ Cal.App.4th ___ (A113370) the First District held four of five §2402 factors "found" by the Board to be unsupported by any evidence. At footnote 14 the court took the time to criticize the Board for its repeated use of a "stock phrase" "generically across the state." The court also clarified that "at minimum, the Board is responsible for articulating the grounds for its findings and for citing to evidence supporting those grounds."

There is nothing in the evidence presented that would allow any conclusion but that, without intervention of the Courts, the Board will ignore the lessons of these rulings in the future and continue to employ its formulaic approach of citing a criteria from §2402(c)(1), repeating the facts of the crime, but never demonstrating a logical connection between the two. This is the core problem with the Board's methodology -- they provide no explanation or rationale for the findings regarding the crime itself. This practice results in violence to the requirements of due process and individualized consideration which are paramount to the appropriate exercise of its broad discretion.

The only solution is one that compels the Board to identify the logical connection between the facts upon which it relies and the specific criteria found to apply in the individual case. For example, the Board often finds that an inmate's motive is "trivial" without ever suggesting why, on these facts, that motive is not just as trivial as the motive behind any other murder. What motive is not trivial? By any definition "trivial" is a word of comparison and

Sep 07 07 11:40a Jacob Burland 858-350-6791 p.28

only has meaning when there can be examples that are not "trivial."

Similarly, although the Sixth District made it plain four years ago that "all [] murders by definition involve some callousness," (*In re Smith* (2003) 114 Cal.App.4th 343, 346,) the Board has continued to deny countless paroles labeling the crime "callous" without ever suggesting what crime would not qualify as "callous" and without consistently explaining why the individual case before it demonstrates "exceptional" callousness.

Respondent has consistently refused to suggest what possible instances of murder would *not* fit the Board's amorphous application of the §2402 criteria. Citing *Dannenberg*, Respondent insists such comparative analysis is unnecessary. Respondent fundamentally misunderstands the *Dannenberg* holding.

The PC § 3041(b) exception to the rule can only be invoked when the "gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual." The word "gravity" is a directive for comparison just as "more lengthy" indicates a deviation from the norm. While *Dannenberg* held there does not need to be intra case comparison for the purposes of term uniformity or proportionality, there necessarily has to be some sort of comparison for the purposes of adhering to the legislative mandate that parole is available. This is implicit in §2402 because the qualifier "especially," in "especially heinous atrocious or cruel," requires that some form of comparison be made. While the original drafters of §2402 seemed to have recognized this fact, the ongoing

conduct of the Board has completely ignored it, and this is the essence of the due process violation Petitioners have asserted.

As noted in his dissent in the recent case of *In re Roderick*, *supra*, Justice Sepulveda would have deferred to the Board's 'exercise' of discretion because "Board members have both training and vast experience in this field. They conduct literally thousands of parole suitability hearings each year. The Board therefore has the opportunity to evaluate the egregiousness of the facts of a great number of commitment offenses. ... The Board's training and experience in evaluating these circumstances far exceeds that of most, if not all, judges." The evidence in this case, however, suggests a flaw in granting such deference. Since the Board continues to place every murder in the category of offenses "tending to show unsuitability," something is certainly wrong. Since the Board's vast experience is undeniable, the problem must be in the Board's training and understanding of the distinguishing features of the guidelines and criteria. Although Justice Sepulveda presumes that Board members receive substantive training, there is no evidence before this court to suggest that it does, and substantial circumstantial evidence to suggest that it does not.

In the vast numbers of Santa Clara County cases reviewed by this Court, the Board's formulaic decisions regarding the commitment offense do not contain any explanation or thoughtful reasoning. Instead, the Board's conclusionary invocation of words from §2402(c)(1) is linked to a repetition of the facts from the Board report by the stock phrase: "These conclusions are drawn from the statement of facts wherein ...." Thereafter the inmate files a habeas

p.30 858-360-6791 Jacob Bufiand Sep 07 07 11:41a

corpus petition and Respondent, after requesting an extension of time, files a boilerplate reply asserting the Board's power is "great" and "almost unlimited" and thus any "modicum" of evidence suffices. Respondent does not cite or distinguish the expanding body of case law that is often directly on point as to specific findings made. Thereafter, if the writ is granted, the Board is directed to conduct a new hearing "in compliance with due process" and that order is appealed by Respondent. On appeal the order is usually upheld with modifications and in the end, after countless hours of attorney and judicial time, the Board conducts a new two hour hearing at which they abuse their discretion and violate due process in some different way.

This system is malfunctioning and must be repaired. The solution must begin with the source of the problem. The Board must make efforts to comply with due process in the first instance. The case law published over the last five years provides ample and sufficient guidelines and must be followed. Although the Board methods suggest it believes this to be optional, it is not.

**THE REMEDY**

Thus, it is the order of this Court that the Board develop, submit for approval, and then institute a training policy for its members based on the current and expanding body of published state, and federal, case law reviewing parole suitability decisions, and specifically the application of §2402 criteria. In addition to developing guidelines and further criteria for the substantive application of §2402 the Board must develop rules, policies and

procedures to ensure that the substantive guidelines are followed.

This Court finds its authority to impose this remedy to flow from the fundamental principles of judicial review announced over two centuries ago in *Marbury v. Madison* (1803) 5 U.S. (1 Cranch) 137. Citing that landmark case, the California Supreme Court has recognized "Under time-honored principles of the common law, these incidents of the parole applicant's right to 'due consideration' cannot exist in any practical sense unless there also exists a remedy against their abrogation." (*In re Sturm* (1974) 11 Cal.3d 258, 268.)

In *Strum* the court directed that the Board modify its rules and procedures so that thereafter "The Authority will be required [,] commencing with the finality of this opinion, to support all its denials of parole with a written, definitive statement of its reasons therefor and to communicate such statement to the inmate concerned." (*Sturm* at p. 273.)

Similarly, in the case of *Minnis, supra,* the California Supreme Court held the Board's policy of categorically denying parole to drug dealers was illegal. Based on its analysis the court there was clearly prepared to order that Board to modify its rules and procedures however such was unnecessary because the Board "voluntarily rescinded" the illegal policy. While the remedy in this case is of greater scope than that necessary in either *Strum* or *Minnis, supra,* so too has been the showing of a systematic abuse of discretion and distortion of process.

The most recent case to address the court's roles and duties in overseeing the parole suitability process has been *In re Rosenkrantz, supra,* 29 Cal.4th 616. In that case the court explained that

79'd

judicial review of a Governor's parole determination comports with, and indeed furthers, separation of powers principles because the courts are not exercising "complete power" over the executive branch and do not "defeat or materially impair" the appropriate exercise or scope of executive duties. (*Rosenkrantz* at p. 662.) Citing *Strum*, *supra*, the court reaffirmed that a life term inmate's "due process rights cannot exist in any practical sense without a remedy against its abrogation." (*Rosenkrantz* at p. 664.)

The *Rosenkrantz* court also put forth what it believed was an extreme example but which, unfortunately, has been shown to exist in this case. The court stated: "In the present context, for example, judicial review could prevent a Governor from usurping the legislative power, in the event a Governor failed to observe the constitutionally specified limitations upon the parole review authority imposed by the voters and the Legislature." This is exactly what the evidence in this case has proven. As noted above the Board has arrogated to itself absolute authority, despite legislative limitations and presumptions, through the mechanism of a vague and all inclusive, and thus truly meaningless, application of standards. The remedy this Court is imposing is narrowly tailored to redress this constitutional violation.

The consequence of the Board's actions (of giving § 2402(c)(1) such a broadly all encompassing and universal application) is that they have unwittingly invalidated the basis of the California Supreme Court's holding in *Dannenberg*. The reason the four justice majority in *Dannenberg* upheld the Board's standard operating procedures in the face of the Court of Appeal and dissent position is because "the

Board must apply detailed standards when evaluating whether an individual inmate is unsuitable for parole on public safety grounds." (*Dannenberg* at p. 1096, footnote 16. See also page 1080: "the regulations do set detailed standards and criteria for determining whether a murderer with an indeterminate life sentence is suitable for parole.") However, Petitioners in these cases have proven that there are no "detailed standards" at all. Instead the Board has systematically reduced the "detailed standards" to empty words. The remedy this Court orders, that there truly be "detailed standards," requires the promulgation of further rules and procedures to constrain and guide the Board's powers. This remedy differs in specifics, but not in kind, from what courts have previously imposed and have always had the power to impose.

The Board must fashion a training program and further rules, standards and regulations based on the opinions and decisions of the state and federal court cases which provide a limiting construction to the criteria which are applied.[8] The Board must also make provisions for the continuing education of its commissioners as new case law is published and becomes binding authority. This Court will not, at this point, outline the requirements and lessons to be taken from the above cases. It is the Board's duty, in the first instance to undertake this task. The training program, and associated rules and regulations, shall be served and submitted to this Court, in

[8] While the showing and analysis in this case was limited to § 2402(c)(1), the conclusions that the evidence compelled, that the Board has been carelessly distorting and misapplying the regulations, is not so limited. Accordingly, the training program that is necessary for the Board can not reasonably be limited to just § 2402(c)(1). Thus, to the extent case law recognizes, clarifies and establishes remedies for other due process violations they must also be incorporated into the necessary rules and training the Board is required to abide by..

writing, within 90 days. Counsel for Petitioners, and any other interested parties, may submit briefs or comments within 30 days thereafter. After receipt and review of the materials this Court will finalize the training program, and associated rules, and the Petitioners in these cases shall receive a new hearing before a Board that does not operate with the unfettered discretion and caprice demonstrated by the evidence here presented.

**ORDER**

For the above reasons the habeas corpus petition is granted and it is hereby ordered that Petitioner be provide a new hearing which shall comply with due process as outlined above. Respondent shall provide weekly updates to this Court on the progress of its development of the new rules and regulations outlined above.

DATED: Aug 30, 2007

LINDA R. CONDRON
JUDGE OF THE SUPERIOR COURT

THE GREAT SEAL OF THE STATE OF CALIFORNIA EUREKA

cc: Petitioner's Attorney (Jacob Burland)
Attorney General (Denise Yates, Scott Mather)

# EXHIBIT PP

EXHIBIT PP

# LIFE PRISONER EVALUATION REPORT
# SUBSEQUENT PAROLE CONSIDERATION HEARING
# MAY 2005 CALENDAR

SNODGRASS, GARY RANDALL C-50459

## I. COMMITMENT FACTORS:

A. Life Crime: All relevant documents from the previous hearing including the transcripts have been considered and that information appears valid, and the writer has no further information to add.

1. Summary of Crime: Remains the same as stated in the previous hearings.

2. Prisoner's Version: Remains the same as stated in the previous hearings.

3. Aggravating/Mitigating Circumstances:

a. Aggravating Factors:

1. The victim was particularly vulnerable having few avenues of retreat when the prisoner pointed the firearm at him.
2. During the commission of the crime, the prisoner had a clear opportunity to cease but instead continue.
3. The prisoner used a firearm at the time of the commission of the crime.

b. Mitigating Factors:

1. The crime was committed during or due to an unusual situation unlikely to reoccur.
2. The prisoner has minimal or no history of criminal behavior.

B. Multiple Crime(s): None.

1. Summary of Crime: N/A.

2. Prisoner's Version: N/A.

SENT TO INMATE ON MAR 04 2005

II. PRECONVICTION FACTORS:

A. **Juvenile Record**: Documents from the previous hearings have been considered and that information remains valid.

B. **Adult Convictions and Arrests**: Documents from the previous hearings have been considered and that information remains valid.

C. **Personal Factors**: Documents from the previous hearings have been considered and that information remains valid.

III. POSTCONVICTION FACTORS:

A. **Special Programming/Accommodations**: None.

B. **Custody History**: Documents from the previous hearings have been considered and the information remains valid. During this period of time since the last hearing, the prisoner has remained at the Correctional Training Facility - II and housed in the general population. He maintained Medium A custody and received above average work grades while assigned to the PIA Wood Furniture Factory, per his work supervisor's report (CDC 101s) dated 3/1/04 and 9/1/04. Per CDC 101 dated 12/1/04, the prisoner's actual work consisted of rough mill/laborer during the work period 9/1/04 to 12/1/04. His supervisor's comments were Snodgrass continues to perform well and is a good worker. He received a CDC 128B training certification chrono dated 8/4/04 on the instruction of the proper operation and safety procedures of the abrasive edge sander while assigned to the rough mill shop. During this review, the prisoner did not pursue any educational or vocational upgrading experience.

C. **Therapy and Self-Help Activities**: There are no documents in the Central File to reflect any therapy treatment, mental health placement, or any participation in self help activities during this review period.

D. **Disciplinary History**: None during this review period.

CDC 128As:

| | | |
|---|---|---|
| 02/15/83 | SQ | Failure to Report to School. |
| Unk. Date | DVI | Possession of Contraband. |
| 10/24/83 | DVI | Possession of Contraband. |
| 03/10/91 | SQ | Failure to Make His Lock Up. |
| 12/11/91 | CMF | Smuggling Wood into CMF-Main. |

| | | |
|---|---|---|
| 09/29/95 | DVI | Disordered Clothing in Cell. |

CDC 115s:

| | | |
|---|---|---|
| 08/31/89 | CMF | Out of Bounds in Mod. Administrative-CDC 115 Subject found guilty: warned and counseled. |

E. Other: On 5/20/04, Snodgrass was seen by the Board of Prison Terms for his Subsequent Parole Consideration Hearing #10. The Board's decision was to deny parole for 1 year, and recommended that the prisoner remain disciplinary free, earn positive chronos, participate in self help programs that would enable him to be able to face, discuss, understand and cope with the stress in a non-destructive manner, and develop parole plans.

