ORIGINAL
FILED

JUL - 9 2008

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

1   Gary Snodgrass
    CDCR #: C-50459
2   CTF-Central
    P O Box 689
3   Soledad, CA  93960-0689

4
    Petitioner In Pro Se
5

6                                                                    (PR)

7               UNITED STATES DISTRICT COURT

8               NORTHERN DISTRICT OF CALIFORNIA        JSW

9

10                                      Case No.:   CV  08   3322

    GARY SNODGRASS,

11
                Petitioner,              California Supreme Court Case No. S162262
12                                       1st App. Dist., Div.3, Case No. A120907
          v.                             Contra Costa Superior Court No. 071708-2
13                                       Former Criminal Case No. 26252

14                                       MEMORANDUM OF POINTS AND
    BEN CURRY,  Warden,                  AUTHORITIES IN SUPPORT OF PETITION
15  California Training Facility, Soledad, CA.,   FOR WRIT OF HABEAS CORPUS

16
                Respondent.
17

18
                              I.
19
                        INTRODUCTION
20
          Petitioner Gary Snodgrass suggests to this Court that it should be highly concerned
21
    whether the Board of Parole Hearings, which carries out the final stage of the sentencing
22
    function begun by a California Court when it sentenced him to an indeterminate sentence under
23
    Penal Code §1168(b), has applied it authority according to all applicable legal standards.
24
    During the jury trial, evidence was presented that Snodgrass suffered a mental disorder from
25
    years of parental and sibling abuse that culminated in the instant offense.  Notwithstanding the
26
    severity of the Murder charge against him, the trial court granted him bail, and he remained on
27
    bail without incident until his trial. (**Exhibit B,** marked pages 13-14, sentencing transcript,
28

*Page 1*

ORIGINAL

1    where the Court made note of this in computing in-custody credits.) It makes no sense at all
2    for the Board to conclude, 26 years later, and after years of therapy and positive programming,
3    and after many forensic evaluations attesting to his lack of danger to society if paroled, after
4    thirteen parole hearings, that he continues to pose an unreasonable risk of danger to society.
5    The Court should not, for any reason, simply defer to the Board's findings and conclusions.
6    Rather, it should carefully scrutinize the allegations, the facts, and the evidence proffered in
7    support, to determine if the Board abused its discretion and, if so, to question why the Board
8    would have done so. Snodgrass offers documented evidence that the Board may well be
9    misapplying its authority, misinterpreting the enabling statute, regulations, and authority,
10   and/or acting pursuant to a *sub rosa* policy against granting paroles. Snodgrass's offense, after
11   considering all circumstances, cannot reasonably be interpreted as containing elements beyond
12   those minimally necessary to sustain the conviction for second degree murder, and certainly no
13   elements to justify repeated denial of parole long past the appropriate term of imprisonment set
14   forth by the Board's own sentencing regulations. The State claims it always gives
15   "individualized consideration" to prisoners via its hearings, but this is precisely how a pro
16   forma sham process is accomplished, through hearings giving the appearance of due process
17   compliance and "individualized consideration" but where the final decision is determined from
18   the outset. This was noted by the California Appellate Court as early as 2000 in the seminal
19   case of *In re Rosenkrantz*, 80 Cal.App.4th 409, at 428 ["It is one thing to go through the
20   motions so that a panel can recite a post hoc rationalization for a decision already made. It is
21   quite another to hold a fair hearing at which three unbiased commissioners actually read the
22   reports and other documents in Rosenkrantz's file and then make a reasoned decision based on
23   the appropriate factors."]. In Gary Snodgrass's case, there is not an ounce of relevant or
24   reliable evidence that he currently poses an unreasonable risk to the public safety, and this is
25   the bottom line determination by law. *In re Lee*, 143 Cal.App.4th 1400, 1408 (2006).

26       The duty of this Court is to stand as the last bastion of protection against arbitrariness
27   of official action and to safeguard the constitutional process of these hearings; when it does not

28

do so, then it implicitly condones a system of official action that is not being regularly performed as the law requires.

## II.

## THE MATTER OF JUDICIAL REVIEW

Under prevailing law, Petitioner recognizes that the standard of judicial review of parole decisions is the deferential "some evidence" standard. (*In re Powell,* 45 Cal.3d 894 (1988); *In re Rosenkrantz,* 29 Cal.4th 616, 653 (2002).) Recent case law has spotlighted deficiencies and divergent applications by the lower courts, with the current concensus being that when a court reviews the reasons given by the Board (or Governor) to deny parole, the question is NOT whether there are facts in the record for the existence of that reason, but whether there is a logical and sufficient connection between the reason and the conclusion that the parole applicant presently poses an unreasonable risk of harm to society if paroled. (*E.g., In re Lee,* 143 Cal.App.4th 1400, 1408 (2006); *In re Scott (Scott II),* 133 Cal.App.4th 573, 595 (2005); and *In re Roderick,* 154 Cal.App.4th 242, 263 (Cal.App. 1 Dist., Div. 4, 08-17-07) (referencing same).) The *Roderick* court noted the dissent's rejection of this interpretation, and pointed out that the flaw in the dissent's reasoning "would require judicial affirmance of every Board decision if even a single unsuitability factor is found, regardless of whether that factor would rationally support a conclusion, based on individualized consideration, that the inmate would pose an unreasonable risk of danger." *Ibid.*
(http://appellatecases.courtinfo.ca.gov/search/case/dockets.cfm?dist=1&doc_id=65258&doc_n o=A113370.)

Division 2 of the First Appellate District also mirrors *Roderick's* interpretation. In the case of *In re Barker,* 151 Cal.App.4th 346, at 366 (Cal.App. 1 Dist., Div. 2, 05-24-07), the court followed *Lee, supra,* at 1408, holding that "the test in reviewing the Board's decision denying parole 'is not whether some evidence supports the *reasons* [the Board] cites for denying parole, but whether some evidence indicates a parolee's release *unreasonably endangers public safety.* [Citations.] Some evidence of the existence of a particular factor does

1  not necessarily equate to some evidence the parolee's release unreasonably endangers public

2  safety.' (*Lee, supra,* 143 Cal.App.4th at p. 1408, 49 Cal.Rptr.3d 931, fn. omitted.)." **The**

3  **Respondent did not appeal this decision.[1]**

4  (http://appellatecases.courtinfo.ca.gov/search/case/dockets.cfm?dist=1&doc_id=132240&doc_

5  no=A114686.)

6       Thus, under the deferential "some evidence" standard, the Court must undertake

7  adequate scrutiny of the Board's decision to determine whether the reasons given for parole

8  denial are not only have a relevant and reliable factual basis in the record, but also that they

9  reliably and with relevance support a conclusion that the parole applicant current poses an

10  unreasonable risk of danger to public safety if paroled.

11       Petitioner submits that no such evidence exists in this case, and that all of the evidence

12  shows that he poses little or no risk to public safety if paroled.