## IV. FUTURE PLANS:

A. Residence: Remains the same as indicated in the previous Board Report.

B. Employment: Remains the same as indicated in the previous Board Report.

C. Assessment: The prisoner plans are to live with his mother temporarily until he creates a positive work record in any of the fields of welding, wood working/cabinet making; or aircraft maintenance.

He has employable skills, as a machine operator (wood furniture products), welding fabrication and installation, vocational Mill and Cabinet, landscaper, drafting and air frame.

However, in preparation for this board report, the prisoner did not offer any updated letters of support regarding his future place of residence or any letters from potential employers in the community where he plans to parole.

## V. USINS STATUS: N/A.

## VI. SUMMARY:

A. Prior to release the prisoner could benefit from:

1. Stay disciplinary free.
2. Earn positive chronos.

      3. Participate in self help programs.
4. Develop future parole plans.

B. This report is based upon an interview with the prisoner on 2/2/05 lasting approximately 1 hour and a complete review of the Central File lasting 3 hours.

C. The prisoner was afforded an opportunity to examine his Central Files on 1/18 and 2/2/05 per a CDC 128B which is located in the general chrono section of the Central File.

---

D. No accommodation was required per the Armstrong vs. Davis BPT Parole Proceedings Remedial Plan (ARP) for effective communication.

BOARD OF PRISON TERMS STATE OF CALIFORNIA

LIFE PRISONER: POSTCONVICTION PROGRESS REPORT

☐ DOCUMENTATION HEARING

☒ PAROLE CONSIDERATION HEARING

☐ PROGRESS HEARING

INSTRUCTIONS

TO CDC STAFF: DOCUMENT EACH 12-MONTH PERIOD FROM THE DATE THE LIFE TERM STARTS TO PRESENT

TO BPT STAFF: FOR EACH 12-MONTH INCREMENT APPLY THE GUIDELINES UNDER WHICH THE PAROLE DATE WAS ORIGINALLY ESTABLISHED, ie., 0-2 MONTHS FOR PBR AND 0-4 MONTHS FOR BPT. SEE BPT §§2290 - 2292, 2410 AND 2439.

| POSTCONVICTION CREDIT | | | |
|---|---|---|---|
| YEAR | BPT | PBR | REASONS |
| 3/10/04 to 2/2/05 (Present) | | | **PLACEMENT:** The prisoner remained at the Correctional Training Facility II, and housed in the General Population. **CUSTODY:** Medium A. **VOC. TRAINING:** None during this review period. **ACADEMICS:** None during this review period. **WORK RECORD:** Assigned to the PIA Wood Furniture Factory Rough Mill Shop as a Machine Operator. He earned above average work grades per CDC 101s dated 3/1/04, 9/1/04 and 12/1/04. His supervisor's comments were Snodgrass continues to perform well in Rough Mill and is a good worker. He received a 128B training certification chrono dated 8/4/04 on the proper operation and safety procedures of the Abrasive Edge Sander while assigned to the Rough Mill Shop. **GROUP ACTIVITIES:** None noted during this review period. **PSYCH. TREATMENT:** None noted during this review period. **PRISON BEHAVIOR:** He remained disciplinary free during this review period. **OTHER:** On 5/20/04 the prisoner was seen by the Board of Prison Terms for his Subsequent Parole Consideration Hearing #10. The Board's decision was to deny parole for 1 year, and recommended that the prisoner remain disciplinary free, earn positive chronos, participate in self help programs and develop future parole plans. |

| CORRECTIONAL COUNSELOR'S SIGNATURE | DATE |
|---|---|
| [signature] CC I | 2-17-05 |

CTF-SOLEDAD

2-17-05

H. Staten Date
Correctional Counselor I

3-1-05

J. Selvidge Date
Correctional Counselor II

3-1-05

R. Pope Date
Facility Captain

CfPR 3-2-05

D. S. Levorse Date
Classification and Parole Representative

CONTINUATION SHEET: LIFE PRISONER : POSTCONVICTION PROGRESS REPORT

| POSTCONVICTION CREDIT | | | |
|---|---|---|---|
| YEAR | BPT | PBR | REASONS |
| 12/03 to 3/9/04 (Present) | | | **PLACEMENT:** CTF II and housed in the general population. **CUSTODY:** Medium A **VOC. TRAINING:** None during this review period. **ACADEMICS:** None noted during this review period. **WORK RECORD:** Remained full time assignment as a machine operator in the PIA Wood Furniture Factory - Rough Mill Shop. There are no work supervisor's reports in the Central File noting work performance **GROUP ACTIVITIES:** None noted during this review period. **PSYCH. TREATMENT:** None noted during this review period. **PRISON BEHAVIOR:** None noted during this review period. **OTHER:** On 3/9/04, Inmate Snodgrass was given an opportunity to review his Central File pursuant to the Olsen decision per CDC 128B dated 3/9/04. |

ORDER:

- ☐ BPT date advanced by months.
- ☐ PBR date advanced by months.
- ☐ BPT date affirmed without change.
- ☐ PBR date affirmed without change.

SPECIAL CONDITIONS OF PAROLE:

- ☐ Previously imposed conditions affirmed.
- ☐ Add or modify

☐ Schedule for Progress Hearing on appropriate institutional calendar

SNODGRASS C50459 CTF-SOLEDAD

LIFE PRISONER EVALUATION REPORT Case 3:08-cv-03322-JSW Document 5-3 Filed 07/09/2008 Page 58 of 71 ADDENDUM

3-15-04

H. Staten Date
Correctional Counselor I

---

3/23/04

R. Leach Date
Correctional Counselor II

3-24-04

R. Pope Date
Facility Captain

3-29-04

D.S. Levorse Date
Classification and Parole Representative

SNODGRASS C50459 CTF-SOLEDAD

BPT 1004 (REV 7/86)

# EXHIBIT QQ

EXHIBIT QQ

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

DEPT 100

Date: August 29, 2003
Honorable: TERRY A. GREEN Judge | G.ARMENTA Deputy Clerk
NONE Bailiff | NONE Reporter

(Parties and Counsel checked if present)

BH 001953
IN RE,
JAVIER CORTEZ
PETITIONER,
ON HABEAS CORPUS

Counsel for Petitioner: NONE

Counsel for Respondent: NONE

Nature of Proceedings: ORDER RE WRIT OF HABEAS CORPUS

The Court has read and considered the respondent's motion to reconsider or modify the order of this Court dated August 5, 2003.

The motion to either reconsider or modify the original order is denied. This Court found no authority in the DOM (Department of Corrections Operational Manual) calling for "an assessment of an inmate's dangerousness" for a lifer hearing or that such a report be prepared by a Counselor I.

It seems especially wrong to use such a report prepared by a Counselor I in lifer hearings where they are relied on and quoted by the Board of Prison Terms in support of their decisions regarding parole dates.

Order is signed and filed this date.

A copy of this minute order is mailed via United States Mail addressed as follows:

Attorney General of the State of California
Attn: Heather Bushman (DAG)
110 West A Street, Ste. 1100
P.O. Box 85266
San Diego, CA 92186-5266

Nancy Tetreault
346 N. Larchmont Blvd.
Los Angeles, CA 90004

AUG 29 2003

, DEPUTY

BY

SUPERIOR COURT LOS ANGELES COUNTY CALIFORNIA

Minutes Entered
8/29/03
County Clerk

# Memorandum

**Date:** October 1, 2003

**To:** Linda Rianda
Classification Services Unit
Institutions Division

**Subject:** "Risk of Threat" in Board of Prison Terms Reports

The attached order from the Los Angeles County Superior Court came to our attention via an inmate appeal filed at the Correctional Training Facility. In his appeal the inmate is attempting to utilize the court's order regarding inmate Cortez to support his request for changes in his Board report.

Although the petition for habeas corpus applies only to inmate Cortez, the court order also states that the Board of Prison Terms is not to require anything in its reports not specifically called for by the Department Operations Manual and is to refrain from asking for an opinion on an inmate's "risk of threat" in the preparation of Board reports. As you are aware, the current report format provided to the Department by the Board of Prison Terms includes a section for the Correctional Counselor to provide an assessment of the inmate's risk to the community if paroled.

We are requesting your assistance in determining the appropriate course of action relative to the court's order. We are not going to implement any changes in the format of Board reports prepared by our staff, without direction from the Department to do so, but we certainly anticipate an increased number of appeals as the inmate population becomes aware of this court order.

Please contact me if your have any questions or need any additional information.

J. R. Solis
Warden (A)
Correctional Training Facility

Attachment
Cc: G. Galaza, Regional Administrator (A)
J. Brown, Chief Deputy Warden
P. Barker, Chief Deputy Warden (A)
D. Levorse, Classification & Parole Representative
W. Childress, Inmate Appeals Coordinator

State of California

noted & file 10/1/03

# Memorandum

Joe Solis - FYI
copies → Pat Barker, Bill Hill, Gerald Harris, Wade Cohen, Bill Childress, Debby Lavorse
pls share with Captains and counseling staff.

Date: October 6, 2003

To: J. BROWN
Chief Deputy Warden
CTF-Central Facility

Subject: **LIFE PRISONER'S EVALUATION REPORT (LPER)**

Recently the Appeals office has received several appeals from inmates not satisfied with their Board Reports, especially the counselor's assessment of their suitability for parole and/or risk factor in society.

These inmates are attaching the August 5, 2003 Superior Court of California, County of Los Angeles decision for a Javier Cortez, D44595, which reflects that the LPER is not to have any "assessment of risk" evaluation unless prepared by either a psychologist or psychiatrist. Further, the report is not to include anything not specifically called for by the DOM, and should preclude asking for the opinion on an inmate's risk of threat in the report.

On this day I spoke with Mike Mott, CC III assigned to Classification Services Unit (CSU). Mike indicated that his office was in receipt of the Cortez – Writ of Habeas Corpus decision. As a result of this decision, CSU was in the process of redefining Section IV (Future Plans), C (Assessment) of the Model Board Report Outline. However, until an instructional/clarification memo is issued, appeals of this nature should be denied and responded to in the following manner:

> **"The attached Los Angeles Superior Court decision rendered for Javier Cortez is noted; however, this decision is exclusive to Javier Cortez. Further, an agreement made by California Department of Corrections and the California Correctional Peace Officers Association through the Counselor Policy Committee for the Board of Prison Terms Model Board Report shall be adhered to until such time as the decision is superseded via a supplemental agreement or a change policy."**

I am recommending that this information be shared with all counseling staff as well.

W.J. HILL
Associate Warden (A)
CTF-Central Facility

OCT 8
AW CentH

RECEIVED
OCT - 7 2003
CDW-CENTRAL

J: 2 of 2

C 1617 (3/89)

State of California

Department of Corrections

CC: CDW'S
C&PR
ASSIST C&PR

# Memorandum

Date : October 15,2003

To : J. Solis
Warden (A)
Correctional Training Facility

→ Bill Hill
pls share with Facility Captains and Counseling staff –

Subject: **"RISK OF THREAT" IN BOARD OF PRISON TERMS REPORTS**

Contact was made with Legal Affairs referencing the above issue. Judy Harper of Legal Affairs relayed that the Correctional Training Facility does not need to confirm to this court mandate.

Note that the court mandate is for that particular inmate and does not constitute compliance across the board. No changes in the Board of Prison Terms reports are necessary at this time.

Should the inmate request to initiate a Writ of Habeas Corpus relevant to his own circumstance, it is within his legal rights.

As Legal Affairs was unaware of this court order regarding a dispute of the Board of Prison Terms reports, an appeal would have been initiated. Until such time as a court order requires all Board of Prison Terms reports reversed, continue to proceed accordingly within present departmental guidelines.

George Galaza
Regional Administrator (A)
Institutions Division-Central

AW Cent H

RECEIVED
OCT 17 2003
CDW-CENTRAL

RECEIVED
2003 OCT 16 A 10:40
WARDENS OFFICE
CTF SOLEDAD

J: 1 of 2

TOTAL P.01

CDC 1617 (3/89)

ORIGINAL FILED

31 2004

LOS ANGELES SUPERIOR COURT

COPY

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES

In re,

TONY AREMU,

Petitioner,

On Habeas Corpus

CASE NO. BH 002661

ORDER RE: WRIT OF HABEAS CORPUS

The Court has read and considered all the pleadings and exhibits filed by petitioner in support of his petition for relief and all pleadings and exhibits filed by respondent in opposition thereto. The central issue is the propriety of a Correctional Counselor I, without any special training, filing a Life Prisoner's Evaluation Report (LPER), Initial Parole Consideration Hearing, assessing an inmate's risk of threat to the community, if released on parole.

In August of 2003, this Court resolved the identical issue in *In re Javier Cortez* BH 001953, finding and holding that the Department Operational Manual (DOM) sections 62090.11 through 62090.11.21.2, nor anywhere else, do not call for or authorize an opinion on "assessment of threat" being filed by a Correctional Counselor I when preparing an LPER. That Court order was never challenged by the Attorney General and remains valid State-wide as to all life prisoners until declared otherwise by a Court of competent jurisdiction.