13

14

---

15  [1] Petitioner asks the Court to note the history of the Wen Lee case. The Appellate court
16  originally summarily denied the petition filed 02/02/2006 on 03/24/06. Petitioner filed for
review on 04/03/2007 (S142267). The Supreme Court ordered the appellate decision vacated on
17  06/20/2007 and to issue an order to show cause. On 10/17/2006, the appellate court GRANTED
18  the petition. The Respondent (AG) requested depublication on 01/16/2007 and filed for review
on 01/17/2007. Petitioner opposed depublication on 01/22/2007. The Supreme Court denied
19  review on 02/07/2007, implicitly affirming the interpretation of the "some evidence" standard
by the *Lee* court. Thus, the dissent in *Roderick,* and the subsequent decision in *In re Jacobson,*
20  154 Cal.App.4th 849, 63 Cal.Rptr.3d 222 (Cal.App. 2 Dist., Div. 4, 08-28-07), rejecting *Lee,*
21  *supra,* and cases following *Lee*, simply has no traction for the rejection of prevailing
interpretation. (at http://appellatecases.courtinfo.ca.gov/search/case/ dockets.cfm?dist=2&doc
22  id=1127487&doc_no=B188831.) That the Supreme Court has granted review in *In re Lawrence,*
150 Cal.App.4th 1511, 59 Cal.Rptr.3d 537 (Cal.App. 2 Dist., Div. 7, 05-22-07), on the sole issue
23  of "to what extent should the Board of Parole Hearings, under Penal Code section 3041, and the
24  Governor, under Article V, section 8(b) of the California Constitution and Penal Code section
3041.2, consider the prisoner's current dangerousness, and at what point, if ever, is the gravity of
25  the commitment offense and prior criminality insufficient to deny parole when the prisoner
otherwise appears rehabilitated," is not necessarily indicative that the Supreme Court will
26  disagree with the *Lee* interpretation of the "some evidence" standard which was relied on by the
27  *Lawrence* court. (At http://appellatecases.courtinfo.ca.gov/
search/case/dockets.cfm?dist=2&docid =1127487& docno=B188831.)

28

**A.    The "Some Evidence" Standard of Judicial Review Is Inappropriate Where Board Irregularity Is Apparent:**

Notwithstanding that the current accepted standard of judicial review is the deferential "some evidence" standard, Petitioner suggests, and argues, that the "some evidence" standard is inadequate under any circumstances to safeguard a parole applicant's due process rights and his substantial liberty interests in parole, which interests were found by the Ninth Circuit Court of Appeals in *McQuillion v. Duncan,* 306 F.3d 895, 901-903 (2002), relying on *Greenholtz v. Inmates of Nebraska Penal & Corr. Complex,* 442 U.S. 1, 99 S.Ct. 2100 (1979). In a situation, as here, where there is evidence of irregularity of official action concerning the Board of Parole Hearings, evidence of irregularity simply proves that the "some evidence" standard violates the parole applicant's liberty interest in parole, because if the proper standard were in place the irregularity would have been ferreted out and rectified long ago.[2] Instead, the history of the Board and Governor's actions show irregularity and inconsistent actions when measured against the statutory and regulatory language of Board authority. (*See, e.g., Martin v. Marshall,* 431 F.Supp.2d 1038, 1048-49 (N.D.Cal. 2006), and *Martin v. Marshall, (Martin II)* 448 F.Supp.2d 1143 (N.D. Cal. 2006), judgment modified [finding evidence of such policy and capitulation with that former policy by Gov. Schwarzenegger's appointees].)

More recently, in the Santa Clara Superior Court case of *In re Criscione,* No. 71614 (review granted Sixth Appellate District No. H032048, 09/14/2007), submitted here for the factual findings made evidencing a complete "malfunctioning" of the Board's administration of the parole scheme, these findings more than adequately weigh in favor of a finding of "irregularity of official action" and thus provides the predicate facts for raising the issue of a proper standard of judicial review when irregularity is present.

_____

2    In this "long ago" regard, the federal district court in *Coleman v. CA. Bd. of Prison Terms,* CV-S-96-0783 (LKK-PAN)) found clear evidence that under the former terms of Governors Wilson and Davis, a no-parole policy existed. These findings of fact were not overturned by the Ninth Circuit when it denied in part and affirmed in part the State's appeal. (*See,* **Exhibit VV.**)

Petitioner suggests, and argues, that the "some evidence" standard cannot be applied in his case, where the evidence strongly suggests irregularity and malfunctioning of official action by the Board. Rather, he argues that the Court must apply a more stringent standard to determine whether the record in his case is legally sufficient to justify a denial of parole.

Evidence Code section 664 presumes "that official duty has been regularly performed. The effect of the rebuttable presumption created by the Evidence Code, that official duty has been regularly performed, is merely to impose upon the party against whom the presumption operates the burden of proof as to the nonexistence of the presumed fact. (*See California Advocates for Nursing Home Reform v. Bonta* (2003) 106 Cal.App.4th 498, as modified.) Presumption that official duty has been regularly performed is rebutted when irregularity is clearly shown. (*See Application of Elsholz* (1964) 228 Cal.App.2d 192.) "the effect of the rebuttable presumption created by section 664 is merely "to impose upon the party against whom it operates the burden of proof as to the nonexistence of the presumed fact." (*California Advocates for Nursing Home Reform v. Bonta, supra*, at 505, citing *Gee v. California State Personnel Bd.* (1970) 5 Cal.App.3d 713, 718.)

Agencies are not normally delegated power to determine authoritatively whether they complied with generally applicable rule-making procedures. As a result, courts may usually determine the lawfulness of agencies' compliance with those rule-making procedures entirely de novo, simply substituting their judgment on that question for that of the agencies." (*California Advocates for Nursing Home Reform v. Bonta, supra*, at 505; citing *Bonfield, State Administrative Rule Making* (1986) § 9.2.12, at p. 582.)

### 1.   *The Application of 15 CCR § 2402(c) In All Cases Shows Irregularity*:

Here, the decisions of the Board of Parole Hearings are apparently predicated on its view that the enabling statute, §3041, permits it to deny parole in nearly all cases of indeterminately-sentenced "term-to-life" prisoners who appear before it, and to shoehorn all murder offenders into §2402(c) of the Cal. Code of Regulations, tit. 15, Div. 2, as the

*MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PETITION FOR WRIT OF HABEAS CORPUS*

1  *Criscione* court found to be true.[3] Thus, by separate motion, Snodgrass asks the Court to grant
2  discovery and order the Respondent to provide the Court with the same documents it provided
3  in the *Criscione* case.[4]

4      Petitioner argues that the Board cannot deny parole to all murder offenders by
5  classifying their crimes as "especially heinous, atrocious, or cruel" under §2402(c), for the
6  same reasons expressed by the *Criscione, supra,* court. As Petitioner has shown in the petition,
7  this is precisely what the Board has done at each of his thirteen hearings. By relying on these
8  static factors interminably, the Board denies him parole for the very reason he is *eligible* for
9  parole in the first instance --- his offense. This the Board cannot do, certainly not in a second
10 degree murder case. These regulations perform a sub rosa policy function, i.e., to give the
11 Board all-encompassing *reasons* to cite for denial of parole which a reviewing court will
12 usually be pre-inclined to defer to.