The LPER at issue herein was prepared in 1999. It remained in petitioner's "C" or central file to be reviewed by the Board as part of the material considered by it at suitability hearings. An effort was

made in connection with the 2004 LPER to satisfy the "*Cortez*" requirement of not having a CC I's opinion on "assessment of threat" as part of the report. But even then, the CC I was permitted to suggest that petitioner should participate in self-help therapy groups and upgrade educationally (Traverse, Ex. A, p. 3) in violation of the letter and spirit of the *Cortez* decision.

Although respondent, in its return, argues that petitioner is not entitled to any relief, this Court finds those arguments to be without merit in view of the conduct of the Board as evidenced by Exhibit "J" of the petition. The supplemental return filed August 23, 2004 declares that correctional counselors will no longer be required to complete risk assessments in life prisoner evaluation reports, pending changes in the DOM. The Court considers that as validating the *Cortez* decision in the light of present authority. It also considered the supplement to the return as approving that portion of the *Cortez* decision that orders the BPT not to require an LPER to have in it anything not specifically called for by the DOM and to refrain from asking for an opinion on an inmate's "risk of threat" in the preparation of that report. (Pet., Ex. A)

Since all LPERs prepared prior to August 19, 2004, the date on which the contents of the Supplement to Return was published and circulated State-wide, contains a risk assessment in violation of "*Cortez*", that assessment should be redacted from the report before being used by the Board at any future suitability hearings. Such an assessment should not appear at all in any future LPERs State-wide unless authorized by competent authority.

(1) The petition for relief is granted and CC I's are prohibited from making an assessment, or stating a conclusion or recommendation regarding petitioner's degree of risk or threat to the public, or potential for violence or dangerousness, and from making any treatment or therapy prescriptions as to petitioner and order that such determinations by made and reported only by qualified psychologists or psychiatrists.

(2) The CC I's assessment of petitioner's potential for violence or dangerousness and degree of risk or threat to the public and the CC I's treatment or therapy prescriptions are ordered redacted from the 1999 LPER pertaining to petitioner (Ex. E of petition) and that the BPT is barred from considering or relying upon said assessment in any future parole-related decision concerning petitioner.

(3) A new LPER is ordered prepared for petitioner's next subsequent suitability hearing and that

the determination of petitioner's potential for violence or dangerousness and degree of risk or threat to the public be made and reported only by a qualified psychologist or psychiatrist.

Date: 8-31-04

DAVID S. WESLEY
Judge of the Superior Court

Clerk to give notice.

JUL 24 2002
LOS ANGELES
SUPERIOR COURT

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES

In re,

JAVIER CORTEZ,

Petitioner,

On Habeas Corpus

CASE NO. BH 001953

ORDER TO SHOW CAUSE

The Warden is ordered to show cause why the petition should not be granted and shall file a return within 30 days of service of this order. Petitioner may file a denial within 30 days after filing and service of the return. Unless further hearing is ordered, the matter will be deemed submitted upon receipt of petitioner's denial or after the expiration of the time for filing the denial.

The affidavit shows a copy of the petition was served on the Attorney General's Los Angeles Office.

The question the court has is why shouldn't the report of the Counselor I be removed from the inmate's central file?

July 24, 2002

Clerk to give notice.

SUPERIOR COURT LOS ANGELES COUNTY CALIFORNIA

DAVID S. WESLEY
Judge of the Superior Court

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES**

**DEPT 100**

Date: August 5, 2003
Honorable: DAVID S. WESLEY Judge | G.ARMENTA Deputy Clerk
NONE Bailiff | NONE Reporter

(Parties and Counsel checked if present)

BH 001953
IN RE,
JAVIER CORTEZ,
PETITIONER,
ON HABEAS CORPUS

Counsel for Petitioner: NONE

Counsel for Respondent: NONE

Nature of Proceedings: ORDER RE WRIT OF HABEAS CORPUS

The Court has read and considered all the pleadings and exhibits filed by petitioner in support of his petition for relief and all pleadings and exhibits filed by respondent in opposition thereto. The central issue is the propriety of a Counselor I, without any special training, filing a Life Prisoner's Evaluation Report, Initial Parole Consideration Hearing, assessing an inmate's risk of threat to the community if paroled. In the instant matter, the report was found defective by the Department of Corrections Inmate Appeals Branch and the institution was ordered to re-write the report. (Pet. Ex. 2.) However, it was referred to by the Board at the suitability hearing held on November 6, 2001 and apparently discounted as "a mistake". (Ex. 1, p. 57, 58.) What effect it may have had on the final decision is hard to say.

Petitioner was making his initial parole consideration hearing when the LPER was considered. He had been convicted of first degree murder on December 8, 1986 and sentenced to a term of 27 years to life with the possibility of parole. His EPRD (Early Possible Release Date) was set at June 17, 2002.

The authority for the preparation of an LPER is DOM (Department Operations Manual) section 62090.8. The contents of the LPER is covered by DOM 62090.11 through 62090.11.2.1.2. Nowhere in these sections, or elsewhere in the DOM, is there authority or an instruction that an "assessment of threat" be opined. The fact, if it be a fact, that the format of the LEPR has a place for an expression of that kind of an opinion does not make it valid. The LEPR should contain only what the DOM authorizes, nothing more, nothing less. If that kind of an opinion was required for a correctional counselor without any specialized training, the DOM could very easily have spelled it out.

Respondent's references to DOM sections other than those between 62090.11 and 61090.11.2.1.2 as supporting an LPER containing an "assessment of threat" prepared by a CCI, is not supported by the manual. The section following 62090.11.2.1.2 is 620909.11.3 and is entitled "Non-Life Prisoner Evaluation Format" and has nothing to do with Life Prisoners. (Resp. Ex. E.) That section is followed by 62090.12 which refers to ISL Prisoner Progress Hearing. Next are sections 62090.13, 62090,13.1, and 62090.13.2 which deal with psychiatric reports, again having nothing to do with a correctional counselor's function vis a vis LPER.

The petition for habeas corpus relief is granted as far as to order the DOC to remove the LPER prepared by Correctional Counselor Mitchell from petitioner's "C" file and substitute the re-written report prepared as ordered by the Inmate Appeals Branch on October 15, 2002. The re-written report is not to have any "assessment of risk" evaluation unless prepared by either a psychologists or psychiatrist.

Further, the Board is not to require an LPER to have in it anything not specifically called for by the DOM and to refrain from asking for an opinion on an inmate's "risk of threat" in the preparation of that report.

Minutes Entered
8/5/03
County Clerk

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

DEPT 100

| Date: August 5, 2003 | | | |
|---|---|---|---|
| Honorable: DAVID S. WESLEY | Judge | G.ARMENTA | Deputy Clerk |
| NONE | Bailiff | NONE | Reporter |

(Parties and Counsel checked if present)

BH 001953
IN RE,
JAVIER CORTEZ,
PETITIONER,
ON HABEAS CORPUS

Counsel for Petitioner: NONE

Counsel for Respondent: NONE

The request for a new Initial Parole Consideration Hearing is denied. This Court can not say the Board abused its discretion by failing to set a parole date at the November 6, 2001 hearing.

Order re Writ of Habeas Corpus is signed and filed.

A copy of this minute order is mailed via United States Mail addressed as follows:

State of California
Department of Justice
Office of the Attorney General
Heather Bushman, DAG
110 West A Street, Ste. 1100
San Diego, CA 92101

California Department of Corrections
Inmate Appeals Branch
P.O. Box 942883
Sacramento, CA 94283-0001

Nancy L. Tetreault
Attorney at Law
346 No. Larchmont Blvd.
Los Angeles, CA 90004

Javier Cortez, D-44595
P.O. Box 689
GW No. 246L
Soledad, CA 93960-0689

THE DOCUMENT TO WHICH THIS CERTIFICATE IS ATTACHED IS A FULL, TRUE, AND CORRECT COPY OF THE ORIGINAL ON FILE AND OF RECORD IN MY OFFICE.

ATTEST AUG 0 5 2003

JOHN A. CLARKE,
Chief Executive Officer of the Superior Court of California, County of Los Angeles.

BY

LOS ANGELES COUNTY · CALIFORNIA

Minutes Entered
8/5/03
County Clerk

# EXHIBIT RR

EXHIBIT RR

Sandi Bowman / connection inc.

October 16, 2006

CCI Staten, Unit I
P.O. Box 687
Soledad, CA 93960-0686

Subject: Gary Randall Snodgrass
C-50459, Box 600, ED 82L

Dear Mr. Staten:

My relationship with Gary is that I am his first cousin. Gary's mother and my mother are sisters. I took care of Gary when he first came into this world. I remember helping Marietta, his mother, when she first came home from the hospital with him. I helped her often when he was growing up. He was a truly good kid. I remember he was sweet and thoughtful of others, especially his mom. His father died of cancer when he was about four years old. Gary didn't have a father to help him grow up. He was lost when he committed a very serious crime. Gary never had a criminal record before this happened. This was a sad day for all of us. Gary is remorseful of what he did and has served nearly 25 yrs. from a sentence that was 15-life.

I have talked with Gary regarding reentry of society. There will be an adjustment time for him. Things are very different now than they were in 1982. I will do every thing I can to see that Gary gets the help he needs in making this transition. Education and counseling will be very helpful for Gary. I have a cabin in the redwoods that my father built in the '50's and I thought he might enjoy this for a while.

My partner works at Infinion Raceway and has contacts with associated businesses there. These racing related businesses can always use help, especially someone who knows welding. This is one of Gary's interest. I also have friends who sail the SF Bay who always need help maintaining their boats. They are always looking for a new hand on board. I am familiar with what he likes because I send him educational books in these areas. I have many contacts in many fields and feel confident that Gary will find a job and place quickly.

In the years that I have met with Gary in prison, he has shown to be intelligent, artistic, articulate and strives to be a better person. He has gotten to know himself. He understands the importance of making the rest of his life worth while by making contributions to society. Thank you for giving me the opportunity to write on Gary's behalf.

Sincerely,

Sandi Bowman

Sandi Bowman

Cc: Gary R. Snodgrass

Furniture / Accessories
52 Slasia Drive
Novato, CA 94947
415.892.3446 T
415.892.3498 F
www.sandibowman.com
sbowman@sandibowman.com

Sandi Bowman / connection inc.

October 16, 2006

California Training Facility
C & PR Grill
P.O. Box 689
Soledad, CA 93960-0689

Re: Gary R. Snodgrass
C-50459

To Whom It May Concern:

Please add the enclosed letter to Gary Snodgrass'es file for his upcoming parole hearing. We expect that review some time in the Fall or Winter of 2006.

Thank you for your attention in this matter.

Sincerely,

Sandi Bowman

Sandi Bowman

Enc.

Furniture / Accessories
52 Stasia Drive
Novato, CA 94947
415.892.3446 T
415.892.3498 F
www.sandibowman.com
sbowman@sandibowman.com

Sandi Bowman / connection inc.

October 16, 2006

CCI Staten, Unit I
P.O. Box 687
Soledad, CA 93960-0686

Subject: Gary Randall Snodgrass
C-50459, Box 600, ED 82L

Dear Mr. Staten:

My relationship with Gary is that I am his first cousin. Gary's mother and my mother are sisters. I took care of Gary when he first came into this world. I remember helping Marietta, his mother, when she first came home from the hospital with him. I helped her often when he was growing up. He was a truly good kid. I remember he was sweet and thoughtful of others, especially his mom. His father died of cancer when he was about four years old. Gary didn't have a father to help him grow up. He was lost when he committed a very serious crime. Gary never had a criminal record before this happened. This was a sad day for all of us. Gary is remorseful of what he did and has served nearly 25 yrs. from a sentence that was 15-life.

I have talked with Gary regarding reentry of society. There will be an adjustment time for him. Things are very different now than they were in 1982. I will do every thing I can to see that Gary gets the help he needs in making this transition. Education and counseling will be very helpful for Gary. I have a cabin in the redwoods that my father built in the '50's and I thought he might enjoy this for a while.

My partner works at Infinion Raceway and has contacts with associated businesses there. These racing related businesses can always use help, especially someone who knows welding. This is one of Gary's interest. I also have friends who sail the SF Bay who always need help maintaining their boats. They are always looking for a new hand on board. I am familiar with what he likes because I send him educational books in these areas. I have many contacts in many fields and feel confident that Gary will find a job and place quickly.

In the years that I have met with Gary in prison, he has shown to be intelligent, artistic, articulate and strives to be a better person. He has gotten to know himself. He understands the importance of making the rest of his life worth while by making contributions to society. Thank you for giving me the opportunity to write on Gary's behalf.

Sincerely,

Sandi Bowman

Sandi Bowman

Cc: Gary R. Snodgrass

Furniture / Accessories
52 Slosia Drive
Novato, CA 94947
415.892.3446 T
415.892.3498 F
www.sandibowman.com
sbowman@sandibowman.com

A-1 CTF

Sandi Bowman / connection inc.

October 16, 2006

CCI Staten, Unit I
P.O. Box 687
Soledad, CA 93960-0686

Subject: Gary Randall Snodgrass
C-50459, Box 600, ED 82L

Dear Mr. Staten:

My relationship with Gary is that I am his first cousin. Gary's mother and my mother are sisters. I took care of Gary when he first came into this world. I remember helping Marietta, his mother, when she first came home from the hospital with him. I helped her often when he was growing up. He was a truly good kid. I remember he was sweet and thoughtful of others, especially his mom. His father died of cancer when he was about four years old. Gary didn't have a father to help him grow up. He was lost when he committed a very serious crime. Gary never had a criminal record before this happened. This was a sad day for all of us. Gary is remorseful of what he did and has served nearly 25 yrs. from a sentence that was 15-life.