13 **2.   *The Parole Denial Rate of 95-99 Percent Demonstrates Irregularity*:**

14     In addition to the practice of putting all murder cases into the §2402(c) category trap,
15 the plain language of the statute states unequivocally that a parole release date "shall normally"
16 be granted. Whether that "shall normally" applies individually or to the class is
17 inconsequential; by either application a denial rate over 51% would raise serious questions of
18 whether the Board's duty to its parole charter is being regularly performed. Granted, while

19

20 ---
   [3]  Petitioner also submits **Exhibit WW**, which is a Declaration by Federal Public Defender
21 Monica Knox in the habeas case of Dennis Kimble, where the court permitted extensive
   discovery. The results of that discovery showed that in every case of parole denial, the Board
22 cited the offense characterizations of section 2403(c) in some form or other. This declaration,
   dated April 24, 2001, predating the same findings by the *Criscione* court, but which never got
23 judicially resolved due to the Board granting Kimble parole and releasing him, thus mooting the
   value of that discovery. (Petitioner suggests that the parole of Kimble became a ploy by the
24 Respondent to prevent an unfavorable decision based on indisputable facts.)
   [4]  To do that, this Court must issue an Order to Show Cause because, pursuant to *California Bd.*
25 *of Prison Terms v. Ngo,* 130 Cal.App.4th 121 2, 1240-1243 (Cal.App. 6 Dist., 07/05/2005),
26 discovery is available once an Order to Show Cause has issued. A prima facie claim is one where
   the petitioner has stated facts which, if true, would entitled him to relief, not that he has to prove
27 them at the time the petition is filed. *People v. Duvall,* 9 Cal.4th 464, 474 (1995).

28

1  some fluctuations would result over time, it cannot reasonably be said that a consistent record

2  of 95% to 99% constitutes regular performance of the statutorily-enabled charter. (This rate is

3  found true in *In re Rosenkrantz, supra,* 29 Cal.4[th] 616, 683-684 (2002).) It was also noted in

4  1985 in the case of *In re Jackson,* 39 Cal.4[th] 464, at 474.

5  "When statutory language is clear and unambiguous, there is no need for construction

6  and courts should not indulge in it." (*People v. Overstreet* (1986) 42 Cal.3d 891, 895.)

7  However, "courts resist blind obedience to the putative 'plain meaning' of a statutory phrase

8  where literal interpretation would defeat the Legislature's central objective." (*Leslie Salt Co.*

9  *v. San Francisco Bay Conservation etc. Com.* (1984) 153 Cal.App.3d 605, 614.) Here, the

10  statutory language guiding the paroles of indeterminately-sentenced prisoners is clear and

11  unambiguous and the Court must order the Board of Parole Hearings to obey the law in the

12  determination of Petitioner's parole application. Penal Code §3041 has been determined to

13  contain an "expectancy of release" by plain and unambiguous mandatory language, thereby

14  creating a protected liberty interest under both state and federal constitutional law. (*In re*

15  *Rosenkrantz*, 29 Cal.4[th] 616, 673 (2002); *McQuillion v. Terhune*, 306 F.3d 895, 901-903 (9th

16  Cir. 2002).) There is no question but that the statute contains a presumption favoring the

17  setting of parole releases dates "more often than not." While the acceptable percentages of

18  "shall normally" has not been determined by state and federal courts reluctant to define this

19  common sense term, there can be no question but that 95% to 99% denials of parole across-

20  the-board deprives state prisoners of their protected liberty interests and violates the parole

21  charter of the Board. Penal Code §3041, subd.(b) contains the <u>exception</u> to granting parole. In

22  the *Criscione* case, **Exhibit OO,** at page 11, expert statistician Professor Kafai testified that

23  "more than 50% can't by definition constitute an exception." (*See In re Ramirez,* 94

24  Cal.App.4[th] 549, 570 (2001) [exception to granting parole may not swallow the rule that parole

25  is normally to be granted].)

26  Since the Board of Parole Hearings cannot show justification for their policy and

27  practice of a virtually "closed door" policy against parole, where the exception has become the

28  rule, this policy and practice flouts explicit statutory mandates such that an abuse of authority

is so palpably unreasonable and arbitrary that it demonstrates an abuse of discretion, and thus a showing of irregularity of official action.

### 3. *A More Stringent Standard of Review Is Required*

Therefore, notwithstanding that the "some evidence" standard is the norm for reviewing habeas petitions challenging parole decisions, this standard is constitutionally inadequate where official action is shown to be irregularly performed. Petitioner only has to demonstrate irregularity with evidence sufficient to dispel the presumption of regularity, after which the habeas court must apply a more stringent standard of judicial review.

Petitioner asks the Court to so find, and to apply the "independent judgment test" or the "substantial evidence test" to determine if the conclusion of the Board that he poses an unreasonable risk of threat to public safety is warranted by the evidence before it.

Petitioner asks that the Court consider the reasoning in *Superintendent v. Hill,* 472 U.S. 445, at 455 (1985) when it established the deferential "some evidence" standard of judicial review. In applying this standard of review to the prison disciplinary process – not the parole context – the High Court said that "Prison disciplinary proceedings take place in a highly charged atmosphere, and **prison administrators must often act swiftly on the basis of evidence that might be insufficient in less exigent circumstances**. *See Wolff*, 418 U.S., at 562-563, 567-569, 94 S.Ct., at 2977-2978, 2980-2981." (emphasis added.) The due process analysis called for, however, weighs substantially differently in the parole context. First, the prisoner's interest in parole is greater. In the prison disciplinary context, the prisoner stands to lose some days of good time credit. Because that will delay his release by that many days, his interest is great, but the decision will not control whether he ever regains his liberty. In California, the **most** credit forfeiture a prisoner can suffer following a disciplinary action is 360 days, and that is possible only upon a finding of serious violent misconduct (15 CCR, Div. 3, §3323), and only upon the preponderance of evidence. (*Id.,* at §3320(l).) The parole suitability hearing is significantly different. A denial of a parole date doesn't just delay a prisoner's release by a set number of days, it leaves the very real possibility that the prisoner may never be found suitable for parole, or that he will be denied in long 2-5 multi-year denials

*Page 9*

1    before again appearing before the Board. Both the federal and state courts have determined that

2    Section 3041 of the Penal Code, which enables the Board's authority to grant or deny parole,

3    creates an "expectancy of release" that is a liberty interest protected by due process of law.

4    (*McQuillion v. Duncan,* 306 F.3d 894 (9th Cir. 2002); *Biggs v. Terhune,* 334 F.3d 910 (9th Cir.

5    2003); *Sass v. California Bd. of Prison Terms,* 461 F.3d 1123 (9th Cir. 2006); *Irons v. Carey,*

6    479 F.3d 658 (9th Cir. 2007); *In re Rosenkrantz,* 29 Cal.4th 616 (2002).) Section 3041

7    explicitly creates, by mandatory language, the presumption that in most cases parole is

8    **normally to be granted.** Thus, the prisoner's side of the due process balancing is substantially

9    weightier than it is in a disciplinary context. A parole grant places the prisoner in a

10   significantly higher liberty interest that promises his release by the term fixed by the Board

11   upon a finding of "suitability" unless by his own actions he later forfeits that suitability

12   finding.