I have talked with Gary regarding reentry of society. There will be an adjustment time for him. Things are very different now than they were in 1982. I will do every thing I can to see that Gary gets the help he needs in making this transition. Education and counseling will be very helpful for Gary. I have a cabin in the redwoods that my father built in the '50's and I thought he might enjoy this for a while.

My partner works at Infinion Raceway and has contacts with associated businesses there. These racing related businesses can always use help, especially someone who knows welding. This is one of Gary's interest. I also have friends who sail the SF Bay who always need help maintaining their boats. They are always looking for a new hand on board. I am familiar with what he likes because I send him educational books in these areas. I have many contacts in many fields and feel confident that Gary will find a job and place quickly.

In the years that I have met with Gary in prison, he has shown to be intelligent, artistic, articulate and strives to be a better person. He has gotten to know himself. He understands the importance of making the rest of his life worth while by making contributions to society. Thank you for giving me the opportunity to write on Gary's behalf.

Sincerely,

*Sandi Bowman*

Sandi Bowman

Cc: Gary R. Snodgrass

RECEIVED
O 1 2006
OF PRISON TERMS

Furniture / Accessories
52 Stasia Drive
Novato, CA 94947
415.892.3446 T
415.892.3498 F
www.sandibowman.com
sbowman@sandibowman.com

Sandi Bowman / connection inc.

October 16, 2006

Board of Parole Hearings
1515 "K" St.
Sacramento, CA 95814

Re: Gary R. Snodgrass
C-50459

To Whom It May Concern:

Please add the enclosed letter to Gary Snodgrass'es file for his upcoming parole hearing. We expect that review some time in the Fall or Winter of 2006.

Thank you for your attention in this matter.

Sincerely,

Sandi Bowman

Enc.

Furniture / Accessories
52 Slasia Drive
Novato, CA 94947
415.892.3446 T
415.892.3498 F
www.sandibowman.com
sbowman@sandibowman.com

GLENN M. WEBER
216 DANVILLE DRIVE
LOS GATOS, CA 95032-3913
OCTOBER 10, 2006

CALIFORNIA TRAINING FACILITY - CENTRAL C& PR GRILL
P. O. BOX 689
SOLEDAD, CA 93960-0689

RE: GARY SNODGRASS C-50459

I HAVE KNOWN GARY SNODGRASS SINCE HE WAS A SMALL CHILD. MY WIFE AND I ARE AMONG THE FRIENDS THAT KEEP IN TOUCH WITH GARY AFTER HIS LONG INCARCERATION.WE HAVE DONE THIS BECAUSE WE STRONGLY BELIEVE THAT GARY WILL BE A USEFUL AND LAW ABIDING CITIZEN IN THE COMMUNITY. HE HAS STRONG LEADERSHIP QUALITIES, AND HAS SHOWN THAT HE CAN FOLLOW HIS INTERESTS IN A PRODUCTIVE WAY WHEN RELEASED. GARY REALIZES HIS MISTAKES, AND WE ARE ASSURED THAT HE WILL NOT REPEAT THEM. HE HAS READ MANY BOOKS ON ANGER MANAGEMENT, AND SELF-HELP. GARY IS REHABILITATED, AND SHOULD NOT HAVE TO REMAIN IN PRISON ANY LONGER. HE HAS AN EXCELLENT RECORD WHILE HE HAS BEEN IN PRISON.

WHEN RELEASED, GARY CAN USE MANY OF THE SKILLS HE HAS DEVELOPED WHILE IN PRISON, SUCH AS AERONAUTICAL, AND MECHANICAL SKILLS. HE HAS CERTIFICATIONS IN CABINET MAKING, DRAFTING, AIRCRAFT MAINTENANCE AND WELDING. HE IS CURRENTLY STUDYING BOAT BUILDING AND SAILING. HE IS A FINE CRAFTSMAN IN WOODWORKING, WHICH IS ANOTHER SKILL THAT WILL HELP HIM UPON HIS RELEASE.

WE ARE CERTAIN THAT GARY CAN SECURE A POSITION IN LANDSCAPING OR CONSTRUCTION, WHILE HE DECIDES ON HIS FUTURE WORK AND LOCATION. IF GARY WISHES, HE CAN RELOCATE TO OREGON, OUR SECOND HOME, OR HE COULD CHOOSE TO STAY WITH US IN SANTA CLARA COUNTY. MANY JOBS ARE AVAILABLE IN BOTH OF THESE AREAS. IF HE WISHES TO RELOCATE TO CENTRAL OREGON, THERE IS ROOM FOR HIM TO HAVE HIS OWN MOBILE HOME ON OUR PROPERTY, AND WE WOULD GIVE HIM IMMEDIATE EMPLOYMENT IN TAKING CARE OF THE ACERAGE, AND THE HORSES. HE COULD USE OUR "SHOP", LOCATED ON THE PROPERTY TO CONTINUE HIS WOODWORKING SKILLS. THERE ARE MANY ART EVENTS, WHERE HE COULD SELL HIS WORK. MY WIFE'S SON IS A BUILDING CONTRACTOR IN SANTA CLARA COUNTY, AND HE WOULD BE WILLING TO GIVE GARY EMPLOYMENT UPON HIS RELEASE, IF HE WISHES TO REMAIN THERE.

WE WILL OFFER GARY TEMPORARY HOUSING, FINANCIAL ASSISTANCE, AND SPEND TIME WITH HIM UPON HIS RELEASE. HE CAN LIVE WITH US AT 216 DANVILLE DRIVE, LOS GATOS, CA 95032, (408)356-6113, OR AT OUR SECOND HOME IN OREGON AT 17430 PLAINVIEW ROAD, BEND, OR 97701, 541-318-0766.

WE WILL PROVIDE HIM WITH TRANSPORTATION, AND CERTAINLY LOTS OF HELP AND ENCOURAGEMENT TO ASSIST HIM IN WHATEVER AREAS ARE NEEDED. WE ARE LONG-TIME RESIDENTS OF SANTA CLARA COUNTY, AND CAN PUT HIM IN TOUCH WITH OTHERS WHO CAN HELP WITH JOBS, AND RELOCATION ASSISTANCE. I AM RETIRED, AND CAN BE THERE FOR HIM MOST OF THE TIME. MY DAUGHTER WORKS FOR A CHURCH IN SAN JOSE, AND THERE WOULD BE ASSISTANCE FOR HIM THERE, AS WELL AS MANY CONTACTS FOR EMPLOYMENT.

PLEASE GIVE GARY SNODGRASS YOUR UTMOST CONSIDERATION AT THIS UPCOMING PAROLE HEARING. HE HAS PAID FOR HIS CRIME, IS TOTALLY REHABILITATED, AND CERTAINLY SHOULD NOT REMAIN IN PRISON ANY LONGER.

YOURS VERY TRULY,

Glenn M. Weber

Lenore A. Shelley Weber

GLENN M WEBER
LENORE A. SHELLEY-WEBER

TO: CALIFORNIA TRAINING FACILITY - CENTRAL C& PR GRILL
P. O. BOX 689
SOLEDAD, CA 93960-0689

RE: GARY SNODGRASS C-50459

SIRS:

I REQUEST THAT THIS LETTER OF SUPPORT BE INSERTED INTO THE CENTRAL FILE OF THE ABOVE PRISONER, SO THAT THEY MAY BECOME PART OF THE RECORD AT HIS UPCOMING PAROLE HEARING.

THANK YOU FOR YOUR HELP IN THIS MATTER

RESPECTFULLY,

Glenn M. Weber

GLENN M. WEBER
216 DANVILLE DRIVE
LOS GATOS, CA 95032-3913

# EXHIBIT SS

**2002 BPT — DENIAL DECISION**

EXHIBIT SS

CALIFORNIA BOARD OF PRISON TERMS

D E C I S I O N

**DEPUTY COMMISSIONER JOHNSON:** We are back on the record. This is side two of the tape.

**PRESIDING COMMISSIONER BORDONARO:** Back on the record in the case of Mr. Snodgrass. All those that were previously in the room have returned. The Panel has reviewed all the information received from the public and relied on the following circumstances in concluding that the inmate is not yet suitable for parole; that he would pose an unreasonable risk of danger to society or a threat to public safety if released from prison. These conclusions are drawn from the Statement of Facts, wherein the inmate shot his stepfather, Mr. John Nailen. Shot him with Mr. Nailen's rifle. Shot him one time in the chest and then shot him a second time. This was after, I guess you could call it a tumultuous relationship between the two over a relatively long period of time. The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering. It was carried out in a cruel manner, a callous manner. The inmate's

     previous record was non-existent. Didn't have a juvenile record nor did he have an adult record at the time of the commitment offense. He was a -- and he has admitted to being a heavy user of alcohol and marijuana in his teenage years. Institutionally, he has not yet fully participated in beneficial self-help and/or therapy programs. He has had only one 115, back in 1989. That was for out of bounds. He's had six 128's; the last was in 1995. The psychological report, which is dated 7/13/1999 -- There are no red flags in this psychological report as far as Axis I or II diagnoses. We are going to ask for a new psych report, mainly because of the age. It's a 1999; should be redone so that it is timely. And this is signed by a -- last name O-B-R-O-C-H-T-A, Obrochta, PhD. Also Dhaliwan, D-H-A-L-I-W-A-N, PhD. They do state that his assessment of dangerousness if he were released to the community, his level of dangerousness is considered average for the general population. I'm not sure if they're speaking of general population inmates or general population outside of the walls, because they do talk about being released to

the community. So again, there's no red flags that are necessarily negative, but I do think that we need to have them clarified. His parole plans, he has a letter of support from his mother that does offer him residence in the last county of legal residence. He does not yet have acceptable employment plans. 3042 notices do indicate opposition to a finding of parole suitability. Specifically from the District Attorney of Contra Costa County. And the correctional counselor writes that this inmate, in their opinion, would pose a low degree of threat. The Panel does make the following findings: That the prisoner does need self-help programming or therapy programming, in order to face, discuss, understand, and cope with stress in a non-destructive manner. And until progress is made, he continues to be unpredictable and a threat to others. He should be commended for not having any 115's since 1989, which is his only 115, and that was for out of bounds. He's been in AA for quite some time. He has completed vocations in mill and cabinet and air engine and frame. In fact, he was FAA certified, in that he has seven certifications

in the various welding processes. And also told us today that he completed a drafting trade. Should be commended on those activities. However, they do not yet outweigh the factors of unsuitability. This is going to be a one-year denial. In the next year, we recommend that the inmate remain disciplinary free. That if available -- if it's available to him, to participate in any self-help programming. If there were to be any therapy programming available to GP inmates, to participate in that also; whether they be groups or any other type of therapy. And if there's any Anger Management, in particular, it might be helpful. And to cooperate with clinicians in the completion of a new clinical evaluation to be performed prior to the next Board hearing, in accordance with the guidelines between BPT and CDC. That concludes the reading of the decision. Commissioner Johnson, any comments?

**DEPUTY COMMISSIONER JOHNSON:** Do you know of any other self-help programs available here at CTF that you might think you -- would benefit you?

**INMATE SNODGRASS:** There's an AA

Program. But there is quite a long waiting list.

DEPUTY COMMISSIONER JOHNSON: I said other than AA group.

INMATE SNODGRASS: Not to my knowledge; no.

DEPUTY COMMISSIONER JOHNSON: Okay. I think the suggestion is that you look at that. Because there is -- there is an issue of anger management that needs to be addressed. And you need to do what you can about addressing that.

INMATE SNODGRASS: Is there some evidence that shows I have an anger problem?

DEPUTY COMMISSIONER JOHNSON: That's my suggestion to you.

INMATE SNODGRASS: But there's no evidence of that.

DEPUTY COMMISSIONER JOHNSON: Okay. I don't have anything further.

PRESIDING COMMISSIONER BORDONARO: Don't forget the tentative decision there for the inmate; the pink copy.

DEPUTY COMMISSIONER JOHNSON: Yes.

PRESIDING COMMISSIONER BORDONARO: That concludes the hearing then, at 11:54. Good

luck.

--ooo--

PAROLE DENIED ONE YEAR

EFFECTIVE DATE OF THIS DECISION DEC 24 2002

# EXHIBIT TT

EXHIBIT TT

BOARD OF PRISON TERMS STATE OF CALIFORNIA
LIFE PRISONER HEARING DECISION FACE SHEET

[ ] PAROLE GRANTED - (YES)
CDC: Do not release prisoner before Governor's review

[X] PAROLE DENIED - (NO) one (1) year

Records Use Only

Parole Release Date ______ YR MO DAY

Attach Prison Calculation Sheet

~~[ ] AGREED UNSUITABLE (Attach 1001A Form) FOR:________YEAR(S)~~
[ ] HEARING POSTPONED/REASON:____________________

**PANEL RECOMMENDATIONS AND REQUESTS**

**The Board Recommends:**

[ ] No more 115's or 128A's [✓] Stay discipline free
[ ] Work to reduce custody level [ ] Learn a trade* [✓] Earn positive chronos
[✓] Get self-help* [ ] Get therapy* [ ] Get a GED*
Parole plans
[ ] Recommend transfer to____________________
[ ] Other____________________
*These programs are recommended if they are offered at your prison and you are eligible/able to participate.