13   Additionally, the interest of the Board in proceeding with less rather than more due

14   process protections is substantially less than the interest of the prison in disciplinary

15   proceedings and maintaining discipline and order. The Board has no need to act swiftly, it does

16   not act in the charged atmosphere of a prison, it is not charged with keeping order and

17   discipline inside the prison, and no exigencies exist to justify such a low quantum of evidence

18   by the Board. In *Hill,* the Court noted the legitimate interests of the prison in proceeding

19   without "burdensome administrative determinants," *id.*, 472 U.S. at 455, but the Board does

20   not have similar interests in avoiding administrative determinants. Indeed, under California

21   law, the Board is already compelled to provide a hearing, a right to be heard and present

22   evidence, due consideration of all relevant information, a record of the proceeding, a fair and

23   neutral decision-maker, a decision that is not arbitrary or capricious and is supported by some

24   evidence, and counsel. (E.g., PC §3041.5(a); PC §3041.7; *In re Sturm,* 11 Cal.3d 258 (1974);

25   *In re Minnis,* 7 Cal.3d 639 (1972); *In re Rosenkrantz,* 29 Cal.4th 616 (2002); O'Bremski v.

26   Maass, 915 F.2d 418, 422. *See also In re Morall,* 102 Cal.App.4th 280, 289-290 (2002),

27   summarizing the statutory and regulatory authorities.)

28

*Page 10*

Given these considerations, the substantial liberty interests that enhance a prisoner's interests, and the Board's decreased interest, it is clear that the due process analysis weighs in favor of a quantum of evidence on judicial review more stringent than the "some evidence" standard for disciplinary proceedings. There is no justification for a standard as low as "some evidence" – which is the lowest standard of review constitutionally permitted.

In the 2001 case of *In re Ramirez,* 94 Cal.App.4[th] 549, at 563, the appellate court noted that the Supreme Court in *In re Powell,* 45 Cal.3d 894, carefully restricted its holding on the applicable standard of judicial review to parole rescission proceedings. The *Ramirez* court also said:

> "On the other hand, we also agree with the Board that such determinations are reviewable for abuse of discretion under the "arbitrary and capricious" standard. The two formulations are not inconsistent, as was implicitly recognized in *Powell, supra,* 45 Cal.3d at p. 904, 248 Cal.Rptr. 431, 755 P.2d 881. The Board conceded at oral argument in this case that a decision made without any supporting evidence would be arbitrary and capricious. (*See People v. Cluff* (2001) 87 Cal.App.4th 991, 998, 105 Cal.Rptr.2d 80.) It follows that searching the record to determine whether some evidence supports the Board's parole suitability determination is a regular function of deferential review for abuse of discretion.

In the final analysis, considering this history, and the State judiciary's concern that the Board's decisions not be allowed to rest undisturbed when an abuse of discretion is apparent, the Court here should not shun its duty to apply a more stringent standard of review when the evidence indicates abuse of discretion or irregularity of official action, as here.

## III.

## NO EVIDENCE SUPPORTS PAROLE DENIAL

Petitioner has made three claims for relief, as follows:

1.     Petitioner is unlawfully imprisoned in violation of the Due Process Clause of the Fourteenth Amendment because of Board of Parole Hearings, at his 2006 hearing, his 13th hearing, had no evidence to sustain Board  findings that he currently posed an unreasonable

1    risk of danger to society if released to parole. *(In re Dannenberg,* 34 Cal.4th 1061 (2005); *In re*
2    *Rosenkrantz,* 29 Cal.4th 616 (2002) ; *Superintendent v. Hill,* 472 U.S. 445 (1985).)

3    2.    Petitioner is unlawfully imprisoned in violation of the Due Process Clause of the
4    Fourteenth Amendment because the Board of Prison Terms, at his 2006 hearing, has essentially
5    transformed his Second Degree Murder sentence into a First Degree Murder sentence or a Life
6    Without Possibility of Parole Sentence without authority when it interminably relies upon the
7    commitment offense as cause for denial of parole.

8    3.    Petitioner also contends that the Board applies a *sub rosa* policy indicative of an
9    anti-parole policy by applying 15 CCR §2402(c) ("especially heinous, atrocious or cruel") to
10   every murder offense, regardless of whether the individual offense meets the "beyond the
11   minimum necessary to sustain the conviction" standard set in *In re Dannenberg,* 34 Cal.4th 1061
12   (2006), thus ignoring not only *Dannenberg*, but also the statute (Section 3041(b)) and its own
13   regulations (§§2401-2405) guiding its discretion.

14

15   **Re: Ground One:**

16   As to the first ground, even if reviewed under the deferential "some evidence" standard,
17   pursuant to the judicial interpretations in *Lee, supra,* 143 Cal.App.4th 1400, and its progeny, the
18   record that was before the 2006 Panel clearly showed that there was not "some evidence"
19   Petitioner Snodgrass posed an unreasonable risk of danger to public safety if paroled. This
20   "unreasonable risk" standard is explicit in 15 CCR §2402(a). As shown in the petition and the
21   supporting exhibits, both the CDCR correctional counselors and their supervisors, and the
22   psychiatrists and psychologists, as well as Snodgrass's prison record of programming and
23   achievements, all demonstrate that he does NOT pose an unreasonable risk if paroled. Despite
24   the Probation Officer's Report indicating offense mitigation due to familial hostilities and mental
25   issues, the Board has done nothing less than maintaining Snodgrass under §2402(c)'s
26   categorizations of "especially heinous, atrocious or cruel" for purposes of parole denial.

27   Compared with other cases, as referenced above and *infra,* where the courts have found
28   no rational evidence to place the offender in those categories, the instant offense also does not

1   meet that standard. Snodgrass was mentally, emotionally, abused since age 7 by the stepfather,

2   and also sexually by the older stepbrother. He grew up angry, and when his stepfather told him

3   the family, except him, was moving, and selling the house, Snodgrass's anger reached 'critical

4   mass.' He did not 'plan' the murder, as a more rational person might; rather, he 'dreamed' of

5   taking revenge, more of a fantasy than a plan, which is evident by not fleeing and not claiming

6   innocence upon arrest. Board regulation, §2402(d)(4), allows the Board to find mitigation where

7   evidence of significant stress in the prisoner's life, especially if built up over a long period of

8   time. Here, not only was there significant stress over a long period of time, but worse, during

9   Snodgrass's most innocent, formative years. He did not ask to be raised in such a dysfunctional

10  environment or to be victimized by his step-sibling or stepfather. Board regulation §2405

11  (Circumstances in Mitigation of the Base Term), includes (2) "The prisoner participated in the

12  crime under partially excusable circumstances that do not amount to a legal defense," which, in

13  this case, might have been his being victimized throughout those years. The Board could, were it

14  reasonable, apply §2402(d)(5) (Battered [] Syndrome) to Snodgrass's circumstances, (cf., Penal

15  Code 13732), but it refuses to recognize these circumstances in mitigation. Section 2405(6) also

16  recognizes mitigation when "The crime was committed during or due to an unusual situation

17  unlikely to reoccur." The Probation Officer's Report recognized this factor to exist. (**Exhibit**

18  **LL,** pp. 18-19.) The Board hasn't. What is wrong with the Board? Untrained? Unqualified?