**Penal Code 3042 Notices** [ X ] Sent Date: 3/30/04

Commitment Offense(s) **PC187** Code(s) **MURDER 2ND** Crime(s)
**CC 26252** Case #(s) **1** Count #(s)

| Date Inmate Came to CDC | Date Life Term Began | Minimum Eligible Parole Date |
|---|---|---|
| 7/19/82 | 7/19/82 | 9/11/90 |

[ ] Initial Hearing [ X] Subsequent (Hearing No.) #10 Date of Last Hearing 11/22/02

CDC Representative
Attorney for Prisoner Address
D.A. Representative County CONTRA COSTA

This form and the Board's decision at the end of the hearing is only proposed and NOT FINAL. It will not become final until it is reviewed.

Chair ________ Date 5-20-04
Panel Member ________ Date
Panel Member ________ Date

| NAME | CDC # | CTF-SOLEDAD | CALENDAR | DATE |
|---|---|---|---|---|
| SNODGRASS, GARY | C-50459 | | May-04 | 5/20/04 |

BPT 1001 (REV. 08/03)

**CALIFORNIA BOARD OF PRISON TERMS**

**D E C I S I O N**

**PRESIDING COMMISSIONER WELCH:** Are we on record?

**DEPUTY COMMISSIONER GARNER-EASTER:** Yes.

**PRESIDING COMMISSIONER WELCH:** Okay. The Panel reviewed all the information received from the public and relied on the following circumstances in concluding that the prisoner is not suitable for parole and would pose an unreasonable risk of danger to society or a threat to public safety if released from prison. One, this offense was carried out in an especially cruel and callous manner. The offense was carried out in a dispassionate and calculated manner. The offense was carried out in a manner that demonstrates an exceptionally callous disregard for another human being. The motive for the crime was inexplicable. The conclusion was drawn from the Statement of Facts wherein the prisoner waited for his stepfather. After he came home, the prisoner had put a weapon in the garage, and apparently the stepfather returned home from dropping off the wife and daughter. He told the prisoner to put the cat out. The prisoner complied with this order, and he went outside. He retrieved the weapon. And as he

was preparing the weapon, it accidentally discharged. The victim came out to investigate the disturbance and was shot by the prisoner twice. The prisoner did not have a major criminal history, an escalating pattern of criminal conduct. There are some contacts with law enforcement agencies that he had. However, there was no major criminality. If we listen to -- reading from the record, it appears that the prisoner did have an unstable social history. There are some unstable dynamics that was talked about today or read into the record. The prisoner has programmed in a somewhat effective manner. Recent psychological report shows that the prisoner is making progress, shows that his level of dangerousness both in a structured and unstructured environment is improved. It shows that he's on the right track. Dr. Joe Reed wrote this report for 10/20/03. The prisoner does not have realistic parole plans, does not have viable residential, nor does he have acceptable employment plans, at least not documented in the record for this hearing today. The Hearing Panel notes that in response to Penal Code 3042 notices, the Deputy District Attorney from Contra Costa County spoke in opposition to a finding of suitability. The Panel makes the

following findings: The prisoner needs to continue to participate in positive kinds of programs, the kinds that would enable him to be able to face, discuss, understand, and cope with stress in a nondestructive manner. Until enough progress is made, the prisoner continues to be unpredictable and a threat to others. Nevertheless, there's some things that we want to commend him for. Certainly, his disciplinary behavior in prison should be -- it should be noted, and he should be commended for that. He should also be commended for his trades that he's developed over the years. All those things are commendable. However, those positive aspects of his behavior does not outweigh the factors of unsuitability. Parole is going to be denied for one year. And in that one year what we're recommending is that you remain disciplinary-free, continue to participate in positive kinds of programs, self-help programs, etceteras. We also recommend that you develop parole plans. This is your hearing. You meet the minimum qualifications to represent yourself, and there's no reason for us to deny you not to represent yourself. But sometimes a lawyer, as I pointed out to you, can help you get everything together and make a better presentation. In some areas, I don't feel that you

represented yourself very well today, even though it's your prerogative to represent yourself. If you've got a chip on your shoulder, you need to get that chip off your shoulder before you come in.

**INMATE SNODGRASS:** Is that an allegation or an accusation?

**PRESIDING COMMISSIONER WELCH:** No, I'm saying if you do. It's neither one. I'm actually trying to help you, trying to tell you that you need to come in and be positive, because you can't intimidate the Board. The Board is not going to be intimidated. I'm trying to tell you how you can better proceed and give yourself a better chance at getting a parole date. You can take it for whatever it's worth. It's not an accusation. It was only an attempt to tell you that you didn't come across very good, at least from my perspective. You didn't -- From my perspective, it didn't appear that you were very well prepared. You didn't cover all the things that you need to cover in order to be found suitable for parole. So that's all I have to say to you. Commissioner, any comments?

**DEPUTY COMMISSIONER GARNER-EASTER:** I do. And I'm going to state them on record to you, sir. I want to tell you what my impression is of voting

for a date for you. So I hope you'll really listen to me. You've asked what you need to do to parole. First of all, in my estimation, you were a very young man when this crime happened. Yes, it was a bad crime. You've done well in prison. If you want a date, the next time you come in you need to -- I would strongly recommend when you come in bring your packet with you, have a decent attitude. Listen to me very carefully. It's like a job interview. And every time you go for a job interview, you have to act like it's the first time. So you can't go to the next job kind of having a predisposed attitude, I'm not going to get this job anyway. So come here fully prepared. Have a letter from your mother if that's where you want to parole to. Have a recent letter, and have some kind -- something in writing about your employment, even if it's the PIA. And I think that will serve you well. If you were to even just have the letters, I probably could have given you a date today. But that's me.

**INMATE SNODGRASS:** It's give and take.

**DEPUTY COMMISSIONER GARNER-EASTER:** I'm sorry?

**INMATE SNODGRASS:** It's give and take these days.

**DEPUTY COMMISSIONER GARNER-EASTER:** Well, it is. But you know what, here's the deal. Just like with a job interview, I'm telling you what you do. When guys come in here and they say, but I've been here 20 years. it's time to go, you need to tell me exactly what I just told you what. If I was on the Panel with you, you need a job, placement for a job or some kind of -- something in writing. You need a letter from your mom offering you a home. You need to bring your packet with you. Show you're prepared, and come in and talk to us, and just talk to us like you need to talk to us. It's not fixed. If I'm on the Panel, that's what I need to see.

**PRESIDING COMMISSIONER WELCH:** Okay. That concludes this hearing at approximately 13 --

--oOo--

**PAROLE DENIED ONE YEAR**

**THIS DECISION WILL BE FINAL ON:** SEP 17 2004.

**YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO THAT DATE, THE DECISION IS MODIFIED.**

**CERTIFICATE AND**

**DECLARATION OF TRANSCRIBER**

I, APRIL ALLEN, a duly designated transcriber, CAPITOL ELECTRONIC REPORTING, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total one in number and cover a total of pages numbered 1 through 54, and which recording was duly recorded at CORRECTIONAL TRAINING FACILITY, at SOLEDAD, CALIFORNIA, in the matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING of GARY SNODGRASS, CDC No. C-50459, on MAY 20, 2004, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape(s) to the best of my ability.

I hereby certify that I am a disinterested party in the above-captioned matter and have no interest in the outcome of the hearing.

Dated June 3, 2004, at Sacramento County, California.

April Allen
Transcriber
**CAPITOL ELECTRONIC REPORTING**

# EXHIBIT UU

EXHIBIT UU

BOARD OF PRISON TERMS — STATE OF CALIFORNIA

LIFE PRISONER HEARING DECISION FACE SHEET

- [ ] PAROLE GRANTED – (YES)
- [ ] CDC: Do not release prisoner before Governor's Review
- [ ] PAROLE DENIED – (NO)

Records Use Only

Parole Release Date ________ YR MO DAY

Attach Prison Calculation Sheet

- [X] AGREED UNSUITABLE (Attach 1001A Form) FOR: One YEAR(S)
- [ ] HEARING POSTPONED/REASON:

## PANEL RECOMMENDATIONS AND REQUESTS

**The Board Recommends:**

- [ ] No more 115's or 128A's
- [ ] Work to reduce custody level
- [X] Get self-help*
- [X] Stay discipline free
- [ ] Learn a trade*
- [ ] Get therapy*
- [X] Earn positive chronos
- [ ] Get a GED*
- [ ] Recommend transfer to
- [X] Other Firm up parole plans

*These programs are recommended if they are offered at your prison and you are eligible / able to participate.

**Penal Code 3042 Notices** [X] Sent **Date: 03/30/04**

Commitment Offense(s)

| Code(s) | Crime(s) |
|---|---|
| PC187 | MURDER 2ND |

| Case(s) | Count(s) |
|---|---|
| CC26252 | 1 |

| Date Inmate Came to CDC | Date Life Term Began | Minimum Eligible Parole Date |
|---|---|---|
| 07/19/82 | 07/19/82 | 09/11/90 |

- [ ] Initial Hearing
- [ ] Subsequent (Hearing No,)

Date of Last Hearing

CDC Representative

Attorney for Prisoner **PAT FOX** Address

D.A. Representative Cabral County **CONTRA COSTA**

This form and the Board's decision at the end of the hearing on only proposed and NOT FINAL. It will not become final until it is reviewed.

Chair Susan Fisher Date 12/7/05

Panel Member [signature] Date

Panel Member Date

| NAME | CDC# | PRISON | CALENDAR | DATE |
|---|---|---|---|---|
| SNODGRASS, GARY | C-50459 | CTF-SOLEDAD | DEC. 2005 | 12/06/05 |

BOARD OF PRISON TERMS STATE OF CALIFORNIA
LIFE PRISONER: PAROLE CONSIDERATION PROPOSED DECISION:
DENY PAROLE

[X] PAROLE DENIED FOR: (1) 2 3 4 5 YEARS

Place the prisoner on the 12/06 calendar for his next subsequent hearing.

If this decision is final, you WILL NOT get paroled. The Board will send you a copy of the decision. It will indicate the reasons you did not get paroled. If this decision is not final, the Board will set up another hearing. You can read the laws about your hearing. You can find the laws at California Code of Regulations, Title 15, section 2041.

**RECOMMENDATIONS**

**The Board Recommends:**

[ ] No more 115's or 128A's
[ ] Work to reduce custody level
[X] Get self-help*
[X] Stay discipline free
[ ] Learn a trade*
[ ] Get therapy*
[X] Earn positive chronos
[ ] Get a GED*

[ ] Recommend transfer to ______
[X] Other Firm up parole plan

* These programs are recommended if they are offered at your prison and you are eligible/able to participate.

**HEARING PANEL**

Name [signature] Date 12/7/05
Name [signature] Date
Name Date

| NAME | CDC# | PRISON | DATE |
|---|---|---|---|
| Snodgrass, Gary | C 50459 | CTF | 12/7/05 |

BPT 1005(b)
(REV 04/04)

Distribution White-C File
Canary-BPT
Pink-Prisoner

BOARD OF PRISON TERMS
LIFE PRISONER HEARING – EXTRAORDINARY ACTION AND DECISION

STATE OF CALIFORNIA
BPT 1001A (Rev. 10/89)

☐ I certify to the best of my knowledge and information, the foregoing reasons as stated by the prisoner are accurate, and that the prisoner was capable of making a knowledgeable decision regarding his/her hearing.

The following information is submitted for the Board's consideration in making their decision:

C&PR Signature | Date

FOR BOARD OF PRISON TERMS USE ONLY

## DECISION / ORDER

### WAIVER OF RIGHT TO ATTEND HEARING

1. ☐ Request is denied.

   ☐ Request is granted. Hearing will be conducted in absence of prisoner.

### POSTPONEMENT

2. ☐ Request is denied.

   ☐ Request is granted. Grant based on a finding of good cause. Place on ____________ calendar.

### WAIVER OF HEARING AND STIPULATION TO UNSUITABILITY

3. ☐ Request is denied.

   ☒ Request is granted. The Board agrees to enter into the stipulation, on a finding of good cause, offered by the prisoner on the waiver of his/her Life Parole Consideration Hearing and orders a:

   ☒ One-year denial ☐ Two-year denial* ☐ Three-year denial**

* The Board must find it unreasonable to expect that the prisoner would be eligible for parole during the second, or second and third year, and the Board must state the reasons for its finding.

** In addition to the above (*), the prisoner must have been convicted of more than one offense which involves the taking of a life.

(The basis of the finding of good cause for postponement or multiple-year denial must be stated below.)

☐ Good cause based on the reasons given by the prisoner.

Other comments (if applicable):

Firm up parole plan

Signature of BPT Commissioners

1. [signature] Date 12/7/05

2. [signature] Date

BPT Action Taken At: ☐ BPT Headquarters ☐ Institution

| NAME | CDC NUMBER | INSTITUTION | CALENDAR | HEARING DATE |
|---|---|---|---|---|
| Snodgrass | C-50459 | CTF | 12-05 | 7 DEC 05 |

BOARD OF PRISON TERMS
LIFE PRISONER HEARING – EXTRAORDINARY ACTION AND DECISION

STATE OF CALIFORNIA
BPT 1001A (Rev. 10/89)

| | | | |
|---|---|---|---|
| ACTION TYPE (select one) | ☐ Waiver of Appearance | nd ☒ Request for Postponement | ☒ Waiver of Parole Consideration Hearing–Stipulation of Unsuitability |
| HEARING TYPE (select one) | ☒ Parole Consideration | ☐ Progress | ☐ Rescission |
| Hearing Date: 7 Dec 05 | | | |

## WAIVER OF RIGHT TO ATTEND HEARING

I understand that I am scheduled for the Board of Prison Terms hearing indicated above.