19  This seems to be the conclusion of the *Criscione, supra,* superior court.

20      15 CCR §2405(7) also provides mitigation where "[t]he crime was committed during a

21  brief period of extreme mental or emotional trauma." Even though the significant stress in

22  Snodgrass's life was a long-term build-up, it cannot be said that the "straw that broke the camel's

23  back" when the stepfather discarded him by telling him the rest of the family was moving and

24  that he was not welcome, that the house he lived in was being sold, did not inflame the anger he

25  had endured for years, such that the culmination of that anger was the instant offense. Snodgrass

26  had no history of criminal behavior, as the trial court (**Exhibit B,** sentencing transcript p. 11),

27  and the Probation Officer noted (**Exhibit LL,** POR pp. 18-19.)

28

*Page 13*

1    Snodgrass decided to kill his stepfather, that's true. He put the rifle in the garage where
2  he could get to it when he was ready. That's true. He accidentally discharged the weapon,
3  causing the stepfather to appear. That's true. The stepfather showed anger, and Snodgrass shot
4  him once, wounding him. The stepfather began cursing at him. Snodgrass shot him again,
5  mortally wounding him. The police were already arriving. Snodgrass did not flee. He admitted
6  shooting the stepfather. He was arrested. Bail was set. He was released on bail until his
7  conviction by jury trial. He presented no threat or danger to public safety during that period of
8  time.

9    No circumstances exist here beyond the minimum elements necessary to sustain the
10  conviction of second degree murder. According to prevailing case law, denial of parole without
11  such a supported finding of elements beyond is a denial of due process, and habeas relief is
12  required. (*In re Dannenberg,* 34 Cal.4th 1061, 1095 (2006).)

13    In the post-*Dannenberg* case of *In re Cooper,* 153 Cal.App.4th 1043, 62 Cal. Rptr.3d 907
14  (Cal.App. 1 Dist., Div.2, 07/27/2007), the appellate court distinguished the factual circumstances
15  with those in *Dannenberg.*  Peter George Cooper killed his wife with a sledgehammer. The
16  Board granted parole in 2006, five years after his Minimum Eligible Parole Date (MEPD) had
17  lapsed. Classifying the offense as "especially heinous" because Cooper struck his wife multiple
18  times with a sledgehammer, then tried to cover it up by transporting her body in the trunk of her
19  car and leaving it at an airport. The court concluded that if Cooper had stopped striking his wife
20  at the first blow, there would have been no murder, or if he had called for medical attention that
21  saved her life, there would have been no murder. The court held that "the fact that he did not
22  stop, but carried out the crime, cannot be a factor that shows this killing was particularly brutal."
23  (*Id.*, 62 Cal.Rptr.3d at 920, distinguishing *Dannenberg* at 921.)

24    In the case of *In re Gray,* 151 Cal.App.4th 379 (Cal.App. 2 Dist., Div.3), the court also
25  distinguished the circumstances of *Dannenberg, supra.*  In a case of spousal strife, where Gray's
26  wife was in the process of seeking divorce and living with her ex-husband, the victim, Gray had
27  appeared at Mrs. Gray's place of employment, demanded the keys to her 1978 Ford Thunderbird,
28  and struck her in the face causing a black eye. Gray left with the vehicle that was registered in

*Page 14*

both their names. Later, Mrs. Gray and her ex-husband Ronald Waddell told her to accompany him to Gray's home to pick up the keys. When they arrived at the husband's home, Waddell parked near a phone booth and made two attempts to call Gray. When Ronald observed Gray outside the home, Mrs. Gray accompanied Waddell when he confronted her husband. Gray returned the keys. Mrs. Gray told Waddell they should go, but Waddell decided to 'teach her husband a lesson' and started towards Gray, who pulled out a revolver from his back pocket. When Waddell ridiculed him about that, Gray shot him once and Waddell fell to the ground. Gray turned himself in to the police the following day.

As in *Cooper,* the Board granted Gray parole, which the Governor reversed. The Governor found that the crime was "cold and calculating or dispassionate," under 15 CCR §2402(c), which the appellate court found no evidence to support that characterization. The Governor tried to make it "more egregious" than the minimum elements necessary to sustain a second degree murder conviction by alleging some premeditation, but the appellate court rejected this as well. (*Id.,* at 408.)

The court in *Lee, supra,* 143 Cal.App.4th 1400, likewise distinguished *Dannenberg.* In *Lee,* the prisoner was engaged in a dispute with the person to whom he had sold a restaurant who refused to pay him. After once confrontation, at which the victim pulled a knife, Wen Lee approached him the next time armed with a pistol. Wen Lee shot the victim, wounding him, but in the multiple shots, missed and accidentally killed the victim's wife. He was sentenced to second degree murder. Wen Lee was 65 years old at the time of the 1989 offense. The Board granted him parole in January 2005, at his sixth hearing. The Governor reversed, calling the offense "atrocious." The appellate court found this offense to be no atrocious than when one human being kills another, finding that Lee's crime was more commonplace than egregious. (*Id.,* p. 1409-1410.)

In *In re Barker,* 151 Cal.App.4th 346 (Cal.App. 1 Dist., Div.2, 05/24/2007), the appellate court was faced with a case of two counts of second degree murder and one count of first degree murder, which occurred in 1977 by the then 17-year-old David Barker. His friend Barry Braeseke elicited Barker to help kill Braeseke's parents and grandfather. Braeseke shot his

1   parents and Barker shot the grandfather, after first hitting him several times on the head with a

2   chisel.  In 2005, Barker appeared before the Board in his ninth attempt to obtain parole.  By this

3   time he had served 28 years.  The Board again denied him parole, this time for 3 years.  The

4   Board characterized the offenses as "carried out in an especially cruel and callous manner," "in

5   a dispassionate and calculated manner," "the victims were particularly vulnerable," and "the

6   motive for the crime was inexplicable or very trivial in relation to the offense in that these

7   murders did not have to take place."  (*Id.*, at 359.)

8         The *Barker* court found no evidence to support the Board's finding that he needed

9   additional therapy, or that his gains were recent; instead, the court found Barker to have

10  participated for numerous years and had matured and grew in judgment and insight, and that

11  there were no therapeutic recommendations from the psychological evaluators.  (*Id.,* at pp. 367-

12  369.)  The court found no evidence that the unsuitability factors supported denial of parole and

13  the Board's reliance on the circumstances of the commitment offenses violated Barker's due

14  process rights.  (*Id.*, at pp. 370-375.)  The court found no evidence to support the conclusion that

15  Barker currently presented a threat to public safety.  (*Id.,* pp. 375-377.)  The court concluded

16  that:

17              The crimes Barker committed and for which he was convicted
                were horrific, resulting in the senseless deaths of three people.
18              Those crimes cannot be excused. Or minimized. At the same time,
                the system provides for parole in appropriate circumstances, if the
19              prisoner has met the prerequisites for release. Resolution of these
                competing considerations led to the conclusion of the Court of
20              Appeal granting Wen Lee's petition for habeas corpus:   "All
                murders represent the basest form of human behavior. Our laws,
21              however, provide for mechanisms by which even murderers, in
                limited circumstances, are entitled to be paroled. The judiciary has
22              an obligation to execute those laws. The record establishes that Lee
                does not pose an unreasonable risk to public safety. Any contrary
23              conclusion lacks any evidentiary support."   (*Lee, supra,* 143
                Cal.App.4th at p. 1414, 49 Cal.Rptr.3d 931.)
24

25         Other similar cases predating these cases also support Petitioner Snodgrass's claim that

26  no evidence supports the Board's findings or conclusion for denial of parole in his case. Some of

27  these cases, some cited in the aforementioned cases, are *In re Scott (Scott I)*, 119 Cal.App.4th 871

28

*Page 16*

1 (2004); *In re Scott (Scott II)*, 133 Cal.App.4th 573 (2005); *In re Elkins*, 144 Cal.App.4th 475

2 (2006); *In re Smith*, 114 Cal.App.4th 343 (2003).