☐ ~~I do not wish to attend my Board hearing and do not wish to be represented at the hearing. The~~ hearing will be held in my absence.

☐ I do not personally wish to attend my hearing but I do wish to be represented by counsel at the hearing.

☐ I will employ counsel to represent me at the hearing.

☐ I cannot afford counsel and wish counsel appointed to represent me.

## POSTPONEMENT

I understand that I am scheduled for the Board of Prison Terms hearing indicated above.

☐ I hereby request that the hearing indicated above be Postponed to ____________________.

The reasons for my request for postponement are stated below.

## WAIVER OF HEARING AND STIPULATION TO UNSUITABILITY

I understand that I am scheduled for the Board of Prison Terms Hearing Indicated above.

☒ I waive my right to a parole consideration hearing and I waive the right to have an attorney represent me at a hearing in by absence. I find that I am unsuitable for parole based on my reasons given on this form and therefore request that you find me unsuitable.

☒ One-year Denial ☐ Two-year Denial ☐ Three-year Denial

PRISONER'S REASON(S) FOR REQUEST:
(For example: Psychiatric Evaluation Not Supportive, Programming Inadequate, Cat H Incomplete, etc.)

Parole plans must be confirmed

| | |
|---|---|
| Signature of Prisoner: Patricia Etex | Date: 7 Dec 05 |
| Signature of Attorney (if applicable): Gary Snodgrass | Date: 7 Dec 05 |
| Signature and Title of Witness (CDC) | Date |

| NAME | CDC NUMBER | INSTITUTION | CALENDAR | HEARING DATE |
|---|---|---|---|---|
| Snodgrass | C-50459 | CTF | 12-05 | 6 Dec 05 |

BOARD OF PRISON  STATE OF CALIFORNIA

# LIFE PRISONER PAROLE CONSIDERATION WORKSHEET

☐ INITIAL HEARING ☒ SUBSEQUENT HEARING

| PRISONER'S NAME | CDC NUMBER |
|---|---|
| **SNODGRASS, GARY** | **C50459** |
| DATE OF HEARING | LOCATION |
| **TUESDAY, DECEMBER 06, 2005** | CORRECTIONAL TRAINING FACILITY - SOLEDAD |

## LEGAL STATUS

| DATE RECEIVED | DATE LIFE TERM STARTS (IF DIFFERENT) | COUNTY |
|---|---|---|
| 07-19-82 | | CONTRA COSTA |
| OFFENSE | | CASE NUMBER |
| MURDER 2ND W/USE OF LEAD WEAPON | | CC26252 |

| COUNT NUMBER(S) | PENAL CODE SECTIONS(S) VIOLATED |
|---|---|
| 1 | PC 187 W/ P12022.5 |
| TERMS | MEPD |
| 15 YEARS TO LIFE | 09/11/90 |

## OTHER COMMITMENT OFFENSES *OR STAYED COUNTS*

| STAYED | OFFENSE | CODE SECTION | COUNTY | CASE NUMBER | COUNT NUMBER |
|---|---|---|---|---|---|
| ☐ | | | | | |
| ☐ | | | | | |
| ☐ | | | | | |

## PRESENT AT HEARING

| PANEL MEMBER | PANEL MEMBER | PANEL MEMBER |
|---|---|---|
| Fisher | Lopez | |

OTHERS PRESENT

☐ PRISONER (IF ABSENT, WHY)

☒ ATTORNEY Fox

☒ DEPUTY D.A. Cabral COUNTY OF Contra Costa

☐ OTHERS:

## STATEMENT OF FACTS

☐ THE HEARING PANEL INCORPORATED BY REFERENCE FROM THE DECISION OF THE HEARING HELD ON ____, PAGES ____ THROUGH ____

☐ THE STATEMENT OF FACT IS

☐ QUOTED FROM THE BOARD REPORT, DATED ____ ,PAGE(S) ____

☐ QUOTED FROM THE PROBATION OFFICER'S REPORT, PAGE(S) ____

☐ QUOTED FROM THE COURT OPINION, PAGE(S) ____

# EXHIBIT VV

EXHIBIT VV

FILED

APR 06 2007

CATHY A. CATTERSON, CLERK
U.S. COURT OF APPEALS

**NOT FOR PUBLICATION**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | |
|---|---|
| MELVYN COLEMAN,<br><br>Petitioner - Appellee - Cross-Appellant,<br><br>v.<br><br>CALIFORNIA BOARD OF PRISON TERMS, et al.,<br><br>Respondents - Appellants - Cross-Appellees. | Nos. 05-17380, 06-15478<br><br>D.C. No. CV-96-0783-LKK-PAN<br><br>MEMORANDUM[*] |

Appeal from the United States District Court
for the Eastern District of California
Lawrence K. Karlton, District Judge, Presiding

Argued and Submitted February 8, 2007
San Francisco, California

Before: TASHIMA, Circuit Judge, CALLAHAN, Circuit Judge, and SCHIAVELLI,[**] District Judge.

---

[*] This disposition is not appropriate for publication and is not precedent except as provided by 9th Cir. R. 36-3.

[**] The Honorable George P. Schiavelli, United States District Judge for the Central District of California, sitting by designation.

Melvyn Coleman ("Coleman") is a California state prisoner serving a sentence of seven years to life following his 1974 conviction on charges of first degree murder, attempted murder, first degree robbery, possession of a firearm by a felon, and a determination that he was armed with a deadly weapon when he committed the offenses.

According to the Findings and Recommendations adopted by the district court, on May 23, 1973, Coleman shot a man and his wife after robbing their home. The victims, Mr. and Mrs. Siewart, returned home while Coleman was burglarizing it. Coleman approached them before they got out of their car. He then robbed and shot both of them, killing Mr. Siewart and seriously wounding Mrs. Siewart. Coleman had a prior juvenile record.[1]

In 1997, Coleman filed a petition for writ of habeas corpus alleging that the California Board of Prison Terms ("Board") unconstitutionally rejected his application for parole during his 1995 parole hearing. In May 2005, the district court granted Coleman's habeas corpus petition because it found that the Board failed to consider his suitability for parole in a fair manner in 1995. As a remedy,

1 The parties are familiar with the facts so we do not discuss them in detail here.

the district court ordered that a fair hearing be held within 60 days, or Coleman would be released from custody.

Accordingly, in July 2005, the Board held a hearing and Coleman was again denied parole because the commissioners concluded that he was not yet suitable for parole and would pose an unreasonable risk to society if released. As a result, the district court denied Coleman's motion for release from custody which was predicated on the earlier habeas petition ruling. Consequently, two separate matters are before this panel.

In Appeal No. 05-17380, the Board appeals the district court's grant of Coleman's petition for habeas corpus relief arising out of the 1995 hearing. The district court adopted findings by a federal magistrate judge that Coleman presented "a convincing case that a blanket [gubernatorial] policy against parole for murderers prevented him from obtaining a parole suitability determination made after a fair hearing."

In Appeal No. 06-15478, Coleman appeals the district court's denial of his Motion for Immediate Release from Custody, which he filed seeking a remedy after his habeas petition was granted in Appeal No. 05-17380.

**Appeal No. 05-17380: Board of Prison Terms v. Coleman**

We have jurisdiction under 28 U.S.C. §§ 1291, 2253 and we conclude that the Board's appeal is moot.[2]

Coleman argues that by giving him a new parole hearing in July 2005, and successfully asserting it complied with the district court's ruling against it, the Board rendered its appeal moot. The Board argues that it should not have been ordered to provide the July 2005 hearing in the first place, but it seeks redress before this Court after having already provided said hearing.[3] "'Where the activities sought to be enjoined already have occurred, and the appellate courts cannot undo what has already been done, the action is moot, and must be dismissed.'" *Foster v. Carson*, 347 F.3d 742, 746 (9th Cir. 2003) (quoting *Bernhardt v. County of Los Angeles*, 279 F.3d 862, 871 (9th Cir. 2002)).

---

[2] At the outset, the Board's subject matter jurisdiction argument may be quickly dispatched. This Court recently held that California prisoners have a federally protected liberty interest and, as a result, may challenge state parole decisions by means of federal habeas petitions. *See Sass v. Cal. Bd. of Prison Terms*, 461 F.3d 1123 (9th Cir. 2006), *petition for rehearing and petition for rehearing en banc denied* February 13, 2007.

[3] For reasons known only to the Board, it did not seek a stay of the judgment granting habeas relief pending appeal pursuant to Fed. R. Civ. P. 62(a) and Fed. R. App. P. 8.

A reversal of the district court's order to provide Coleman with an impartial hearing would not undo or take back the July 2005 hearing, and, therefore, this Court cannot provide any effective relief "even if the dispute is decided in favor of the appellant." *Garcia v. Lawn*, 805 F.2d 1400, 1402 (9th Cir. 1986) (citation and quotation marks omitted). In addition, the action was made moot not merely by the Board having complied with the district court's order to hold a new parole hearing for Coleman, but also because Governor Arnold Schwarzenegger had been elected by July 2005, and, as discussed below, the record is bereft of any evidence that the Schwarzenegger administration instituted a "no parole for murderers" policy.

The Board maintains that its appeal is not moot because this Court can provide it with "effective relief." Specifically, the Board argues that a favorable decision of its appeal can provide "effective relief" by negating the potential collateral estoppel effect of the district court's order in other actions brought by inmates challenging their parole hearing(s) during the administrations of Governors Wilson and Davis.

However, this potential for collateral estoppel is illusory because the Supreme Court unanimously rejected the application of offensive nonmutual collateral estoppel against the government. *United States v. Mendoza*, 464 U.S. 154, 160 (1984) (finding "[a] rule allowing nonmutual collateral estoppel against

the government in such cases would substantially thwart the development of important questions of law"); *see Idaho Potato Comm'n v. G&T Terminal Packaging, Inc.*, 425 F.3d 708, 714 (9th Cir. 2005) (applying *Mendoza* to nonmutual defensive collateral estoppel against a state agency); *Coeur D'Alene Tribe of Idaho v. Hammond*, 384 F.3d 674, 689-90 (9th Cir. 2004) (applying *Mendoza* to nonmutual offensive collateral estoppel against a state agency). Thus, prisoners cannot use the district court's opinion in this case as offensive nonmutual collateral estoppel against the Board.[4]

In sum, we do not see what concrete disadvantage the Board suffers by the existence of a district court order in one prisoner's unique case,[5] requiring it to hold a parole hearing that has already been held. Furthermore, this Court should adopt judicial restraint and avoid deciding the constitutional question regarding Coleman's due process claim if there is no live case or controversy. *See O'Bremski v. Maass*, 915 F.2d 418, 423 (9th Cir. 1990) (noting a federal court's

---

4 Moreover, the potential for its preclusive use or use as precedent is present as to every judgment and such a potential has never prevented a case from being moot.

5 We emphasize that the narrowness of our ruling impacts only Coleman's case because the evidence presented was specific and limited to Coleman's 1995 parole hearing. Thus, the district court's findings in this case and the evidence on which they are based should not be extrapolated to parole challenges by other prisoners.

lack of power to issue an advisory opinion on a prisoner's due process claim alleging a biased parole board); *see Alexander v. Louisiana*, 405 U.S. 625, 633 (1972) (stating there is a custom to avoid deciding constitutional issues unnecessarily); *see Ashwander v. TVA*, 297 U.S. 288, 346-47 (1936) (Brandeis, J., concurring) (noting courts should avoid passing unnecessarily on constitutional questions when an alternative ground for decision exists).

Accordingly, we conclude this appeal is moot and must be dismissed. Therefore, we do not consider whether the district court erred in finding that the Board under Governor Wilson and Governor Davis failed to provide fair parole hearings.[6]

**Appeal No. 06-15478: Coleman v. Board of Prison Terms**

We have jurisdiction under 28 U.S.C. §§ 1291, 2253 and we affirm.

On May 19, 2005, the district court issued a conditional order stating Coleman's petition for habeas corpus "*will be* granted, unless, within 60 days, respondent provides a fair parole suitability hearing, conducted by a board free of any prejudice stemming from a gubernatorial policy against parole for murderers."

---

6 Moreover, while we do not reach the propriety of district court's finding relating to the Wilson and Davis administrations, we do note that the only hearing challenged by the habeas petition, the 1995 hearing, occurred during the Wilson administration.

The issue in this appeal is whether, after finding bias on the Board, the remedy of a new hearing ordered by the district court was sufficient or whether Coleman's motion for release should have been granted.

The district court's denial of Coleman's motion for release is affirmed because the remedy of a new parole hearing was sufficient and there is no evidence in the record that Coleman's July 2005 hearing was biased.

In No. 05-17380, the appeal is **DISMISSED**.

In No. 06-15478, the judgment of the district court is **AFFIRMED**.

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

MELVYN COLEMAN,

Petitioner,

v.

BOARD OF PRISON TERMS, et al.,

Respondents.