3       There simply was no evidence to support the Board's conclusion that Gary Snodgrass,

4 after 26 years imprisonment, currently poses an unreasonable risk. The offense is not "especially

5 heinous, atrocious, or cruel" nor does it contain elements beyond the minimum necessary to

6 sustain the second degree murder conviction, by comparative analysis to other cases, cited *ante,*

7 so parole denial based on the offense, violates due process in this case. Nor is there any evidence

8 that Gary Snodgrass lacks insight or that he needs a lengthier period of time to gain insight and

9 understanding. All of the psychological evaluations show a maturity and insight that resulted in

10 conclusions that parole considerations need be made on other than psychological considerations

11 because he exhibits no psychopathy nor poses more than a low risk, if at all, to public safety if

12 paroled.

13       The Court must grant the petition on Ground No. 1.

14

15 ## Re: **Ground Two:**

16       As to ground 2, the commitment offense, prevailing law prohibits the interminable

17 reliance on the commitment offense for repeated denials of parole.

18       Whatever the value of Snodgrass's crime at the time of his initial parole suitability

19 hearing, it is now thirteen hearings later, and more than 16 years beyond his MEPD, and its

20 probative value of his dangerousness is now far less than it was then. (*In re Roderick, supra,* 154

21 Cal.App.4th 242, at 277.)

22       *Roderick* noted that at the federal level:

23       As recently explained, " *Sass* did not dispute the principle that,
other things being equal, a criminal act committed 50 years ago is
24       less probative of a prisoner's current dangerousness than one
committed 10 years ago." ( *McCullough v. Kane* (N.D.Cal. June 1,
25       2007, No. C 05-2207 MHP) 2007 WL 1593227, *8, 2007 U.S.Dist.
Lexis 43674.) Thus, "the message of [ *Biggs, Sass,* and *Irons II* ] is
26       that the [Board] and Governor can look at immutable events, such
as the nature of the conviction offense and pre-conviction
27       criminality, to predict that the prisoner is not currently suitable for
parole even after the initial denial ( *Sass* ), but the weight to be
28       attributed to those immutable events should decrease over time as a

predictor of future dangerousness as the years pass and the prisoner demonstrates favorable behavior ( *Biggs* and *Irons* ).... Not only does the passage of time in prison count for something, exemplary behavior and rehabilitation in prison count for something according to *Biggs* and *Irons*. *Superintendent v. Hill*'s standard might be quite low, but it does require that the decision not be

arbitrary." ( *Id.* at *7, *8.) Applying this standard, the court in *McCullough* concluded the Governor**43 had violated the inmate's due process rights by denying parole 21 years into a 15-years-to-life sentence based only upon the commitment offense and past criminality, in the face of an exceptional prison record. (*Id.* at *9.)

Other federal courts have reached similar conclusions. (*E.g., Martin v. Marshall,* 431 F.Supp.2d 1038 (2006); *Rosenkrantz v. Marshall,* 444 F.Supp.2d 1063 (C.D. Cal., 2006); *Sanchez v. Kane,* 444 S.Supp.2d 1049 (C.D.Cal., 2006); *Thomas v. Brown,* ---F.Supp.2d ---, 2006 WL 3783555 (N.D.Cal. 2006); *Blankenship v. Kane, slip copy,* 2007 WL 1113798 (N.D.Cal. 2007); *McCullough v. Kane, slip copy,* 2007 WL 1593227 (N.D.Cal. 2007); *Fowler v. Butler, slip copy,* 2007 WL 1725684 (E.D.Cal. 2007); *Thelander v. Kane,* 2007 WL 2220973 (N.D.Cal. 2007); *Willis v. Kane,* 485 F.Supp.2d 1126 (N.D.Cal. 2007).

## Re:    Ground Three:

The California state supreme court has acknowledged that if the parole board was operating pursuant to a *sub rosa* policy of denying parole to all prisoners in a certain category, that would be illegal. (*In re Minnis, supra,* 7 Cal.3d 639 (1972); *In re Rosenkrantz,* 29 Cal.4th 616 (2002).) The *Rosenkrantz* court, however, set the bar at 100% denials of parole. (*Id.,* 29 Cal.4th at 683-684.)

However, the federal district court for the Eastern District of California, *Coleman v. CA. Bd. of Prison Terms,* CV-S-96-0783 LKK PAN (2005) was not so deferentially generous. After discovery and testimony, the court detailed the evidence supporting a finding that under former Governors Wilson and Davis a "no parole policy" clearly existed. (**Exhibit VV,** *Coleman* decision.) *See also Martin v. Marshall,* 431 F.Supp.2d 1038, at 1048-1049 (N.D.Cal. 2006), referencing *Coleman* and noting evidence that the current Board under Schwarzenegger has also capitulated to such a policy. The State did not appeal the *Martin* decision, nor did it appeal the

modified judgment in *Martin,* 448 F.Supp.2d 1143, at 1145. Further, in finding the matter of relief in *Coleman's* 05-17380 appeal moot, since he obtained a new parole hearing in July 2005, the Ninth Circuit did "not consider whether the district court erred in finding that the Board under Governor Wilson and Governor Davis failed to provide fair parole hearings" and stating, "Moreover, while we do not reach the propriety of district court's findings relating to the Wilson and Davis administrations, we do note that the only hearing challenged by the habeas petition, the 1995 hearing, occurred during the Wilson administration. The Ninth Circuit affirmed the district court's conditional order requiring the Board to "provide a fair parole suitability hearing, conducted by a board free of any prejudice stemming from a gubernatorial policy against parole for murderers." (**Exhibit VV,** documents.)