NO. CIV. S-96-0783 LKK/PAN P

O R D E R

The court is in receipt of the U.S. Court of Appeals for the Ninth Circuit's November 23, 2005 order dismissing the appeal as the court's May 19, 2005 was not a final appealable order. The court hereby AMENDS the May 19, 2005 order to read as follows:

Petitioner, a state prisoner proceeding pro se, has filed this application for a writ of habeas corpus. The matter was referred to a United States Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and Local General Order No. 262.

On December 22, 2004, the magistrate judge filed findings and recommendations herein which were served on all parties and which

contained notice to all parties that any objections to the findings and recommendations were to be filed within twenty days. Respondent has filed objections to the findings and recommendations.

In accordance with the provisions of 28 U.S.C. § 636(b)(1)(C) and Local Rule 72-304, this court has conducted a de novo review of this case. Having carefully reviewed the entire file, the court finds the findings and recommendations to be supported by the record and by proper analysis.

Accordingly, IT IS HEREBY ORDER that:

1. The findings and recommendations filed December 22, 2004, are adopted in full; and

2. The petition for writ of habeas corpus is GRANTED and petitioner is ordered released unless, within sixty days, respondent provides a fair parole suitability hearing, conducted by a board free of any prejudice stemming from a gubernatorial policy against parole for murderers.

IT IS SO ORDERED.

DATED: December 2, 2005.

/s/Lawrence K. Karlton
LAWRENCE K. KARLTON
SENIOR JUDGE
UNITED STATES DISTRICT COURT

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

---

**JUDGMENT IN A CIVIL CASE**

**MELVYN – COLEMAN,**

CASE NO: **2:96–CV–00783–LKK–PAN**

v.

**BOARD OF PRISON TERMS,**

---

**XX** –– **Decision by the Court.** This action came to trial or hearing before the Court. The issues have been tried or heard and a decision has been rendered.

IT IS ORDERED AND ADJUDGED

**THAT JUDGMENT IS HEREBY ENTERED IN ACCORDANCE WITH THE COURT'S ORDER OF 12/2/05**

**Jack L. Wagner**
Clerk of the Court

ENTERED: **December 2, 2005**

by: /s/ – D. Duong
Deputy Clerk

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

MELVYN COLEMAN,

Petitioner, No. CIV S-96-0783 LKK PAN P

vs.

BOARD OF PRISON TERMS, et al.,

Respondent. ORDER

_______________________________/

Petitioner, a state prisoner proceeding pro se, has filed this application for a writ of habeas corpus. The matter was referred to a United States Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and Local General Order No. 262.

On December 22, 2004, the magistrate judge filed findings and recommendations herein which were served on all parties and which contained notice to all parties that any objections to the findings and recommendations were to be filed within twenty days. Respondent has filed objections to the findings and recommendations.

In accordance with the provisions of 28 U.S.C. § 636(b)(1)(C) and Local Rule 72-304, this court has conducted a de novo review of this case. Having carefully reviewed the entire file, the court finds the findings and recommendations to be supported by the record and by proper analysis.

Accordingly, IT IS HEREBY ORDERED that:

1. The findings and recommendations filed December 22, 2004, are adopted in full; and

2. The petition for habeas corpus will be granted unless, within 60 days, respondent provides a fair parole suitability hearing, conducted by a board free of any prejudice stemming from a gubernatorial policy against parole for murderers.

DATED: May 19, 2005.

/s/Lawrence K. Karlton
LAWRENCE K. KARLTON
SENIOR JUDGE
UNITED STATES DISTRICT COURT

FILED

DEC 2 2 2004

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

United States District Court

Eastern District of California

Melvyn H. Coleman,

Petitioner,

vs.

Board of Prison Terms, et al.,

Respondents.

No. Civ. S-96-0783 LKK PAN P

Findings and Recommendations

-oOo-

Petitioner seeks a writ of habeas corpus.

In his November 14, 1997, second amended petition petitioner claims his federal due process guarantee was violated because the California Board of Prison Terms (Board) has failed to conduct a fair parole suitability hearing.

In 1974 petitioner was convicted of first degree murder, attempted murder, first degree robbery, first degree burglary and other charges. The victims, Mr. And Mrs. Siewart, returned to their home while petitioner was burglarizing it; he then

approached before they got out of their car and robbed and shot them, killing Mr. Siewart and seriously wounding Mrs. Siewart. Petitioner had a prior juvenile record.

Under California law, a prisoner including a convicted murderer serving an indeterminate term (i.e., seven years to life) is entitled to a hearing before a panel composed of members of the Board to determine his suitability for parole. By statute, parole at some point normally is appropriate and the Board "shall set a release date unless it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration. . . ." Cal. Penal Code § 3041(b). Procedures governing suitability hearings are set forth in Penal Code § 3041.5 (providing prisoners with notice and an opportunity to be heard and requiring a written statement of reasons if the panel refuses to set a parole date). Regulations prescribe factors for the panel to consider in determining whether each prisoner is suitable or unsuitable for parole. 15 CAC § 2281.[1]

---

[1] Factors supporting a finding of unsuitability include: (1) whether the prisoner's offense for which he is confined was committed in an "especially heinous, atrocious or cruel manner"; (2) the prisoner's record of violence prior to the offense; (3) whether the prisoner has an unstable social history; (4) whether the prisoner has committed sadistic sexual offenses; (5) whether the prisoner has a lengthy history of severe mental problems related to the offense; and (6) whether the prisoner has engaged in serious misconduct in prison or jail. Factors supporting a finding of suitability include: (1) whether the prisoner has a juvenile record; (2) whether the prisoner has experienced reasonably stable relationships with others; (3) whether the prisoner shows signs of remorse; (4)

Petitioner presents evidence that under Governors Wilson and Davis the Board disregarded regulations ensuring fair suitability hearings and instead operated under a sub rosa policy that all murderers be found unsuitable for parole. The record shows that between 1992 and 1998 less than one percent of the prisoners in this group were released on parole. During the previous period the parole rate had been about four percent. Petitioner presents sworn testimony that the policy was enforced by (1) appointing Board members less likely to grant parole and more willing to disregard their statutory duty; (2) removing Board members more likely to grant parole; (3) reviewing decisions finding a prisoner suitable and setting a new hearing before a different panel; (4) scheduling rescission hearings for prisoners who had been granted a parole date; (5) re-hearing favorable rescission proceedings and hand-picking panels to ensure the desired outcome; (6) panel members agreeing upon an outcome in advance of the hearing; and (7) gubernatorial reversal of favorable parole decisions. See e.g., declaration of former BPT Commissioner Albert Leddy (Leddy) paras. 5, 6, 8-17, 20 (attached as Ex. 17 to petitioner's March 27, 2003, motion for discovery); deposition of Leddy taken in In re Fortin, et al., San Diego Superior Court

---

whether the prisoner committed his crime as the result of significant stress in his life; (5) whether the prisoner suffered from Battered Woman Syndrome when she committed the crime; (6) whether the prisoner lacks any significant history of violent crime; (7) whether the prisoner's present age reduces the probability of recidivism; (8) whether the prisoner has made realistic plans for release or has developed marketable skills that can be put to use on release; and (9) whether the prisoner's institutional activities indicate an enhanced ability to function within the law upon release. 15 CAC § 2281.

case number HSC10279 at 18-19, 47-50, 56-59, 61-63, 65-66, 88-89, 95, 97-99, 102, 106, 110, 118 & 126 (attached as Ex. 10 to petitioner's March 27, 2003, motion for discovery); deposition of former BPT Commissioner Edmund Tong taken in Kimble v. Cal. BPT, C.D. Cal. case number CV 97-2752 at 42-43, 45-47, 71, 73, 80-82, 85-86, 96, 103, 105, 107 & 109 (lodged December 30, 2003).[2]

The unrefuted record shows the no-parole-for-murderers policy existed and continued under Governor Davis. In In re Rosencrantz, the California Supreme Court took note of evidence presented in the state trial court establishing that the Board held 4800 parole suitability hearings between January 1999 through April 2001, granting parole to 48 murderers (one percent). 29 Cal. 4th 616, 685 (2003). Of those 48, the governor reversed 47 of the Board's decisions and only one murderer out of 4800 actually was released on parole. Id. Petitioner in Rosenkrantz also submitted evidence of the following interview of Governor Davis reflected in the April 9, 1999, edition of the Los Angeles Times: " '. . . [T]he governor was adamant that he believes murderers - even those with second-degree convictions - should serve at least a life sentence in prison. [Para.] Asked whether extenuating circumstances should

---

[2] Meanwhile, the annual cost to taxpayers of conducting these "pro forma" hearings is enormous, amounting to millions of dollars per year. See Exhibit 7 to petitioner's March 27, 2003, motion for discovery (California Legislative Analyst's Office - Analysis of the 2000-01 Budget Bill for the Board of Prison Terms criticizing proposed $19 million annual budget and noting huge cost of additional incarceration resulting from no-parole policy).

be a factor in murder sentences, the governor was blunt: "No. Zero . . . They must not have been listening when I was campaigning. . . . If you take someone else's life, forget it. I just think people dismiss what I said in the campaign as either political hyperbole or something that I would back away from . . . . We are doing exactly what we said we were going to do."'" 29 Cal. 4th at 684.

Respondent does not refute the alleged facts. Instead, respondent argues that, assuming arguendo prisoners in California have an interest in a parole date protected by the due process clause, constitutional requirements are met so long as there is "some evidence" supporting the findings petitioner is unsuitable. See Oppo. at 7:20 (so long as "some evidence" standard is met, "the Board decisions could not have been arbitrary.") For the reasons explained, this court rejects that claim. As this court previously has found, there always will be "some evidence" that can be used to explain a denial or rescission under the circumstances. Federal due process requires more.

California's parole scheme gives rise to a protected liberty interest in release on parole. McQuillion v. Duncan, 306 F.3d 895, 902 (2002); Jancsek v. Oregon Bd. of Parole, 833 F.2d 1389, 1390 (9th Cir. 1987); Greenholtz v. Inmates of Nebraska Penal & Correctional Complex, 442 U.S. 1 (1979); Biggs v. Terhune, 334

F.3d 910, 915 (9th Cir. 2003); In re Rosenkrantz, 29 Cal. 4th 616 (2003).[3]

Therefore, petitioner is entitled to the process outlined in Greenholtz, viz., notice, opportunity to be heard, a statement of reasons for decision, and limited right to call and cross-examine witnesses. The determination that petitioner is unsuitable for parole must be supported by some evidence bearing some indicia of reliability.

These guarantees do not exhaust petitioner's right to due process. The fundamental core of due process is protection against arbitrary action:

> The principal and true meaning of the phrase has never been more tersely or accurately stated than by Mr. Justice Johnson, in Bank of Columbia v. Okely, 17 U.S. 235, 4 Wheat. 235-244, 4 L.Ed. 449 [(1819)]: "As to the words from Magna Charta, incorporated into the Constitution of Maryland, after volumes spoken and written with a view to their exposition, the good sense of mankind has at last settled down to this: that they were intended to secure the individual from the arbitrary exercise of the powers of government, unrestrained by the established principles of private right and distributive justice."

Hurtado v. California, 110 U.S. 516, 527, (1884). "The concessions of Magna Charta were wrung from the king as guaranties against the oppressions and usurpations of his

---

[3] That is so because the parole statute, Penal Code § 3041, uses mandatory language ("The panel or board shall set a release date unless it determines" further incarceration is necessary in the interest of public safety) which "'creates a presumption that parole release will be granted," unless the statutorily defined determinations are made. Board of Pardons v. Allen, 482 U.S. 369, 378 (1987) (quoting Greenholtz, 442 U.S. at 12). As of 1988, by amendment of the state constitution, a parole date given can be withdrawn by the Governor under the same factors considered by the Board.

prerogative." Id. at 531. "The touchstone of due process is protection of the individual against arbitrary action of government." Wolff v. McDonnell, 418 U.S. 539, 558 (1974), citing Dent v. West Virginia, 129 U.S. 114 (1889).

A government official's arbitrary and capricious exercise of his authority violates the essence of due process, contrary to centureis of Anglo-American jurisprudence. See Yick Wo v. Hopkins, 118 U.S. 356, 369 (1886) ("When we consider the nature and the theory of our institutions of government, the principles upon which they are supposed to rest, and review the history of their development, we are constrained to conclude that they do not mean to leave room for the play and action of purely personal and arbitrary power."); United States v. Lee, 106 U.S. 196, 220 (1882) ("No man in this country is so high that he is above the law. No officer of the law may set that law at defiance with impunity. All the officers of the government from the highest to the lowest, are creatures of the law and are bound to obey it. It is the only supreme power in our system of government, and every man who by accepting office participates in its functions is only the more strongly bound to submit to that supremacy, and to observe the limitations which it imposes upon the exercise of the authority which it gives."); U.S. v. Nixon, 418 U.S. 683, 695-96 (1974) (rule of law is "historic commitment"); Accardi v. O'Shaughnessy, 347 U.S. 260, 267-68 (1954) (Attorney General must abide by regulations and cannot dictate immigration board's exercise of discretion in decision on application to suspend

deportation; remedy is new hearing where board will exercise it's discretion free from bias).