In a 2001 case, later mooted by the parole of the petitioner Dennis Kimble, *Kimble v. California Board of Prison Terms,* CV-97-2752-LGB (Mc), after discovery was granted and evidence received, Kimble's attorney, Monica Knox, a Federal Public Defender, submitted a declaration to the court summarizing what the evidence obtained via discovery showed. Of 284 randomly selected cases, the evidence showed 283 were found unsuitable for parole, all 283 were found unsuitable based, first and primarily, on the offense, 277 showing a finding of cruel and/or callous or for no reason at all as specified in the regulations. Although the Board found each and every offense to be cause to find the lifer unsuitable, the offenses ranged from planned, premeditated murders and torture or execution murders to accidental killings or kidnaps without any injury at all. The evidence showed that although the Board almost always gave secondary reasons for the findings of unsuitability, those reasons were often not supported by the facts or were so questionable given the facts that they suggested the Board was simply reaching for anything less than positive about the lifer. Of the 283 lifers found unsuitable, 12 had no prior record at all, no disciplinaries of any kind in prison, psych reports of average or low risk of danger, programming (self-help programs and work) in prison, and release plans. Four had no prior record at all, no disciplinary actions in the last 10 years, a psych report of average or low risk, programming (self-help programs and work) in prison, and release plans. Eighteen had only minor prior record (just arrests or just non-violent juvenile actions), no disciplinary actions

in the last 10 years, a psych report of average or low risk, programming (self-help or work) in prison, and release plans. Eleven had more serious prior records (felony convictions) but had been disciplinary free for at least 10 years, had a psych report of low risk of danger, had programmed (self-help and work), and had release plans. Ms. Knox's declaration also included a summary of the sworn testimony of Albert Leddy, former Commissioner of the Board, who testified in the San Diego Superior Court, *In re Fortin, Sheets, Zych, Barrientos, Jackson* and *Slaman,* of the misconduct of the Board commissioners during the former *Wilson* and *Davis* administrations. (**Exhibit WW**, Declaration of Monica Knox.)

Thus, a history of Board and gubernatorial misconduct with regards to the parole scheme appears to be an unrebutted fact. The *Martin v. Marshall* court, *supra,* 431 F.Supp.2d 1038, cited above, found similar Board misconduct that appeared to be a continuation of that former misconduct under *Wilson* and *Davis.*

More recently, however, is the *In re Criscione* case. (**Exhibit OO**.) The court in that case, after having reviewed evidence obtained through extensive discovery and expert testimony, also took judicial notice of the several other cases also pending in that court. (At footnote 1) The law is that findings of fact by a lower court are presumed correct and are reviewed for clear error. (*Ghirardo v. Antonioli,* (1994) 8 Cal.4th 791, 800.) The *Criscione* court exhaustively reviewed evidence and expert testimony. The court found, by the *Rosenkrantz* 100% standard, that in all 100% of the cases reviewed where parole was denied, "counsel for Respondents stipulated that 'in all of those cases examined [by Respondent pursuant to the Criscione discovery orders] the Board relied on the commitment offense as a basis for denying parole." (*Id.,* at page 8.) The court found that "it was shown that 100% of commitment offenses reviewed by the Board during the 13 months under examination were found to be "especially heinous, atrocious or cruel" under Title 15 §2402(c)(1)." (*Id.,* at 8-9.) The court also noted, "A further statistic of significance in this case is that there are only 9,750 inmates total who are eligible for, and who are currently receiving, parole consideration hearings as life term inmates." (*Id.*, at 9.) The court heard from an expert statistician, Professor Mohammad Rafai, who is the director of the statistics program at San Francisco State University, where he personally teaches statistics

1    and probabilities, and it was undisputed that he was qualified to give the expert testimony that he

2    did. He concluded that the evidence showed that in 100% of all cases examined the statistical

3    probability is that the Board takes this action in all of its cases where parole is denied. (*Id.,* p.

4    11.) Based on the evidence, the court concluded that the "evidence conclusively demonstrates

5    that the Board completely disregards the detailed standards and criteria of §2402(c). (*Id.,* p. 12.)

6    The court described the Board's methods. (*Id.,* pp. 13-18.) The court found evidence of bias by

7    the Board. (*Id.,* pp. 23-26.) The court concluded that "This system is malfunctioning and must

8    be repaired." (*Id.,* p. 30.) The court further noted that the Board's conduct has "unwittingly

9    invalidated the basis of the California Supreme Court's holding in *Dannenberg.* (*Id.,* pp. 32-33.)

10          Thus, there is strong evidence that must dispel the presumption that the Board is acting

11    correctly, such that this Court must invalidate the Board's decision in this case, apply a more

12    stringent standard of review, and then conduct its own determination as to what the facts are to

13    the law, and whether the facts show that Gary Snodgrass is currently suitable for parole. If so,

14    the Court must grant the petition and order habeas relief. To say there is no evidence under the

15    Schwarzenegger administration of misconduct by the Board commissioners is to ignore the

16    blatant reality that there is. In fact, this Board is worse than any before it. The Senate Rules

17    Committee has rejected more of Governor Schwarzenegger's appointments than any before. On

18    or about June 25, 2008, the Rules Committee 'fired' Commissioners Eng and Martinez after

19    strong opposition about their misconduct and abuse on the Board. Eng presided in Gary

20    Snodgrass's hearing at issue.

## IV.

## PROCEEDINGS IN THE LOWER COURTS

### A.    Superior Court:

25          Petitioner filed a petition for writ of habeas corpus to the superior court for the county of

26    Contra Costa on or about October 26, 2007,and asked for discovery for certain facts in the

27    respondent's control that would support his claim of abuse of discretion. The superior court

28    denied the petition December 18, 2007, in a 5-page decision, (**Appendix 1**), stating "there was

1    some evidence to support the Board's determination that the commitment offense was especially
2    cruel" and "there is some evidence to support the Board's assessment that the nature of the
3    commitment offense indicated petitioner would present an unreasonable public safety risk if
4    released from prison." *Id.,* decision page 3. This reasoning was at odds with the unusual
5    situational circumstances of the case where Snodgrass suffered for years abuse from the
6    stepfather and sexual abuse from the stepbrother, and when told he was being kicked out of the
7    house and was not welcome at the place to which his mother and stepfather were moving, his
8    long-term stress and anger resulted in him shooting to death the stepfather. The judge's finding
9    of "some evidence" that the crime was especially cruel was based entirely on the fact Snodgrass
10   shot the stepfather twice to kill him, and that the motivation appeared "trivial in comparison with
11   the magnitude of the offense." Without any further analysis, the Judge Theresa Canepa accepted
12   the Board's finding that Snodgrass had not participate in *enough* self help and improvements
13   programs in the last two years, and that he had only completed one anger management class in
14   that period; this totally disregarded the fact that Snodgrass had already been imprisoned since
15   1981, i.e., 25 years, and had participated in all manner of self help improvement programs.
16   There was nothing in Board regulations to require a life prisoner to participate over and over and
17   over again in the same programs he had completed, and to say he didn't participate "enough" in
18   the past two years is, on its face, ambiguous and arbitrary in light of the record, and the judge
19   should have so found. Furthermore, Judge Canepa made no analysis of the Board's statement
20   that although he had realistic parole plans he needed to "firm them up" in order to be suitable for
21   parole. The judge raised no question of what "firm them up" means, or whether this phrase was
22   vague and ambiguous as well as arbitrary in light of the many years of rehabilitation and forensic
23   evaluations showing lack of unreasonable risk, even if he didn't have a precise job offer but did
24   have plenty of marketable skills. The Board made no link between *firming up* parole plans,
25   whatever that means, and his current risk to public safety if released.