Concomitant to the guarantee against arbitrary and capricious state action is the right to a fact-finder who has not predetermined the outcome of a hearing. See Withrow v. Larkin, 421 U.S. 35 (1975) (a fair trial in a fair tribunal is a basic requirement of due process, and this rule applies to administrative agencies which adjudicate as well as to courts); Edwards v. Balisok, 520 U.S. 641 (1997) (recognizing due process claim based on allegations that prison disciplinary hearing officer was biased and would suppress evidence of innocence); Bakalis v. Golembeski, 35 F.3d 318, 326 (7th Cir. 1994) (a decision-making body "that has prejudged the outcome cannot render a decision that comports with due process").

Courts too numerous to list have recognized that the right to a disinterested decision-maker, who has not prejudged the case, is part of the fundamental guarantee against arbitrary and capricious government conduct in the California parole context. See, e.g., Rosenkrantz, 29 Cal. 4th at 677 (parole decision "must reflect an individualized consideration of the specified criteria and cannot be arbitrary and capricious"); In re Ramirez, 94 Cal. App. 4th 549, 563 (2001) ("some evidence" standard is "only one aspect of judicial review for compliance with minimum standards of due process" (citing Balisok) and Board violates due process if its decision is "arbitrary and capricious"); In re Minnis, 7 Cal. 3d 639 (1972) (blanket no-parole policy as to certain

category of prisoners is illegal); In re Morrall, 102 Cal. App. 4th 280 (2003) (same). The guarantee of neutral parole officials in a suitability hearing is just as fundamental as the right to a neutral judge in a court proceeding. Compare Sellars v. Procunier, 641 F.2d 1295 (9th Cir. 1981) (holding that California parole officials, analogous to judges, are entitled to absolute immunity).

The Ninth Circuit previously has acknowledged California inmates' due process right to parole consideration by neutral decision-makers. See O'Bremski v. Maas, 915 F.2d 418, 422 (9th Cir. 1990). In that case the appellate court found that a neutral parole panel at a new hearing would reach the same outcome and so denied relief. The record in this case simply will not permit the same conclusion. The requirement of an impartial decision-maker transcends concern for diminishing the likelihood of error. As the Supreme Court clearly held in Balisok a decision made by a fact-finder who has predetermined the outcome is *per se* invalid -- even where there is ample evidence to support it. 520 U.S. at 648.

Petitioner presents a convincing case that a blanket policy against parole for murderers prevented him from obtaining a parole suitability determination made after a fair hearing. Respondent offers nothing to counter petitioner's showing.

Accordingly, the court hereby recommends that the petition for habeas corpus be granted unless, within 60 days of the district court's adoption of these recommendations, respondent

provides a fair parole suitability hearing, conducted by a board free of any prejudice stemming from a gubernatorial policy against parole for murderers.

Pursuant to the provisions of 28 U.S.C. § 636(b)(1), these findings and recommendations are submitted to the United States District Judge assigned to this case. Within 20 days after being served with these findings and recommendations, respondent may file written objections. The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." The district judge may accept, reject, or modify these findings and recommendations in whole or in part.

Dated: DEC 21 2004.

Peter A. Nowinski
Magistrate Judge

cole0783.f&r grant

bd

United States District Court
for the
Eastern District of California
December 22, 2004

* * CERTIFICATE OF SERVICE * *

2:96-cv-00783

Coleman

v.

Board of Prison Term

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Eastern District of California.

That on December 22, 2004, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office, or, pursuant to prior authorization by counsel, via facsimile.

Tami M Warwick TM/PAN
Attorney General's Office for the State of California
PO Box 944255 AR/LKK
1300 I Street
Suite 125
Sacramento, CA 94244-2550

Ann Catherine McClintock
Federal Defender
801 I Street
Third Floor
Sacramento, CA 95814

Jack L. Wagner, Clerk

BY: ______________
Deputy Clerk

# EXHIBIT WW

EXHIBIT WW

# DECLARATION OF MONICA KNOX

I, MONICA KNOX, declare as follows:

1. I am a Deputy Federal Public Defender and, together with Deputy Federal Public Defender Guy Iversen, I represent petitioner in this matter.

2. The factual disputes underlying petitioner's claims center on whether there is a policy and/or practice of the Board of Prison Terms to deny findings of suitability and parole dates to prisoners serving life terms; petitioner claims there is such a policy and/or practice and that is the reason he has been denied parole; respondent claims there is no such policy and/or practice.

3. Earlier discovery orders by this court gave us access to, among other things, the transcripts of parole suitability hearings held between 1995 and 2000 as well as the "lifer packets," i.e., the accompanying material the Board relies on to determine suitability. We have read, by random selection, over 300 of those transcripts and reviewed the accompanying lifer packets. We have tabulated the results of 284 of those cases (the others not being tabulated because they were stipulated findings of unsuitability, usually in exchange for a shorter denial period). The tabulated results appear as Exhibit A.

4. The tabulated results, we believe, are strong evidence that there is in fact a policy and/or practice by the Board of finding all lifers unsuitable for parole. Some of the significant findings in the 284 cases are as follows:

A. 283 were found unsuitable for parole

B. All 283 were found unsuitable based, first and primarily, on the offense

C. 277 were found unsuitable because their offenses were considered cruel and/or callous or for no reason at all as specified in the regulations

D. Although the Board found each and every offense to be cause to find the lifer unsuitable, the offenses ranged from planned, premeditated murders and torture or execution murders to accidental killings or kidnaps without any injury at all.

E. Although the Board almost always gave secondary reasons for the findings of unsuitability, those reasons were often not supported by the facts or were so questionable given the facts that they suggested the Board was simply reaching for anything less than positive about

the lifer. For example, the Board would cite the lifer's disciplinary history in prison as a reason for finding him unsuitable despite the fact that the lifer may not have had any disciplinary action in many years or may have had disciplinary actions for only trivial matters (such as using a bed sheet for a clothesline or being late to work). The Board would cite the lifer's "escalating pattern of criminal history" as a reason for finding him unsuitable despite the fact that the lifer may have no prior convictions or only minor (non-violent misdemeanor) convictions. The Board would cite an unfavorable psychological report as a concern regarding suitability despite the fact that the lifer's psych report would assess him as an average or below average risk of danger.

F. Of the 283 lifers found unsuitable

12 had no prior record at all, no disciplinaries of any kind in prison, psych reports of average or low risk of danger, programming (self-help programs and work) in prison and release plans

4 had no prior record at all, no disciplinary actions in the last 10 years, a psych report of average or low risk, programming (self-help programs and work) in prison and release plans

18 had only minor prior record (just arrests or just non-violent juvenile actions), no disciplinary actions in the last 10 years, a psych report of average or low risk, programming (self-help programs and work) in prison and release plans

11 had more serious prior records (felony convictions) but had been disciplinary free for at least 10 years, had a psych report of low risk of danger, had programmed (self-help and work) and had release plans

5. Although we are continuing to review transcripts, we believe, based on the data we already have, that information held by current and former commissioners, current and former deputy commissioners and current and former executive directors is critical. In particular, we need to explore with these person how they understood their jobs relative to suitability hearings for lifers. We have reason to believe that many, if not all, of them have understood their jobs in the last ten years to be to find all lifers unsuitable for parole.

000939

6. Former Commissioner Albert Leddy recently was deposed in consolidated cases pending in San Diego Superior Court, In re Fortin. Sheets. Zych. Barrientos. Jackson and Slaman., HSC 10279, 10270, 10329, 10336, 10373, 10325. Those cases raise issues similar to those pending in this matter, and we have worked closely with the attorney in the San Diego cases, Deputy Public Defender Matthew Braner. A copy of Mr. Leddy's deposition is attached as Exhibit B.

7. Mr. Leddy was a BPT Commissioner from August, 1983, until May, 1992. He noticed a significant change in how hearings were conducted after Pete Wilson became governor in January, 1991. Specifically, he noticed that the findings of suitability dropped significantly, the number of recissions increased dramatically, and yet the lifers and their factors (background, offense, and prison programming) had not changed.

8. Mr. Leddy testified that Governor Wilson' Secretary of Youth and Adult Corrections, Joe Sandoval, met with the BPT commissioners, told them to "be more careful" about finding lifers suitable for parole, and explained that Governor Wilson did not want a "Willie Horton." (Exhibit B at 34-35.) He provided specific examples of how things changed and of suitability hearings and recision decisions that were conducted pursuant to political agendas and not the regulations. (See, e.g., Exhibit B at 50, 59-60, 65, 89.)

9. Mr. Leddy testified that the governor's public statements regarding lifers not being paroled had a direct effect on the commissioners, explaining that they were political appointees and understood the need to please the governor in order the keep their jobs. (Exhibit B at 61, 70.)

10. Mr. Leddy testified to conversations he had with other commissioners and deputy commissioners about the changes in the process. He indicated, for example, that former Commissioner O'Connell told him that certain commissioners would be "hand picked" for recision hearings because they were known to always rescind the finding of suitability and the grant of parole. (Exhibit B at 68.) He noted that former Commissioners O'Connell and Aceto told him that former Commissioner and Chairman Gillis had told them not to give parole dates to lifers. (Exhibit B at 71, 73-75.)

11. Mr. Leddy explained that he was chastised by former executive officer Patterson for giving "too many" parole dates to lifers. (Exhibit B at 71-72.)

12. Based on the foregoing, we have reason to believe that the current and former commissioners have relevant and critical information regarding the practices and unwritten policies of the Board in making parole determinations for lifers. However, it appears that they are unwilling to voluntarily provide the information.

13. When I spoke with Mr. Leddy last year, he indicated that he believed a few of the former or current commissioners and deputy commissioners would be willing to talk with me. He later advised me, however, that he had checked with them and they had told him they would be willing to talk and answer questions only if subpoenaed and required to do so.

14. Respondent's counsel herein, Deputy Attorney General Barbara Spiegel, has advised us that she will "not agree to allow" the deposition of the former or current commissioners, deputy commissioners or others we want to speak with.

15. There is a proceeding pending in the Eastern District of California, a habeas petition filed by a lifer, raising the same claims as raised in this proceeding regarding the Board's practice and/or policy of refusing to find suitable for parole any lifer. Melvin Coleman v. California Board of Prison Terms, CV-S-96-783 LKK PAN P. A request to depose some current and former commissioners and deputy commissioners is pending in that action. At a hearing on February 28, 2001, counsel for the Board in that case indicated that the Board Chairman had sent a letter to current and former commissioners and deputy commissioners advising them to contact the Board and/or the Attorney General's office if they were contacted by any defense attorney seeking to speak with them about lifer hearings. The Attorney General's office, in the Eastern District case, in the San Diego Superior Court case and apparently in this case, has instructed current and former commissioners and deputy commissioners not to speak with defense counsel (although recently, after a ruling by the magistrate in the Eastern District case, that deputy attorney general agreed that she would no longer instruct former commissioners and deputy commissioners not to speak).

16. Based on the foregoing, we will need an order for this Court allowing us to subpoena to deposition the current and former commissioners and deputy commissioners and others we need to interview in order to get the relevant information we have reason to believe they hold.

17. We have not filed a Joint Stipulation re: Discovery relative to depositions at this point because we believed that we should first seek permission under Rule 6 for leave to conduct depositions. As soon as we receive that leave, we will serve on respondent's counsel our portion of a Joint Stipulation, obtain her portion and file it with the Court (assuming there are any disagreements about depositions).

I declare the foregoing is true and correct.

Executed under penalty of perjury this 24th day of April, 2001, at Los Angeles, California.

MONICA KNOX
Deputy Federal Public Defender

000942



Priority ✓
Send ✓
Enter
Closed
JS-5/JS-6 ✓
JS-2/JS-3
Scan Only

FILED
CLERK US DISTRICT COURT
JUN - 4 2004
CENTRAL DISTRICT OF CALIFORNIA
BY DEPUTY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

| | |
|---|---|
| DENNIS KIMBLE, Petitioner, v. CALIFORNIA BOARD OF PRISON TERMS, et al., Respondents. | Civil No. CV 97-2752-LGB (Mc) ORDER |

DOCKETED ON CM
JUN 7 2004
BY 021

The parties have now submitted a Stipulated Dismissal of the Petition, filed June 3, 2004, signed by all parties who have appeared in the action. A stipulated dismissal of an action signed by all parties who have appeared in the action constitutes a self-executing dismissal of the action without an order of the court. Rule 41(a)(1)(ii), Federal Rules of Civil Procedure.

Accordingly, the action is deemed dismissed by operation of law. The Clerk is ordered administratively to close this action.

IT IS SO ORDERED.

Dated: June 3, 2004



UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

DENNIS KIMBLE,

             Petitioner,

        v.

CALIFORNIA BOARD OF PRISON
TERMS, et al.,

             Respondents.

Civil No. CV 97-2752-LGB (Mc)

ORDER

On May 21, 2004, the petitioner filed his Petitioner's Request For Dismissal Of The Petition. The petitioner's request states that the petitioner has been released from custody and that the petition is moot.

After the filing of an answer, a petition may be dismissed without an order of the court only by a stipulation of dismissal signed by all parties who have appeared in the action. Rule 41(a)(1)(ii), Federal Rules of Civil Procedure. On June 20, 1997, the respondent filed an answer in this action. Accordingly, it appears that the petitioner must file a stipulation of dismissal signed by counsel for all parties to effectuate a dismissal.

The petitioner is ordered to prepare a stipulation for dismissal, submit the stipulation to respondent's counsel for signature, and to file a stipulation signed by counsel for all parties forthwith.

IT IS SO ORDERED.

Dated: May 21, 2004

JAMES W. McMAHON
United States Magistrate Judge