26       In addition, Snodgrass acknowledged the "some evidence" standard was the standard
27   mandated by state precedents, but argued that such standard only applied if the Board was
28   proceeding in a lawful manner under the doctrine of the "presumption of correctness of official

1  action." He argued that where abuse of discretion dispelled that presumption, the reviewing
2  court was free to apply a more stringent standard to ensure that justice would be done in that
3  case. The Judge totally missed that point, and based on a finding of "some evidence" – which
4  was clearly erroneous – also refused Snodgrass's motion for discovery that would have garnered
5  facts from the Board showing that it was "malfunctioning" by placing ALL murder offenders
6  into the one single regulation that allowed denial of parole if the facts showed the crime to be
7  "especially heinous, atrocious and cruel." Obviously, under the law, not every murder offense
8  can be characterized under that standard, but if the Board were doing so, then that would be
9  proof they were proceeding in an unlawful and/or irregular manner such that the reviewing court
10  would have to apply a more stringent standard of review. Since by a more stringent standard the
11  Board's decision could not be sustained, Judge Canepa avoided that judicial responsibility by
12  denying discovery based on a finding of "some evidence" to support the Board's conclusion.
13  This superior court decision was an abuse of judicial discretion, and contrary to, and an
14  unreasonable application of, clearly established precedent set forth by the United States Supreme
15  Court in *Superintendent v. Hill*, 472 U.S. 445, 455 (1985) and *Edwards v. Balisok*, 520 U.S. 641,
16  647 (1997).

### B.     Appellate Court

Upon receiving the decision denying the petition, Petitioner Snodgrass filed a petition for writ of habeas corpus to the Court of Appeal for the First Appellate District, Division Three, on March 13, 2008, which court summarily denied the petition on March 21, 2008. (**Appendix 2.**)

### C.     California Supreme Court

On June 11, 2008, the California Supreme Court denied Petitioner's Petition for Review, thus exhausting all State remedies. (**Appendix 3**.)

Petitioner asks the Court to reverse the State court's decision and grant the petition.

*Page 23*

# V.

## SUMMARY

As Snodgrass showed in his State he met all the criteria for parole after thirteen previous denials of parole. The forensic psychological evaluations supported parole, classifying him as low risk. Low risk is not "unreasonable risk," thus, there was no evidence before the Board that he posed an "unreasonable risk." The bottom line standard for parole unsuitability is whether the evidence shows he is an "unreasonable risk." (15 CCR sec. 2401(a); *In re Lee,* 143 Cal.App.4[th] 1400, 1408; *In re Dannenberg,* 34 Cal.4[th] 1061, 1080-1082 (2005); *Superintendent v. Hill, supra,* 472 U.S. at 455 (1985).) In sum, "the Board, exercising its traditional broad discretion, may protect public safety in each discrete case by considering the dangerous implications of a life-maximum prisoner's crime individually." *Id.* at 1071, 23 Cal.Rptr.3d 417, 104 P.3d 783. While the federal court is bound by a State's interpretation of its own laws, *Hicks v. Feiock*, 485 U.S. 624, 629-30, 108 S.Ct. 1423, 99 L.Ed.2d 721 (1988), it is not a "potted plant" but may determine whether the assessment of dangerousness is arbitrary and capricious, or supported by some relevant and reliable evidence. (E.g., *Martin v. Marshall, supra,* 431 F.Supp.2d 1049 (N.D.Cal. 2006).) Snodgrass's offense was his only crime, committed under significant stress under exigent circumstances that no longer exist and not susceptible of future duplication. He has attended therapy for years, and the forensic experts give him a clean bill of health. Where then is the 'evidence' he currently remains a danger to public safety?

Snodgrass has been denied parole repeatedly on this offense, despite the lack of predictive value this quarter-century old offense currently has, which raises the specter of a Board which disregards its charter to consider all relevant facts, including rehabilitation, so that it can imprison as many inmates as possible until death. Already, since 2000, 686 lifers over the age of 45 years have died in prison. (**Appendix 4**.) Does this Court find those numbers acceptable? By contrast, only 129 "lifers" have been released still alive since 2000 to 2006, out of perhaps 15,000 to 20,000 parole hearings since 2000. (**Appendix 5**.) Can anyone of good conscience find such numbers of deaths and paroles acceptable? If this were a malfunctioning dog kennel, there would be a huge public outcry, and government intervention. Yet here, there is

only *Criscione* and the conjoined cases out of Santa Clara County superior court, and the Sixth Appellate District could overturn that, but only by direct disregard of the indisputable facts.

At page 41 of his appellate petition, Snodgrass presented the court with the 2007 case of *In re Criscione,* No. 71614, on appeal in the Sixth App. Dist., No. H032048, which, after extensive discovery and expert testimony, concluded that the facts unequivocally demonstrated that the Board drives ALL life prisoners into 15 CCR sec. 2402(c)'s "especially heinous, atrocious and cruel" regulation, the exception to granting parole regulation, so that it can deny nearly every single lifer parole indefinitely until, in some cases, it arbitrarily determines that the offense was suddenly no longer relevant for parole denial. The *Criscione* court, by the California Supreme Court's own standards of statistical analysis (in *In re Rosenkrantz,* 29 Cal.4th 616), found the Board "malfunctioning" and in dire need of overhaul. The lower courts ignored this reference, and ignored Snodgrass's requests for discovery of the same evidence presented in the *Criscione* case. At pages 39-40 of his appellate petition, he showed how the Board has driven his case into sec. 2402(c) for repeated denial from his very first hearing, even escalating it at the 2006 hearing to recast it as "very much like an execution style murder," i.e., a *first* degree murder, a recasting the lower courts also ignored. There is no evidence this was an "execution style" murder; this was the culmination of a rage and pain grown by the stepfather and his stepbrother over years. These are *mitigating* factors. §2402(d)(4).

The State courts also ignored Snodgrass's demand for a higher standard of review than the "some evidence" standard, even in the fact of evidence from *Criscione* that the Board's actions were irregularly performed and not deserving of the presumption of correctness.

//

//

//

//

//

//

## V.

## CONCLUSION

WHEREFORE, for good cause shown, and a prima facie case presented, and based on the facts, the law, and the evidence presented, the Court must grant this Petition and order the relief requested in the Petition. The Court should also order discovery in this case, and allow Petitioner to present the Court with the evidence presented to the superior court in the *Criscione* case.

Dated: July 1, 2008                     Respectfully submitted,

                                        GARY SNODGRASS, in pro se

*MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PETITION FOR WRIT OF HABEAS CORPUS*

## DECLARATION OF SERVICE BY MAIL

| | |
|---|---|
| **Case Name:** | GARY SNODGRASS v. BEN CURRY, WARDEN |
| **Court:** | United States District Court, Northern District of California |
| **Title of Doc.:** | **MEMORANDUM OF POINTS & AUTHORITIES TO PETITION FOR WRIT OF HABEAS CORPUS** |

I, the undersigned, declare:

I am the party in the foregoing action. I am over 18 years of age and a citizen of the United States. On the date below I have served a copy of the attached subject document upon the opposing party by placing a true copy of same in the U.S. mail depository, proper postage affixed thereto, and correctly addressed as follows:

Attorney General of California
Attn:  Scott C. Mather, Deputy Attorney General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004

SWORN TO UNDER PENALTY OF PERJURY, under the laws of California, this

1st day of July, 2008, at Soledad, CA.

GARY SNODGRASS, declarant

*Page 27*

*MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PETITION FOR WRIT OF HABEAS CORPUS*